## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TODD COURSER

     Plaintiff                     Case No. 1:18-cv-01232

v.

RADISSON HOTELS INTERNATIONAL, INC., a Delaware corporation, RADISSON GROUP, INC., a Minnesota corporation, CARLSON REZIDOR HOTEL GROUP, an international partnership, BLOCK 100 LIMITED PARTNERSHIP, a Michigan limited partnership, and WINEGARDNER & HAMMONS, INC., an Ohio corporation, and WINEGARDNER & HAMMONS HOTEL GROUP, LLC, a Delaware limited liability company.

     Defendants.

HON. GORDON J. QUIST

Magistrate: HON. PHILLIP J. GREEN

_____/

## PLAINTIFF'S COLLECTIVE RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## [ECF No. 181, 182, 183]

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

EXHIBIT LIST ................................................................................................. v

FACTS ............................................................................................................ 1

    1.      General ................................................................................ 1

    2.      Todd Courser deposition (January 28, 2020) ........................... 4

    3.      David Horr deposition (February 27, 2020) ............................. 7

    4.      Joe Gamrat deposition (February 28, 2020) ............................. 9

    5.      Cindy Bauer (f/k/a Gamrat) deposition (May 27, 2021)............ 13

STANDARD OF REVIEW ................................................................................... 18

LEGAL ARGUMENT ......................................................................................... 19

    1.      The Radisson Franchise System; Issues of fact ....................... 19

    2.      Winegardner & Hammons and Block 100; Issues of fact.......... 23

    3.      RICO ................................................................................. 24

    4.      The evidence and text messages are not hearsay ...................... 27

    5.      Wiretapping claims under 18 U.S.C. § 2511 and MCL § 750.540; statute of limitations ........................................................... 27

    6.      Additional state claims; statute of limitations.......................... 28

            (a)      Count 4 (Civil Stalking)............................................ 30

            (b)      Count 5 (Invasion of Privacy and Intrusion Upon Seclusion) .................. 30

            (c)      Count 6 (Tortious Interference with Business Relationships) ................. 31

            (d)      Count 7 and 8 (Negligent Infliction of Emotional Distress)..................... 31

            (e)      Count 9 (Conspiracy and Concert of Actions)............ 32

CONCLUSION and RELIEF  ............................................................................... 32

Certificate of Service and Certificate of Compliance  ......................................... 33

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                               Page

*Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ..................... 18, 19

*Amini v. Oberlin College*, 440 F.3d 350 (6th Cir. 2006) ................................................. 23

*Fitzke v. Shappell*, 408 F.2d 1072 (6th Cir. 1972) .......................................................... 18

*General Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095 (6th Cir.1994) ................... 18

*Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ........................ 25

*United States v Caporale*, 806 F.2d 1487 (11th Cir. 1986) ............................................... 24

*United States v Corrado*, 227 F.3d 543 (6th Cir. 2000) ............................................... 24, 25

*United States v Corrado*, 286 F.3d 934 (6th Cir. 2002) .................................................. 24

*United States v Errico*, 635 F. 2d 152 (2d Cir. 1980) ..................................................... 26

*United States v Hewes*, 729 F. 2d 1302 (11th Cir. 1984) .................................................. 26

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) ................................................ 25

*United States v Lyons*, 870 F.Supp.2d 281 (D. Mass. 2012) ............................................. 24

*United States v Riccobene*, 709 F. 2d 214 (3d Cir. 1983) ................................................. 26

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ..... 25

*United States v Simmons*, 154 F.3d 765 (8th Cir. 1998) .................................................. 24

*United States v Weinstein*, 762 F. 2d 1522 (11th Cir. 1985) ............................................. 26

**Michigan Supreme Court Cases**

*Abel v. Eli Lilly and Co.*, 418 Mich 311 (1984) ............................................................. 27

*Bahr v Miller Bros Creamery*, 365 Mich 415, 112 NW2d 463 (1961) ................................. 26

*Brown v Brown,* 338 Mich 492, 61 NW2d 656 (1953) ........................................... 26, 27, 30

*Brown v Drake-Willock International*, 209 Mich App 136; 530 NW2d 510 (1995) ................... 29

*Connelly v Paul Ruddy's Equip Repair & Service Co*, 388 Mich 146; 200 NW2d 70 (1972) ...... 28

*Hope-Jackson v. Washington*, 311 Mich. App. 602, 877 N.W.2d 736 (2015) ........................... 29

*Maiden v. Rozwood*, 461 Mich 109; 597 NW2d 817 (1999) ..........................................................32

*Lorencz v Ford Motor Co,* 439 Mich 370; 483 NW2d 844 (1992) ................................................31

*Moll v Abbott Laboratories*, 444 Mich 1; 506 NW2d 816 ....................................................28, 29

*Moning v. Alfono*, 400 Mich 425; 254 NW2d 759 (1977).............................................................32

*Warsop v Cole,* 292 Mich 628, 291 NW 33 (1940)................................................................27, 30

**Michigan Court of Appeal Cases**

*Doe v Mills*, 212 Mich App 73; 536 NW2d 824 (1995)................................................................30

*Horvath v Delida,* 213 Mich App 620; 540 NW2d 760 (1995)....................................................28

*Mino v Clio School Dist*, 255 Mich App 60; 661 NW2d 586 (2003) ...........................................31

*Rosenberg v Rosenberg Bros Special Account,* 134 Mich App 342; 351 NW2d 563 (1984) .26, 30

*Warren Consolidated Schools v WR Grace & Co*, 205 Mich App 580; 518 NW2d 508 (1994) ..29

**Federal Statutes**

18 U.S.C. § 1961 ..........................................................................................................................25

18 U.S.C. § 1963 ..........................................................................................................................24

18 U.S.C. § 2511 ..........................................................................................................................27

42 U.S.C. § 1985 ..........................................................................................................................27

**Michigan Statutes**

MCL 600.5827..............................................................................................................................28

MCL 600.5855..............................................................................................................................29

MCL 600.5856........................................................................................................................27, 28

MCL 750.213................................................................................................................................25

MCL 750.483a..............................................................................................................................26

MCL 750.540................................................................................................................................27

**Federal Court Rules**

FRCP 56.................................................................................................................................18, 19

**<u>Michigan Court Rules</u>**

NONE

**<u>Other Citations</u>**

6 Moore P 56.15(3) ................................................................................................18

Advisory Committee Notes on 1963 Amendment to Fed. R. Civ. P. 56 ......................................19

W. Prosser, *Handbook of the Law of Torts* §46, at 292 (4th ed 1971) ...................................26, 30

## EXHIBIT LIST

EXHIBIT 1:     Radisson Reservation Information..........................................................1

EXHIBIT 2:     Police Report with text messages ...........................................4

EXHIBIT 3:     Todd Courser Deposition, Jan 28, 2020....................................... 4-7, 27

EXHIBIT 4:     David Horr Deposition, Feb 27, 2020........................................ 7-9, 27

EXHIBIT 5:     Joe Gamrat Deposition, Feb 28, 2020........................................ 9-13, 27

EXHIBIT 6:     Cindy Bauer Deposition, May 27, 2021 ................................. 13-18, 27

EXHIBIT 7:     Kevin Ross Deposition, Oct 13, 2020........................................ 19-23

EXHIBIT 8:     Kevin Ross Deposition, Oct 20, 2020........................................23

EXHIBIT 9:     Memorandum, dated Jan 25, 2010 ...........................................25

NOW COMES Plaintiff TODD COURSER, by and through his attorney, the DePERNO LAW OFFICE, PLLC, and hereby responds to Defendants' Motions for Summary Judgment.

## FACTS

### 1.      General

Plaintiff is a former elected member of the Michigan House of Representatives. In the winter of 2015, Courser stayed at the Radisson Hotel Lansing ("the Hotel"). *Complaint*, ¶23. The last stay by Plaintiff at the Hotel was May 19, 2015 to May 21, 2015. After the period of December 2015 through May 2015, it became known that Defendants were granting and assisting unauthorized agents' physical access to Plaintiff's rooms at the Hotel. *Id*. at ¶24. In fact, the Defendants' employees and staff allowed and actively assisted unauthorized agents, such as Joe Gamrat, to secretly and repeatedly enter Plaintiff's rooms at the Hotel. *Id*. at ¶25. The Defendants' employees and staff also allowed and actively assisted unauthorized agents, such as Joe Gamrat, to secretly enter Plaintiff's hotel rooms to install illegal surveillance equipment. *Id*. at ¶26. The Defendants' employees and staff then passed surveillance information about Plaintiff on to others who were conducting surveillance on Plaintiff to gain leverage on Courser, extort him, and have him removed from office. *Id*. at ¶27. They obtained information through unauthorized access to Plaintiff's account information. *Id*. at ¶28. This also included access to Plaintiff's hotel account, which was sent to others through email. This included reservation and billing information. *Id*. at ¶29. The Defendants were all part of a conspiracy to remove Plaintiff from office and have him charged with crimes. In this conspiracy, Defendants broke numerous laws. This included:

1.      Fictitious email addresses were added to Plaintiff's personal Lansing accounts by Defendants and Radisson staff several times, compromising statements and giving access to Plaintiff's personal information [Exhibit 1].

2.      An extortion text sent to Plaintiff revealed Defendants' employees and staff were being paid to provide information, monitor Plaintiff's hotel rooms and provide physical access to Plaintiff's hotel rooms.

3.      Text messages from different co-conspirators (Joe Gamrat, David Horr, and Vincent Krell), of the extortion plot to remove Plaintiff from office, revealed that the Defendants had provided information to the co-conspirators allowing access to Plaintiff's information from Defendants, physical access to the rooms and updates from Defendants' employees and staff on the rooms themselves. This happened even after Plaintiff met with Defendants' management and was assured no information about Plaintiff's stay at the Hotel was being broadcast out. The information and access was still being provided to the co-conspirators, of the extortion plot to remove Plaintiff from office and have him prosecuted.

4.      Defendants' employees and staff were actively providing private information illegally to unauthorized agents who were extorting Plaintiff and allowing hotel room access to unauthorized agents. Updates provided to the unauthorized agents involved in the extortion plot, by the Defendants' employees and staff, included emails to the unauthorized agents regarding Plaintiff's hotel accounts, temperature of Plaintiff's hotel rooms, lights on or off in Plaintiff's hotel rooms, shower curtain placement in Plaintiff's hotel rooms, luggage placement in Plaintiff's hotel rooms, listening devices in Plaintiff's hotel rooms, audio and video from Plaintiff's hotel rooms, as well as physical entry and exiting the hotel time stamps of Courser and arrival and departure of Plaintiff's vehicle at the hotel.

5.      Plaintiff was told by Defendants' employees and staff that Plaintiff's personal information including reservations information, room number, and payment information were automatically sent to the unauthorized email addresses attached to Plaintiff's account.

6.      Upon information and belief, later through a Michigan State Police ("MSP") investigation of the extortion plot to remove Plaintiff from office, it was determined that the co-conspirators were gaining illegal access to Plaintiff's Hotel rooms and hotel information via Defendant's employees and staff.

7.      Texts between Joe Gamrat, David Horr, and Vincent Krell clearly show that they had access to Plaintiff's personal information, hotel account, reservations, time stamps on Plaintiff's arrival and departure, room numbers and payment information.

(1)     "I just think it's strange that both beds are used. I typically sleep in one and put my suitcase or bag on the other. You? Heat was high too which is just the way Cindy likes it."

(2)     "Housekeeping usually makes both beds when they clean each day so both beds used yesterday?"

2

(3)     "FYI She checked in at 1:29a and he checked in at 7:51a Tuesday morning."

(4)     "And he checked in at 7:51 Tuesday morning."

(5)     "Hotel room is considered private."

(6)     "Hotel has now told me that his reservation is for Tuesday and Wednesday, not Monday and Tuesday."

(7)     "By the way, he obviously didn't take a shower this am as the shower curtain was 'out' of the tub? Must have had a bath last night?"

(8)     "Yeah some one was in both of those beds."

(9)     "His clothes are still there."

(10)    "Have you checked if ass is staying there this week?"

(11)    "when I called that morning they said there were two reservations"

(12)    "He hasn't checked out yet."

(13)    "But he is scheduled to check out."

(14)    "What the f@$& her room?" "His"

(15)    "Was looking for potential evidence like trash or a wrapper. Nothing – which doesn't say a whole lot though."

(16)    "What would you make of this? Normal or abnormal?"

(17)    "the room is in his name."

(18)    "Next to each other?" "Under todds name again?" "Don't know and yes."

(19)    "Todd turned off his light around 6:20"

8.      Plaintiff met several times with Defendant managers to share concerns about the breach of security of Plaintiff's privacy.

9.      Plaintiff was assured by Defendant management that the failures and security breaches would not be repeated, but unbeknownst to Plaintiff that his personal information was continuing to be released by all Defendants to the unauthorized agents who then used this information in the extortion plot to remove Plaintiff from office.

3

[*Id.* at ¶38]. See also *Police Report*, <u>Exhibit 2</u>, which contains the text messages. The information received from Defendants was used in an extortion plot, to remove Courser from office, for nearly five months in a series of anonymous texts that resulted in a worldwide scandal that ended with Plaintiff resigning from office. *Id.* at ¶39. The above deleted texts taken from Joe Gamrat and David Horr's phones taken by the Michigan State Police ("MSP") reveal the connection with the Radisson surveillance. *Id.* at ¶40. The illegal access to Plaintiff's hotel room, Plaintiff's hotel account, Plaintiff's personal information stored at the Hotel, and the physical surveillance done by Defendants' co-conspirators, that was allowed by Defendants, did irreparable harm to Plaintiff. *Id.* at ¶41.

## 2.    Todd Courser deposition (January 28, 2020)

During his deposition, Plaintiff discussed text messages that originated from conversations he had in his Hotel rooms:

> Q.    Yeah. Okay. So as of let's say February of 2015, Joe was already -- had suspicions about your two's relationship; fair?
> A.    **Well, the text messages show that he, and also his deposition shows that he was receiving phone calls and also he was getting emails from the Radisson and that they were giving him updates as to my coming and going from the hotel and that he knew my hotel room and he also confirms that he was receiving emails of my reservations and cancellations and that sort of thing. As a matter of fact, it comes down to the minute-by-minute of my entry and exit of the hotel. It also shows that he was in my hotel room and there were some pictures taken and there's some communication about a recording. He confirms that in the deposition, most of that, that detail and some of it is in the rest of the texts.**

[*Todd Courser deposition*, <u>Exhibit 3</u>. 80:20-81:11 (01/28/2020)].

> A.    **So they had somebody else's email on my account which was telling them the reservation information, apparently the check-in information, he got there at**

**7:51 a.m., he left at such-and-such a time. All of that information we saw later in the texts that said that somebody or somehow they were getting that information from the hotel. Those meetings -- I didn't have any of that information. I just knew that my, my statements were being emailed to someone that wasn't me. They wouldn't tell me who. But I did know on February 12th that they were giving out my room number at that point. So --**

[*Id.*, Ex 3. 184:20-185:5 (01/28/2020)].

Q.   I'm gonna hand these to you and you can explain to me why you brought them. The first is this stack. It's labeled 552 through 570.

**A.   Yeah. I mean I can read the whole thing or not, but this -- there were -- I was obviously reviewing the evidence, and there's a lot of evidence, and this was a handbook from Winegardner & Hammons, which I believe is the management of the Radisson Hotel. And it just went through kind of their training or the way that they handle -- and it just said keep control and guest privacy and it said that Winegardner & Hammons, the safety and security of our guests is priority, our guests have choices, and this is what separates us from other hotels, it's our responsibility to refrain from giving out information about the identity, room number and activities of our guests.**

[*Id.*, Ex 3. 227:1-16 (01/28/2020)].

**A.   -- from Joe Gamrat's deleted texts, that he was attempting to delete them. It says: "By the way, he obviously didn't take a shower this a.m. as the shower curtain was out of the tub. Must have had a bath last night."**

Q.   How would Joe Gamrat know that your shower curtain was out of the tub?

MR. KOSTELLO: Form and foundation. How can he possibly answer that?

**A.   Well, the only way he would know that is if he was in the hotel room.**

BY MR. DePERNO:

Q.   And who gave him access to the hotel room?

MR. KOSTELLO: Form and foundation.

**A.   That happened through the hotel. He said that he was in the hotel room.**

5

BY MR. DePERNO:
Q. Did you give Joe Gamrat access to your hotel room?
A.   **I did not. Joe Gamrat also gained access to the, to the reservation information and other email and political databases through Allard, Graham and Cline.**

[*Id.*, Ex 3. 234:1-20 (01/28/2020)].

A.   **The page is, this is a series of texts, the actual texts, the extortion texts that were received from May 29th on -- or I'm sorry -- May 19th on. And there's one that I highlighted that says, "I pay them better for info, Radisson."**
Q.   And who is this text message -- this is a text message from the extortionist?
A.   **Yes. And it says, "Pay people better to keep quiet." And we obviously see from the other information from Joe, he was getting information related to, to my stay.**
Q.   So the extortionist is actually telling you that he pays people for information hashtag Radisson?
A.   **That's correct.**

[*Id.*, Ex 3. 236:6-18 (01/28/2020)].

Q.   Okay. And what does Vincent Krell say?
A.   **What the, you know, basically saying, "What the F her room?" He writes "his" room.**

[*Id.*, Ex 3. 239:2-4 (01/28/2020)].

Q.   Okay. Go on.
A.   **And then he writes, Vincent Krell writes, "His clothes are still there."**

[*Id.*, Ex 3. 239:11-13 (01/28/2020)].

Q.   What does Joe Gamrat say?
A.   **Joe Gamrat said, "He hasn't checked out yet."**
Q.   How would Joe Gamrat know if you checked out?
MR. KOSTELLO: Form and foundation.
A.   **That information, that information would've had to have been provided to someone, from someone to him, from someone at the hotel to him. He says, "But he is scheduled to check out."**
BY MR. DePERNO:
Q.   Okay. That's from Joe Gamrat?

```
     A.    This is from Joe Gamrat.
```

[*Id.*, Ex 3. 240:14-24 (01/28/2020)].

```
     Q.    What's the next one?
     A.    It says, it says -- and then Vincent Krell writes,
           "Thought you were going home," and then the response.
           So it looks like it's continuing. There seems to be
           something missing in there. But he says, "I am on my
           way now. Was looking for potential evidence like trash
           or wrapper. Nothing -- which doesn't say a whole lot
           though."
     Q.    So Joe Gamrat's looking for trash or a wrapper in your
           room?
     A.    That's --
     MR. KOSTELLO: Form and foundation.
     A.    This conversation happens one after another over, in
           this situation, it's over about nine minutes.
     BY MR. DePERNO:
     Q.    How does Joe Gamrat get into your room to look for
           trash or a wrapper?
     MR. KOSTELLO: Same objection.
     A.    Someone obviously gave him access.
```

[*Id.*, Ex 3. 241:16-242:9 (01/28/2020)].

```
     A.    And then he writes: "I just think it's strange that
           both beds are used. I typically sleep in one and put
           my suitcase or bag on the other. You? Heat was high
           too which is just the way Cindy likes it."
     Q.    So how does Joe Gamrat know which beds were used?
     MR. KOSTELLO: Same objection.
     A.    He would -- he obviously was in the room and also was
           able to know that the heat was, that the heat was up.
           And then Krell responds to that and says, "Yeah
           someone was in both of those beds."
```

[*Id.*, Ex 3. 242:15-24 (01/28/2020)].

## 3.      David Horr deposition (February 27, 2020)

During David Horr's deposition, he admitted that he was the person who sent the

extortion text messages to Plaintiff.

```
     Q     I'm just trying to see if there's any number we can
           get 5 to. Some closer number more than ten.
```

A     **It's more than ten. I'm sure the document exists that shows all of the texts.**

Q     Okay. I'm trying to get your understanding of what you may recall. Do you recall if there's more than 50, less than 50?

A     **More than ten, less than a hundred.**

Q     Did you hide your involvement from the police in sending these text messages?

A     **No.**

Q     Did there come a point where you destroyed that burner 16 phone?

A     **Yes.**

Q     Why?

A     **I didn't need it any longer.**

Q     When did you destroy it?

A     **I have no idea.**

Q     June of 2015?

A     **No idea.**

Q     July of 2015? No idea at all?

A     **No idea.**

Q     How did you destroy it?

A     **I broke it in half and threw it in the garbage.**

Q     Most people who don't want a cell phone anymore just put it in their drawer, why did you break that one in half?

A     **I didn't need it any longer.**

Q     No other reason than I didn't need it any longer?

A     **That's the only reason.**

Q     You weren't worried that someone might find out about it?

A     **No.**

Q     Not at all?

A     **No.**

Q     Did anyone tell you to break that phone in half?

A     **No.**

Q     Okay. Number 37 says, "The MSP later discovered that extortion texts were sent from a phone that was in the possession of Horr, who neither Plaintiff nor Cindy Gamrat had ever met." You denied that. You said "I disagree with the statement because it was not extortion."

A     **Correct.**

Q     Setting that issue aside, whether or not it was extortion, is there anything else you disagree with in that statement?

A     **No.**

8

[*David Horr deposition*, <u>Exhibit 4</u>. 31:3-33:1 (02/27/2020)].

**4.      Joe Gamrat deposition (February 28, 2020)**

Joe Gamrat also admitted that he was involved with sending the extortion text messages

to Plaintiff. He also admitted that he gained personal information from Defendants' staff that

furthered the extortion plot.

> Q.    **Did there come a point where you and David Horr worked together to send Todd Courser a series of text messages through an anonymous phone?**
> A.    Sure, yep.

[*Joe Gamrat deposition*, <u>Exhibit 5</u>. 27:17-24 (02/28/2020)].

> Q.    **Were you part of these text messages in paragraph 19?**
> A.    They look familiar, so I would say yes.

*Id.*, Ex 5. 42:12-13 (02/28/2020).

> Q.    **How did you get access to those account statements?**
> A.    I would call up the hotel -- other than that first one, which we can go into details on that if you ever -- if you want to.

[*Id.*, Ex 5. 65:17-20 (02/28/2020)].

> Q.    **And they would give you that information?**
> A.    And they would ask, you know -- I don't even know if they would ask.  I think I -- before they'd ask anything I'd say it was reserved under -- you know, the reservation is under Gamrat or the reservation is under Courser, you know, checked out on Thursday, or whatever it was, just because that's what -- that's what they did.

[*Id.*, Ex 5. 66:7-13 (02/28/2020)].

> Q.    **And they would do it?**
> A.    And they would do that.
> Q.    **Just that easy?**
> A.    Well, I guess, yeah.
> Q.    **They didn't ask you to verify who you were?**
> A.    I think, you know, if you -- I think if you step back from this case, I think -- you know, who would be

9

```
           calling up and saying, well, it was Tuesday through
           Thursday, the name was Courser. I don't know. I think,
           looking at all this, maybe -- maybe that -- yeah,
           there was probably some more questions that could be
           asked, right? But in general, I mean, there was a lot
           of information that was shared that -- it was
           generalities, but it was, hey, this is the name, this
           is the dates.
```

[*Id.*, Ex 5. 66:24-67:12 (02/28/2020)].

Joe Gamrat also acknowledged that he gained access to Plaintiff's hotel room and account

information. He stated that the Radisson staff gave him this information.

```
      Q.   So you got that information directly from hotel staff?
      A.   Yeah.
```

[*Id.*, Ex 5. 77:4-5 (02/28/2020)].

```
      Q.   On the first page that you see there, line 12, the
           question was, so you had those two email addresses on
           file at the Radisson to receive information about when
           Cindy and Todd were going to be checking in; is that
           accurate? And you said, no, I didn't have emails on
           file at the Radisson. That's false, right? You did
           have emails?
      A.   I didn't have files on -- emails on file. And I
           certainly didn't have emails on file for -- to know
           when they're going to be checking in.
      Q.   Well, certainly you called up the Radisson and told
           them to put TCourser72@Gmail.com on file, correct?
      A.   Incorrect.
      Q.   Then how did they get that email address?
      A.   I asked them to send the statement to that email, I
           didn't ask them to put anything on file.
      Q.   But they had it on file.
      A.   You'd have to talk to the Radisson about that. I
           didn't ask anybody to put anything on file. I said,
           could you send it to this address instead of -- send
           it to B instead of A. I didn't say, do me a favor, put
           this one on there and send these statements to me all
           the time. Nothing like that. It was, could you send it
           to this email address instead. That's the -- that's
           the end of the -- hard stop on that.
```

Q.    **Okay. So when the Radisson then switched out the email addresses and started sending stuff to TCourser72@Gmail, that was their mistake?**

A.    They only sent an email to that address if I called and asked to have the email sent to that address or the -- if I called to have a statement sent. It wasn't just a constant flow of statements.

Q.    **But it happened on more than one occasion?**

A.    Several.

Q.    **So the email addresses were TCourser72@Gmail.com and TowardsABetterDay@Gmail.com?**

A.    I believe so, yes.

Q.    **These were two e-mail address that you created, correct?**

A.    Uh-huh, yes.

Q.    **You would call the Radisson up and ask them to send information to those addresses?**

A.    Correct.

Q.    **And they would do that?**

A.    Yeah.

Q.    **And then you're saying the fact that then those email addresses were added to the account is not something you requested?**

A.    Correct.

[*Id.*, Ex 5. 164:21-166:15 (02/28/2020)].

Q.    **The next page talks about a Radisson charge of $539, no room under Cindy Gamrat, room is under Todd Courser, checked in at 1, king with sleeper sofa, paid for four nights. So you got that information from the Radisson, right?**

A.    Yeah.

Q.    **Then below that, two rooms, both under Todd, Cindy paid-for room is four nights. Todd's paid-for room, his card, is two nights. So you were getting information from the Radisson about Todd's room that he paid for also?**

A.    No, I think that was all the same one. I think it might have been when he checked in it ended up being a different card or something. But that was all in that one time frame. I couldn't tell you exactly what happened, but what I had said earlier is what I remembered on all that.

Q.    **Then it says, rooms on Grand Avenue. What is Grand Avenue?**

A.    I think that was just me understanding what rooms are where in the hotel. So basically evens are from Michigan to Ottawa, starting with number 2, and then the back side is 1 through 31, odds.

**Q.    Who is Susan Day?**

A.    I believe that was the name that Cindy used as an alias.

**Q.    Why did she use that name?**

A.    I have no idea.

**Q.    On page 1871 it says TCourser72@Gmail.com, below that arrogant ass. Is that the password?**

A.    It was.

**Q.    And for TowardsABetterDay@Gmail Susan Day is the password also?**

A.    Yep.

**Q.    So you knew she used the alias Susan Day?**

A.    I learned that one time, yeah.

**Q.    When did you learn that?**

A.    I don't recall the exact time frame, but at some point she had a copy of a bill that she left out and that was what was on there.

**Q.    Did you get any emails from when she registered as Susan Day?**

A.    I probably did. That's probably why that email address was set up.

**Q.    So she was registered with the Radisson, Cindy Gamrat was registered with the Radisson under the name Susan Day?**

A.    That's what I would assume, yeah. That's what I recall.

**Q.    And you were still able to get her information from that account?**

A.    Well, it's the same kind of process, Matt. It's, call up, I'd like -- can I get a receipt for a previous stay, the stay was Tuesday through Thursday, Monday through Thursday, and name on the reservation was, and then can you send it to this email.

(Deposition Exhibit 24 was marked for identification.)

[*Id.*, Ex 5. 184:19-166:15 (02/28/2020)].

Joe Gamrat acknowledge that he may have sent information that he received from the Radisson to Keith Allard about Plaintiff staying at the Radisson.

**Q.    Did you ever relay information to Keith Allard about Todd staying at the Radisson Hotel?**

> A.    I don't recall that I did. Maybe that first -- that
> first go around in early or that second week of
> February.

[*Id.*, Ex 5. 197:10-13 (02/28/2020)].

## 5.    Cindy Bauer (f/k/a Gamrat) deposition (May 27, 2021)

Defendants elected to take the deposition of Cindy Bauer [Exhibit 6]. Notably, they failed

to mention her deposition and the damaging testimony in their motions for summary judgment.

Indeed, Cindy Bauer's testimony presents significant issues of fact that must be presented to a

jury.

> Q.    Is it your belief or do you have any information that
> the Radisson Hotel Lansing or Radisson Hotels
> International, Incorporated, or any other affiliates
> performed any recording or wiretapping or
> eavesdropping on any conversations that you had?
> **A.    There's an awful lot of evidence that shows recordings
> were made at the Radisson, and I don't know if -- they
> could have been made by somebody at the Radisson, I
> don't know.**
> Q.    Do you have any information or I guess I should say
> would you agree with me that you would be speculating
> that the Radisson Hotel or any representatives had any
> involvement in any of those recordings?
> MR. DePERNO: Objection to the of the question.
> **A.    From my own personal experience, employees of the
> Radisson did communicate to me that my information was
> given to my current ex-husband, and there's evidence
> that shows that he received information from the
> employees. The extent of that information and how
> much, you know, I don't know that. It's speculating.
> There's evidence that shows it.**

[*Cindy Bauer deposition*, Ex 6, 12:23-13:17 (05/27/2021)].

> Q.    What specific information is it your understanding
> that was provided by any hotel representatives and to
> whom was it provided?
> **A.    They told me that people working the desk, that all of
> the information related to my visits, my stay there at
> the ·Radisson, was being sent to an e-mail address
> that was attached -- they had attached to my Radisson**

**stay, that I did not put on there and I did not have ownership of that e-mail address. When I asked them what information was being sent there, they said everything that had to do with my stay, so I asked them to remove the e-mail address. I told them it wasn't mine and I don't want an e-mail address put on my stay. That happened again, another e-mail address. Although I don't know the names of the people working there, the Radisson is right next to the House of Representatives and as a representative I stayed there frequently and they greeted me by name when I walked up. That was their common approach. They certainly knew who I was, so they told me all the information that had to do with my stay was being sent. I believe they specifically mentioned room number, billing information and whatever else was there.**

[*Id*. Ex 6, 13:23-14:19 (05/27/2021)].

Q.   When you booked your hotel room at the Radisson Hotel Lansing, you would do that with a credit card; is that correct?

A.   **I had until there was a night that Joe Gamrat knocked on my door about 2:30 in the morning and wanted in, and we were estranged at the time, and I was concerned for my safety and did not let him in. He was escorted out, I found out later, by, I guess, the security at the Radisson. Afterward I actually had a conversation with the manager at the Radisson in his office right outside the lobby area. I told him about my concerns for my safety, and I said I would like to continue staying here because it's very convenient right next to the House, but yet I had concerns for my safety and I asked him what we could do about that.**

[*Id*. Ex 6, 16:10-(05/27/2021)].

Q.   What do you know about a contact that Mr. Todd Courser had with any representatives of Radisson Hotels International?

A.   **I do recall a conversation. I believe he was checking in the same time as me when that e-mail incident occurred and they said that there was an e-mail and it wasn't my e-mail. He also asked well, do I have an e-mail on my account, and sure enough, there was an e-mail that had been placed on his account that was also not his. It had something to do with his name. I can't**

**remember exactly what the e-mail was, so he also asked for that to be removed from his account. I remember that conversation as well, and I know there is evidence that also shows that the communications between him and Vincent Krell about going into Mr. Courser's room and looking through things like his clothes and shower curtain and bedding and the temperature and all that kind of stuff.·I remember seeing that in the evidence as well.**

[*Id.* Ex 6, 19:9-25 (05/27/2021)].

Q. Do you have any information that any representative of the entities I just mentioned were involved in a conspiracy against Todd Courser?

MR. DePERNO: Objection to the form of the question.

**A. Yes.·There were some texts that both Todd and I received from at the time an anonymous texter, extortionist, that mentioned the Radisson, mentioned audio recordings done at the Radisson, mentioned the Radisson actually specifically in the texts, that they paid -- something about they were paying people at the Radisson for this information. These texts were, like I said, anonymously sent to us at the same time or shortly after, around that same time period that my information was being sent from the Radisson, and from my understanding, hearing what Todd said, his information was also being sent from the Radisson to unknown sources that were unknown to us at the time, so yes, it did seem like there were a number of people sharing this information, this private information.**

[*Id.* Ex 6, 24:5-23 (05/27/2021)].

Q. The anonymous texts you were referencing, did you come to learn who sent those text messages?

**A. David Horr has admitted to sending text messages, and we don't know exactly who else might have had access to that burner phone that was sending the text messages and how he got all the information necessarily. He did say Joe Gamrat provided information and some of the evidence shows that some of that information was being also discussed at that time period by the staff, Joshua Cline, Ben Graham and David Allard.**

Q. Other than the anonymous text messages you referenced regarding audio recordings taken at the Radisson and

15

allegations that individuals were paying hotel staff
for information, are you aware of any sources related
to any allegations of recordings done at the hotel or
monetary payments being paid to hotel staff?

**A.   There were texts that were between Horr and Joe that
discussed the audio recordings. They discussed that
they are recordings like of Todd and I being together
in the shower and those kinds of things, which sounded
like it came from the Radisson Hotel. I don't know
that it mentioned it specifically, but the context
would certainly go to that. There was discussion in
the texts, I believe, about somebody getting the audio
-- or between Horr and Joe getting the audio
transcribed or looked at. There was somebody else they
were talking about getting this audio from or that had
something to do with this audio, but that person
wasn't named, I don't believe, in the text.**

Q.   Do you agree with me that you don't know the source or
location of the device that recorded any conversations
that you and Mr. Courser had?

MR. DePERNO: Objection to form.

**A.   No. As far as the location, there are other texts by
the anonymous texter at the time that also included
conversations that Todd and I had had that I recall in
the Radisson together. They were private
conversations, so as far as the context and the
content of the texts between Joe and Horr and
anonymous texts we were receiving, definitely some of
that came from the Radisson while we were in the
Radisson in those rooms. The location is pretty
specific, but, you know, as far as who planted the
device or how, I don't know that.**

[*Id.* Ex 6, 24:25-26:16 (05/27/2021)].

Q:   As you sit here today, do you have any evidence that
any recording device was ever planted in a hotel room
at the Radisson Hotel Lansing?

                              * * *

**A.   Yes. I would also say it seems it had to be somebody
who knew where I would be staying and who knew when I
would be staying there in order to do that.**

[*Id.* Ex 6, 24:25-26:16 (05/27/2021)].

Q.   What is your understanding of what information was
transmitted?

16

**A.    Room number, check-in and when I'm supposed to depart, that kind of information, billing information. She said whatever information is connected with my visit would be sent.**

[*Id.* Ex 6, 35:9-13 (05/27/2021)].

Q.    Are you aware of any employees of the hotel who granted access to Mr. Courser's room at the Radisson Hotel Lansing?

* * *

**A.    Well, as far as physical access, again, there's the texts going back to the -- that we've already discussed that Joe and Krell were talking about looking through Todd's room and the information that was on Joe's phone where he talks about the dates and times, arrivals, departures of myself and Todd and what room we were staying in, even to the fact that he knew what side of the building it was on and would reference that, so yes, it seems pretty clear with the evidence that he was granted physical access.**

BY MR. HOUBECK:

Q.    Do you have any personal knowledge that any of the information you just referenced was provided to Mr. Gamrat or any other individual from a hotel representative?

**A.    Yes. My personal knowledge is that communication I have had with the staff there that said to me directly they had put an e-mail on there that gave this information to someone else other than me. They confirmed that and they verified it.**

Q.    Let me ask it this way then. I'm referencing paragraph 24 and I should have been more clear. Do you have any information or any personal knowledge to support paragraph 24, that any hotel employee granted or assisted unauthorized physical access to any of Mr. Courser's rooms at the Radisson Hotel?

* * *

**A.    I'm sorry I'm struggling because the recordings were from time I spent in Todd's room. If the hotel didn't give them access, who did? It wasn't me. When you say do I have personal understanding or awareness, that's my personal understanding and awareness.**

* * *

**A.    I have personal knowledge where they provided information to somebody outside of Mr. Courser's room through a fake e-mail set up on his account, his**

> **staying in the room. I can personally confirm that information, so I'm trying – maybe I'm not really understanding, but --**

[*Id.* Ex 6, 52:15-54:17 (05/27/2021)].

Finally, the entire cross-examination of Cindy Bauer confirms the allegations made by Plaintiff and provides additional support to Plaintiff's allegations. See *Id.* Ex 5, 61:24-82:8 (05/27/2021).

## STANDARD OF REVIEW

Summary judgment is proper only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Moreover, the Court must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *General Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1097-98 (6th Cir.1994). Under Fed. R. Civ. P. 56(c) the moving party always has the initial burden of showing the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Adickes v. Kress & Co.*, 398 U.S. 144, 159-60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See generally* 6 Moore P 56.15(3). If, and only if, the initial burden has been supported by additional materials, the non-moving party must then come forward with specific facts which demonstrate to the court that there is a genuine issue for trial. In this case, the ultimate burden of proving the propriety of summary judgment remains on the moving party. *See Adickes*, *supra* at 159-60, 90 S.Ct. 1598; *Fitzke v. Shappell*, 408 F.2d 1072 (6th Cir. 1972). As the Supreme Court observed in *Adickes*, the Advisory Committee on the 1963 Amendments to Fed. R. Civ. P. 56 expressly rejected the idea that subdivision (e) altered the ordinary standards of proof in a motion for summary judgment: "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be

denied even if no opposing evidentiary matter is presented." *Adickes,* 398 U.S. at 160, 90 S.Ct. at

1610, quoting Advisory Committee Notes on 1963 Amendment to Fed. R. Civ. P. 56.

## LEGAL ARGUMENT

### 1.     The Radisson Franchise System; Issues of fact

The Radisson defendants argue that they cannot be liable because the Radisson Hotel

Lansing ("the Hotel") is "independently owned, operated, and controlled" by Defendant Block

100 and managed by Defendant Winegardner and Hammons. The point to a License Agreement

(Defendants' Ex H) as the definitive agreement and further argue that the they cannot be held

liable for the actions of the employees of the Hotel. Defendants Radisson argue that they can

only be held liable if a "principal-agent relationship exists." [ECF No. 181, PageID.2729]. They

further argue that the Defendants Radisson can only be liable if they had "the right to control the

day-to-day operations of the franchise." [*Id.* at PageID.2729-30]. Defendants Radisson based

their entire argument on the assertion that Plaintiff cannot establish that the Radisson Defendants

had any control over the day-to-day operations of the franchise. [*Id.* at PageID.2730]. In order to

back up this claim, the Radisson Defendants point to their license agreement, rather than the

actual facts. Clearly, they are trying to contract out of liability by signing an agreement that

differs from their actual conduct but then pointing to the contract in order to nullify the actual

facts. The Defendants argue that this Court not only appreciate this tactic, but actual condones it.

Interestingly, Defendants failed to include the deposition of Kevin Ross [Exhibit 7]. Kevin Ross

was the Hotel director of operations at the time of the incidents set forth in this lawsuit [*Kevin

Ross deposition*, Ex 6, 11:4-12 (10/13/2020)]. Mr. Ross acknowledged going through a

comprehensive training program:

> **A     Well, I mean, you have to go through trainings and
> certifications through the brand for training. So you**

> have to maintain or take initial training courses
> through their training program.
> Q    What's that training program called?
> A    I don't remember.
> Q    And who --
> A    I know it's based under the "Yes, I Can" motto, or it
>      was at the time anyway, and it's all about delivering
>      service, service expectations, safety, how to train,
>      how to be a leader, what things to look for, how to
>      use certain systems in terms of accounting and those
>      types of things. So it's a pretty broad-ranged
>      training process. It takes months to complete.
> Q    And who puts on this training program?
> A    Radisson has their own training, and then Winegardner
>      & Hammons also has their own training.
> Q    And you did both training?
> A    That's correct.

[*Id.*, Ex 7, 21:5-22 (10/13/2020)]. The Radisson Defendants claim in their motion that "[t]he

Radisson Defendants did not have any control over the conduct of the Hotel staff." [ECF No.

181, PageID.2727]. That is false. Mr. Ross clearly stated that Radisson had their own training;

meaning Radisson did supervise and oversee Hotel staff.

> Q    And you have to be able to prove that you are
>      compliant in 21 certain areas?
> A    Yup. They'll review logs. They'll check pieces of
>      equipment. They'll ask staff what the standards are,
>      what the cleaning process is; how many times did the
>      mattresses get rotated, checking them; checking the
>      logs, making sure our HVAC units are getting filters
>      replaced and it's all getting logged; and they go
>      through all of the maintenance and safety logs and of
>      the hotel. So it's a cumbersome audit. The Radisson
>      also conducts an audit, but that's more on the guest
>      service and making sure we're what they call brand
>      compliant on. And that is an unannounced audit as
>      well. And that could be done up to twice a year. If
>      you pass your first audit, you don't necessarily get a
>      second audit in a year, but they still can if your
>      customer satisfaction scores are below a certain
>      level.
> Q    Okay. You said guest services would be one area of an
>      12 audit?

> **A**    **But from the Radisson brand would conduct that audit; correct.**
> Q    And what else? "The Radisson brand," you said?
> **A**    **The Radisson brand does that audit; correct. And that can 17 be up to two times per year, depending on your hotel's 18 performance.**

[*Id.*, Ex 7, 24:20-25:18 (10/13/2020)].

> Q    Have you ever been disciplined by Radisson?
> **A**    **Not me directly. But the hotel from a customer satisfaction standpoint, if your score falls below a certain number, you're considered in the red zone and then they have extra attention, and they -- so they discipline -- discipline -- they make you write an action plan in order to get back into an acceptable service level score.**
> Q    And did your hotel -- was it disciplined? And maybe that's not the right wording.
> **A**    **From that way it was more of a -- building needs to be renovated every so often. And when you fall behind in the quality of product, as they deem it; you have scuffs in the vinyl, you have stains in the carpet, you have other issues that need to be -- capital investments to bring it back up to standards; then you can fall into that red zone. And so we were at times in and out of that red zone in communications with the Radisson. So in a sense, yes, the hotel -- you say "disciplined" from Radisson for not being compliant with that, but that's the only one I'm aware of.**

[*Id.*, Ex 7, 25:25-26:18 (10/13/2020)].

> **A.**    **With my general manager we had to submit action plans to the brand; yes.**
> Q    Do you remember specifically what was in that action plan?
> **A**    **It was a lot of complete maintenance on this by a certain date or complete retraining on this cleaning method by this certain date. Beyond that, nothing specific to that.**
> Q    Anything related to guest services?
> **A**    **Minimally in terms of using the guest's name whenever possible. It's a blind audit, so when Radisson sends somebody, they're unannounced, and they stay a night in the hotel and go through all of the different services that the hotel offers. And then they announce**

> **themselves the next day and then they tell you**
> **exactly, point to point, how their stay was. And then**
> **if something wasn't brand compliant, as in, "I wasn't**
> **greeted at the host stand within 30 seconds" or "I**
> **wasn't offered an alcoholic beverage when I was given**
> **my menu or -- those types of things are considered**
> **guest service components. And once they leave, if you**
> **missed on those areas, you have to write an action**
> **plan for how you're going to make sure that those**
> **things are corrected by the next visit, those types of**
> **things. So from a guest service standpoint, yes, there**
> **were some action items that needed to be corrected by**
> **the next audit. But it's a very cumbersome audit, so**
> **we – I don't know what else to expand on from there.**

[*Id.*, Ex 7, 27:1-28:1 (10/13/2020)]. This is clearly day-to-day operations.

> Q    But key control is done by Winegardner & Hammons;
>      correct?
> **A    Well, key control is also done by Radisson.**

[*Id.*, Ex 7, 33:1-2 (10/13/2020)].

> Q    Okay. Understood. And then the Radisson MOD training
>      is a program performed by Radisson; is that correct?
> **A    Correct. Again, Winegardner & Hammons has an enhanced**
>      **version of that, but it's inclusive of all of the**
>      **things within the MOD training that Radisson puts out.**
> Q    And you went through the key control training with
>      Winegardner & Hammons; correct?
> **A    Correct.**
> Q    And you went through the MOD training with Radisson;
>      correct?
> **A    Correct.**

[*Id.*, Ex 7, 34:12-22 (10/13/2020)].

> Q    So if there's update on new technology, who does that
>      training?
> **A    The department manager would make sure that each of**
>      **their associates went through -- usually it's a**
>      **virtual training, and then they print off at the end**
>      **that they've done the training. It's a certificate of**
>      **some kind. And then it's recorded with Radisson that**
>      **so-and-so has completed these online modules.**
>              **(Deposition Exhibit 3 marked)**

> ```
> A     And it's also part of the audit that Radisson does
>       when they show up to the properties to make sure that
>       you have your trainings completed to a certain
>       percentage and within so many days of employment.
> ```

[*Id.*, Ex 7, 35:24-36:11 (10/13/2020)].

> ```
> Q     Did you manage advertising for the hotel?
> A     No.
> Q     Who did manage the advertising?
> A     It would have been done through corporate, Winegardner
>       &  Hammons,  or  --  actually  most  advertising  for
>       Radisson  as  a  brand  would  have  been  done  through
>       Radisson, not locally.
> ```

[*Id.*, Exhibit 8, 141:1-6 (10/19/2020)]. The Radisson Defendants claim that "[a]t no time did the

Radisson Defendants voluntarily undertake any control, ownership, supervision, or other

obligation with respect to the Hotel." This is clearly not true. These statements above, and the

deposition of Kevin Ross in general, tell a story that is different than the fiction created by the

Radisson agreement. The Kevin Ross statements create an issue of fact for the jury regarding the

amount of control. This is not a legal issue. This is an issue of fact. The Defendants have failed

to demonstrate that "there is an absence of evidence to support the nonmoving party's case."

Rather, Plaintiff has identified specific facts that "demonstrate a genuine issue for trial." *Amini v.

Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). The Radisson Defendants' motion for

summary judgment must be denied.

**2.     Winegardner & Hammons and Block 100; Issues of fact**

Winegardner & Hammons and Block 100 have presented the same additional arguments

as the Radisson Defendants (*i.e.* RICO, wiretapping, and state law claims). Those arguments are

addressed below.

Block 100 has presented the same additional arguments as the Radisson Defendants (*i.e.*

RICO, wiretapping, and state law claims). Those arguments are addressed below.

DePerno Law Office, PLLC ● 951 W. Milham Ave. ● PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 353-2726 (Fax)

### 3.     RICO

Defendants were involved in a conspiracy. Defendants fail to understand the nature of conspiracy. A co-conspirator does not need to be involved in the entire conspiracy or have knowledge of other co-conspirators' roles or motives. By engaging in this conspiracy, and being part of the racketeering activities, Defendants are liable as co-conspirators for all of the claims asserted. Once a Defendant partakes in any of the activities, they are jointly and severally liable for the damages. See *United States v Corrado*, 227 F.3d 543, 552 (6th Cir. 2000) (co-conspirators in a RICO enterprise are held jointly and severally liable for the reasonably foreseeable proceeds of the enterprise, and are not limited to amounts each defendant personally obtained). See also *United States v Corrado*, 286 F.3d 934, 937-38 (6th Cir. 2002) (holding that co-conspirators in a RICO enterprise are jointly and severally liable even for damages not part of the conspiratorial enterprise). See also *United States v Lyons*, 870 F.Supp.2d 281, 290-291 (D. Mass. 2012) (gross proceeds of RICO enterprise, not merely net proceeds, are subject to forfeiture under 18 U.S.C. 1963). A plaintiff "is not required to prove the specific portion for which each defendant is responsible. Such a requirement would allow defendants 'to mask the allocation of the proceeds to avoid forfeiting them altogether.'" *Corrado*, *supra,* 227 F.3d at 552 (citing *United States v Simmons*, 154 F.3d 765, 769-70 (8th Cir. 1998)). See also *United States v Caporale*, 806 F.2d 1487, 1507 (11th Cir. 1986) (stating that "joint and several liability is not only consistent with the statutory scheme [of RICO], but in some cases will be necessary to achieve the aims of the legislation").

In their argument, Defendants completely miss the mark when they claim there is no continuity and that there was only one goal. As stated in the Complaint [ECF No. 1, PageID.11] the purpose was threefold: "remove Courser from office, extort, and bring criminal charges." Defendants are wrong when they state that "[o]nce Plaintiff was removed from office, the alleged

24

'scheme' was complete." That is false. The scheme continued through the criminal trial of Todd

Courser, which lasted for several years after Plaintiff was removed from office. Further:

> Unlike the general conspiracy statute, §1962(d) requires no "overt act or specific act" in carrying it forward. *Salinas v. United States*, 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Furthermore, "the supporters are as guilty as the perpetrators, so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *Id.* at 64, 118 S.Ct. 469. A RICO conspirator "may be convicted 'so long as he' agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime." *Id.* at 65, 118 S.Ct. 469 (quoting the Model Penal Code §5.03(1)(a) (1962) (emphasis added)). *Salinas*, moreover, summarizes these conspiracy principles applicable to the RICO charges in counts one and two: "A conspiracy may exist even if a conspirator does not agree to commit or facilitate every part of the substantive offense. See *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 153-54, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)." *Id.* at 63, 118 S.Ct. 469 (emphasis added). We agree that "it is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise." *Id.*; see also *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (en banc).

*Corrado*, *supra*, 227 F.3d at 552. In summary, Defendants cannot avoid liability as co-

conspirators. Their arguments fail. The facts demonstrate that Joe Gamrat, Vincent Krell, and

David Horr engaged in a conspiracy to extort Plaintiff. They turned over information to Keith

Allard and Ben Graham who used that information to have Plaintiff expelled from office. Joe

Gamrat, Vincent Krell, and David Horr obtained their information, in part, through access they

gained at Hotel (through Defendants). Indeed, Joe Gamrat admitted that he added "fake" email

addresses to Plaintiff's Radisson account. That act alone is sufficient to create an issue for the

jury. This isn't the first time Defendants have engaged in fraud [Exhibit 9].

Defendants also argue that Plaintiff has not pleaded "predicate acts". This is false. For

example:

- extortion (18 U.S.C. 1961(1)(A) and MCL 750.213)
- fraud (sec 1029),
- mail fraud (sec 1341),
- wire fraud (sec 1343),

- obstruction of justice (sec 1503 and MCL: 750.483a),
- obstruction of criminal investigations (sec 1510),
- obstruction of state or local law enforcement (sec 1511),
- extortion (sec 1951),
- extortion, fraud, obstruction of justice,

See *Complaint*, at ¶¶52-79. The bedrock principle of conspiracy liability and RICO is that conspirators are legally responsible for each other's foreseeable actions in furtherance of their common plan. See *Pinkerton v United States*, 328 US 640 (1946)). Liability for participation in a RICO enterprise does not require "participation of all members throughout the life of the enterprise." *United States v Weinstein*, 762 F. 2d 1522, 1537 (11th Cir. 1985). "The law does not require all members of the RICO enterprise to have maintained their association with it throughout the enterprise's life." *United States v Hewes*, 729 F. 2d 1302, 1317 (11th Cir. 1984). That "the various associate function as a continuing unit" "does not mean that individuals cannot leave the group or that new members cannot join at a later time." *United States v Riccobene*, 709 F. 2d 214, 223 (3d Cir. 1983). Membership in an enterprise may change over time. *United States v Errico*, 635 F. 2d 152, 155 (2d Cir. 1980).

A civil conspiracy is, at its root, "an agreement, or preconceived plan, to do an unlawful act." *Bahr v Miller Bros Creamery*, 365 Mich 415, 427, 112 NW2d 463 (1961). In Michigan, "All those who, in pursuance of a common plan to commit a tortious act, actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with the wrongdoer." *Rosenberg v Rosenberg Bros Special Account,* 134 Mich App 342, 354; 351 NW2d 563 (1984) (quoting W. Prosser, *Handbook of the Law of Torts* §46, at 292 (4th ed 1971)). "Whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein." *Brown v Brown,* 338 Mich

492, 503, 61 NW2d 656 (1953) (quoting *Warsop v Cole,* 292 Mich 628, 291 NW 33 (1940)), *cert denied,* 348 US 816 (1954).

When Defendants participated in a conspiracy to record conversations, follow and stalk Plaintiff, extort Plaintiff, and engage in other criminal acts or torts, they engaged in the conspiracy to violate Plaintiff's constitutional and statutory rights. They knew this was wrong. Indeed, Plaintiff need not allege that Defendants committed any crimes, only that they committed an unlawful (i.e., tortious) act, which clearly is alleged. See ex. *Abel v. Eli Lilly and Co.*, 418 Mich 311, 338; 343 NW2d 164 (1984). When even one of the Defendants engaged in a tortious act (in this case allowing Joe Gamrat access to Plaintiff's Hotel files), the conspiracy was complete. It clearly establishes a conspiracy and RICO violation and must survive this motion for summary judgment. In terms of the conspiracy under 42 U.S.C. § 1985(2), a plaintiff is permitted to bring a claim that is primarily a state concern. It specifically encompasses the conspiracy to obstruct the court of justice in state courts. This is detailed throughout the course of the Complaint.

**4.      The evidence and text messages are not hearsay**

Defendants claim that the text messages are hearsay. That is false. They have all been authenticated in the depositions of Todd Courser [Exhibit 3], Cindy Gamrat (a/k/a Bauer) [Exhibit 6], Joseph Gamrat [Exhibit 5], and David Horr [Exhibit 4].

**5.      Wiretapping claims under 18 U.S.C. § 2511 and MCL § 750.540; statute of limitations**

Defendants argue that the wiretapping and eavesdropping claims must be dismissed because of the 2-year statute of limitations. They assert that the limitation date starts on May 21, 2015, but this case was not filed until November 2, 2018. However, Defendants fail to account for the tolling provisions of MCL § 600.5856, which states that the statute of limitations is tolled

during the period in which the initial actions was pending (September 8, 2016 through July 31, 2018).[1] That action was pending 691 days. Therefore, the statute of limitations was tolled for 691 days, extending the filing period from April 11, 2017 + 691 days = April 11, 2019, making this complaint timely by 160 days.

**6.      Additional state claims; statute of limitations**

Defendants argue that Plaintiff's additional state law claims are also time barred. Defendants claim the statute of limitations for these claims is 3-years. Using Defendants' dates, the deadline to file would have been May 21, 2018. This case was filed November 2, 2018. As stated above, the tolling provision of MCL § 600.5856 makes this case timely. Even if it didn't, MCL § 600.5827 provides that "the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." However, the appropriate application of this statute is called into question when there is a lengthy period between the tortious conduct and the resultant damage; or when there is a delay between the damage and the plaintiff's discovery of a causal connection between the defendant's conduct and the damage. The Michigan Supreme Court has held that the term "wrong," as used in the accrual statute, specified the date on which the "defendant's breach harmed the plaintiff, as opposed to the date on which the defendant breached his duty." *Moll v Abbott Laboratories*, 444 Mich 1, 12; 506 NW2d 816 (citing *Connelly v Paul Ruddy's Equip Repair & Service Co*, 388 Mich 146; 200 NW2d 70 (1972)); *Horvath v Delida,* 213 Mich App 620, 624; 540 NW2d 760 (1995). This interpretation avoids the absurd result of the statute of limitations running before the plaintiff knows that he is injured. *Moll*, at 12. Under this rule, a "plaintiff's cause of action accrues when all the elements of the claim have occurred and can be alleged in a complaint." *Moll*, at 15; *Horvath*, at 624.

---

[1] *Courser v Allard, et al*, United States District Court for the Western District of Michigan, Case No. 1:16-cv-01108.

DEPERNO LAW OFFICE, PLLC ● 951 W. MILHAM AVE. ● PO BOX 1595 ● PORTAGE, MI 49081
(269) 321-5064 (PHONE) ● (269) 353-2726 (FAX)

The Michigan Supreme Court has also adopted the discovery rule to avoid premature barring of a plaintiff's cause of action. *Moll,* at 12. Under the discovery rule, a plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the injury and the causal connection between the plaintiff's injury and the defendant's breach. *Id., 16.* It is not necessary that a plaintiff be able to prove each element of the cause of action before the statute of limitations begins to run. *Warren Consolidated Schools v WR Grace & Co*, 205 Mich App 580, 583; 518 NW2d 508 (1994). Further, a plaintiff need not be aware of the identity of the person causing the injury. *Brown v Drake-Willock International*, 209 Mich App 136, 142; 530 NW2d 510 (1995). The discovery rule applies to the discovery of a specific injury, not to the discovery of the identities of all the possible parties. *Id.*

Here, Plaintiff did not gain access to much of the evidence until the prosecution turned over discovery in his criminal case on May 1, 2018. As stated in the Complaint, the wrongful conduct continued through Plaintiff's criminal case, which did not end until August 28, 2019. MCL 600.5855 also extends the statute of limitations. It states:

> "If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations."

Application of these rules is confirmed by case law. For example, in a 2015 Michigan case, an anonymous blogger fraudulently concealed their identity from the plaintiff. Therefore, the plaintiff's claims were not barred by the statute of limitations. The defendant claimed that the plaintiff's claim was still time barred because she knew the cause of action existed. However, the understanding was based on an older formulation of the law. *Hope-Jackson v. Washington*, 311 Mich. App. 602, 877 N.W.2d 736 (2015).

29

### (a)  Count 4 (Civil Stalking)

Defendants fail to understand the overarching scope of the complaint and its claims. Certain co-conspirators directed Allard, Graham, and Cline to follow and stalk Plaintiff. Joe Gamrat, Vincent Krell, and David Horr continued this stalking at the Hotel. [*Complaint,* at 25-39]. The Defendants aided this conspiracy by allowed Joe Gamrat access to Plaintiff's hotel room and account information. But for that access, the co-conspirators would not have obtained information that allowed them to extort Plaintiff, *i.e.* evidence of the affair. In Michigan, "All those who, in pursuance of a common plan to commit a tortious act, actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with the wrongdoer." *Rosenberg v Rosenberg Bros Special Account,* 134 Mich App 342, 354; 351 NW2d 563 (1984) (quoting W. Prosser, *Handbook of the Law of Torts* §46, at 292 (4th ed 1971)). "Whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein." *Brown v Brown,* 338 Mich 492, 503, 61 NW2d 656 (1953) (quoting *Warsop v Cole,* 292 Mich 628, 291 NW 33 (1940)), *cert denied,* 348 US 816 (1954). Plaintiff does not have to show that any of these Defendants personally took part in the stalking. Plaintiff only needs to allege that Defendants were part of the conspiracy, which is readily apparent and alleged. The facts and deposition testimony present issues of fact for the jury.

### (b)  Count 5 (Invasion of Privacy and Intrusion Upon Seclusion)

"An action for intrusion upon seclusion focuses on the manner in which information is obtained, not its publication." *Doe v Mills*, 212 Mich App 73, 88; 536 NW2d 824 (1995). There are three elements to establish a prima facie case of intrusion upon seclusion: (1) the existence of a secret and private subject matter; (2) a right possessed by the plaintiff to keep that subject

30

matter private; and (3) the obtaining of information about that subject matter through some method objectionable to a reasonable person. *Id*. Next, Defendants falsely assert that Plaintiff failed to plead "malice". See *Complaint*, at ¶141. All elements are satisfied here. The evidence and deposition testimony support these elements. Plaintiff clearly had a secret and private subject matter, he had the right to keep that matter private, and Defendants obtained information through a method objectionable to a reasonable person. The facts and deposition testimony present issues of fact for the jury.

### (c)    Count 6 (Tortious Interference with Business Relationships)

At the outset, to be clear, the Defendants knowingly gave Joe Gamrat and other co-conspirators access to Plaintiff's private information and Hotel room. That information and information related to an affair was then used by the House of Recordings and Attorney General. "The elements of tortious interference with a business relationship are [1] the existence of a valid business relationship or expectancy, [2] knowledge of the relationship or expectancy on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and [4] resultant damage to the plaintiff. . . ." *Mino v Clio School Dist*, 255 Mich App 60, 78; 661 NW2d 586 (2003). These elements are all set forth and satisfied in the Complaint ¶¶135-141. The facts and deposition testimony reveal that Plaintiff was an attorney, the Defendants knew it, and they interfered with that business when they allowed co-conspirators to gain access to his personal information and Hotel rooms. Plaintiff was damaged. The facts and deposition testimony present issues of fact for the jury.

### (d)    Count 7 and 8 (Negligent Infliction of Emotional Distress)

The requirements in a negligence case are: 1) a duty, 2) a breach of that duty, 3) causation (both proximate cause and factual cause), and 4) damages. *Lorencz v Ford Motor Co*, 439 Mich 370, 375; 483 NW2d 844 (1992). A negligence action can be maintained if a legal

31

duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm. *Maiden v. Rozwood*, 461 Mich 109, 131; 597 NW2d 817 (1999). To determine whether the relationship between the parties is sufficient to create a legal duty, a court must consider "whether the defendant is under any obligation for the benefit of the particular plaintiff . . . ." *Id.* at 132. Another important consideration in whether a defendant owes a duty is "whether it is foreseeable that the actor's conduct may create a risk of harm to the victim, and whether the result of that conduct and intervening causes were foreseeable." *Moning v. Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). All is satisfied here. Certainly, Defendants owed a duty to Plaintiff to not engaged in the conduct described in Count 8, *Complaint*, ¶¶146-155. If was foreseeable that Defendants conduct would create a risk of harm to Plaintiff. The facts and deposition testimony present issues of fact for the jury.

### (e)     Count 9 (Conspiracy and Concert of Actions)

The Defendants fail to understand the concept of a conspiracy claim. The arguments set forth under the RICO section hold true for this claim. The facts and deposition testimony present issues of fact for the jury.

## CONCLUSION and RELIEF REQUESTED

For all the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' motions in their entirety and award such costs and attorney fees to which Plaintiff may be entitled.

DePERNO LAW OFFICE, PLLC

Dated: July 23, 2021                    */s/ Matthew S. DePerno*
                                        Matthew S. DePerno (P52622)
                                        Attorney for Plaintiff
                                        951 W. Milham Avenue
                                        PO Box 1595
                                        Portage, MI 49081
                                        (269) 321-5064

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021, I electronically filed the foregoing brief with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document to all attorneys of record.

Dated: July 23, 2021                    /s/ Matthew S. DePerno
                                        Matthew S. DePerno (P52622)


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in LCivR 7.3(b) because the brief contains 10,769 words, excluding certain parts of the brief exempted by LCivR 7.2(b)(i). The brief was prepared in proportionally spaced typeface using Microsoft Word 2019 in 12-point Times New Roman.

Dated: July 23, 2021                    /s/ Matthew S. DePerno
                                        Matthew S. DePerno (P52622)

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 353-2726 (Fax)