# Exhibit 3

**Todd Courser deposition, Jan 28, 2020**

**Todd Courser**
**01/28/2020**

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4  TODD COURSER,

 5              Plaintiff,          Case No. 1:18-cv-01232

 6  vs.                            Hon. Gordon J. Quist

 7  RADISSON HOTELS INTERNATIONAL, INC., a  Mag. Phillp J. Green

 8  Delaware corporation, RADISSON GROUP,

 9  INC., a Minnesota corporation, CARLSON

10  REZIDOR HOTEL GROUP, an international

11  partnership, BLOCK 100 LIMITED

12  PARTNERSHIP, a Michigan limited

13  partnership, and WINEGARDNER &

14  HAMMONS, INC., an Ohio corporation,

15  and WINEGARDNER & HAMMONS HOTEL GROUP,

16  LLC, a Delaware limited liability

17  company,,

18              Defendants.

19  _____/

20

21              DEPOSITION OF TODD COURSER

22  taken by the Defendants on Tuesday, January 28, 2020, at the

23  office of DePerno Law Office, 951 W. Milham Avenue, Portage,

24  Michigan, at 10:09 a.m.

25
```



**Todd Courser**
01/28/2020                                    **Page 2**

```
 1   APPEARANCES:

 2   For the Plaintiff:
                            MR. MATTHEW S. DePERNO (P52622)
 3                          DePerno Law Office, PLLC
                            951 W. Milham Avenue
 4                          Portage, Michigan 49081
                            (269) 321-5064
 5                          matthew@depernolaw.com

 6   For the Defendants:
                            MR. ANTHONY J. KOSTELLO (P57199)
 7                          Vandeveer Garzia, PC
                            840 W. Long Lake Road
 8                          Suite 600
                            Troy, Michigan 48098
 9                          (248) 312-2800
                            akostello@vgpclaw.com
10

11   ALSO PRESENT
     (Block 100):           MR. JONATHAN M. BYE
12                          Ballard Spahr, LLP
                            2000 IDS Center
13                          80 South 8th Street
                            Minneapolis, Minnesota 55402-2119
14                          byej@ballardspahr.com

15   REPORTED BY:           Ms. Diane Murray, CSR-4019, RPR

16

17

18

19

20

21

22

23

24

25
```



**Todd Courser**
**01/28/2020**                                   **Page 3**

 1                    TABLE OF CONTENTS

 2     EXAMINATIONS                                      PAGE

 3      Examination by Mr. Kostello                         4
        Examination by Mr. DePerno                        221
 4

 5

 6

 7

 8

 9

                            EXHIBITS

                       (Attached hereto.)

        EXHIBIT              DESCRIPTION              PAGE
10
       Number  1          Text messages                97
11     Number  2          Email                       110
       Number  3          Text messages               118
12     Number  4          Text messages               126
       Number  5          Detroit News article        140
13     Number  6          Complaint                   190
       Number  7          Transcript of Britvec and   223
14                        Swartzle
       Number  8          Key Control Training Overview  231
15     Number  9          MOD Training Manual         232
       Number 10          Supplemental Incident Report  235
16     Number 11          Texts                       236
       Number 12          Texts                       238
17     Number 13          Texts                       246

18

19

20

21

22

23

24

25


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                              Page 4

1          Portage, Michigan

2          Tuesday, January 28, 2020 - 10:09 a.m.

3                    TODD COURSER,

4              having been called and duly sworn:

5          MR. KOSTELLO:  Would you please state your full

6      name for the record?

7          **THE WITNESS:  Todd Anthony Courser.**

8          MR. KOSTELLO:  Let the record reflect this is

9      the deposition of Mr. Todd Anthony Courser.  It's taken

10     pursuant to notice, to be used for any and all purposes

11     under the Federal Rules of Civil Procedure.

12                                    EXAMINATION

13  BY MR. KOSTELLO:

14  Q.  Mr. Courser, my name's Tony Kostello.  I represent the

15     Defendants in this matter.  I understand you're an

16     attorney so you understand the deposition process,

17     generally.

18          Have you ever given a deposition before?

19  **A.  I have.**

20  Q.  Okay.  So you know generally what the rules here are.  I

21     will tell you obviously the court reporter's taking down

22     everything that's being said.  You're gonna know the

23     answers to a lot of my questions before I spit them out of

24     my mouth.  Just so we have a clear record, let me finish

25     my question before you give an answer; okay?



1  A.    Yep.

2  Q.    If there's ever a time where you don't understand a

3        question or just think I'm, you know, being vague or

4        whatever, please make me re-ask or rephrase the question.

5        If you give an answer to a question, I'm gonna assume that

6        you understood it; okay?

7  A.    **(Nodding head affirmatively.)**

8              COURT REPORTER:  Answer out loud, please.

9  BY MR. KOSTELLO:

10 Q.    Obviously, your answers have to be verbal.  Head nods --

11 A.    **You want me to respond?**

12 Q.    Yes.

13 A.    **Okay.**

14 Q.    Head nods, head shakes, you know, obviously she can't take

15        down.

16 A.    **I just saw you cough in there and so I --**

17 Q.    Yeah.  And then I will tell you this.  This is not an

18        endurance test, so if there's ever a time you need to take

19        a break at all, let me know.  We can do that.  I would

20        just ask that you answer any question pending at that

21        time; okay?

22 A.    **Yeah.  Well, I have -- I've had some coffee so I'll**

23        **probably have to use the restroom a few times.**

24 Q.    Okay.  What's your date of birth?

25 A.    **August 2nd of 1972.**



Todd Courser
01/28/2020                                          Page 6

1   Q.   And your current address?

2   A.   **It is 3110 Murphy Lake Road, Silverwood, Michigan, 48760.**

3   Q.   How long have you lived there?

4   A.   **Since '98, 1998.**

5   Q.   Okay.  Any plans on moving anytime in the near future?

6   A.   **Not that I'm aware of.**

7   Q.   And who do you reside there with?

8   A.   **My wife and my four children.  Three are at home; one is**

9        **away at college.**

10  Q.   Your wife's name is?

11  A.   **N-a-m-f-o-n.**

12  Q.   N-a-m-f-o-n?

13  A.   **Yes.**

14  Q.   How long have you two been married?

15  A.   **Since 1997.**

16  Q.   Any divorce filings in those years?

17  A.   **No.**

18  Q.   Any separations?

19  A.   **Nope.**

20  Q.   Where were you two married?

21  A.   **North Branch, Michigan.**

22  Q.   Your oldest child is named?

23  A.   **Chloe Anne Courser.  Chloe Anne, two words.**

24  Q.   What's her date of birth?

25  A.   **November 17th of 1999.**



1  Q.   And she's the one currently at school?

**2  A.   Yes, she is.**

3  Q.   Where does she go to school?

**4  A.   New York City.**

5  Q.   Is she in college there?

**6  A.   She is.**

7  Q.   What college?

**8  A.   Kings College.**

9  Q.   What year is she?

**10  A.   I don't know what you would say year because she's a**

**11      transfer student.**

12  Q.   Where did she transfer from?

**13  A.   Spring Arbor University.  She did her first classes, I**

**14      think, at Mott Community College and then went to Spring**

**15      Arbor for a year and now she's completing a year at Spring**

**16      Arbor University --**

17  Q.   Then after --

**18  A.   --no -- now she's completing a year at -- I'm sorry --**

**19      Kings College.**

20  Q.   Kings College.  After Chloe comes?

**21  A.   Elijah.  E-l-i-j-a-h.**

22  Q.   Date of birth?

**23  A.   Daniel Courser.  So it would be Elijah Daniel Courser.  I**

**24      don't know the year, so it's April 12th is his birthday.**

**25      I would have to do some math on that.**



Todd Courser
01/28/2020                                          Page 8

1  Q.  Is he in high school now?

2  **A.  He's seventeen.**

3  Q.  Okay.  So '02?

4  **A.  I think so.**

5  Q.  Is he a junior in high school?

6  **A.  Yes.  He's finishing his junior year.**

7  Q.  Okay.  Where does he go to school?

8  **A.  He's home schooled.**

9  Q.  And after Elijah comes?

10 **A.  Adoniram, A-d-o-n-i-r-a-m.**

11 Q.  Date of birth?

12 **A.  Is -- I'm, I'm at a loss.  I'm sorry.**

13 Q.  How old is --

14 **A.  I'd have to think about that.**

15 Q.  Boy or girl?

16 **A.  No.  He's a son.  Yes.**

17 Q.  And how old is he?

18 **A.  He's sixteen.**

19 Q.  Is he also home schooled?

20 **A.  He is.**

21 Q.  Would be a sophomore?

22 **A.  Yes.**

23 Q.  And then your fourth child?

24 **A.  Israel Jacob Courser.**

25 Q.  Date of birth?



```
 1  A.   It's December 2nd.  I don't know what year.

 2  Q.   How old?

 3  A.   He's fourteen.

 4  Q.   Just turned fourteen?

 5  A.   Yes.

 6  Q.   Okay.  So '05?

 7  A.   I think so.

 8  Q.   Eighth grade?

 9  A.   He's a little ahead.  So --

10  Q.   Ninth grade?

11  A.   Probably.

12  Q.   Home schooled?

13  A.   Yes.  He's already taken his SAT once, so he's a little

14       bit ahead.

15  Q.   Let's go through your educational background a little bit.

16                  High school graduate?

17  A.   I was.

18  Q.   1990?

19  A.   '90.

20  Q.   Where'd you graduate from high school?

21  A.   Lapeer East High School.

22  Q.   Attend college after that?

23  A.   I went to Mott Community College, then I went to

24       University of Michigan Flint, then I went to Thomas M.

25       Cooley Law School.
```



**Todd Courser**
01/28/2020                                          Page 10

```
 1  Q.  Did you obtain an associate' degree from Mott?

 2  A.  I don't think I ever did.  I think I got as many credits

 3      as they'd allow to transfer.  They had some program with U

 4      of M and --

 5  Q.  Did you receive a degree from U of M Flint?

 6  A.  I did.

 7  Q.  What was that degree in?

 8  A.  Bachelor's in business administration.

 9  Q.  '94?

10  A.  I don't think so.  I think it was '95.

11  Q.  Did you go straight to law school after that?

12  A.  Did not.

13  Q.  What did you do after graduating from U of M Flint?

14  A.  I ended up, I ended up -- I worked at several different

15      places and then I started my accounting and tax practice.

16  Q.  Okay.

17  A.  And then I started law school in the fall of '99.  Chloe

18      was born that first semester.

19  Q.  And when did you complete your degree at Cooley?

20  A.  I think it was four years.  I think it was four years.  I

21      think we were -- maybe that's how that worked --

22  Q.  Okay.

23  A.  -- because I took a semester off each year to do tax

24      season.

25  Q.  All right.  So received your J.D. in 2003, spring of 2003?
```



Todd Courser
01/28/2020                                    Page 11

1   A.   Probably, yeah, I would think so.

2   Q.   And you took the Michigan Bar?

3   A.   I did.

4   Q.   And when did you take that?

5   A.   I don't know.

6   Q.   Okay.  Did you pass the first time?

7   A.   No, I did not.

8   Q.   How many times did you take it?

9   A.   The second time I passed it.  I took it immediately out of

10       school and then I didn't study for it and then I failed

11       by -- I don't know -- it was -- and then the next time

12       around, I actually did the prep.

13  Q.   And when were you admitted to the Michigan Bar?

14  A.   I'm not sure.

15  Q.   What's your Bar number?

16  A.   P69829.

17  Q.   I want to go back to where you worked after graduating

18       from U of M Flint.

19            What was your first job after U of M Flint?

20  A.   Well, I was still -- I worked at Meijer through college,

21       so I think I still worked there a little while after U of

22       M Flint.

23  Q.   What were you doing there?

24  A.   I worked in the Meat Department.

25  Q.   Okay.  And then after that, what was your next employment?



Todd Courser
01/28/2020                                    Page 12

1  A.  I started out in getting my securities licensing, so I did

2      a short stint with a couple of different brokerage

3      firms -- Edward Jones, a company called, I think it was

4      called Dean Witter at the time -- and then I moved over to

5      a mortgage company that's no longer in business, like it

6      was in Lapeer.

7  Q.  What was that called?

8  A.  I think it was called CM Mortgage or CAM or CMA Mortgage,

9      something like that.  They just did -- they were a

10      mortgage broker originator.

11  Q.  How long were you there?

12  A.  Not long.  Probably -- I was, I was using those first jobs

13      to acquire licensing is the deal.  And then I went to work

14      for a tax practice that was out of Flint, a tax and

15      accounting practice.

16  Q.  What was the name of that?

17  A.  It's no longer there and I don't know.  The guy's first

18      name was Clarence.

19  Q.  How long were you there?

20  A.  Just that first season.  Yeah.  That first season, I think

21      that was in '97 or '98.  It was -- maybe it was '96,

22      somewhere right in there.

23  Q.  Okay.  And what did you do after that?

24  A.  Then I started my tax and accounting practice.

25  Q.  What was the name of that?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                              Page 13

```
 1  A.   Started out, it was really just a d/b/a.  I think it
 2       was -- I think I did like TA Courser, or Todd, and then it
 3       became Todd Courser & Company, I think, is how we did it,
 4       LLC.
 5  Q.   Where was that located?
 6  A.   The first location was -- I think it was 235 West Genesee
 7       Street.
 8  Q.   What city?
 9  A.   Lapeer.  A little house there.
10  Q.   Where was Todd Courser & Company, LLC operating out of?
11  A.   Out of that little house.
12  Q.   The same one?
13  A.   Yeah.  It was just the same.  It was just me.
14  Q.   How long did you operate Todd Courser & Company, LLC?
15  A.   I still am.
16  Q.   Okay.
17  A.   Yeah.  I don't do as much tax anymore, but --
18  Q.   And where does it currently live?
19  A.   It's at my -- the office where I'm at now.
20  Q.   Which is?
21  A.   455 South Main Street, which is a little house again.
22  Q.   In Lapeer?
23  A.   Yeah.  Yeah.
24  Q.   How long have you been at that address?
25  A.   I wanna say I moved in there in 2003 or '04.
```



Todd Courser
01/28/2020                                      Page 14

1  Q.  Is that a house you own or do you --

**2  A.  No.**

3  Q.  You just rent space there?

**4  A.  I rent space there.  Yeah.**

5  Q.  Are you the only occupant of that space?

**6  A.  I am.  Yeah.**

7  Q.  You've been there continuously since '03 or '04?

**8  A.  '03 or '04.  Yeah.  Yeah.**

9  Q.  And who's your landlord?

**10  A.  Well, it's a partnership between myself and my**

**11      brother-in-law but it's in a different LLC.**

12  Q.  Okay.  So the different LLC owns it?

**13  A.  Yeah.**

14  Q.  What's the name of the LLC that owns that building?

**15  A.  455 South Main Street, LLC.**

16  Q.  What's the name of your brother-in-law?

**17  A.  Raymond Megie.**

18  Q.  Where does Raymond live?

**19  A.  He lives in Metamora.**

20  Q.  What does he do for a living?

**21  A.  He's a realtor.**

22  Q.  Do you know when you incorporated Todd Courser & Company,

23      LLC?

**24  A.  It was, it was around that same time of '90 -- what did I**

**25      say that we started that -- '96?  So if we started in '96,**



Todd Courser
01/28/2020                                    Page 15

1        it was probably in '98 that I, that I created that name.

2        I'd have to check the State website to --

3    Q.  Does Todd Courser & Company, LLC have any employees?

4    A.  No.  I do have one employee that will work occasionally

5        because it's just tax stuff.  So --

6    Q.  Yeah.  Seasonal kind of stuff?  Tax season work?

7    A.  Yeah.  Yeah.  Yep.

8    Q.  What is his or her name?

9    A.  Her name is Karen Couture.

10   Q.  Can you spell that?

11   A.  C-o-u-t-u-r-e.  I think that's how you spell it.  She only

12       works remotely now though.  She moved.  So --

13   Q.  Where does she live?

14   A.  Downriver.  So she -- I don't know the town.  South of

15       Detroit.  She got, she got remarried and moved down there.

16   Q.  What was the first legal employment you had after passing

17       the Bar and being admitted to practice here in the state

18       of Michigan?

19   A.  I didn't.  I didn't.

20   Q.  No?

21   A.  No.  I already had a practice that was -- at that time it

22       was, it was, it was thriving pretty well as far as tax and

23       accounting, so I didn't.  I didn't have time for that.  I

24       started -- I had so many clients already at that point, I

25       couldn't.  As a matter of fact, I started employing people



Todd Courser
01/28/2020                                                   Page 16

```
 1          at that point.  So --

 2   Q.     Okay.  And at any point did you start a legal practice?

 3   A.     Yeah.

 4   Q.     Okay.  When was that?

 5   A.     I think as soon as I passed the Bar, then I started

 6          practicing.

 7   Q.     Okay.  Yeah.  That's what I was asking you.

 8                 Like when was the first time after you passed

 9          the Bar, you had a -- you were employed in the legal

10          profession?

11   A.     Yeah.  So you're just saying -- so then it was started at

12          that point, so it would've been '03 or '04, somewhere in

13          there --

14   Q.     Okay.  So did you start your own --

15   A.     -- from my memory.  Yeah.

16   Q.     So did you start your own professional corporation?

17   A.     Yeah.

18   Q.     And what was the name of that?

19   A.     Todd A. Courser, PLLC, or Todd A. Courser & Associates,

20          PLLC.

21   Q.     And it's been in existence since 2003, 2004?

22   A.     I think so.  Yeah.  Right in there.

23   Q.     Does Todd A. Courser & Associates, PLLC have any employees

24          currently?

25   A.     No.  Karen either -- I can't remember if she's designated
```



```
 1        under the, the law practice or under the, the accounting

 2        side.  I can't remember.  But she's the only employee

 3        left.  She works just a few hours.

 4   Q.   So I take it she would do work for both the accounting

 5        practice and the law practice?

 6   A.   Depending on what's happening, exactly.  Right.

 7   Q.   Right.

 8   A.   She doesn't do -- because she really wants to be done.

 9        She only really does special assignments --

10   Q.   Okay.

11   A.   -- gets a project organized.

12   Q.   Has your law practice had any employees, other than Karen,

13        over the years?

14   A.   Yes.  Oh, yeah.  One time we had eight.  So --

15   Q.   When was that?

16   A.   I wanna say probably '07 through '10, '10 or '12,

17        somewhere in there.  I mean it went up.  Then it started

18        to (indicating).  So --

19   Q.   Of those eight employees or so during that time frame, how

20        many of them were attorneys?

21   A.   There were -- there usually was one other or two others,

22        and they would come out of law school or they had some

23        other issue and so they kinda housed themselves there for

24        a time.

25   Q.   Okay.
```



Todd Courser
01/28/2020                                    Page 18

1   A.   So you had employees but some of them worked accounting

2        and tax and the others worked the legal files that came

3        in.

4   Q.   Gotcha.  And --

5   A.   It was a small town.

6   Q.   What's the nature of your law practice?

7             Is it a little bit of everything or do you

8        specialize in anything in particular?

9   A.   Mostly it was estate planning, some probate, and the vast

10       majority was probably tax, tax and tax resolution.

11  Q.   Did you ever go and get your LLM or anything along those

12       lines?

13  A.   Uh-uh.

14  Q.   That's a no?

15  A.   No.  Excuse me.  There was coffee there.

16  Q.   I don't mean to be rude.  I just need to make sure the

17       record is clear.

18  A.   Yeah.

19  Q.   You mentioned that you had eight employees or so at one

20       time.  Then you said maybe from 2007 and 2010.

21            What happened at that point that that reduced

22       the number of employees?

23  A.   I don't know.  I think it was just there was -- you know,

24       you get better at it as time goes on and so you had less

25       employees and it just seemed like things kinda -- there



1      was, there was some change.

2           So I had employees, for the most part, from that

3      point forward, but, you know, I was obviously looking to,

4      you know, as an owner, you try to reduce that and reduce

5      the inefficiencies that you can along the way.

6   Q.  Sure.  From up until the point you were elected to the

7      Michigan House of Representatives, were your two

8      businesses -- the tax business and the law business --

9      your only two sources of income?

10  A.  Yes.

11  Q.  Are you currently employed?

12  A.  I'm doing the same thing.

13  Q.  Okay.  So tax business and the law practice?

14  A.  Yep.

15  Q.  Okay.  And forgive me if I did not -- does either

16      currently have, either currently have any other employees,

17      other than Karen?

18  A.  No.  No.

19  Q.  So it's just you, essentially, running both?

20  A.  Yeah.  And Karen might not even.  Some weeks she works not

21      at all.  So it will be weeks where there's no work and

22      then she'll work and I'll just electronically send her

23      some stuff and she'll work on it for me.

24  Q.  Okay.  And from an income standpoint, what's the

25      percentage that each business contributes to your income?



1  A.   It's probably a quarter or a third is tax and accounting,

2       and I would say the other, you know, obviously two-thirds

3       or three-quarters being the legal side.  There's not much

4       income left.

5  Q.   There's not much income left?

6  A.   No.

7  Q.   In 2019, what was your, what was your total income for

8       both businesses?

9  A.   I think the -- I don't know for -- I had a server, my

10      server.  I'm on my second guy trying to recover it.  Both

11      the hard drive and the backup are, I guess, cooked, which

12      held everything, and that was right before Christmas, so

13      we're trying to recover that.

14           So I don't have any, I don't have any -- it's

15      crazy -- even my client stuff.  I, I would guess it's 20

16      to 25,000 dollars.

17 Q.   Between the two businesses?

18 A.   Yeah, I would say.

19 Q.   What about in 2018?

20 A.   About the same.  Yeah.  My guess is it's about the same.

21      Everything's digital.  So --

22 Q.   2017?

23 A.   Probably a little more.  And I don't -- I'd have to see

24      some documents to be able to remember anything further

25      than that.



Todd Courser
01/28/2020                                    Page 21

```
 1  Q.   2016?

 2  A.   I can't.  I can't mentally.  I don't, I don't know.

 3  Q.   Do you currently --

 4  A.   I mean this is currently going on five years.  So --

 5  Q.   Yeah.  Do you currently have any other employment other

 6       than your tax practice and your law practice?

 7  A.   No.

 8  Q.   Have you had any other employment since September of 2015?

 9  A.   What do you mean any other employment?

10  Q.   Other than the tax practice and the law practice.

11  A.   No.

12  Q.   Is your wife currently employed?

13  A.   She is.

14  Q.   Where does she work?

15  A.   She works at a dental office.

16  Q.   What's the name of that?

17  A.   I don't know the actual name of it.  It's for Dr. Hale and

18       he's out of Davison.

19  Q.   What does she do there?

20  A.   Administration.  She has an accounting degree herself.

21  Q.   How long has she worked there?

22  A.   Not long.  Probably six months.

23  Q.   Where was she employed before that?

24  A.   She worked at Kohl's before that.

25  Q.   Which Kohl's?
```



Todd Courser
01/28/2020                                           Page 22

```
 1  A.   The one in Lapeer.

 2  Q.   What was she doing there?

 3  A.   I don't really know.  I think she did customer service.

 4  Q.   How long did she work there?

 5  A.   Probably six months as well.

 6  Q.   Do you own your home?

 7  A.   It's, it's in her name, so, so no.

 8  Q.   Has it always been in your wife's name?

 9  A.   No, it has not.

10  Q.   When did that happen?

11  A.   In the spring of last year.

12  Q.   Why was that change made?

13  A.   We, we are dealing with whether or not we're gonna remain

14       married, so ongoing discussions.

15  Q.   Who home schools your children?

16  A.   Well, for the most part, it's a shared effort, so I do,

17       she does, and I have three teachers in my family as well.

18  Q.   Gotcha.  So --

19  A.   So both my sisters are teachers and my mother.

20  Q.   When was --

21  A.   When they get to be teenagers, they can pretty much --

22  Q.   Yeah.  I assume there's a lot of online stuff that they do

23       and whatnot; right?

24  A.   It is very self-directed.

25  Q.   Yeah.
```



Todd Courser
01/28/2020                                    Page 23

 1  A.   So --

 2  Q.   Okay.  When was the first time you ran for public office?

 3  A.   I think it was 2008.

 4  Q.   What did you run for at that point?

 5  A.   State Representative.

 6  Q.   For Lapeer?

 7  A.   Yeah.  82nd District.  It could've been '06, but I think

 8       it was '08.

 9  Q.   How far did you get in that?

10  A.   It was a seven-way race.

11  Q.   You're talking primary?

12  A.   It was a primary.  Yeah.

13  Q.   Republican primary?

14  A.   It was, yeah.

15  Q.   So seven people in the Republican primary?

16  A.   Yeah.  I got in at the end.  I didn't know what I was

17       doing.

18  Q.   So you didn't make it out of the primary?

19  A.   No.  I definitely did not.

20  Q.   Any idea like where you finished out of the seven?

21  A.   I don't.  Probably middle.  That would be my guess.

22  Q.   Okay.  Did you have a person that was running that

23       campaign for you?

24  A.   No.

25  Q.   Just doing it yourself?



Todd Courser
01/28/2020                                    Page 24

1  A.   Yeah.  I mean you had helpers, but nothing -- yeah.

2  Q.   Okay.  Who ended up winning that seat?

3  A.   I think that was Kevin Daley.

4  Q.   Was he the Republican candidate or the Democrat candidate?

5  A.   He was the Republican.  It's a Republican district.

6  Q.   Kevin Daley?

7  A.   D-a-l-e-y.

8  Q.   And the terms for the House of Representatives?

9  A.   The terms?

10  Q.   The terms are how long?

11  A.   Oh, you mean the --

12  Q.   Yeah.

13  A.   -- time in office?

14  Q.   Yeah.

15  A.   It's, it's a two-year term.  Yep.

16  Q.   Two-year.  Okay.

17            When was the next time you ran for public

18        office?

19  A.   The next time I ran for public office was the following

20        cycle, I ran for -- and this is -- there's a lot of them,

21        so -- and it was for State Senator, for the same district.

22  Q.   So the following cycle would have been 2010?

23  A.   Yes.

24  Q.   You ran for State Senate?

25  A.   Yeah, which is Lapeer County and St. Clair County.  I



Todd Courser
01/28/2020                                    Page 25

```
 1      don't think it has Sanilac.  I think it's just those two

 2      counties.

 3   Q.  Okay.  And was the incumbent at that time a Republican?

 4   A.  Yes.

 5   Q.  Okay.

 6   A.  His name was, I think it was Gilbert I think is the guy's

 7      last name.  He was from Port Huron.  His last name I think

 8      was Gilbert.

 9   Q.  Okay.  And so you ran in the primary?

10   A.  Yes.  It was an open seat because he was done.

11   Q.  Oh, okay.  He was term limited or --

12   A.  Yes.  Right.

13   Q.  Gotcha.

14   A.  That's correct.

15   Q.  So how many people were running in that primary?

16   A.  There were three people running in that primary -- a man

17      named Lauren Hager, who was a former rep, and a guy named

18      Phil Pavlov, Pavlov, and then --

19   Q.  Dog breeder?

20   A.  I don't think he's a dog breeder.  It would've been cute

21      though.

22   Q.  Bad joke.

23   A.  It is a bad joke but I got it.  And then myself.  So there

24      were two guys in St. Clair and then myself.

25   Q.  Okay.  Did you make it out of that primary?
```



 1  A.   No.  No.

 2  Q.   Did you have a campaign manager for that one?

 3  A.   There was no campaign manager.  I always had some help.

 4       There was -- I, I think Josh Cline helped a little bit in

 5       that one, if I remember correctly.

 6  Q.   When was the next time you ran for public office?

 7  A.   I was out for a couple years.  I didn't do any political

 8       stuff.  And then I remember I got a call from a gentleman,

 9       I think it was in the summer of, and I can't even

10       remember, but he asked me to run for -- and that might

11       have been '12, might have been '12 -- in the convention,

12       which would have been a party nomination, for State Board

13       of Education, which was in August, but I can't remember

14       the year.  But it was very quick.  It was a couple of

15       weeks and then the election happened.

16  Q.   Did you get the Party's nomination for that?

17  A.   I did.

18  Q.   You did?

19  A.   Yeah, I did.  Yeah.  Kinda took the convention by storm

20       that year, so it shocked everyone.

21  Q.   So that convention was in August of '12?

22  A.   It was in August.  I don't know if it was '12 but I think

23       so.

24  Q.   Okay.

25  A.   Yeah.



Todd Courser
01/28/2020                                                    Page 27

1  Q.   So then that sent you into the general in November?

2  A.   It did.  And then Romney, Romney was the top of the

3       ticket, so he ended up losing, and of course if the top of

4       the ticket loses then, because at that time we were a

5       straight-ticket state --

6  Q.   Yeah.

7  A.   -- then I lost the, the bottom because we were down at the

8       bottom.

9  Q.   Gotcha.  And what was the next time you ran for office?

10 A.   So kind of interestingly, that got done and then I ended

11      up -- long story short -- immediately ended up running for

12      State party chair, chairman of the Michigan Republican

13      Party, brought a challenge to the existing chair.

14 Q.   Who was the existing chair at that time?

15 A.   His name was Bobby Schostak.  I don't think that's his

16      actual first name, but Bobby Schostak of Schostak

17      Brothers.

18 Q.   The realty family?

19 A.   Yeah.  Yeah.  It was found out that he had donated to

20      Hillary Clinton and John Kerry and a whole bunch of other

21      Democrats and so that was obviously offensive to the

22      people when he was supposedly putting forward Mitt Romney,

23      and so I lost that one by I think it was 42 votes.

24 Q.   Who'd you lose to?

25 A.   It was to him.



Todd Courser
01/28/2020                                          Page 28

1  Q.  To him?

2  A.  Yeah.

3  Q.  So you think that was right after?  That was maybe in 2012

4      or --

5  A.  It was immediately after.

6  Q.  Immediately after that?

7  A.  Yeah.  It was crazy.

8  Q.  After the --

9  A.  I wouldn't suggest that.  Yeah.

10 Q.  All right.  And then your next effort was what?

11 A.  There was all kinds of talk about me running at that point

12     for Lieutenant Governor, Attorney General, Supreme Court.

13     I mean there was all kinds of talk of that stuff because

14     obviously it could go through the convention and all of

15     those were convention seats.

16              I didn't run again until I ran in '14 for State

17     Representative.  I filed to run on the last day to file,

18     which was I think in June before the election in August.

19 Q.  For the primary in August?

20 A.  Yeah.  Yeah.

21 Q.  So you ran for that same seat out of Lapeer?

22 A.  Yep.

23 Q.  82nd District?

24 A.  It was, yeah.

25 Q.  And who was the incumbent at that time?



Todd Courser
01/28/2020                                        Page 29

 1  A.   It was an open seat.  It was at that point Daley was done.

 2       So --

 3  Q.   And how many were in that primary?

 4  A.   I honestly don't remember.

 5  Q.   Okay.

 6  A.   There was a lady in that.  Her name was Jan Peabody.  She

 7       was kind of the establishment frontrunner.  And I think

 8       there was some other people in it but I honestly can't

 9       remember.

10  Q.   Okay.  You made it out of the primary in August?

11  A.   I did.

12  Q.   '14?

13  A.   Yeah.

14  Q.   And then who did you go against in the general?

15  A.   I don't remember.  It was a lady from Imlay City.  I can

16       see her but I can't remember her name.  She was the

17       Democrat.

18  Q.   Did you end up winning in the general?

19  A.   Yes.

20  Q.   And when were you sworn in as State Representative?

21  A.   Well, swearing in happens in, I think it was the 23rd or

22       24th of January of that year.  You're sworn in a couple of

23       times.  You're sworn in by a judge locally and then you're

24       sworn in in the legislation in a ceremony.

25  Q.   Okay.  At the time you won that seat, you were still



**Todd Courser**
**01/28/2020**                                      **Page 30**

1    operating both your tax and law practices; right?

2 A.  Yes.  That's correct.

3 Q.  And I take it you were planning on doing that as you were

4    also a State Representative?

5 A.  Yeah.  We're, we're technically a, a part-time

6    legislature.  So the legislature only meets somewhere

7    between sixty and eighty days a year.  They talk like

8    they're in legislation a lot, but technically I think it's

9    sixty to eighty days a year.  The rest of the time you're

10   actually supposed to be in district.

11 Q.  And what's the salary for being a State Representative?

12 A.  I think it was 76,000.  I think that's what it was.  And

13   then you do get a stipend amount of I think 10,000 for

14   expenses.

15 Q.  How long have you known Cindy Gamrat?

16 A.  Since -- well, I knew of her, but I didn't know, I didn't

17   know her until I ran for State party chair.

18 Q.  What was she -- what was her position at that time?

19 A.  When you run for State party chair, there's a requirement

20   that the cochair be of the opposite sex.  So, so I had to

21   have somebody run with me, to bring the challenge against

22   Bob Schostak, who was a lady, so she was willing to do

23   that.

24 Q.  Okay.  And how did you know her, though, before that point

25   or were you just kind of put together by the Party?



 1  A.   Oh, no.  The Party didn't want the challenge.

 2  Q.   Well, yeah.

 3  A.   Did a lot to try and stop it.

 4  Q.   Okay.  So then how did you two get together to do that?

 5  A.   Well, I knew of her, so you start looking at who are the

 6       possible people that would do it, but I never had a

 7       conversation with her, and then it just kinda came down to

 8       I asked her to be the -- if she was willing to do it and

 9       she was willing.

10            There were several others that were not willing

11       to.  When you're going against the Party in that way,

12       you're kinda going against the establishment.  It kinda

13       cuts off your possibilities going forward.

14  Q.   And how did you know of her, though, at that point?

15  A.   She's a, she's a -- in the grassroots community for the

16       Tea Party, sorta the conservative liberty people.  She's a

17       huge coordinator.

18            She had coordinated, also the cycle before that,

19       she had coordinated for Gary Cline and ran a volunteer

20       organization in every county in the state, to gather the

21       signatures so that he could run for office, and then he,

22       then he backed out at the last moment.

23  Q.   Okay.

24  A.   So I knew of her just from reputation.

25  Q.   Gotcha.  So you two were running as -- you were running



```
 1        for the Republican Party chair position and she was

 2        running for cochair, and this was late 2012, early

 3        2013-ish?

 4   A.   I mean I could try to look it up on my phone to get the

 5        right year, but --

 6   Q.   No.  You said it was right after the 2012 State Board

 7        election?

 8   A.   Yeah.

 9   Q.   So roughly we're talking --

10   A.   Right in that area.

11   Q.   -- right in that area?

12   A.   Yeah.

13   Q.   Okay.

14   A.   It seems like it was '12.

15   Q.   Okay.

16   A.   It seems like it was '12.  But the problem is you ran in

17        '12 but then it's actually in January.

18   Q.   Sure.

19   A.   So you're running but then it seemed like it was the end

20        of January, somewhere in February, that the actual

21        election happened.

22   Q.   Gotcha.  She also ended up running for State

23        Representative in '14; correct?

24   A.   She did.

25   Q.   Had she held public office before then?
```



Todd Courser
01/28/2020                                          Page 33

 1  A.   She had not.

 2  Q.   So that was her first go-round, also?

 3  A.   Yes.

 4  Q.   Okay.  So you knew, you knew her personally starting in

 5       late '12, early 2013?

 6  A.   Yeah.  Well, I wouldn't say personally, but we ran on the

 7       same ticket.  I really didn't know her personally at that

 8       point.

 9  Q.   Okay.  Did you stay in touch after that loss for State

10       party chair?

11  A.   Yeah.  I mean obviously, at that point, there was a lot

12       going on.  I can't remember if that was the year -- it was

13       either right before that -- I think it was right before

14       that there was the Right to Work movement, so it was

15       pretty big in the -- which was a huge deal in the state

16       and people don't quite comprehend that.

17              So I had forgotten that part.  Before the State

18       Board of Education race and during that time, during that

19       fall was the, the Right to Work movement.  So there were

20       always issue -- you know, she was an issues activist and I

21       was an issues activist, so we knew of each other that way.

22  Q.   Okay.  Gotcha.

23  A.   So I was all over the state at that point after I ran for

24       chair, speaking everywhere, and so was she.

25  Q.   Okay.  When you were both elected to the House of



```
 1        Representatives for your term beginning in January of

 2        2015, there was apparently a decision made to have a

 3        combined office in Lansing; is that correct?

 4   A.   It wasn't a combined office; it was shared staff.

 5   Q.   Okay.  Shared staff?

 6   A.   Yeah.

 7   Q.   When was that decision made?

 8   A.   It was decided in November.  I think the -- it was first

 9        proposed by the staff, actually.  It was proposed by, I

10        think it was Keith Allard and Joshua Cline that proposed

11        that.

12   Q.   And what was the reason, rationale, for proposing that?

13   A.   They would be able to make more money and be paid more,

14        staff members aren't paid much, and we'd also be able to

15        save the taxpayers one person.  So instead of four people

16        -- so you have two staff members for each office --

17        instead we'd have three that would operate handling the

18        issues between two offices.

19   Q.   But each of those three would receive salaries from both

20        or would they receive --

21   A.   No.  They received increased salary because you had one

22        less person.

23   Q.   So essentially between the three of them, whatever that

24        fourth salary was, they were splitting that fourth salary

25        between the three of them?
```



 1  A.   Not really.  We actually cut it back.  They got an

 2       increase of maybe -- they did get an increase, which

 3       brought them to kinda top of scale for people working in

 4       the State House, and so that allowed us to save -- I don't

 5       know, but it was quite a bit as far as office expenses.

 6       One person, essentially.

 7  Q.   Okay.  All right.  So obviously no big secret -- you and

 8       Ms. Gamrat were having an affair; correct?

 9  A.   **We did, yes.**

10  Q.   Okay.  When did that start?

11  A.   **It started as we, as we went into office.  I can't**

12       **remember the date of that.**

13  Q.   So you're saying in 2015, early 2015?

14  A.   **Late '14, I think it was.**

15  Q.   Okay.  Not before that?

16  A.   **Yeah.  No.  We spent a lot of time together, but --**

17  Q.   Well, when you say spent, when did you guys start spending

18       lot of time together?

19  A.   **Well, we saw each other going through -- well, I take that**

20       **back because during my election and her election, we**

21       **didn't see each other but we talked by phone a lot.**

22               **So during '14, that was -- she was running for**

23       **office from '13 on she ran for office, so we spoke to each**

24       **other a lot, got to know each other basically through the**

25       **phone.**



Todd Courser
01/28/2020                                                    Page 36

1  Q.   Okay.  And then started having -- when did you two start

2       having a physical relationship?

3  A.   **I don't remember the exact date of that.**

4  Q.   Was it in '15 or '14?

5  A.   **I think it was late '14.**

6  Q.   Her husband's name is Joe, Joseph?

7  A.   **Joseph, yeah, Joseph Gamrat.**

8  Q.   When did you first meet him?

9  A.   **At the, at the chairman's race.**

10 Q.   So this was back in late --

11 A.   **'14 -- or '12.**

12 Q.   -- late '12 or early '13?

13 A.   **Yeah.  I think so, yeah, late '12 or early '13.**

14 Q.   Did you have any contact with him after that point and up

15      to the point that you won your seat in the House of

16      Representatives?

17 A.   **I, I, I don't, I don't remember.  I don't remember how**

18      **much contact I would have had.  He was working on her**

19      **campaign.  They kinda had their own thing going on after**

20      **that because she was running for office, so there's**

21      **literally thousands of doors to knock and a staff to do,**

22      **you know, to take care of and work through those details,**

23      **and he was very involved in that.**

24 Q.   Okay.  So if anyone suggested that you and Ms. Gamrat's

25      relationship, physical relationship, began in let's say


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

**Todd Courser**
**01/28/2020**                                          Page 37

1     the summer of 2014, that just wouldn't be true?

2  A.  **We had a relationship but I don't, I don't think it was**

3     **physical at that point.**

4  Q.  Okay.

5  A.  **Yeah.**

6  Q.  All right.

7  A.  **Yeah.  I think there was -- I don't know when it started,**

8     **the actual physical relationship.**

9  Q.  I mean you're aware, I take it, during the course of all

10    the legal wranglings that have surrounded your tenure with

11    the House of Representative, you've seen various reports

12    from the Michigan State, or a Police Report from the

13    extortion complaint you made, the House of Representatives

14    report, and countless other pages of documents; right?

15 A.  **Tons of it.  Yeah.**

16 Q.  Yeah.  There's thousands of pages of documents on this

17    thing.

18 A.  **Yeah.**

19 Q.  There's some indication -- and, frankly, it's either in

20    probably the State Police Report or the House report --

21    that Mr. Gamrat claimed to have audio recordings of you

22    and Cindy being physical with each other back in the

23    summer of 2014.

24          Is that a possibility?

25 A.  **I don't remember that even being said in the House report**



Todd Courser
01/28/2020                                                Page 38

```
 1         or the State Police Report.

 2  Q.     Okay.  You'd deny it if that's the case?

 3  A.     Well, I'd have to know what the statement was.

 4  Q.     Okay.

 5  A.     Yeah.  And I'd have to know when he's trying to say that.

 6         Like I said, that was during a time when I had -- she had

 7         a campaign and I had a campaign, so like I said, I don't

 8         remember when it started.

 9  Q.     Okay.

10  A.     That's been going on six years ago.  So --

11  Q.     So I understand you guys shared staff.

12         Did you physically share office space, though?

13  A.     No.  She was in one tower and I was in a different tower.

14  Q.     So how, logistically, did that work when you guys were

15         sharing employees?

16         I mean did they -- were they stationed in one

17         office versus the other?

18  A.     Well, they were supposed to be there every day.

19  Q.     Right.

20  A.     We were there, like I said, just the days when the, the --

21         so, so let's say there's seventy days that we're there.

22         They're there every day.  So you've got staff that handles

23         one office and staff that handles another office.  And

24         what was happening is you had two staff members who had no

25         experience and one staff member that had supposedly a lot
```



```
 1        of experience.

 2   Q.   All right.  And --

 3   A.   And he had basically one front person, one front person

 4        each, and he was supposed to be able to manage that --

 5   Q.   The three --

 6   A.   -- but really what was happening was they weren't coming

 7        to work.

 8   Q.   The three staff members were?

 9   A.   Well, there were multiple part-timers that filled in

10        hours.

11   Q.   Your three main -- there were three main staff members.

12             Who were they?

13   A.   Keith Allard, Benjamin Graham, and Joshua Cline.

14   Q.   So you mentioned that two of those three really had no

15        experience in doing this; correct?

16   A.   Very little, yeah.

17   Q.   So would that be Ben Graham and Joseph Cline?

18   A.   Yeah.  Joshua Cline.

19   Q.   Joshua Cline.  I'm sorry.

20   A.   Yeah.

21   Q.   Keith Allard was the one that did have some experience?

22   A.   Yeah.  He supposedly did.  He worked for, he worked for

23        Justin Amash for a short time and he worked in the

24        Granholm offices before that.

25   Q.   Okay.  And how is it that he came to your attention so
```



Todd Courser
01/28/2020                                    Page 40

1      that you hired him?

2  A.   He was a plant.

3  Q.   He was a plant?

4  A.   Yeah.  He was a plant.

5  Q.   By who?

6  A.   Essentially he was there to try and project whatever

7       information he could regarding us.

8  Q.   What do you, what do you mean project?

9  A.   Well, you can see the way that he was using fake Facebook

10      profiles and sending out information related to us,

11      Twitter accounts, that sort of thing, passing along -- we

12      have his text messages, the one text message talking

13      about, you know, they had sex just now.  And they say how

14      do you know that?  The bug.  So they're aware of the

15      activities at, I guess it's your hotel, from the plant,

16      the wiretapping.  That was Keith Allard, Keith Allard's

17      texts.

18              We have, we have Joe Gamrat's texts talking

19      about -- they have recordings of that at the hotel.  They

20      were working together from the very beginning.

21  Q.  Let's, let's step back for a second.

22              Keith Allard worked for who immediately before

23      working for your office?

24  A.  He worked -- he ran for office himself.

25  Q.  Okay.  In the '14 cycle or before that?



Todd Courser
01/28/2020                                    Page 41

```
 1  A.   I think so.  I think it was the '14 cycle and he lost.

 2  Q.   Okay.  So what was he doing, though, at the time he ran?

 3            What was his job at the time he ran?

 4  A.   I don't think he worked.  I think he, I think he -- before

 5       that, before he started running for office, he worked for

 6       Justin Amash --

 7  Q.   Okay.

 8  A.   -- out of his Republican office I think in Grand Rapids,

 9       if there's one there.  I would guess it's there.

10  Q.   And, at the time, was Justin Amash a State Representative

11       or State Senator?

12  A.   He was a Congressman at that point.

13  Q.   He was a Congressman at that point?

14  A.   Yeah.  I think they let him go.  That probably should've

15       been a clue.

16  Q.   Justin let him go?

17  A.   I think so.

18  Q.   Okay.  So then Keith ran for office in the '14 cycle,

19       didn't win, and you ended up hiring him to work in your

20       office?

21  A.   He was begging to work in our office.  Yes.

22  Q.   So he --

23  A.   I did not know him otherwise.

24  Q.   Okay.  So he --

25  A.   Cindy did not either, that I'm aware of.
```



**Todd Courser**
**01/28/2020**                                      **Page 42**

1  Q.   Okay.  So he -- tell me how that happened.

2            Did he affirmatively contact you after --

3  **A.   He contacted her.**

4            MR. DePERNO:  Hold on.  Let's -- before you jump

5       in -- make sure you let him fully ask his question.

6       You're --

7            **THE WITNESS:  Sorry, Matt.  I'm --**

8            MR. DePERNO:  -- kinda talking --

9            **THE WITNESS:  -- talking over him.  I'm --**

10           MR. DePERNO:  -- over him --

11           **THE WITNESS:  -- trying to get through.  Okay.**

12      **All right.  Go ahead.**

13           MR. DePERNO:  -- and you're sorta anticipating

14      what he's saying.

15           **THE WITNESS:  All right.  Go ahead.**

16           MR. DePERNO:  Just slow down and let him ask the

17      question.

18           **THE WITNESS:  I'm trying to fill in the blanks**

19      **because --**

20           MR. KOSTELLO:  Yeah.  We're having a very

21      conversant sort of --

22           **THE WITNESS:  Yeah.**

23           MR. KOSTELLO:  -- back and forth --

24           **THE WITNESS:  Yeah.**

25           MR. KOSTELLO:  -- here, so --



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

1            COURT REPORTER:  You're doing it now, though,

2       while they're telling you not to.

3            **THE WITNESS:  Does that cause you some trouble?**

4            COURT REPORTER:  You've got to stop.  It does

5       cause a lot of trouble.

6   BY MR. KOSTELLO:

7   Q.   So just walk me through.  You said that he contacted -- he

8       reached out to Cindy.

9            Is that how it happened that he came into your

10      world?

11  **A.   Okay.  Are you done?**

12  Q.   Yeah.

13  **A.   All right.  I think that was as she was running in the**

14      **general election in '14, I think he reached out to her,**

15      **attempting to get in her office.  It's a pretty common**

16      **practice to try and get someone inside a -- when, when a**

17      **political party knows they're gonna have trouble with**

18      **someone, they try to get someone in their office to be**

19      **able to report back.**

20  Q.   So I take it was Mr. Allard from the west side of the

21      state, also?

22  **A.   He was.**

23  Q.   Okay.  So he reached out to Cindy during the '14 general

24      and expressed some interest in working for her in the

25      event that she won?



Todd Courser
01/28/2020                                              Page 44

1  A.   Yeah.

2  Q.   And from what I'm understanding from you, you believe that

3       it was the Republican Party that had kinda pushed him to

4       do that?

5  A.   **No.  There's, there's always -- you know, the, the way**

6       **that politics works, I mean there's people in the**

7       **background and a position like that is powerful because**

8       **essentially you have inside information and, you know,**

9       **Allard, you know, obviously he was very good at using that**

10      **information.**

11 Q.   Well, you said before that he was a plant.

12           I guess what I'm getting at is who planted him

13      in your office?

14 A.   **Well, inside of that, what happens inside the Republican**

15      **Party, the establishment did not want either one of us to**

16      **win, and so, so Keith Allard was an establishment plant.**

17      **Who he worked for, I have no idea.**

18           **I know who he was connected with.  He was**

19      **connected Truscott.  He was connected with Chad Livengood.**

20      **He was connected with a whole host of people that created**

21      **the situation.  Some people at your, sounds like some of**

22      **your people at your, your hotel.  So, you know, obviously**

23      **he had lots of friends on both sides of the aisle because**

24      **he worked in the Granholm administration as well.**

25 Q.   By Truscott, you mean who?



Todd Courser
01/28/2020                                    Page 45

1  A.   John Truscott.

2  Q.   And John Truscott is who?

3  A.   **He's a big, I guess you'd say a lobbyist or a -- a**

4       **lobbyist in Lansing.**

5  Q.   Okay.  And you mentioned Chad Livengood.

6            Mr. Livengood's actually a reporter for the

7       Detroit News; right?

8  A.   **He was; he's not.**

9  Q.   Yeah.  He was at that time; right?

10 A.   **Yeah, he was.**

11 Q.   Okay.  And so --

12 A.   **I think he works for Cranes now.**

13           MR. DePERNO:  You guys are talking over each

14      other again.  You've got to let him ask his questions.

15      You've got to stop.  You're not having a casual

16      conversation.

17           **THE WITNESS:  Okay.**

18           MR. DePERNO:  Let him ask his questions and then

19      you answer.

20 BY MR. KOSTELLO:

21 Q.   And just so I'm clear on this, is it you believe that

22      Mr. Allard was communicating with Mr. Livengood and

23      Mr. Truscott, or that it was Mr. Truscott and

24      Mr. Livengood that pushed him to seek the position in your

25      office, or both?



Todd Courser
01/28/2020                                Page 46

1  A.  I only have texts.

2  Q.  Okay.

3  A.  So the texts show conversation back and forth between

4      those people.

5  Q.  Okay.  That they conversed with each other?

6  A.  I don't know if they conversed with each other.  I just

7      have the texts that show that they texted each other.

8  Q.  Conversed by way of text message?

9  A.  I would say so.

10 Q.  Okay.  Did you know Benjamin Graham at all before he took

11     a position in your office?

12 A.  Yes.

13 Q.  How did you know Benjamin Graham?

14 A.  I knew his mom and dad.

15 Q.  What are their names?

16 A.  Oh, my goodness.  It's been years now.  Alen Graham and

17     Cheryl Graham.

18 Q.  Lapeer residents?

19 A.  I don't know.

20 Q.  How did you know them?

21 A.  I filed a bankruptcy for them.  I don't know if -- I think

22     I knew them before that.  I, I don't know.  I think it was

23     just the same community.

24 Q.  Okay.  And how is it that Ben Graham came to work in your

25     office?



 1  A.   He was in high school and then obviously worked on a

 2       couple of those different campaigns sporadically and then

 3       worked out of my office, running a consulting, they called

 4       it consulting company.

 5  Q.   Is that Bellwether?

 6  A.   Bellwether Strategies.

 7  Q.   You say they.  Do you mean him and Joshua Cline?

 8  A.   Joshua Cline.  Yes.

 9  Q.   Okay.  Did Ben Graham go to college?

10  A.   I, I believe he did.

11  Q.   Did he graduate?

12  A.   I don't know.

13  Q.   Do you know where he went to college?

14  A.   Cedarville, if I remember correctly.

15  Q.   So did you approach him about the position in your office

16       or did he approach you?

17  A.   He was fired from Subway --

18  Q.   Okay.

19  A.   -- and he needed work and he didn't have any experience,

20       very little, but he liked politics, so I let him work out

21       of my office.

22  Q.   Any idea why he was fired from Subway?

23  A.   I have no idea.

24  Q.   Okay.  Was that important to you at all?

25            It seems kind of --



1  A.   Well, he -- that was -- he didn't have any work and

2       couldn't hold that job down, so it should've been a clue.

3  Q.   Yeah.  That's what I guess I was getting at.  You know,

4       hindsight's always 20/20; right?

5            So you've got a guy that is -- he was what; in

6       his early twenties at that point or mid twenties,

7       twenty-five, twenty-four --

8  A.   I don't know.  Yeah.

9  Q.   -- who you knew got fired from a fast-food job?

10  A.   Yep.

11  Q.   Then you offer him a job in your office in Lansing?

12  A.   No.  No.  He worked out of my office in Lapeer, running

13       their little shop.  They tried to put something together

14       called Bellwether Strategies.

15  Q.   Okay.  So that was first.

16            When did, when did Bellwether start occupying

17       space in your office?

18  A.   I don't know when they actually filed for a d/b/a or

19       Articles of Organization.  I'm not sure.  They worked out

20       of the office, but I'm not sure when their actual name

21       came into being.

22  Q.   But this was sometime before you ran in the '14 election?

23  A.   Yes.

24  Q.   Was it -- any idea how long before; a year, two years?

25  A.   I would say on and off for two years.



**Todd Courser**
01/28/2020                                         Page 49

```
 1  Q.   Okay.  Did they work on your 2012 State Board of Education
 2       election?
 3  A.   No, not that I remember that they were big pieces of that,
 4       that I can remember.  I think, I think Cline was, Joshua
 5       Cline I think was working in that cycle on the Hoekstra
 6       campaign, and I think Ben was at that point, I think he
 7       was doing some stuff out of my office, but I can't
 8       remember.
 9  Q.   Were you, were you charging them rent for the space in
10       your office?
11  A.   No.
12  Q.   So you were just letting them use an extra space that you
13       had, I take it?
14  A.   No.  He did, Ben did data stuff, so it was helpful to have
15       somebody as far as a computer person, and that's where he
16       was kinda putting his time and energy, doing his, you
17       know, his work.  And so it was helpful to have somebody
18       who could deal with those pieces, pieces of information
19       and handle all that stuff.
20  Q.   Sure.  Was he on the payroll of either your tax business
21       or --
22  A.   He was.
23  Q.   -- your law practice?
24  A.   Yeah.  I think it was the accounting practice.
25                  MR. DePERNO:  You've got to wait till he's
```



1    finished.

2                    THE WITNESS:  Okay.

3    BY MR. KOSTELLO:

4    Q.   And how long was he on your payroll for your law practice?

5    A.   I don't remember.

6    Q.   A year?  Two years?

7    A.   Probably.

8    Q.   Okay.  Do you remember what you were paying him?

9    A.   Maybe ten dollars an hour.

10   Q.   Okay.  Gotcha.  So he was kinda doing computer stuff, data

11        stuff, as needed, on an as-needed basis for you?

12   A.   Yes.

13   Q.   Yeah.  Okay.  So then you knew him for what, a year or two

14        before you ultimately ended up hiring him to be part of

15        your staff in Lansing?

16             Well, you knew him for a while because you knew

17        his parents; right?

18   A.   I knew him when he was in high school.

19   Q.   High school.  Okay.

20             You knew him kind of professionally for a year

21        or two before you ended up hiring him?

22   A.   I was at his open house, I think, when he graduated from

23        high school, I was at his wedding, and I filed a

24        bankruptcy for his mom and dad.  So I mean there was a

25        enough connections.  Yeah.



Todd Courser
01/28/2020                                    Page 51

```
 1  Q.  Okay.  Other than his, his Bellwether Strategies company

 2      that him and Josh/Joshua Cline started, did he have any

 3      other relevant experience to work in your office, that you

 4      were aware of?

 5  A.  He worked a lot of campaigns.  I'm not sure how many he

 6      worked.  He was kinda -- that group of people, it's a

 7      political class, so they -- they're kinda hired guns and

 8      they work for, many times, opposing candidates on the same

 9      race, so be involved in sharing information with different

10      people running in the same race who were operating other

11      campaigns.  And he did that both volunteer and also to

12      make money.

13  Q.  How did you know Joshua Cline?

14  A.  I knew his mom and dad back to probably -- Ron -- and I

15      can't remember his mom's name -- probably '99, maybe 2000.

16      They live in Iowa now.

17  Q.  The mom and dad do?

18  A.  Yes.

19  Q.  You mentioned Ron was the dad's name?

20  A.  Yeah.

21  Q.  Mom's name?

22  A.  I can't remember.  She has a lot of health issues.

23  Q.  And any idea how you knew them?

24          Do you have any recollection of why it is you

25      knew them?
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1   A.   Well, they were, they were tax clients.  I don't know if I

2        had a relationship with them outside of that before that.

3   Q.   Okay.  Were Ben and Joshua around the same vintage, same

4        age?

5   A.   I think so.

6   Q.   Okay.  Was Joshua Cline ever on the payroll of your tax

7        business or law practice?

8   A.   Yeah.  He did some hours.  He, he was kind of a graphics

9        guy, so he made flyers and then he would, you know, he'd

10       work eight, ten, twelve hours, something like that, and

11       then you wouldn't see him for a while and then he'd do

12       another little project.

13  Q.   Okay.

14  A.   He worked also -- I think he did work at Ford Motor

15       Company for a time.  He was studying for his nursing

16       degree and license.  I don't know if that ever happened or

17       if it was even true.  That's what he claimed anyway.  And

18       he worked for a time at Starbucks, if I remember

19       correctly.

20  Q.   Okay.  So was it you that reached out to Ben and Joshua

21       about coming to work in your office in Lansing?

22  A.   Well, they worked pretty heavily on the actual primary

23       campaign.

24  Q.   We're talking the '14?

25  A.   Yeah.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

1  Q.  Yeah.

2  A.  And then on the general campaign as well.  And I paid them

3      through Bellwether Strategies.

4  Q.  Yeah.  You anticipated my next question.

5          Any idea what you paid them total for their work

6      on your '14 campaign?

7  A.  I don't remember, but it was a lot.

8  Q.  Okay.  And so was it kind of just an understood sort of

9      thing, that if you ended up winning that seat in the

10      general, that they would come and work with you in

11      Lansing?

12  A.  They wanted to do it.  I didn't think either one of them

13      were equipped to do it.  And I should've -- I give people

14      opportunities that I, that I probably shouldn't have done,

15      and neither one were really able to handle that.

16  Q.  Okay.  So, nonetheless, you offered them the positions.

17          Did they have to be vetted by Cindy, first,

18      before they were formally hired or --

19  A.  They -- one of them worked -- I think, I think one or both

20      of them were on my payroll and I think, I think Allard was

21      on her payroll I think is how that worked.  There was

22      misgivings about having them come on board from November

23      on.  Immediately there was problems.

24  Q.  Misgivings by yourself?

25  A.  Both myself and Cindy.



1  Q.   Okay.  So even before you got to Lansing in January, you

2       were having some concerns about hiring them?

3  A.   Yeah.

4  Q.   And how did those -- what were the concerns?

5  A.   Well, they wouldn't show up for work.  Ben wouldn't bathe.

6       He didn't brush his teeth, you know.  He was sleeping at

7       the office.  In my office, I came in one time, and he's

8       kinda going through my personal stuff.

9  Q.   Well, and I hate to interrupt you, but was that your

10      office in Lansing or your office in Lapeer?

11 A.   Well, first it was the office in Lapeer.

12 Q.   Okay.

13 A.   And so there was just -- he, he -- they weren't

14      professional.  They were two guys that were in the

15      positions that they were in.  They weren't administrators.

16             Working in an office in Lansing is really a

17      customer service job where you get -- in a normal office,

18      you'll get dozens of calls a day.  With her and I being

19      kinda lightning rods when we came into Lansing at that

20      moment, it wasn't unusual to have a couple hundred calls a

21      day that had to be fielded and taken care of, you know.

22      There was -- from all over the country, literally, we had

23      calls that had to be fielded from across the country.

24 Q.   And I take it that's in addition to emails you were

25      probably getting, also, that needed to be responded to?



1  A.    Yeah.  And so they didn't really have the mind for it and

2        they weren't going to work.  There's text messages that

3        show that they were playing hooky and covering for each

4        other and really not taking care of any of the actual

5        administration.

6  Q.    And that stuff you discovered after you got to Lansing in

7        January; correct?

8  A.    Correct.  Yeah.

9  Q.    And I guess I want to go back to maybe some of the

10       misgivings you had in November and ask the question of if

11       you were noticing those sort of things back in November,

12       why is it that you brought them to Lansing in January?

13  A.   Well, because they were people that you trusted and you

14       knew their familiars for going on twenty years and, you

15       know, I try and give people opportunities to do stuff and

16       see if they can -- you know, they either rise to the

17       occasion or they don't, but in their case, neither one of

18       them were suited to it and they just weren't --

19  Q.   Once you got to Lansing, were they -- where were they

20       physically located?

21             Was one in your office; one in Cindy's physical

22       office?  How did that work?

23  A.   That became a problem immediately.  The three of them

24       liked to spend time together, so they locked the doors

25       when we weren't there and turned the lights off and all



Todd Courser
01/28/2020                                              Page 56

```
 1     hung out in one office, either hers or mine.

 2  Q.  Were they supposed to be, though, separated?

 3  A.  They were, yeah.

 4  Q.  And the plan was to have who physically stationed where?

 5  A.  That there would be Graham, Benjamin Graham, in one

 6      office, I believe in mine at the front desk, and Joshua

 7      Cline in her office at the front desk, and then Keith

 8      Allard would administer the two of them.

 9  Q.  So he'd kinda go back and forth between the two offices

10      and watch over both of them?

11  A.  Supposedly.

12  Q.  And what was, what was Ben and Joshua's official titles?

13  A.  I think they were administrative assistants.

14  Q.  I think I may have seen somewhere, in them signing emails,

15      where they were calling themselves legislative aides.

16          Does that sound about right or is that

17      overstating what they actually were?

18  A.  I think that's probably right.

19  Q.  Yeah.  Okay.  I take it at some point you started having

20      some concerns or misgivings about Mr. Allard and his work;

21      is that fair?

22  A.  Yeah, immediately.

23  Q.  Okay.  Describe that to me.

24  A.  Well, when he came on board, to come on board, he, you

25      know, he produced kind of a job description for himself,
```



1     the things he was gonna take care of that he was gonna be

2     able to do this and had this experience and was able to

3     administer these things in a series of back and forth in

4     emails and also some meetings, and really he just, he

5     didn't do anything.  And I think he was maybe there three

6     days a week.

7   Q.  What was his official title?

8   A.  I think technically he was also just a legislative aide.

9     They liked to give themselves titles, you know, and so he

10    was called the Chief of Staff.

11  Q.  Okay.

12  A.  But I don't think the House of Representatives technically

13    calls them that.

14  Q.  Did he make more than Ben and Joshua did?

15  A.  He did.

16  Q.  Okay.

17  A.  I think that he made, I wanna say 60,000 a year.  And I

18    think the other two made around 35 or 40,000 a year.

19  Q.  Yeah.  I think I saw some numbers somewhere.

20         It's like 35 or 37?  Does that sound about right

21    for those two, Ben and Josh?

22  A.  That's probably about right.

23  Q.  Okay.  So the document he created with his, his job

24    responsibilities, what sort of things were around that?

25         I mean what was he to be doing?



1  A.   Well, you know, obviously responding to every phone call

2       that came in, making sure the constituents were happy,

3       managing the calendars, making sure that we were at the

4       events where you needed to be, and if we weren't there,

5       that they were covering those events.  So there was some

6       duty, back in those districts themselves, for every

7       township meeting and gun owners' meeting and, you know,

8       the Farm Bureau meeting, all of those things needed to be

9       covered by the State Representative.  You couldn't make

10      every meeting but you really needed to have them on a

11      calendar to be able to handle that, writing and drafting

12      letters.

13             And then also the big thing was kind of the

14      scoring of legislation that was coming up for first,

15      second or third reading for the week, which means the

16      legislation was going to come up possibly for a vote.  And

17      so whether or not we would be voting for it or against it,

18      you needed help to read through that and sort of score it,

19      because it changed in the hours right before, before it

20      came to the floor for a vote.

21             And during the days when I was there, I would be

22      there three days normally during the week, but the

23      committee meetings were primarily on two days.  So I had

24      five committees that heard testimony continuously.  And so

25      you didn't have time to be able to kinda bring that stuff

Todd Courser
01/28/2020                                          Page 59

1       forward, to comprehend what changes had happened over the

2       weekend, because obviously they didn't give it to you

3       until the last minute.  So his job was to assist with

4       that, to make sure that we were voting in line with what

5       our promises were to the voters.

6   Q.  So the job for Keith, Ben and Joshua was a full-time job;

7       correct?

8   A.  Yes.

9   Q.  Full-time in Lansing?

10  A.  It was supposed to be, but it was supposed to be both in

11      Lansing and in district.

12  Q.  Okay.  They were expected to -- and by full-time, I mean

13      they were expected to work Mondays through Fridays,

14      sometimes on the weekends, if necessary?

15  A.  Yes.

16  Q.  Okay.  And I think you just mentioned that you were in

17      Lansing about three days a week?

18  A.  Not every week, but yes, three days a week.

19  Q.  Yeah.  That was my next question.

20              So how many, how many weeks out of the year

21      would, would that be the case when the House was meeting?

22  A.  Well, they'd only meet between seventy, between sixty and

23      eighty days.  So most of the summers, you know, they would

24      go there or somebody would gavel in and gavel out but

25      nobody was there.  They called that a day, a meeting, even



1        though no one was there.  That counted into their

2        seventy-something days.

3                So, so we were only there those days, primarily,

4        unless there was some other reason to be in Lansing.

5   Q.   Okay.  But the times you were there, it would be for --

6        you would go for three consecutive days and then you might

7        not go back the next week or the next week after that but

8        then you'd go back and be there for three consecutive

9        days; is that fair?

10  **A.   No.**

11  Q.   Okay.  Explain to me how that worked then.

12  **A.   Yeah.  Some weeks, it was like that.  I think I understand**

13       **what you're saying or asking.  But when you got there, you**

14       **also had stuff back in district that would happen in the**

15       **evenings.  So you would do a day, a Tuesday, Wednesday**

16       **Thursday, you would go there on Tuesday morning, and**

17       **Tuesday evening you may have a meeting back in your**

18       **district, in the evening, and you would drive back to your**

19       **district, do the meeting, then come back, and maybe you**

20       **would stay the night back in district, depending on how**

21       **the meeting went, or you would come back to district**

22       **because you had to be back in your chair as a**

23       **representative at whatever time in the morning.**

24  Q.   Okay.  So it was fair to say it was a bit fluid as to how

25       that worked on a, on a week-to-week basis?



1  A.   Yes.

2  Q.   If you had a meeting that ran like super late, you know,

3       11:30 or whatever, you'd probably just go home and spend

4       the night and then wake up early and drive to Lansing the

5       next day?

6  A.   Yes.

7  Q.   If you were done with the meeting early, you know, 8:00 or

8       whatever, you might drive back to Lansing, stay the night

9       there so you're there in the morning to be in your seat

10      the next morning?

11 A.   I think that's fair.

12 Q.   Okay.  And it just depended on how your schedule was;

13      correct?

14 A.   **And if your staff was willing to take care of the meeting**

15      **back in district, given the fact that they were supposed**

16      **to be there anyway.**

17 Q.   Okay.  And I take it, it sounds to me like they didn't do

18      that on any --

19 A.   That is correct.

20 Q.   Yeah.  So, and, and your issues with your staff, with

21      Keith, Joshua and Ben, started almost immediately; is that

22      fair?

23 A.   That is correct.

24 Q.   Okay.  So was that a point of --

25 A.   If I can stop you there.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO      313.567.8100

Todd Courser
01/28/2020                                    Page 62

1  Q.   Yep.

2  A.   That email stated they would do forty hours a week and

3       then they would take care of outside issues.  Normally

4       inside of the legislature, the staff takes care of the

5       official government responsibilities.  That's what they're

6       being paid for.  But the staff is also, at the same

7       moment, taking care of the political responsibilities for

8       the Representative.  And technically you're not supposed

9       to have those things meshed together, but everything is

10      meshed between government and political, especially in the

11      legislature.  So a meeting would be both official, when

12      you went back to district, and it would be political.

13 Q.   Sure.  So you and, I take it, Cindy shared your concerns

14      with the way the staff was going immediately?

15 A.   Yeah.  She had more concerns.  I had more, I had more

16      relationship with the other two.  She had no relationship

17      really with them.  And her judgment was that they should

18      have been let go before they were ever let into Lansing.

19 Q.   So when, when did the conversations between you two start

20      about, hey, we need to replace these guys?

21 A.   Before we got to Lansing.  Yeah.

22 Q.   Okay.

23 A.   I would say in November and December and January.

24 Q.   Okay.  So you started having these conversations in

25      November and December before you got to Lansing yet you


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

1     still brought them to Lansing and then once they got to

2     Lansing, there were immediate concerns about their job

3     performance; fair?

4  A.  Yes.

5  Q.  Okay.  So then, despite that, they were kept on into

6     February, March, and then we can say April, right, at

7     which time you lost one of them; right?

8  A.  Yes.  We became, we became aware and I don't know when

9     that --

10            MR. DePERNO:  Can we take a break at some point?

11            MR. KOSTELLO:  Yeah.  Can we just get an answer

12     to this one and then --

13            MR. DePERNO:  No problem.

14            MR. KOSTELLO: -- probably a good breaking point?

15  A.  Tell me your question again.  I'm sorry.

16  BY MR. KOSTELLO:

17  Q.  Yeah.  So despite these concerns you had with the staff,

18     they were kept on in January, February March and into

19     April, and in April you lost one of the staff members;

20     correct?

21  A.  I think it was in April.  The issues with that is, is

22     obviously you had friendships between -- I had friendships

23     with two of them and their families, and so you tried to

24     work out the details but you weren't there to see their

25     job performance.



1           So when all three of them are kinda working

2     together, I'm not really in Lansing enough, and when I am,

3     I'm not in the office.  I would actually be in the

4     physical office maybe an hour out of the day out of the

5     three days that I was there, so you might be in the actual

6     physical office three hours in the week, maybe five or six

7     in total for three days.  So you really didn't know that

8     calls weren't being handled, that things weren't being

9     done, because they were able to sorta cover for each

10    other.

11          And when you did find out -- there were a few

12    days where I stopped in there because I had meetings on

13    the other side of the state and -- now, we didn't

14    technically end up in Lansing until the end of January

15    because that's when we were sworn in, so you didn't really

16    have -- you had a few weeks of that and then you realized

17    they weren't even showing up.

18  Q.   Last question before we take a little break here.

19          Who was it that quit in April of '15?

20  A.   Joshua Cline.

21          MR. KOSTELLO:  Okay.  We can pick up from there.

22    Go off the record.

23          (At 11:28 to 11:38 a.m. recess taken.)

24          MR. KOSTELLO:  Back on the record.

25  BY MR. KOSTELLO:



1  Q.  So we ended up there, after going on a short little break,

2      with Joshua Cline quitting in April of 2015.

3              Do you remember that?  That was the last

4      question I asked you; right?

5  A.  Yes.

6  Q.  And we confirmed he quit his job in April of 2015.

7              Why is it that he quit?

8  A.  **Well, he didn't -- they didn't work for me.  Once they --**

9      **at January 1 -- and I guess you don't know this because**

10      **you're not in Lansing -- on January 1 they became**

11      **government employees, so they didn't work for me; they**

12      **worked for the Speaker of the House.**

13  Q.  Okay.  So he quit his position, though?

14  A.  **So the Speaker of the House is the only one that can hire**

15      **and the only one that can fire individuals.  I can make**

16      **recommendations of who we'd like, but their actual**

17      **employment is through the Speaker of the House.  Once they**

18      **were employed in January, the problems became pretty**

19      **obvious for Allard, Graham and Cline.**

20              **So, there were pornographic pictures left for**

21      **the part-time, female staffers, of testicles, genitalia,**

22      **pictures on computers, government computers.  We went to**

23      **the Business Office and said, hey, look, these guys are --**

24      **you know, they're not handling the work and there's some**

25      **very serious issues.**



1    Q.   And I don't mean to interrupt you, but when was it that

2         you went to the Business Office to voice your concern

3         about them?

4    A.   So I didn't start actually going to Lansing until I think

5         it was the third or fourth week of January, so it was

6         after that.  It might've been February.  It might've been

7         March.

8    Q.   Okay.

9    A.   But immediately there were issues with the three of them.

10        And later it was confirmed -- I don't know who drew the

11        pictures -- but they were of, you know, penises and

12        testicles and left for the lady staffers on desks.

13                 And one of them, Graham, we found out later, was

14        actually a porn addict, who was very involved in lots and

15        lots of video porn, by his own testimony and by his own

16        emails.

17                 And then Cline was actually involved in a gay

18        dating site, a pay-for-sex dating site, and that exploded.

19        I didn't know anything about this.  And then we found that

20        out later.

21                 So I didn't know who was doing the pictures or

22        who was doing the videos, of the three of them, but it

23        turned out that they were all involved in it.

24   Q.   All right.  Let me --

25   A.   And their text messages show that.



1  Q.   All right.  Here's, here's my -- and I get your desire to

2       get things on the record here, but I think the specific

3       question that I had right there was why is it that Joshua

4       Cline resigned his position in April of 2015?

5  A.   **I don't know the specific reason, other than the fact that**

6       **they heard the tape of us discussing -- they were -- there**

7       **was a wiretapping situation and there was a conversation**

8       **about letting him go because of what had happened with --**

9       **her name was Ann.**

10 Q.   Is this Ann Hill?

11 A.   **I think it was a situation with Ann Hill.  But I may be --**

12      **yeah, Ann Hill.  But I don't know if Ann Hill was -- no,**

13      **Ann Hill was later.  I think Ann Hill was with just Allard**

14      **and Graham, in June.  I know what he told me and I know**

15      **what he gave me as far as a letter, but I also know later,**

16      **when it call came out, that he, of course, claimed some**

17      **other things.**

18 Q.   Well, I've seen the email or the letter that he wrote

19      about why he quit and I guess I was wondering what he

20      voiced to you at that time as to the reason he was

21      leaving.

22 A.   **He voiced the same, the same issues.  I can't remember the**

23      **exact conversation because it was kind of a shock.  What**

24      **we found out later is that he was actually reading my**

25      **emails.  They were reading my emails and had been in my**



1     emails right before that.

2  Q.  And who's they?

3  A.  Allard, Graham and Cline and Joe Gamrat.  And I don't know

4      who else.  I think David Horr, those emails went to as

5      well.

6  Q.  Okay.  And they were reading your emails from which email

7      address?

8  A.  My personal emails and my personal archive.

9  Q.  Okay.  Well, I think if I, if I have got this correct, you

10     had three separate email addresses that you used.

11          There was a toddcourser72@gmail.com, something

12     along those lines?

13 A.  I don't think that was mine.  I think that was Graham's.

14     I don't know.  I actually don't know about what went into

15     that box or what didn't go into that box.

16 Q.  So you -- the toddcourser72@gmail.com was not an email

17     address that you used?

18 A.  Graham set up all the emails to be able to sort the

19     information.  The one that I used primarily, let me just

20     tell ya, I used todd@toddcourser.com and I used a second

21     one as far as a gmail account, courserlaw@gmail.com.  I

22     don't remember what specifically the courser72 email was

23     for or why it was set up or what information went into it

24     or came out of it.

25 Q.  That was not an email address that you had in existence



```
 1        before you got to Lansing in January of 2015?
 2   A.   I can't, I can't say that I have -- I don't know if -- it
 3        would've been someone else setting that up.  I think it
 4        might've been Ben Graham, but I'm not sure.
 5   Q.   Okay.  And so you think Ben Graham set up that email
 6        address; you just don't know the reason why?
 7   A.   I, I don't.
 8   Q.   And the todd@toddcourser.com email address, was that the
 9        one you used for your law office or did you -- was that
10        one you used for political purposes?
11   A.   That's my personal one.  There was
12        lawoffice@toddcourser.com that I used for the law office.
13   Q.   Well, you just mentioned courserlaw@gmail.com.
14   A.   That's, that's the one I used that aggregates them all,
15        brings everything into one bucket.
16   Q.   The toddcourser.com server, where does that exist?
17   A.   I think it's a GoDaddy account, but I could be wrong.
18   Q.   Does that still exist?
19   A.   Yes.  I don't access it.  It dumps into the Courser Law
20        Group is where I see everything, so it kinda routes
21        through that server to Courser Law.
22   Q.   So when you, in the course of your legal work now, which
23        one do you primarily use if you're gonna be emailing with
24        a client or opposing counsel or something like that?
25   A.   Courserlaw@gmail.
```



1  Q.  @gmail.com.  And how long has that been in existence for?

2  A.  I wanna say -- I really don't know.  Eight or ten years.

3  Q.  Was there also, was there also an email account that you

4      had through the State of Michigan?

5  A.  I'm sure there were multiple email accounts through the

6      State of Michigan.

7  Q.  You just can't tell me that they were?

8  A.  I cannot.

9  Q.  What were those used for?

10 A.  For -- well -- for people that had issues that there was

11     State business.

12 Q.  Were those used for constituents?

13 A.  Yes.  That's what I mean by State business.

14 Q.  Yeah.

15 A.  But those were handled by the staff.  I actually didn't

16     have those routed to my phone at all, or my, my Inbox.  I

17     don't know that I ever accessed those email accounts.

18 Q.  So now when you were saying before, when we were talking

19     about Mr. Allard, Mr. Graham and Mr. Cline accessing your

20     emails and reading your emails, what account were they

21     accessing?

22 A.  Toddcourserandcompany or -- I'm sorry --

23     todd@toddcourser.com.

24 Q.  So that was, okay, todd@toddcourser.com?

25 A.  Yes.



 1  Q.  So that was, again, the email address that, through your

 2      GoDaddy account, that fed into your courserlaw@gmail.com?

 3  **A.  That's my personal account.  Yeah.**

 4  Q.  And so again, I'm sorry, but who exactly was or would be

 5      using that -- who would be emailing you at that account?

 6          Was it used for business purposes?  Was it used

 7      primarily for personal purposes?

 8  **A.  I mean I would say it's both.**

 9  Q.  Both?

10  **A.  Yeah.  I mean if it's opposing counsel, I used the**

11      **courserlaw@gmail.com.  I think that's the one you**

12      **(pointing) emailed me at as well.**

13  Q.  So when is it that you discovered that they were accessing

14      the todd@toddcourser.com email account?

15  **A.  I actually don't -- I'm not exactly sure when I discovered**

16      **it was them, so I guess I have to kinda clarify your**

17      **question.  I knew someone was accessing it.**

18  Q.  How did you know someone was accessing it?

19  **A.  Because I received the extortion text messages that said it.**

20  Q.  Okay.  All right.

21  **A.  That was I wanna say right around May 12th, May 15th?**

22  Q.  May 12 or May 15 was the first text message you received?

23  **A.  I think it was in that, right in that week somewhere.**

24  Q.  Okay.  So I don't know if you remember this or not, but I

25      think by the time --



**Todd Courser**
01/28/2020                                      Page 72

1   A.   Of 2015.

2   Q.   Yeah.  Right.  I gotcha.

3             By the time the State Police had got to your

4        phone, when you made the extortion complaint back in

5        August of 2015, ultimately they had computer specialists

6        try to pull information off your phone, I think, at that

7        point.

8             The first, quote/unquote, extortion text that

9        was on there was May 19, does that sound about right,

10       2015?

11  A.   **No.  It doesn't sound right because -- I don't know -- I**

12       **know the date is what that date says, May 19th, but it**

13       **might've been because she received them earlier than that,**

14       **but there were issues with my phone, so my phone wasn't --**

15       **so it seemed like I received both calls and text messages**

16       **prior to that.  But you might be right.  I mean the data**

17       **says May 19th.  I, I don't know if --**

18  Q.   Well --

19  A.   **-- or what it was before that.**

20  Q.   -- I think what you had told -- and maybe this refreshes

21       your recollection, maybe it doesn't, maybe I'm

22       misremembering this -- but I think you told the police,

23       actually, that you deleted the first couple of them just

24       because, you know, you saw them and you said, "What the

25       hell?" and, you know, you just deleted them, and then once



Todd Courser
01/28/2020                                    Page 73

1     you got to a few that kept on coming, then you started

2     saving them as of the May 19 one.

3              Does that sound about right?

4  A.  **That sounds about right.  Yeah.**

5  Q.  Do you use toddcourser72@gmail.com for anything as of

6     today?

7  A.  **No.  I don't even know that that's -- I wouldn't even know**

8     **how to access that.  I should probably see if I can do the**

9     **recovery on the password to see what's even in there.**

10    **Yeah, I'm sorry, I honestly don't know what the --**

11 Q.  Okay.  So going back, it was, it was once you started

12    receiving these texts that you realized that Mr. Allard,

13    Mr. Cline and Mr. Graham, or you suspected that those

14    three had access to your emails?

15 A.  **Yes.**

16 Q.  And --

17 A.  **That someone had.  Someone had.  At that point, I didn't**

18    **know who, and obviously, you know, I mean you don't wanna**

19    **draw conclusions from a couple of anonymous texts on your**

20    **phone, that it's, you know, these, you know, two people**

21    **that you've known for many years.**

22 Q.  Okay.  I want to go back.  You had mentioned, before, that

23    there was a recording that you referenced and I think you

24    mentioned that you were bugged.

25              Was it your office that was bugged?



Todd Courser
01/28/2020                                                    Page 74

1  A.   Some of the conversations, the initial conversations, were

2       at the hotel that were referenced in the extortion texts.

3  Q.   Like what conversation?

4  A.   I had a conversation in the hotel, I was on the phone, and

5       I believe actually Cindy was there for that conversation.

6       I wasn't talking to her.  She just heard the conversation.

7       And we were talking about that there -- that it was a

8       veterans issue.  And I made a very specific reference to

9       four veterans -- the number four -- four veterans.  And

10      when I walk out on the street, that's when I got the text

11      that said how come, I think it says how come you only know

12      four veterans.  So someone was actually listening to the

13      live conversation that was happening in the hotel room.

14 Q.   Okay.  And when, when was this?

15 A.   Whenever that text came in.

16 Q.   Was there ever a point where you thought your office was

17      bugged?

18 A.   Well, I only have what the State Police gave me and the

19      data that came from Allard and Graham and Cline's phones

20      and Joe Gamrat's phone, so I only have the conversations

21      that they have.  And Allard says that they were using and

22      employing bugs in the conversation, so they were listening

23      to conversations that we had in the office as well.

24 Q.   Right.  So the short answer to that is yes --

25 A.   No.  That's not what I said.



Todd Courser
01/28/2020                                    Page 75

1  Q.  -- at some point you came to believe, you came to believe

2      that there were bugs in your office?

3  A.  **That's not what I said.**

4  Q.  Okay.  Tell me why I'm wrong.

5  A.  **Okay.  I'm not trying to fight with you.**

6  Q.  No.

7  A.  **So there were conversations that were happening.  And**

8      **those conversations, once I saw the stuff, we knew that**

9      **there were bugs.  Allard and Graham and Cline, in their**

10     **conversations between each other and then with Joe Gamrat,**

11     **confirmed there were bugs.**

12          **Do I know where they were, no.  I only know the**

13     **one time that I can remember specifically is that there**

14     **was a live conversation that happened.**

15          **I also know that there were other times where we**

16     **had had conversations and I believe that they were bugged**

17     **as far as in the office, but I have no -- I only have**

18     **their words to show that.**

19 Q.  Whose words?

20 A.  **Their text messages from Allard, Graham and Cline and Joe**

21     **Gamrat.**

22 Q.  Right.  So you got those text messages as a result of the

23     investigation, the Michigan State Police investigation

24     that took place, correct, and/or the House investigation?

25 A.  **No, not exactly.  Those came through the criminal case.**



Todd Courser
01/28/2020                                    Page 76

1        The Joe Gamrat stuff came from the Michigan State Police.

2   Q.   Okay.

3   A.   We got that one in -- I think we finally got access to

4        that one at the end of '16, 2016, but we didn't get access

5        to the text messages for Allard and Graham which showed

6        the communications between all the parties, the selected

7        ones that we were given, until I think it was June or July

8        of 2018.

9   Q.   Fair to say that based upon your reading of those text

10       messages between Allard, Graham, and Cline maybe, you saw

11       a reference to conversations in those text messages that

12       took place in your office?

13  A.   I, I, I'd have to go back and look at them.

14  Q.   Is that not what you just told me?

15  A.   Well, I know I had conversations in the office but I don't

16       know that that's where they heard them.  I mean I could

17       have had other conversations.  I don't know the specific

18       time that I was in the office that they were bugging me

19       through my phone or a computer or how that worked.

20              But it appeared that, from the text messages,

21       that they were bugging the offices and it appeared from

22       their text messages by them noting the times that we had

23       sexual contact, they noted those specifically as they were

24       happening, and those were in the hotel room.

25  Q.   Did you come to find out that Joseph Gamrat had also



Todd Courser
01/28/2020                                              Page 77

```
1       placed recording devices in Cindy Gamrat's car?

2   A.  Yes.

3   Q.  Okay.  Did you come to find out that Joseph Gamrat had

4       placed, at various times, recording devices in either

5       luggage or bags or purses of hers?

6   A.  I never saw that.  I don't know that that's -- I don't

7       know that part.

8   Q.  Okay.

9   A.  She confirmed that it was -- that there was one in her

10      car.  He also confirmed that he had placed recording

11      devices and I think she found -- it sounded like it was

12      upwards of a dozen of them.

13  Q.  Where?

14  A.  I don't know where she found them.

15  Q.  You never had a conversation with her about that?

16  A.  Yeah.  I don't know where, where she found them.  There

17      was a batch of them.  So I don't know if she found them in

18      the, in the bathroom or the bedroom or the basement or --

19      I don't know.

20  Q.  Of her house?

21  A.  I have no idea.  Yeah.  I don't know where she found those

22      pieces.

23  Q.  Okay.  So when is it -- did Cindy tell her husband about

24      the affair at some point?

25  A.  Yes.  I think she did.
```



Todd Courser
01/28/2020                                             Page 78

```
 1  Q.  When was that?

 2  A.  I think that was in I wanna say March or April.

 3  Q.  Of '15?

 4  A.  I think so.

 5  Q.  Did he suspect anything before that time?

 6  A.  Yes, I think so.  My understanding is they were estranged

 7      for quite sometime.

 8  Q.  What does quite sometime mean?

 9  A.  I don't know.  They -- she just -- from my understanding

10      is they were not really together for, I don't know if it

11      was a year or two or whatever that was.

12  Q.  Well --

13  A.  Even while she was running for office.

14  Q.  -- but he was helping, he was helping run her campaign

15      when she was running for office?

16  A.  That's correct.

17  Q.  Yet they were estranged at that point?

18  A.  That's my understanding.  There had been some physical

19      altercations as well.

20  Q.  Any of those reported to the police?

21  A.  I don't know.

22  Q.  Where does Cindy currently reside?

23  A.  I think, I think here in Kalamazoo.  Well, we're not in

24      Kalamazoo here; are we?  Portage.  So she's in Kalamazoo,

25      I think.
```



Todd Courser
01/28/2020                                          Page 79

1  Q.  When was the last time you spoke to her?

2  A.  **I speak to her by phone frequently.  I have not spoken to**

3      **her by phone in the last, I wanna say the last month.**

4      **It's probably been a month ago.**

5  Q.  Okay.  So you believe that Cindy told her husband about

6      your affair in March or April of 2015.

7             Was there a time before that, though, where you

8      came to realize that, hey, Joe might know what's going on?

9  A.  **I don't know.  I didn't have much contact with Joe.**

10 Q.  Yeah.

11 A.  **So --**

12 Q.  Was there ever a time where he showed up at the, the

13     Radisson in February of 2015?

14 A.  **He showed up.  I was not there.  I did not know that he**

15     **was there.  My understanding is he came, I think it was**

16     **the 12th or 13th of February.**

17 Q.  And wasn't it your understanding -- were you staying there

18     at that time?

19 A.  **I was, yeah.**

20 Q.  Yeah.

21 A.  **Yeah.**

22 Q.  Okay.  And was Cindy staying with you?

23 A.  **No.  She had her own room.  I was unaware that they had a**

24     **altercation till the next day.**

25 Q.  And what, what do you recall about that?



 1  A.   The next day I was told that there was an altercation

 2       between her [sic] and Cindy.

 3  Q.   Tell me what she told you.

 4  A.   She said he came to the hotel, she didn't open the door,

 5       and he was removed by Security.

 6  Q.   Did she tell you that he had witnessed her walking out of

 7       your room?

 8  A.   He -- she said that that's what he claimed.

 9  Q.   Did that likely happen?

10  A.   No.  No.  I'm not aware of that.  I was asleep when that

11       all happened.

12  Q.   She wasn't in your room at any point during that stay?

13  A.   Yeah.  She was in my room at points during that stay, but

14       she was -- I had no idea of that incident happening that

15       night.

16  Q.   And that incident, though, was brought on by him

17       suspecting that you two were having an affair; fair

18       statement?

19  A.   I think so.

20  Q.   Yeah.  Okay.  So as of let's say February of 2015, Joe was

21       already -- had suspicions about your two's relationship;

22       fair?

23  A.   Well, the text messages show that he, and also his

24       deposition shows that he was receiving phone calls and

25       also he was getting emails from the Radisson and that they



1   were giving him updates as to my coming and going from the

2   hotel and that he knew my hotel room and he also confirms

3   that he was receiving emails of my reservations and

4   cancellations and that sort of thing.  As a matter of

5   fact, it comes down to the minute-by-minute of my entry

6   and exit of the hotel.

7           It also shows that he was in my hotel room and

8   there were some pictures taken and there's some

9   communication about a recording.  He confirms that in the

10  deposition, most of that, that detail and some of it is in

11  the rest of the texts.

12  Q.   And that was a deposition that he gave in what?

13  A.   I think he gave that one in the fall of 2018.

14  Q.   In what action?

15  A.   The action between Cindy and Joe.

16  Q.   And that was Cindy suing Joe or was that --

17  A.   Yes, I believe so.  They had a divorce, so I -- but I

18       think it was in the civil case.

19  Q.   Did Joe know Mr. Allard and Mr. Cline and Mr. Graham?

20  A.   Only from the campaigns, my understanding was.  He didn't

21       care for any of the three of them, but they seemed to

22       spend a lot of time together.  Initially, he claimed he

23       didn't like any of the three of them, but the

24       communications show that they, they spent a lot of time

25       together, I guess is what I'm saying.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

1   Q.   After that incident in February of 2015, were there any

2        other circumstances where you became aware that Joe was

3        either confronting Cindy about your affair or taking steps

4        to try to gather information about your affair?

5             MR. DePERNO:  Objection to the form.  I think

6        it's a compound question and may be confusing.

7   BY MR. KOSTELLO:

8   Q.   Do you understand what I was asking you?

9   **A.   It's difficult to kinda say that because it's after the**

10      **fact so I have all the evidence between here and there.  I**

11      **became aware of it through the evidence that we received**

12      **at the various spots where we received the evidence.**

13  Q.   Yeah.

14  **A.   But that was -- some of that was in '18; some of it was in**

15      **'17.  So --**

16  Q.   Right.  All right.  In any event, there's no question

17       that, that before Cindy even told him that she was having

18       an affair with you, he was suspicions of it and was taking

19       steps to try to figure out if, in fact, you were having an

20       affair; fair statement?

21  **A.   I, I, I don't know.  I mean you have to ask him what his**

22      **steps were.**

23  Q.   Okay.  All right.  Why is it that Cindy told him in March

24       or April of 2015?

25  **A.   I think it was the -- I actually don't know.  I, I don't**



Todd Courser
01/28/2020                                    Page 83

1      know when the text messages started to come, the extortion

2      text messages that were being sent, and I don't know if

3      she told him before that or after that.

4   Q. Well, we just talked about that and, you know, the first

5      documented one that we have is May of, May 19 of 2015, and

6      I thought we had just talked about the fact that they

7      maybe started about four days before that, on the 15th,

8      but you deleted the first couple of them.  So we're

9      talking pretty -- you know, the middle of May here for

10     when those texts came.  If she told him March or April,

11     that's seemingly a month or two before the text messages

12     started.

13             So was there any other event that precipitated

14     her affirmatively telling him about the affair?

15  A. I can't remember that.

16  Q. Okay.

17  A. I mean I just can't remember that time period.

18  Q. Was that something she consulted with you before doing?

19  A. I, I don't know.  I don't know that I -- I don't remember

20     having a conversation about, about what you're talking

21     about, did she tell me or ask me if she should tell him.

22  Q. Did you know she was gonna tell him?

23  A. I, I honestly can't remember.

24  Q. Did she tell you after -- was after the fact the first

25     time you learned about it?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Todd Courser**
01/28/2020                                          Page 84

 1  A.   I, I don't remember.

 2  Q.   And I don't mean to badger you about it, but it seems like

 3       a pretty significant sort of issue.  You were having an

 4       affair with a married woman, and her husband, she

 5       affirmatively told her husband about it, which arguable

 6       could cause some issues for you, both with perhaps your

 7       family and others, and it seems to me that you might have

 8       a recollection of exactly how that went down or why it

 9       went down.

10  A.   **I don't remember if it happened that she told me before or**

11       **she told me after is what I'm trying to say.**

12  Q.   But you knew, nevertheless, you knew that she told him;

13       right?

14  A.   **Yes.  She did tell me.**

15  Q.   And what was that?  Did she, did she tell you what his

16       reaction was at that time?

17  A.   **I can't remember that.**

18  Q.   Okay.

19  A.   **Like I said, they had, my understanding is they'd been**

20       **estranged for quite sometime.**

21  Q.   Right.  Were you concerned with him knowing about it, that

22       he would reach out to your wife?

23  A.   **You know, at that point I don't, I don't, I don't remember**

24       **what my reaction was to that.**

25  Q.   Okay.  Did you care one way or the other whether or not



Todd Courser
01/28/2020                                                    Page 85

1       your wife found out about it?

2    A.  I mean I think, you know, obviously I did care, but I

3        don't remember how that happened.  I told my wife and the

4        -- and I can't exactly remember the day, but it was -- it

5        seemed like it was in, in May as well.

6    Q.  Okay.  Did anyone from your family know about it before

7        you told your wife?

8    A.  I can't remember who I told first.  There was a -- that

9        was one of the emails that happened in March that they had

10       gotten out of my computer.  And that email, I think, was

11       between my mother and my brother and myself, discussing

12       those, those issues.

13   Q.  So there was an email that existed in March of '15 between

14       yourself, your brother and your mother wherein you were

15       discussing the affair you were having with Cindy?

16   A.  Yes.  I believe that's when it happened.

17   Q.  And your brother is Dan?

18   A.  Dan, yes.

19   Q.  Your mother is?

20   A.  Georgeann.

21   Q.  Georgeann.  Okay.

22               And why is it that you were having that email

23       communication with them at that point?

24   A.  Well, it's within my family.  It's an issue that's gonna

25       come out.



**Todd Courser**
01/28/2020                                           Page 86

1   Q.   Yeah.  Okay.  Let me ask you a different way.

2            Was that -- did you affirmatively reach out to

3        your mother and brother, at that point, to tell them about

4        it?

5   A.   It was before the email.  The email is actually kind of

6        the end of that conversation.

7   Q.   Okay.  The email's the closure to you telling them?

8   A.   It seemed like it, and then there's more after that,

9        but --

10  Q.   All right.  So did you tell them by way of a phone call, a

11       meeting in person?

12  A.   I don't remember.

13  Q.   Why is it that you decided to tell your mother and brother

14       at that point?

15  A.   I, I don't know.

16  Q.   Okay.

17  A.   It seems like they're the people I would tell.

18  Q.   Fair enough.  So then it sounds to me like the email that

19       was kinda the closure to that conversation between your

20       mother and your brother about the situation, that got in

21       the hands of Mr. Cline, Mr. Allard and Mr. Graham?

22  A.   Yeah.  They were -- apparently it wasn't just those

23       emails.  There were others.

24  Q.   And this was an email that would have gone to the

25       todd@toddcourser.com email address?



Todd Courser
01/28/2020                                        Page 87

1   A.   Yes, I believe so.  They also were going through the

2        archives of old emails from ten years ago they could use

3        in the, in the extortion texts and they did use some of

4        those pieces of information in the extortion texts.

5   Q.   Okay.  So they found this information by accessing your

6        private email account; correct?

7   A.   That is correct.

8   Q.   And that would have told them at that time --

9   A.   That's my understanding.  I don't wanna say correct.

10       That's my understanding.

11  Q.   That's fine.  That would have given them the information?

12            It sounds like the email, for example, that you

13       sent to your mother and your brother, the closure email,

14       essentially would have given them the impression that you

15       were in fact having an affair with Cindy at that time;

16       correct?

17  A.   You'd have to repeat that question because I'm not sure

18       what you're saying.

19  Q.   Yeah.  I mean that email that we're referring to in March,

20       if someone read it cold, you know, if you were to hand it

21       to me right now and not knowing anything about this, would

22       I get the gist of the fact that you were having an affair

23       with someone?

24  A.   I don't know.  You'd have to read it.

25  Q.   Yeah.  Well, I'm asking you.  You wrote it.



Todd Courser
01/28/2020                                    Page 88

```
 1  A.   But you're asking me would you get it.  I'd have to read

 2       it myself to remember that.

 3  Q.   Did it contain reference to the fact that you were having

 4       an affair with Cindy?

 5  A.   I think you'd have to read it because I can't remember the

 6       context.  It was quite long.  It was a back-and-forth that

 7       happened.

 8  Q.   All right.  In any event, the fact that you were having an

 9       affair was out of the bag at least in March of 2015?

10  A.   Yes, I think so.

11  Q.   So Joe Gamrat at least knew about it and then --

12  A.   March or it might've been April.

13  Q.   Somewhere in there --

14  A.   Yeah.

15  Q.   -- he knew about it; right?

16  A.   Yeah.

17  Q.   Okay.  Just to tie up a few loose things before we move on

18       to something here.

19            Ultimately, Mr. Allard and Mr. Graham were

20       dismissed from their positions?

21  A.   Yes.  They were fired by the Speaker of the House.

22  Q.   And that took place in July of 2015; correct?

23  A.   I believe July like --

24  Q.   6 or 7?

25  A.   -- 7th or 8th, somewhere in there.
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

```
 1   Q.   Okay.  And that came about because you made a
 2        recommendation that they should be fired?
 3   A.   No.  It came about because they had taken Ann Hill off of
 4        State property and then threatened her and there was a
 5        recording that she made of that --
 6   Q.   Okay.
 7   A.   -- and tried to -- somehow they were, they were listening
 8        in on the conversations between Cindy and I, and we were
 9        discussing letting them go.  We tried to hire someone else
10        to replace one, and I brought Karen in as well, so we were
11        making a transition and we were gonna let the two of them
12        go.  So they moved to try and get -- you don't understand
13        how Lansing works, but basically they, they realized, from
14        listening in on the conversations between Cindy and I,
15        that we were gonna fire them and that we had met with Ann.
16   Q.   Ann, as I understand it -- and correct me if I'm wrong --
17        was brought in because there was a decision made at some
18        point to, to separate the staff; is that correct?
19   A.   We made the -- we, we wanted them to separate the staff
20        from January on, just said it isn't gonna work so we need
21        to hire somebody else, and they continued to fight to
22        continue to stay as a joint unit.  They didn't want
23        anybody else on staff.
24             We brought in Ann Hill and then Karen Couture.
25        And the two of them on their own were taking care of the
```



1    two offices.  And both ladies said that they're

2    undermining you guys and that they are trying to get you

3    guys removed from office.  And both of them said they're

4    not responding to constituents, they're refusing to go to

5    meetings, they were not following up with required

6    in-district events that were required.

7             And so once that information was coming

8    together, they got wind of the fact that we were gonna

9    fire them and we were gonna hire a gentleman named Justin.

10   And they got -- they were listening in on that

11   conversation, from the text messages that I've seen, and

12   therefore moved to try and run Ann out of the office by

13   threatening her.  That's on a recording with Ann.

14 Q.   When was Ann hired?

15 A.   I don't know.

16 Q.   When was Karen brought in?

17 A.   I think Karen was brought in the end of May or June.

18 Q.   After Joshua resigned in April of '15, was anyone retained

19      or hired to replace him?

20 A.   We were attempting to find someone.  We interviewed a

21      bunch of people.  Of course they were never the right

22      person for Keith Allard or for Ben Graham, and so there

23      was always a reason that a new staff member wasn't going

24      to work out.  And so they would set up the interviews, of

25      course, and it seemed like there was some resistance to



1    hiring anyone else.

2            So I brought in Karen, because Karen is a

3    administrative wizard, and so she immediately said, as a

4    matter of fact, when the day Karen was hired, they set her

5    at a computer and there was a chat stream that was

6    happening between Allard and Graham and they said he's not

7    going to the funeral, we should follow him and take

8    pictures, along the lines of I think they were, they were

9    trying to suggest that I was making up the funeral of my

10   uncle to go and have sex with Cindy.  And Karen saw that

11   her first day and then came to me.

12           I then, I then confronted them about that and

13   then, again, went to the House Business Office to say how

14   do we, how do we deal with this, move them to someplace

15   else, can we get them out of this office, and that's,

16   that's how that went.

17  Q.   Okay.  So it was you that went to the HBO to ask about

18       them being removed from your office?

19  A.   I think Cindy went separately, and I believe Karen or Ann

20       went as well because of the pictures, the pornography,

21       because of the statements they made, the artwork.  We'll

22       just say it that way.

23  Q.   Who was Mr. Allard's supervisor?  I mean if you had to --

24       if someone asked you the question who was his supervisor,

25       who was above him, who did he report to, who was his boss?



Todd Courser
01/28/2020                                    Page 92

1  A.  We didn't have the ability to hire or fire.  And I don't

2      know if they would've called us the direct supervisor, but

3      they worked for what's called the House Business Office.

4      And the House Business Office, I think the gentleman's

5      name, he's retired now, I think his name is Bowlin.

6  Q.  Tim Bowlin?

7  A.  Tim Bowlin.  Yes.  I, I think he moved to Las Vegas or

8      Phoenix or something like that.

9  Q.  Right.  But the House Business Office didn't have

10     day-to-day contact with these individuals?

11  A.  Yeah.  Yes, they did.

12  Q.  They did?

13  A.  Yeah.

14  Q.  How so?

15  A.  Well, their, their office is the -- so any timecards, any

16     of the legislative information, I believe, goes through

17     the House Business Office, requests for stamps, paper,

18     costs, calendaring, time off, all of that stuff is not

19     handled from us; it's handled from them.

20  Q.  That's like kind of, you know, supplies, administrative

21     sort of stuff, though.

22          I mean from a day-to-day perspective, was

23     someone watching over Mr. Allard and his job performance?

24          Was that person you?  Was it Cindy?  Was it a

25     combination of both of you?



1   A.   **Well, Allard was in her office, I believe paid for by her,**

2        **but like I said, it's kind of a weird thing.  Essentially,**

3        **the person that hires and fires and has control is the**

4        **Speaker of the House, he designates that to the, I think**

5        **it's called the House Manager, Tim Bowlin, and then, from**

6        **there, the administration happens.**

7   Q.   All right.

8   A.   **Now, they're supposed to serve us as the State**

9        **Representatives for the district.  They're, they're**

10       **actually employed to serve the district.**

11  Q.   So if there were issues that you had with job performance

12       of any of the legislative aides, including Mr. Allard, Mr.

13       Cline or Mr. Graham, was there a method where you could go

14       to the HBO and paper their file, so to speak, put a formal

15       complaint in their file, a warning a, hey, this is what

16       happened on this date?

17            Let's say, you know, there was some episode of

18       insubordination, came in five hours late without an excuse

19       or whatever.  In a normal job situation, you open an

20       employment file and those sort of things appear.

21            Was there a method by which you could do that

22       with the HBO?

23  A.   **I'm sure there was.  I was told obviously they go through**

24       **that process to try to reassign them and I was told they**

25       **were working through that process --**



Todd Courser
01/28/2020                                    Page 94

```
 1  Q.  Well, but --

 2  A.  -- but I was new to the seat so I had never experienced

 3      any of this before.

 4  Q.  Sure.  So my question, though, then is from January of

 5      2015 up until the point that Mr. Allard and Mr. Graham

 6      were fired in July of 2015, were there any times where

 7      either you or Cindy papered their file with, hey, their

 8      job performance sucks, they weren't in on this day, Ben

 9      smells because he hasn't bathed, anything along those

10      lines?

11  A.  I know those conversations happened with the HBO.  Whether

12      or not they turned it into an actual written complaint, I

13      don't know.

14  Q.  Okay.  How many conversations did you have with the HBO

15      about them during the course between January of '15 and

16      July of '15?

17  A.  I, I don't know.

18  Q.  And who would you go to in the HBO to make those

19      complaints?  Would it be Tim Bowlin?

20  A.  Yeah.  It's Tim Bowlin's office.  He's the director of

21      that and you can go in and sit in his office.  He has an

22      administrative person.  Some of that happened with Tim

23      Bowlin, but he had a lady that really was the one that,

24      that ran that operation.  I, I don't know her name.

25  Q.  If you had issues that you wanted to report to Mr. Bowlin
```



Todd Courser
01/28/2020                                    Page 95

```
 1        or the HBO, would you do it in person or would it be done

 2        by way of email?

 3                    Is there a form to fill out where you could, you

 4        know, fill out the form and just hand it to his

 5        administrative assistant --

 6   A.   I'm sure there --

 7   Q.   -- or what?

 8   A.   I'm sure there are steps with that.  I don't know what the

 9        process was.

10   Q.   Did you take any of those steps?

11   A.   Yeah.  I spoke to them at the, at the HBO.

12   Q.   Okay.  When you spoke to them, when you say them, is it

13        Mr. Bowlin or his assistant or --

14   A.   It was him and his -- it was him and -- I can't remember

15        the lady's name that was his assistant.

16   Q.   When you did --

17   A.   I don't know who, I don't know who Cindy spoke to and I

18        also don't know who Ann Hill spoke to.

19   Q.   When you had those conversations, were they filling out

20        anything formal that you could note?  Were they taking

21        notes?  Did they have you sign anything after the fact?

22                    Anything along those lines?

23   A.   No.  I don't, I don't know if they took notes, but I don't

24        remember signing anything.

25   Q.   Okay.  And I guess the --
```



1  A.  Wait.  Wait.  I think I did sign something.  I don't, I

2      don't know when that was.

3  Q.  I guess the ultimate question was if I get the employment

4      files for Mr. Cline, Mr. Allard and Mr. Graham, and I open

5      them up, are they gonna be -- am I gonna see documentation

6      of these problems that you claim existed from the get-go

7      in January through the time they were dismissed in July?

8  A.  That would be great if you could get those.  I'd love to

9      see those myself.

10 Q.  I'm asking you.  Am I gonna see written complaints?  Am I

11     gonna see written reprimands?  Am I gonna see written

12     warnings?  Anything along those lines?

13 A.  How would I know that if I haven't seen them?

14 Q.  I don't know.

15 A.  I don't know.

16 Q.  Okay.

17         MR. DePERNO:  If I can interject, my guess is

18     you won't see any of that.

19         MR. KOSTELLO:  That's my guess, also, maybe for

20     different reasons.

21         MR. DePERNO:  Right.  We probably have different

22     reasons for thinking that, but --

23 A.  We gave him, also, the pictures of the, the pornographic

24     pictures that were coming in that they were leaving, their

25     artwork, and I think they were concerned about a sexual



1       harassment issue because it was more than one and then it

2       turned out there's the computers and then they had

3       complaints from the ladies as well.

4    BY MR. KOSTELLO:

5    Q.    Okay.

6    A.    But I don't know if they papered that into the file or

7          not.

8                    (At 12:25, Deposition Exhibit Number 1 was

9                    marked.)

10                   MR. DePERNO:   What's your plans on --

11                   MR. KOSTELLO:   This is off the record.

12                   (At 12:26 to 12:46 p.m., recess taken.)

13   BY MR. KOSTELLO:

14   Q.    Mr. Courser, let me show you what I've marked as Exhibit

15         1.   This is a document, actually, that was produced by Mr.

16         DePerno during the course of discovery in this matter.

17                   Have you ever seen this document before?   Just

18         for the record, it's Bates Number Plaintiff's Document

19         Production 1235 through 1239.

20   A.    Yes.

21   Q.    And what is this?

22   A.    This appears to be a Word document of the text messages

23         that I received during 2015.

24   Q.    Okay.   And these are the -- we've -- you've referred to

25         them before and I think I have, too, as the,



1        quote/unquote, extortion texts; correct?

2   A.   **That is correct.**

3   Q.   Okay.  Now, the first one here we see is dated 5-19-2015;

4        correct?

5   A.   **Yes.**

6   Q.   But we discussed, before, that you thought there may have

7        been a couple before this, before the May 9th -- 19th;

8        correct?

9   A.   **Yes.  We discussed that.**

10  Q.   Okay.  This first text starts out, "Boo!  The phone is a

11       burner.  Don't bother trying."

12            Did I read that correctly?

13  A.   **Yes, you did.**

14  Q.   Okay.  It kind of seems to me that that's almost an

15       introductory sort of like, "Hey, hello, this is me, I've

16       got a burner phone, you know, don't bother trying to trace

17       it" sort of thing.

18            It almost seems to me that that is a first type

19       of text that you may have received, but you're certain

20       that there were others before this?

21  A.   **I'm certain there were other texts.**

22  Q.   From the same number?

23  A.   **I'm not certain of that.**

24  Q.   Okay.  So when you went to the -- you ultimately went to

25       the police about these texts; correct?



Todd Courser
01/28/2020                                           Page 99

1  A.   That is correct.

2  Q.   And I think you went to the FBI first, is that right, or

3       did you go to the local Lapeer Police first?

4  A.   Local Lapeer Police first.

5  Q.   Okay.  And then you went to the FBI?

6  A.   Yes.

7  Q.   And the FBI told you to go to the Michigan State Police?

8  A.   Yes.

9  Q.   Which is what you did?

10 A.   Yes.

11 Q.   In August of 2015?

12 A.   Yes.

13 Q.   Okay.  So at that time when you provided them with the

14      texts that you were receiving, all of those texts that you

15      showed them were all from the same phone number, correct,

16      a 313 number?

17 A.   I believe so.

18 Q.   So you're telling me that there may have been ones before

19      that that were from a different number or you just don't

20      know one way or the other?

21 A.   It seemed to me that some of the texts that I received

22      were different than the ones that Cindy received.

23 Q.   Okay.

24 A.   But I can't remember.  I did receive other texts, but I'm

25      not certain that they were from the same number or not.


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 100

1  Q.   Okay.  Were any texts that were deleted ever recovered

2       from your phone, as far as you know?

3  **A.   I do not know that.**

4  Q.   All right.  So the first question, I guess, so these texts

5       start off, at least in Exhibit 1, on May 19 of 2015 and

6       the last one is on August 7, 2015.

7            It looks like you went into the Michigan State

8       Police on August 14, 2015; correct?

9  **A.   I believe that's correct.**

10  Q.   Okay.  Why is it that it took you three months to go

11       report these texts to the police?

12  **A.   Well, that's not true.**

13  Q.   Okay.  When did you make your first complaint about the

14       texts?

15  **A.   I spoke to the sheriff of our county earlier than that.**

16  Q.   When was that?

17  **A.   I do not remember.  It seemed like it was in the summer.**

18  **Probably June.**

19  Q.   And what did he tell you, though, at that time?

20  **A.   We had a conversation in my office concerning this and he**

21  **said that they could do an investigation on it.  If, if we**

22  **wanted to follow through with that, they would need my**

23  **phone.  He didn't really want to go, go forward with it.**

24  **He also suggested that I talk to the FBI.**

25  Q.   Okay.  So when he said we can do an investigation but I



Todd Courser
01/28/2020                                          Page 101

1       need your phone, what'd you tell him?

2   A.  In that conversation, he suggested that I go to the FBI

3       first.  Because it was political, he was from the local

4       community, I think he wanted to distance himself from it.

5   Q.  Okay.  So you think this may have been in June of 2015?

6   A.  I can't remember when the conversation happened in my

7       office, but I believe so.

8   Q.  When is it that you went to the FBI?

9   A.  I think it was right before the State Police.

10  Q.  So that was in August of '15; correct?

11  A.  That is correct.

12  Q.  So why is it that you waited another two months, then,

13      between June of 2015 and August of 2015?

14  A.  Because I was State Representative and I was having an

15      affair with another State Representative.

16  Q.  And you didn't want that to get out?

17  A.  Well, I wasn't sure exactly how to bring that out.  My

18      family already knew at that point.

19  Q.  Your family knew; Joe Gamrat knew; right?

20  A.  That's right.

21  Q.  Your staffers knew?

22  A.  Yes.  That is correct.  Apparently Joe Gamrat, Keith

23      Allard, Benjamin Graham, Joshua Cline, and a man named

24      David Horr had been working from the beginning of 2015,

25      together, putting this in place and conspiring to do the



Todd Courser
01/28/2020                                    Page 102

```
 1        extortion texts.

 2  Q.    Okay.  So who actually, to your knowledge, sent the

 3        extortion texts?

 4  A.    The phone was held by a man named David Horr.  The

 5        information was only information that could have been

 6        obtained by Allard, Graham, and Cline.  Some of it is

 7        information that Joe Gamrat had, but the rest of it came

 8        through Allard, Graham, and Cline.

 9  Q.    So are you claiming that Allard, Graham and Cline had

10        direct contact with Mr. Horr?

11  A.    I didn't say that.

12  Q.    Okay.  So how did Horr get the information from Allard,

13        Graham and Cline?

14  A.    He got it through Joe Gamrat.

15  Q.    Okay.

16  A.    He may have gotten it directly, but we haven't gotten that

17        discovery.

18  Q.    Okay.  So Mr. Gamrat was obtaining information you believe

19        through Allard, Graham and Cline and then passing it on to

20        David Horr and telling him what to text out?

21  A.    That's what the texts show.

22  Q.    Okay.

23  A.    At the time is different than what I know now.  The texts

24        at the time, these texts, I didn't know where the

25        information was coming from, but it was very personal
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Todd Courser**
01/28/2020                                        Page 103

1       information.

2   Q.   Uh-huh.  Okay.  So --

3   A.   **Now I have the text messages from the various discovery**

4        **and it shows the, the connections between Allard, Graham**

5        **and Cline and Joe Gamrat and David Horr.**

6   Q.   Okay.  So between March of 2015, when Joe Gamrat found out

7        about this through Cindy and your family found out about

8        this from yourself, through May of 2015, when you started

9        getting these texts, was there anything you were doing to

10       try to keep this affair quiet so that, you know, either

11       the Press didn't learn about it, your constituents didn't

12       learn about it, your wife didn't learn about it or --

13  A.   **Well, we already, we already, we already discussed --**

14            MR. DePERNO:  Wait.  Let him finish the

15       question.

16  BY MR. KOSTELLO:

17  Q.   -- was it just kind of fingers crossed, "Let's hope no one

18       says boo about this"?

19  A.   **I can't answer your question.  It's compound.  Which part**

20       **do you want me to answer?**

21  Q.   Answer the first part.

22  A.   **Which part?**

23  Q.   Was there anything you did between March of 2015 and May

24       of 2015, when you, when you started getting these texts,

25       to affirmatively make sure that this information about the



Todd Courser
01/28/2020                                      Page 104

```
 1    affair did not come out?

 2 A. Well, I went to the police.  Is that what you're --

 3 Q. You didn't go to the police until June of 2015.

 4 A. Sure.  So I went to the HBO, said, hey, these guys,

 5    they're -- I was obviously disgusted with them.

 6       Also, there was another police officer, and I

 7    can't remember if it was before or after, which was the

 8    Capitol Police, which is separate, and I'm not sure when

 9    that meeting was.

10 Q. Well, when did you go to the HBO about this?

11 A. I didn't go to the HBO about this, the actual text

12    messages.  I went to the HBO regarding Allard, Graham and

13    Cline and their work performance.

14 Q. I get that.  So when was the first time you went to the

15    HBO about their work performance?

16 A. I believe that was in March --

17 Q. Okay.

18 A. -- because I think that's when we found out about the

19    pornographic stuff.

20 Q. Was that not enough, the pornographic stuff, was that not

21    enough to get them dismissed?

22 A. Well, yes, if you actually wanted to dismiss them.

23 Q. You did not at that point?

24 A. No.  We wanted them dismissed.

25 Q. The HBO did not?
```



Todd Courser
01/28/2020          Page 105

1   A.   We wanted them reassigned to someplace else.  The HBO

2         refused and said they would work on it and strung us along

3         with that.

4   Q.   What does that mean, work on it?

5   A.   Well, you tell me.

6   Q.   Work on finding them, work on finding them another post?

7   A.   That was my understanding.  Yes.

8   Q.   So given that supposedly pornographic material was found,

9         again, your position is that they were looking to just

10         make them someone else's problem?

11   A.   Their concern was that it was a sexual harassment issue.

12   Q.   Right.  So my point is that reassigning them to another

13         Representative doesn't solve that problem, does it, if

14         they're inclined to have pornographic pictures on their

15         computer, for example?

16   A.   No.

17   Q.   It's someone else's issue, then, at that point?

18   A.   It wouldn't be my problem, it would be someone else's

19         problem, but I didn't have any mechanism to fire them.  I

20         had to go through the channels that were government, the

21         government channels, to be able to bring into the record

22         the actions of these employees.

23   Q.   Okay.

24   A.   That's all I could do.

25   Q.   Needless to say, is it a fair statement that from March of



Todd Courser
01/28/2020                                    Page 106

1       2015, when you know that Joe Gamrat knew about the affair,

2       and you told your brother, Dan, and your mom, Georgeann,

3       about the affair, through the time you first started

4       getting these extortion texts, that you were hoping that

5       this information about the affair didn't become public?

6   A.  **No.  That's not true.  I knew it was going to become**

7       **public.**

8   Q.  How did you know it was gonna become public?

9   A.  **Because they said it's gonna become public.**

10  Q.  They said it was gonna become public in the texts;

11      correct?

12  A.  **That is correct.**

13  Q.  Okay.  So listen very carefully to my question then.

14              From March of 2015 until the time you received

15      the first text in May of 2015, is it fair to say that you

16      were hoping that the information about the affair did not

17      become public?  So in March and April up through May of,

18      May 19 or May 15, whenever you may have received the first

19      text.

20  A.  **Yes, I would've hoped that, but I assumed it would become**

21      **public.**

22  Q.  Why did you assume?

23  A.  **Because you now had people who were trying to make it**

24      **public, and I was approached by reporters that Allard,**

25      **Graham and Cline -- and I don't know if Joe Gamrat -- were**



Todd Courser
01/28/2020                                    Page 107

1      speaking to who were coming to me about the affair.

2   Q.  Okay.

3   A.  It was already public at that point.

4   Q.  When did it -- when did you first realize that reporters

5      knew about the affair?

6   A.  It was on the House floor when they sent anonymous texts

7      to one of the reporters or several of the reporters, but

8      one of them approached me.

9   Q.  And this was before you received the first extortion text?

10  A.  I believe it was.

11  Q.  Okay.  So do you remember who the reporter was that

12     approached you?

13  A.  Kyle Melinn.

14  Q.  MR -- MIRS?

15  A.  He was at MIRS; I don't think he is now.

16  Q.  MIRS.  Okay.  At the time, though, he was at MIRS?

17  A.  Yes.

18  Q.  And he approached you and asked you about the affair?

19  A.  I believe that's how it happened.

20  Q.  Okay.

21  A.  I believe it was in the back hallway at the State Capitol,

22     so it was, at that point, it was my sense it was going to

23     be public.

24  Q.  Okay.  Gotcha.  When the extortion texts started coming

25     in, I take it you realized there was a greater chance that



Todd Courser
01/28/2020                          Page 108

1      it would ultimately become public; you were being

2      threatened --

3   A.   I was being --

4   Q.   -- that it was going to be public?

5   A.   -- extorted, yes, into -- obviously this, this all fits in

6        with Flint water.  You don't understand politics, and I

7        get it.  You're trying to do your job.  But there were

8        issues related to Flint water.  Flint water hadn't become

9        public at that point.  But we were getting information

10       that there was a problem with Flint water, that people

11       were dying from legionnaires' disease, all that stuff was

12       happening.

13             And so obviously they were concerned and I

14       myself was one of the few votes against the road tax and

15       all that sort of stuff, so there was a lot of attention to

16       try to get leverage over myself and over Cindy.  And so

17       you didn't really know where the pressure was coming from.

18       Was it Allard, Graham Cline or was it the Speaker of the

19       House or was it from someplace else.

20             Obviously we were both against Prop 1, and that

21       was happening at the very same time.  Prop 1 was the

22       attempt by Schneider to get the tax increase.  So the

23       sense was the extortion was, was trying to get us to vote

24       a certain way on that key piece of legislation --

25   Q.   Okay.



Todd Courser
01/28/2020                                        Page 109

1  A.  -- so that they could pass it.

2  Q.  That was your thought at the time when you first started

3      getting these?

4  A.  **That was my thought at the time and that's my thought now.**

5  Q.  Really?  In hindsight, looking back and seeing who was

6      involved in the extortion texts, you still believe that

7      the purpose of them was political in nature and not

8      personal in nature?

9  A.  **Allard, Graham and Cline met with the Speaker's House and**

10     **the Speaker's chief legal counsel repeatedly, both on site**

11     **and off site, concerning this before the text messages**

12     **came.**

13 Q.  Right.  But ultimately the two main individuals behind the

14     text messages were Joe Gamrat and David Horr; correct?

15 A.  **That's incorrect because the information came from Allard,**

16     **Graham and Cline.**

17 Q.  Mm-hmm.  Joe Gamrat, what was his motivation for being a

18     part of this whole thing?

19 A.  **Joe Gamrat's motivation was to -- it says in the texts --**

20     **to remove us from office.**

21 Q.  Okay.  And you believe that as opposed to maybe Joe

22     Gamrat's desire in sending these was simply to have you

23     stop having sex with his wife?

24 A.  **He never says that.**

25 Q.  Yeah.



Todd Courser
01/28/2020                                    Page 110

1  A.   So I don't believe that these texts were from Joe Gamrat

2       alone; I believe they're from Allard, Graham and Cline.

3  Q.   Mm-hmm.  Okay.  Gotcha.

4  A.   I think that would've been Joe's motivation, and I think

5       Allard, Graham and Cline used that to get him to act out

6       the pieces they needed him to, and that's what the text

7       messages show.

8                 (At 1:01 p.m., Deposition Exhibit Number 2 was

9                 marked.)

10 BY MR. KOSTELLO:

11 Q.   I show you what I've marked as Exhibit 2.

12                Have you seen this document before?

13 A.   Not this specific one.

14 Q.   Have you seen the text of what's contained in this

15      document before?

16 A.   I have.

17 Q.   And what is that text?

18 A.   That is a -- that is the text from a email that was

19      crafted and then it was sent out.

20 Q.   The email was crafted by who?

21 A.   It was crafted by myself and a man named Benjamin Graham.

22 Q.   So you actually had a meeting with Ben Graham on May 19,

23      2015 to discuss sending out this email; correct?

24 A.   Yes.  I believe it was on May 19th.

25 Q.   And that meeting took place in your law office in Lapeer?



Todd Courser
01/28/2020                                    Page 111

1  A.   Yes, it did.

2  Q.   Late at night, like 10:00 p.m., something along those

3       lines?

4  A.   I don't know the exact time but that sounds right.

5  Q.   And the reason -- you actually asked for that meeting with

6       Mr. Graham; correct?

7  A.   Correct.

8  Q.   And the reason you asked for that meeting was to discuss

9       with him sending out this email in order to create a

10      diversion of some sort because of -- I think -- well,

11      correct me if I'm wrong -- your concern about the

12      information regarding your affair coming to light; is that

13      fair?

14 A.   I met with him concerning the extortion texts that I was

15      receiving and that Cindy was receiving.

16 Q.   Mm-hmm.  Okay.  And you just discussed with him or asked

17      him, at that time, to send out this email; did you not?

18 A.   I asked him how would we deal with this in regards to the

19      extortion texts.

20 Q.   Okay.  And what did he tell you?

21 A.   We went through scenarios on what would be the actual

22      language that went into this.

23 Q.   Okay.  Whose idea was it to send this out?

24 A.   I actually can't remember.  I think he brought it up first

25      and then approached a man named Ike Eickholdt and made a



Todd Courser
01/28/2020                                Page 112

1        phone call to him prior to our meeting, asking him if he

2        would be available to send out an email.

3   Q.   Okay.  So it's your testimony that it was Mr. Graham's

4        idea to send out this email to distract from the issue of

5        the extortion texts and ultimately the affair?

6   A.   No.  We had a conversation.  I don't know that it was his

7        idea.  I think that the two of us had a conversation that

8        night --

9   Q.   Okay.

10  A.   -- and this was the result of that.

11  Q.   I asked you, though, the question about whose idea it was.

12            Whose idea was it?

13  A.   I can't remember who had the original idea.

14  Q.   Okay.

15  A.   That, that night was pretty rough.  So --

16  Q.   All right.  Mr. Graham has indicated that it was your

17       idea.  Is he mistaken in that?

18  A.   I think he is.

19            MR. DePERNO:  Objection to the form of the

20       question and, and the source of the information that you

21       just presented.  I'm not sure that's an accurate

22       statement.

23            MR. KOSTELLO:  Oh, I believe it's completely

24       accurate.

25            MR. DePERNO:  Is there a document you're



Todd Courser
01/28/2020                                          Page 113

```
 1      referring to?

 2   BY MR. KOSTELLO:

 3   Q.   Okay.  So you believe it was his idea then?  Is that what

 4        you're saying?

 5   A.   There was a, there was a tape made of that conversation.

 6        Mr. Graham has released a portion of that.  The rest of it

 7        has been redacted, twenty-something minutes of it.  The

 8        conversation between him and I happened before that.  He

 9        spoke, if I remember correctly, now this is all very vague

10        from that night, but Mr. Graham spoke to Ike Eickholdt and

11        reached out to him beforehand, asking if he would be

12        available to assist on doing some emails.

13   Q.   When you say beforehand, before what?

14   A.   Before the actual meeting that I had with Ben, with Ben

15        Graham.

16   Q.   So before May 19, Ben Graham had reached out to Ike

17        Eickholdt, to ask him about sending out a mass email?

18   A.   I believe it was the hours before that.

19   Q.   Okay.  So --

20   A.   We have that text message, I believe.

21   Q.   So in the hours before your late night May 19 meeting,

22        Mr. Graham reached out to Ike Eickholdt about sending out

23        this email?

24   A.   I was not aware of that at the time.  Ike -- I'm aware of

25        that now from the text messages.  At the time, I did not
```



Todd Courser
01/28/2020                                    Page 114

1      know that Ben had reached out, that Ben Graham had reached

2      out to Ike Eickholdt.  Ike Eickholdt, my understanding was

3      he believed that he was doing this on behalf of me.  I had

4      not spoken to him at that point; Ben had reached out to

5      him.  I'm just going from the text messages and the, and

6      the actual call logs.

7   Q.  Mm-hmm.  And who wrote the text of this email?

8   A.  It was written on my computer.  He and I sat there and

9      went through the actual language of it.

10  Q.  Okay.  So both you of sat there together and jointly

11     constructed this email?

12  A.  Yes.

13  Q.  Okay.

14  A.  He, he made recommendations on word phraseology or phrases

15     to use and, like I said, there's twenty-something minutes

16     missing from the conversation tape that was released

17     publicly.

18  Q.  All right.  And tell me exactly what the point of sending

19     this out was.

20  A.  The point of this was to actually to force the person that

21     was extorting myself with these texts, to force that

22     person to, to respond and therefore reveal themselves, and

23     they did.  And I knew it was very close to Benjamin Graham

24     because immediately the text messages that we were

25     receiving and the conversations that were being had and



**Todd Courser**
01/28/2020                                   Page 115

1       people reaching out confirmed that that was the case.

2   Q.   So after this was typed out that evening, was it then sent

3        to Ike Eickholdt to send out?

4   **A.   Yes, it was.**

5   Q.   Who sent it to him?

6   **A.   I pushed Send on the computer.  Yes.**

7   Q.   From what email account?

8   **A.   I wanna say that was from, I believe that was from**

9   **todd@toddcourser.com but it could've been**

10  **courserlaw@gmail.com.**

11  Q.   And when did the email go out, so to speak, to however

12       many people it went out to?

13  **A.   I believe that Ike sent it out the next day.**

14  Q.   So we're talking May 20?

15  **A.   I believe so.**

16  Q.   Do you know what time it went out?

17  **A.   I do not.  I don't know who he sent it to either.**

18  Q.   And that was -- just so I'm understanding, your position

19       is that Ben Graham was complicit in the whole decision to

20       send out the email, the writing of the email and, well,

21       the initial idea, the writing of the email, and then the

22       decision to send it out?

23           MR. DePERNO:  Objection to the form of the

24       question.  Compound.  You can answer it.

25  BY MR. KOSTELLO:



Todd Courser
01/28/2020                                    Page 116

1  Q.   You can answer it.

2  **A.   Oh, okay.**

3            MR. DePERNO:  Just trying to make sure you

4       understand it.

5  **A.   What I understood at the time versus what I understand now**

6       **is different because of the evidence.  So do you wanna**

7       **know what I thought then or what I think now?**

8  BY MR. KOSTELLO:

9  Q.   Yeah.  Why don't you tell me what you think -- thought

10      then.

11 **A.   What I thought then is that we were trying to figure out**

12      **how to deal with this.  What I, what I understand now is**

13      **that Mr. Graham --**

14           MR. DePERNO:  You said this.

15           **THE WITNESS:  The extortion texts that I was**

16      **receiving.**

17 **A.   What I understand now is that Ben Graham was working with**

18      **Allard, Graham, Cline and Joe Gamrat and David Horr, and**

19      **so they were the ones that were actually sending the**

20      **extortion texts while Mr. Graham was sitting in the**

21      **office.**

22 BY MR. KOSTELLO:

23 Q.   Did the police investigation ever link Mr. Graham,

24      Mr. Allard, Mr. Cline to any plot to send those out?

25           I mean -- and I guess I'll step back because



Todd Courser
01/28/2020                              Page 117

```
1       there's a difference, I guess a distinction between Joe

2       Gamrat having conversations with them and obtaining

3       information versus them affirmatively being involved in a

4       plot to send these extortion texts out.

5               Are you aware of any evidence that exists

6       wherein they were implicated, by the Michigan State

7       Police, in that plot to send out the texts?

8    A. Yes.  When you read their texts, it's pretty clear what

9       they're doing.  So I don't know if you read through --

10   Q. Yeah, I have.  And I --

11   A. -- the thousands of pages of texts.

12   Q. -- can't point to a single text where they talk about

13      sending out these texts to you.  There's not one and I've

14      read every one of them.  So I'm just wondering where,

15      where exactly that exists.

16   A. I mean I'd have to go through the text messages, those

17      thousands of pages.

18   Q. Yeah.  Okay.

19              You've also probably read the Police Report on

20      your extortion complaint; correct?

21   A. Yes, many times.

22   Q. Where, in that report, does it come to the conclusion that

23      Mr. Graham, Mr. Cline and Mr. Allard were involved in

24      that, in that plot in any way?

25   A. It doesn't say it in the Police Report.  Where it does say
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 118

1       it is the Speaker of the State House said, and we became

2       aware, that these employees were involved in a months'

3       long extortion plot to remove their, their State

4       Representatives from office.

5    Q.  Okay.

6    A.  Do you want me to find that for you?

7    Q.  No.  That's fine.

8    A.  They said it, the Speaker of the State House said it, it's

9       a quote that was then used in multiple other spots.

10   Q.  Mm-hmm.

11              (At 1:12 p.m., Deposition Exhibit Number 3 was

12              marked.)

13   BY MR. KOSTELLO:

14   Q.  Let me show you what I marked as Exhibit 3.  These are

15      Bates Number Plaintiff's Document Production 213 through

16      215.

17              Have you ever seen a form of this document

18      before or, or these pages?

19              Do you recall reading these pages?

20   A.  Yes, I do.

21   Q.  Okay.  These appear to be text messages from -- to and

22      from Ben Graham; is that fair?

23   A.  I don't see his name so I'd have to -- there were a lot of

24      text messages mixed in, so I'm not sure.

25   Q.  Well, if you go down to Page 213, for example, the second



Todd Courser
01/28/2020                                    Page 119

1    one from the bottom, it's from Todd Courser and it looks

2    like, perhaps, your phone number was, was redacted, but

3    the message is, "Ben, I realize that was probably not the

4    way to handle that with you and I know you are now

5    probably making a decision of how to proceed forward", and

6    you're addressing Ben.

7             I assume that's Ben Graham; correct?

8  A.  Yes.  I would assume so, but I'm not -- go ahead.

9  Q.  Okay.  So the meeting that you had with Mr. Graham on May

10   19 started at around 10:00 p.m.

11            When did that end?

12  A.  There's some dispute about that, based on the tape and

13      Joshua Cline's affidavit that he gave I think in -- a year

14      ago -- where he said that there are twenty minutes missing

15      from the tape.  So I believe the whole meeting lasted 102

16      or 112 minutes, somewhere in there.

17  Q.  Okay.  Looks like, if you go to Page 215, there's a text

18      from you to Ben Graham on May 20, 2015, at 1:07 a.m.

19            Do you see that?

20  A.  I'm sorry.  I don't see that.

21  Q.  It's about four down from the top.

22  A.  Yes.  I see that.

23  Q.  It says, "Hey, Ben, if you're not coming back, please let

24      me know.  I know it doesn't make sense and maybe it

25      doesn't.  If you see another way, then let me know, but if



Todd Courser
01/28/2020                                    Page 120

1       I can keep this from blowing all to hell, then I would

2       like to give it this shot.  Maybe it's nothing and maybe I

3       should not have ever run but I felt and still feel that

4       God brought me here and had me here and maybe it hasn't

5       accomplished anything but I have to believe it has done

6       some good in spite of me"?

7  A.   I don't see where you're reading.  I'm sorry.

8  Q.   Okay.  Do you see, "Hey, Ben" at 1:07 a.m. on May 20, four

9       texts down from the top?

10  A.   "Hey, Ben", yes, I see that one.

11  Q.   Okay.  So I started reading there.  And then if you look,

12       these texts are broken up and they're in chronological or

13       they're in order though, so if you go up to the next one,

14       that's the continuation of the one that starts, "Hey,

15       Ben".  It says, "This from blowing all to hell" and the

16       next one up is, "God brought me here."

17               Those are all from you --

18  A.   Yep.  I see that.

19  Q.   -- at 1:07 a.m. on May 20.  Do you see that?

20  A.   Yes.

21  Q.   That would've been after your meeting with Ben that

22       evening on the evening of May 19; correct?

23  A.   I think the question that we found out about these text

24       messages is the gentleman that did the -- Ed Primo stated

25       that the actual, the actual recording was pieces of a



1       recording that were put together.

2   Q.  I'm not talking about a recording.

3           I'm talking about these are actual text messages

4       sent between you and Ben Graham?

5   A.  That's correct.  And Ben Graham is -- what we, what we had

6       is several ways to kind of how to address these, this

7       situation (pointing).  This was one of the ways that we

8       discussed (pointing).

9   Q.  Okay.  So just if you listen real carefully to what my

10      question was, you sent this text to Ben Graham shortly

11      after your meeting with him in the evening of May 19;

12      correct?

13  A.  Yes, I believe so.

14  Q.  And what was this text?  What did you mean by this text?

15          What was the point of sending it?

16  A.  Trying to figure out what exactly to do with the extortion

17      texts, to try and figure out who the person was that was

18      sending them to me.

19  Q.  Okay.  So you told me, before, that Mr. Graham was

20      complicit in the idea to send this email, the writing of

21      the email and the actual sending of the email.

22          I want you to take a look at the top text there

23      that was a return, a reply to you at 1:24 a.m. on May 20

24      where he says, "I don't know what the answer is but this

25      isn't it.  This kind of stuff never stays hidden.  It's



Todd Courser
01/28/2020                    Page 122

1    going to blow up and I can't help cover it up.  If it

2    wasn't true, I would go to the end of the earth to defend

3    you but I can't help you cover it up.  My best advice,

4    consider resigning.  You may be able to protect Cindy and

5    her family and your family.  I'm sorry.  I really am.

6    I've prayed on it and I just don't feel right with it."

7              Did I read that correctly?

8  A.  **Yes.  That was his -- after he left and there was some**

9      **time, he responded with that.  That was different than the**

10     **conversation we had at the office.**

11 Q.  Okay.  So what you're telling me is that a couple hours

12     earlier, this was his idea, he helped write it, he helped

13     send it out, and then as of 1:24 a.m. he is writing this

14     text saying I don't want any part of this?

15 A.  **He said I prayed on it and I just don't feel right with**

16     **it.  It says he made a decision not to do it.  He doesn't**

17     **want to be involved in it.**

18 Q.  Okay.

19 A.  **That's what the text says.**

20 Q.  And that wasn't something he had indicated to you at any

21     point earlier that evening?

22 A.  **I think there was discussions about were there other ways**

23     **to do it and his misgivings about this, about this way of**

24     **doing it, but he made different references as far as the**

25     **words being used.**



Todd Courser
01/28/2020                                   Page 123

1  Q.   Okay.  So going back to the email, the thought process was

2       to send this out to a bunch of people to distract from the

3       affair --

**4  A.   No.**

5  Q.   -- or was it to send this out with the idea that you're

6       gonna flush out the extortionist?

**7  A.   We were receiving the extortion texts, so the idea was to**

**8       send this out and then find out who was involved in the**

**9       extortion plot to remove Cindy and myself from office.**

10  Q.   Maybe I'm just not good at that kind of stuff, but if you

11       could walk me through exactly how it is sending out that

12       email accusing you of being a drug user and having gay sex

13       behind nightclubs, was going to flush out the

14       extortionist?  Because I'm just a little unclear on how

15       that exactly would work.

**16  A.   My sense was is that it was very connected to Ben Graham,**

**17       Joshua Cline and Keith Allard.  And so the meeting was,**

**18       what's missing out of the twenty minutes in the tape is me**

**19       confronting Ben Graham about the fact that my emails, the**

**20       stuff in here came from the emails in my Inbox, the stuff**

**21       in here came from old archives of emails, and so I**

**22       confronted Ben Graham about doing this and of being**

**23       involved in it.**

**24            And he, of course, was, at that point, taping me**

**25       and those pieces of information have been removed from the**



Todd Courser
01/28/2020                                    Page 124

1     tape.  So I was attempting to find out how close the

2     people were to Ben Graham, and what happened was we

3     figured out that it was him.

4  Q.  And sending out this email was gonna do that how?

5  A.  Because immediately I got responses that said -- you know,

6     you got responses that, that confirmed that Ben Graham

7     was, was forwarding out this information, so in the coming

8     days after that.  So --

9  Q.  Ben Graham was forwarding what information?

10 A.  I can show you your whereabouts.  I mean you can go

11    through all the various texts of it.  And so my sense was

12    it was somebody who was very close to Ben Graham.  The

13    reporters that were coming said they knew about the

14    meetings with Ben Graham and obviously the text messages

15    afterward show that they were actually watching my email

16    Inbox and Outbox when the actual text or the actual email

17    went out.

18 Q.  Okay.  So in order to flush out that fact and instead of

19    first going to the police, you decide to send out an email

20    that acuses you of being a drug user, of soliciting gay

21    prostitutes and a whole heck of a lot of other stuff that

22    was true or not true?

23         That email, the stuff in the email, true or not

24    true?

25 A.  You're, you're saying as far as the truth of it?



Todd Courser
01/28/2020                                      Page 125

1   Q.   Yeah.

2   **A.   Truth of the matter, no, it's not true.**

3   Q.   Any of that true (pointing)?  No?

4   **A.   I'd have to read through each word of it, but no.**

5   Q.   Okay.  So that was your master plan, to send this out to

6        -- how many people did this go out to?

7   **A.   I don't know.**

8   Q.   I saw a number like upwards of a thousand.

9   **A.   I wasn't aware of who it went to or -- I think Ike got**

10       **that list from Ben.**

11  Q.   Mm-hmm.  So instead of reporting this originally to the

12       police and letting them deal with it as soon as you got

13       the first text, this was the plan, to send out this email?

14  **A.   Well, you remember I was having an affair.  Did it make**

15       **sense to go public or to go to the police in that**

16       **situation?  My sense was, at that point, that we were**

17       **being extorted to either, one, remove us from office so**

18       **they could pass or -- so they could pass it.**

19  Q.   That made more sense?

20  **A.   At the time it did.**

21  Q.   Who's David Forsmark?

22  **A.   He's somebody that, that, that is a political consultant**

23       **that Cline, Joshua Cline, is friends with.**

24  Q.   Did he ever do work for you?

25  **A.   No.**



1  Q.   Did you, at one point, believe that David Forsmark was

2       involved in the blackmail texts, extortion texts?

3  **A.   Yes, I did.**

4  Q.   Why?

5  **A.   Because of the, because of the communications back and**

6       **forth with Graham and Cline.  So my sense was it was**

7       **something to do with David Forsmark.  I've since -- I**

8       **don't -- I think he was still involved and I think he was**

9       **aware of it, but I, but I have not seen any text messages**

10      **that say that he was somehow at the forefront of it.**

11                  (At 1:24 p.m., Deposition Exhibit Number 4 was

12                  marked.)

13  BY MR. KOSTELLO:

14  Q.   I'll show you what I've marked as Exhibit 4.  This is

15       Bates Number Plaintiff's Document Production 209.

16                  Do you recall seeing this page before?

17  **A.   Yes.**

18  Q.   Okay.  These are, again, text messages back and forth

19       between individuals; correct?

20  **A.   Yes.**

21  Q.   All right.  I want you to turn your attention to the third

22       one up from the bottom and it's a text from Joshua Cline,

23       and I believe it's to Ben Graham, but it's dated May 21,

24       2015 at 8:56 p.m., where Joshua Cline says to Ben Graham,

25       "I think the blackmailer is Joe.  Dan gets texts the day



1    he speaks with Joe."

2               Did I read that correctly?

**3  A.   Yes.**

4               MR. DePERNO:  Object to the question.  How do we

5       know it's from Ben Graham?  I don't think there's any

6       foundation for that.

7  BY MR. KOSTELLO:

8  Q.   Well, the second text from the top, there's a text dated

9       May 26, 2015 from Bob Murphy.

10              Do you know who Bob Murphy is?

**11  A.   Bob Murphy is a guy at The Tea Party --**

12  Q.   Okay.  In any event --

**13  A.   -- Lapeer Tea Party.  He's not there now.**

14  Q.   Okay.  In any event, that text from Bob Murphy, the

15      message is, "Ben, are we all set for a town hall next

16      Tuesday?  We want to put notice in paper today.  Please

17      call me."  So that's why I'm assuming these are Ben

18      Graham's texts.

19              In any event --

**20  A.   Hold on.  I don't understand.  So you're saying because**

**21      Bob Murphy sent this to Ben, these are Ben's texts?  Is**

**22      that what you're saying?**

23  Q.   Yeah.

**24  A.   Okay.**

25  Q.   Do you know any other Bens that we have text messages,



Todd Courser
01/28/2020                                    Page 128

1       that you produced text messages from?

2  A.   I don't know.  I was just trying to follow where you were

3       at.

4  Q.   Okay.  Do you see where I'm reading from?

5  A.   I do.

6  Q.   Okay.  So could these be any other -- do you know of any

7       other Ben's texts that you have that you're in possession

8       of that you've produced in the course of this litigation?

9            The problem with the reports that you've

10      produced is it doesn't have any indication of where the

11      phone number is coming from, so you kinda have to read

12      them and try to figure out who the people are talking, but

13      again, I'm going under the assumption since Bob Murphy was

14      texting this phone, saying, "Ben, are we all set for a

15      town hall?", that it's Ben Graham.

16           Fair assumption?

17 A.   Okay.

18 Q.   Okay.  In any event, going back down to the third one from

19      the bottom:  "I think the blackmailer is Joe."  This,

20      again, is from Joshua Cline.  "Dan gets texts the day he

21      speaks with Joe."

22           Did I read that correctly?

23 A.   Yes.

24 Q.   If Mr. Cline, Mr. Graham, were involved in the extortion

25      texts plot, why would they be texting each other saying,



1        "I think the blackmailer is Joe"?

2  A.    I don't know.  My sense is because what was going on is

3        Josh wasn't cut in at that point because he was no longer

4        working at the office, and the phone calls primarily were

5        not between, that we found, between Cline and Joe Gamrat;

6        they were primarily between Allard and Joe Gamrat.

7  Q.    So when was Josh Cline piped into the whole scheme?

8  A.    Well, you can see from other texts that he's involved in

9        other parts of it -- the surveillance repeatedly.

10 Q.    I'm talking about the extortion texts.

11              When was he involved in sending out the -- you

12       told me, before, that you believe Joshua Cline was

13       involved in sending out the extortion texts.

14              When did he get piped into that plan?

15 A.    Well, Ben was texting him as he was at my office and went

16       to his office immediately after that, and then Joshua

17       Cline was aware of the fact that I sent it out of my

18       Inbox, my email Inbox immediately, and those text messages

19       show that he was, that he was connected to that.

20 Q.    Connected to the extortion texts plot?

21 A.    Yes.  I mean what you have is you have these extortion

22       texts and we have a conversation, we had a conversation

23       that night on May 19th and you have then text messages

24       with Joshua Cline immediately following and during that

25       time.  And so the information that I have, when you look



Todd Courser
01/28/2020                                          Page 130

1    at this, you can see pretty clearly that Joshua Cline was

2    involved in the gathering and dissemination of that

3    information.

4 Q. Okay.  You authorized that email to go out, right, the

5    false flag email, Exhibit 2?

6 A. Actually there was some confusion on that between myself

7    and Mr. Eickholdt and it was paused the next morning and I

8    said hold off and then he, he assumed that I -- that

9    because he had some technical difficulties in getting it

10   set up, that, you know, basically once he got that figured

11   out, he continued on in sending it out.

12 Q. You know Mr. Eickholdt --

13 A. But I was unaware of the -- that -- who it went out to and

14   when it went out.

15 Q. You understand that Mr. Eickholdt has denied being

16   involved in sending that out; right?

17 A. No.  Mr. Eickholdt was on the stand and he said that he

18   did actually send it out.

19 Q. And he also has denied it, too, in newspaper articles to

20   reporters; correct?

21 A. He did that initially and then he admitted to it, I think,

22   in his police interview and also on the stand in Judge

23   Clark's preliminary exam.

24 Q. Mm-hmm.  At some point the Press started reporting that

25   you were behind that email; correct?



Todd Courser
01/28/2020                                    Page 131

 1  A.   That is correct.

 2  Q.   And when did, when did that first report come to light?

 3  A.   I'm not sure.

 4  Q.   It was August-ish; wasn't it?

 5  A.   No.  I think there was, I think there was -- from the text

 6       messages, you can see that they were communicating with

 7       other people immediately following it being sent out.

 8  Q.   I'm not asking you who they were communicating with.

 9            I'm asking you when the first report in the

10       Press -- either on the Internet, on the newspaper,

11       whatever -- came out that you were behind it.

12            That wasn't until August; was it?

13  A.   There was an email or a text message between I believe it

14       was Ben Graham or Joshua Cline and someone else where they

15       said I think his, I think his email got hacked, and they

16       said no, it wasn't.  And so I believe that then it showed

17       up on the House floor, from one of the reporters, within a

18       few -- I don't know if it was a few days or a few weeks.

19  Q.   Of the email going out?

20  A.   Yeah.  Yeah.  I mean a copy of it.

21  Q.   A copy of the email?

22  A.   Yeah, a copy of the email.

23  Q.   Yeah.  That's not what I'm asking you, though, sir.

24  A.   It came --

25  Q.   What I'm asking you is when -- look -- yeah, a copy of the



Todd Courser
01/28/2020                                    Page 132

1      email may have, but when was the first report linking you

2      to sending out that email?

3  A.   I, I believe it was when Chad Livengood wrote the story,

4      but I'm not sure.  I think that I guess what I'm saying is

5      media -- are you saying newspapers or are you saying

6      Twitter?  Because there was a whole bunch of Twitter

7      information related to the idea that I sent it out.

8  Q.   Okay.  So there was speculation on Twitter that you had

9      sent it out, but do you know who Brandon Hall is?

10 A.   Yes.

11 Q.   Okay.  Wasn't he one of the first ones to report that it

12     was you that sent that email out?

13 A.   Yes.  He was in, he was in communication with Allard,

14     Graham and Cline.  He was connected to them.

15 Q.   So if they were, they were intending -- it sounds like to

16     me like what the gist of your thought process here is that

17     ultimately this goes back to a plot to have you removed

18     from office because of -- for political reasons; is that

19     fair?

20 A.   Yes.

21 Q.   Okay.  So if that was the stated goal of this plot, why is

22     it that they would have sat on this idea that it was you

23     who sent out the email from the time it went out on May 20

24     until August 7, 2015?

25         Wouldn't it have made more sense, if their



Todd Courser
01/28/2020                                    Page 133

1      stated goal was to get you out, to immediately have leaked

2      that you were responsible for it?

3                  MR. DePERNO:  Objection to the question.  It's

4      compound.  It's speculative.  I don't think the witness

5      can testify as to what people were thinking.

6                  MR. KOSTELLO:  I'm asking what his thought

7      process is.

8                  MR. DePERNO:  That's not what you asked.  You

9      asked --

10  BY MR. KOSTELLO:

11  Q.   Wouldn't it make more sense?

12                 MR. KOSTELLO:  Yeah.  That's exactly what I

13      asked.

14                 MR. DePERNO:  You asked about wouldn't it make

15      more sense by the people doing the extortion.

16  BY MR. KOSTELLO:

17  Q.   Wouldn't it make more sense to you to have released it,

18      the information that you were behind that email,

19      immediately, if their stated goal was to --

20                 MR. DePERNO:  Objection.  Objection.

21                 MR. KOSTELLO:  You've got to let me finish.

22                 MR. DePERNO:  Okay.  I'm sorry.

23  BY MR. KOSTELLO:

24  Q.   You just told me that it was Cline, Allard and Graham who

25      gave Brandon Hall the information about where the email



Todd Courser
01/28/2020                                    Page 134

1      came from.

2             So my question is wouldn't it have made more

3      sense, if the stated goal was to get you out of office, to

4      have released that or put that in some reporter's ear on

5      May 22, May 21, the day after the email went out?

6             MR. DePERNO:  Objection again.  You're asking

7      him to speculate on, on what the extortion plotters were

8      thinking or why they were doing what they were doing.  I

9      don't think you can ask him that question.

10            MR. KOSTELLO:  Oh, I can absolutely.

11  BY MR. KOSTELLO:

12  Q.   So you can answer it.

13  **A.   Well, you can keep smiling.  You're just kinda smiling and**

14  **rolling your eyes.  It's a little offensive.  I mean if**

15  **you wanna ask me a question --**

16  Q.   I've asked you the question.

17  **A.   Well, stop rolling your head around and --**

18  Q.   I'm not rolling my head around.

19  **A.   -- rolling your eyes and smiling like that.  It's**

20  **offensive.  Just even that.  If you wanna ask a**

21  **question --**

22  Q.   I did.

23  **A.   -- I think I can answer it, but stop being a jerk.**

24  Q.   I'm not being a jerk at all.

25  **A.   You are being a jerk.**



Todd Courser
01/28/2020                                    Page 135

1   Q.   Not at all.

2   **A.   You are.**

3   Q.   Go ahead.

4                **THE WITNESS:  Can I answer it?**

5                MR. DePERNO:  I think you can answer it to the

6        extent you can put yourself in the mind of the

7        extortionist and try to tell him --

8                MR. KOSTELLO:  So --

9                MR. DePERNO: -- what you think they were

10       thinking at the time.

11               MR. KOSTELLO:  -- Matt, your objections are form

12       and foundation.  Form and foundation.  That's it.  It's

13       not speaking objections.  It's not commenting on the

14       record.  If you have an objection to the form, fine, you

15       can say object to the form.  If you have an objection to

16       the foundation, you can say object to the foundation.

17       It's not a speaking objection after that.

18   BY MR. KOSTELLO:

19   Q.   So can you answer the question?

20               MR. DePERNO:  No.  My objection was speculation.

21               MR. KOSTELLO:  So that's okay.  Calls for

22       speculation.  Great.  That's not a discovery deposition

23       objection.

24   BY MR. KOSTELLO:

25   Q.   But can you answer the question?



1          MR. DePERNO:  And I will agree, for the record,

2     too, you are being a little bit hostile to the witness.

3          MR. KOSTELLO:  I'm not at all.

4          MR. DePERNO:  You have been.  I haven't called

5     it out but you have been rolling your eyes a lot during

6     the answers.  You do make a lot of head gestures.  You do

7     make of a lot of offensive gestures to the witness while

8     he's answering, and it is bit unprofessional.

9  BY MR. KOSTELLO:

10  Q.   Can you answer the question?

11  **A.   Yeah.  I can answer the question.**

12  Q.   Okay.  Answer it, please.

13  **A.   Can you ask it one more time so I can --**

14  Q.   Yeah.

15  **A.   -- just make sure I'm answering correctly?**

16  Q.   Wouldn't it have made much more sense, if the stated goal

17     of this whole extortion plot was to get you out of office

18     as opposed to what I suggested before -- simply Joe Gamrat

19     wanted you to stop having sex with his wife -- but if the

20     stated purpose of the extortion plot was get you out of

21     the office, wouldn't it have made more sense for

22     Mr. Allard, Mr. Cline, Mr. Graham, whoever, to have leaked

23     to the Press that it was you who sent out that extortion

24     email on May 21 as opposed to in August of 2015?

25  **A.   It's because you don't understand -- and I'll answer your**



Todd Courser
01/28/2020                                              Page 137

1   question, I don't have a problem with that -- because you

2   don't understand anything about the political game and the

3   way it works, you want to act as though you're, you're

4   just an arrogant jerk, but what I'm trying to tell you is

5   the way that this works here, the way it works is they

6   wanted leverage over me.  They didn't wanna go any further

7   than they had to.  What they wanted to do is to own my

8   vote, so they don't want to remove you from office.  They

9   want to extort you --

10  Q.   Aah.

11  A.   -- into being or in doing what they want you to do.

12  Q.   Where, in the extortion texts, so I guess we'll refer to

13       Exhibit 1, does it talk anywhere about wanting you to vote

14       a certain way for anything, wanting to control your vote,

15       anything along those lines?

16  A.   You asked me what I thought.  That was my thinking.

17  Q.   Okay.  I'm just asking you in the extortion texts, where

18       did they ever say that?  Did they ever say that?

19  A.   The extortion texts say, four times, they want to remove

20       me from office and to resign --

21  Q.   Right.

22  A.   -- or they're going to release this information.  That is

23       a ploy, if you understand.  You want to know what I was

24       thinking.  My thinking, when I read that, is because we

25       have legislation up for a billion dollars in tax



Todd Courser
01/28/2020                                    Page 138

1      increases.  I'm one vote.  I'm one vote that they're

2      trying to remove in that situation.  I'm also somebody

3      that's interested and very focused on the idea of Flint

4      water.  So this, to me, is getting leverage over me.

5      That's what they were attempting to do.

6               Now, you can roll your eyes again, but that's --

7   Q.  I'm not rolling my eyes.  I'm trying to process what

8      exactly it is you're telling me.

9   A.  It's leverage.  Do you understand leverage?  Do you

10     understand what I'm saying?  That's what I'm trying to

11     say.

12  Q.  Okay.

13  A.  That's all.

14  Q.  When did you tell your wife about the affair?

15           MR. DePERNO:  It's 1:30.  We may need a break or

16     to get some lunch.

17           THE WITNESS:  My sugar's shot, but --

18           MR. DePERNO:  Yeah.  I think you need to have

19     some lunch.  And we're still waiting for any questions

20     that have anything to do with the lawsuit against the

21     Radisson.  I'm starting to wonder why you're here, asking

22     these questions.

23           MR. KOSTELLO:  It's a discovery deposition and I

24     can ask whatever it is I feel is relevant.  So --

25           MR. DePERNO:  I understand.  I get it.



**Todd Courser**
01/28/2020                                                        **Page 139**

1          MR. KOSTELLO:  -- I don't care if you understand

2    one way or the other.  I don't expect you to.  So let me

3    finish my questions.  If we can just move on with this,

4    I'd appreciate that.  If you really need a break, then

5    fine.

6          MR. DePERNO:  Yeah.  We're gonna take a break

7    now.

8          MR. KOSTELLO:  Fine.

9          MR. DePERNO:  I think at some point we may learn

10   why you're asking these questions and, and, and for whose

11   benefit you want to know this stuff for.

12         MR. KOSTELLO:  Matt, I honestly don't care if

13   you understand one way or the other; okay?  I don't.  Not

14   in the least bit.

15         MR. DePERNO:  And it's that attitude.  I don't

16   understand why you're so hostile and angry.

17         MR. KOSTELLO:  Because I don't need you to tell

18   me how to do my job; okay?  So I honestly do not care why,

19   why you think I'm asking any of this; okay?

20         So we can either finish this right now or we can

21   take a half-hour break.  That's fine, too; all right?

22   Whatever you prefer.

23         MR. DePERNO:  Yeah.  We've got -- it's 1:40.  So

24   it's been three hours and forty minutes so far.  I guess

25   you've got another --



1             MR. KOSTELLO:  Minus the breaks you took.

2             MR. DePERNO:  -- I guess you got another three

3       hours and twenty minutes.  But if you're gonna use -- if

4       you're gonna keep going, you said you didn't think you'd

5       go till 5:00, it seems like you are now --

6             MR. KOSTELLO:  I wasn't planning on it.

7             MR. DePERNO:  I think we need to take a break

8       for lunch.

9             MR. KOSTELLO:  Well, I wasn't planning on going

10      till 5:00, so I mean we can either do that or we can --

11      and we can go off the record.

12             (At 1:41 to 2:25 p.m., recess taken.)

13             MR. KOSTELLO:  Back on the record.

14             (At 2:25 p.m., Deposition Exhibit Number 5 was

15             marked.)

16   BY MR. KOSTELLO:

17   Q.  Mr. Courser, let me show you what I've marked as Exhibit

18       5.  I think you had referred earlier to an article by Chad

19       Livengood of the Detroit News that kinda, for the first

20       time, exposed the relationship and the email that we

21       previously discussed.

22             Is that that article that we were talking about

23       before?

24   **A.  Yes.  I believe it is.**

25   Q.  And that's dated August 7, 2015; is that correct?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 141

1   A.   That is correct.

2   Q.   Okay.  On that same day, August 7, 2015, the House

3        Speaker, Kevin Cotter, ordered an investigation into any,

4        whether any rules, house rules, were broken by either you

5        or Miss Gamrat; correct?

6   A.   I don't know if it was that day or not.

7   Q.   Right around the same time?

8   A.   That's my understanding.  Yes.

9   Q.   Okay.  And ultimately that investigation led to a very

10       large report that was issued by, I think it was Mr. Bolin,

11       Tim Bolin, with the Business Office; correct?

12  A.   Actually, the report was only a few pages; I think the

13       rest of it was the evidence that connected to it.

14  Q.   The exhibits; right?  All right.  And that report was

15       dated August 31, 2015.

16              At some point thereafter, and I believe it may

17       have been on September 10 of 2015, a panel of the House

18       recommended expulsion for both you and Ms. Gamrat; is that

19       correct?

20  A.   I believe so.

21  Q.   Okay.  And what was the end result of that recommendation?

22  A.   I believe they voted, in the committee, to remove her and

23       I, and they voted I think three times from the House

24       floor, I believe it was three times they voted over the

25       next fourteen hours or maybe it was longer than that,



Todd Courser
01/28/2020                                    Page 142

1    whether or not to remove me from office, and then I think

2    it was at 3:00 a.m. or somewhere in there, I resigned from

3    office.

4  Q.  How did that -- how does that work, though?

5        When you say three times, like was it the same

6    vote three times just taken at different points, or what?

7        When you say three times, like why would they

8    take three different votes?

9  A.  Well, because they can only keep it up so long on the

10   board, so then it's the next day, so they had to do it

11   again.  I'm not sure why that was.  I believe there were

12   two before midnight.  Then they put it back on the board

13   after that.

14 Q.  Okay.  And what was the stated reason for -- in an attempt

15   to expel you from the House?

16 A.  I, I don't know.  Are you wanting me to refer to a

17   document?

18 Q.  Well, I would imagine you would have some sort of idea as

19   to why they were seeking to kick you out.

20 A.  The, the idea with, with impeachment, it's in the

21   Constitution that they can remove a, they can remove a

22   legislator from office.  There's specific criteria by

23   which the legislature can do that.  They felt that they

24   met those criteria; I disagreed with that.

25 Q.  Based on what?  What was their rationale for believing



Todd Courser
01/28/2020                                    Page 143

1     that they could expel you?

2               MR. DePERNO:  Objection to speculation as to

3     what they felt.

4  **A.   I have no idea what they were thinking.**

5  BY MR. KOSTELLO:

6  Q.   Really?

7  **A.   You'll have to ask Kevin Cotter, I guess, at that point.**

8  Q.   Have you ever read the House report?

9  **A.   Uh-huh.**

10 Q.   That's a yes?

11 **A.   Yes, I have.**

12 Q.   So you are familiar with what it found; correct?

13 **A.   Yes.**

14 Q.   In your mind, were any of the findings of the House report

15    reason why you were ultimately expelled --

16 **A.   That's not what you asked me.**

17 Q.   -- or that they were seeking to expel you?

18 **A.   That's not what you asked me.**

19 Q.   What did I ask you?

20 **A.   Why did they do it.  That was the report from Tim Bowlin.**

21 Q.   I said what was the stated reason that they were

22    attempting to expel you and Ms. Gamrat?

23             MR. DePERNO:  That's not what you asked.  You

24    asked why he -- what -- why they did it is what used.

25 BY MR. KOSTELLO:



Todd Courser
01/28/2020                                                    Page 144

1  Q.   What was the stated reason of their attempt to expel you

2       and Ms. Gamrat?

3  A.   Well, you have the House report.  I don't know if each one

4       of them would have their own stated reason.  Are you

5       saying collectively as the House?

6  Q.   Yes.  Collectively as the House.

7  A.   I'm not sure.  You'd have to ask the collective of the

8       House.

9  Q.   Okay.  I assume that --

10  A.   We have the report.  The report was issued by the House

11       Business Office, the employee of Kevin Cotter, not the

12       normal channels for an official investigation that should

13       have been conducted by the clerk.  Kevin Cotter wanted

14       control of it, so he had his own employee, Tim Bowlin, do

15       the investigation.  Investigations are supposed to exist

16       in the Clerk, who is a separate, a separate official, not

17       under the, the Speaker of the House.

18  Q.   The stated -- well, let me put it this way.  Strike that.

19            The House report itself doesn't necessarily find

20       misconduct on your part for having an affair; right?

21            MR. DePERNO:  Objection to the form of the

22       question.  I don't think that's accurate.

23  BY MR. KOSTELLO:

24  Q.   I mean the affair itself, it's not saying you should be

25       expelled because you were having an affair; right?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                         Page 145

1  A.   I mean what are you asking me?  Are you asking me what the

2       report says?

3  Q.   I'm asking you --

**4  A.   I'd have to refer to the report and review it.**

5  Q.   The report doesn't find any misconduct on your part or Ms.

6       Gamrat's part simply because you were having an

7       extramarital affair; right?

**8  A.   I'd have to refer to the report and reread it.  I'm not**

**9       sure where you're going with that.**

10  Q.   It's a simple question.  There were certain findings in

11       the report and one of those is not that you broke any

12       House rules, for example, by simply having an affair; can

13       we agree on that?

14            MR. DePERNO:  I think I will object again.  The

15       witness has said several times he's probably not

16       understanding your question.  If you have a document to

17       show him, then --

18            MR. KOSTELLO:  I don't need to show him any

19       document.  It's pretty -- and, again, that's a speaking

20       objection.  You can make a form and foundation objection,

21       but it's a pretty simple question and I'm sure, again, he

22       said he read the report.

23  BY MR. KOSTELLO:

24  Q.   There's no finding that you broke any House rules simply

25       because of the fact you had an affair; right?



Todd Courser
01/28/2020                                    Page 146

1          MR. DePERNO:  Objection to the form of the

2     question again.  I don't think that's accurate as to what

3     the House reports says.

**4  A.   I'd have to refer to the report.**

5  BY MR. KOSTELLO:

6  Q.   Huh.  Okay.

**7  A.   It's a big report.  I think you have 800 hundred pages of**

**8       that plus the exhibits.  So --**

9  Q.   You just told me that the report was only a few pages.

**10  A.   I know, but if you want me to read the report plus the**

**11       exhibits or if you just want me to read the report, I can**

**12       refer to it and see what Tim Bowlin said.**

13  Q.   The misconduct that was found in the House report related

14       to the attempts to cover up the fact that you were having

15       an affair; isn't that correct?

**16  A.   The misconduct in office, the removal from office, I don't**

**17       know -- the report states some certain things but that**

**18       isn't -- what the report says and what the committee**

**19       did -- are you referring to what Tim Bowlin wrote?**

20  Q.   I'm asking in the report, yes, what Tim Bowlin wrote.

**21  A.   Okay.  So Tim Bowlin wrote a report and you wanna talk**

**22       about the report.  Go ahead.**

23  Q.   Yeah.  I thought I asked pretty straightforward questions.

24            Tim Bowlin's report found misconduct on your

25       part and Miss Gamrat's part related to the attempts to



Todd Courser
01/28/2020                          Page 147

```
 1        cover up the fact that you were having an affair; correct?

 2   A.   I'd have to read it.  I do remember Tim Bowlin, in the

 3        reportings with the State Police, he said that the report

 4        was done hastily.  It was done -- he only had two weeks to

 5        do it.  Everybody wanted it done.  He wasn't able to be

 6        thorough with it and he was hoping there would be more

 7        time, during the hearings, to go through that information.

 8   Q.   Do you recall reading, in the report, that Mr. Bowlin

 9        indicated that Representative Todd Courser and

10        Representative Cindy Gamrat are not credible witnesses?

11             Do you recall reading that?

12   A.   Yes.  I do remember reading that.

13   Q.   Do you recall reading, in the report, wherein Mr. Bowlin

14        said:  Representative Courser and Representative Gamrat

15        committed misconduct in office that warrants further

16        investigation review by a select committee formed in House

17        Resolution 129?

18             Do you recall that?

19   A.   I don't remember that.

20   Q.   Mr. Bowlin goes on to state:  While the affair itself was

21        primarily a personal, not official matter, the

22        Representatives abused their offices in attempting to

23        cover it up.

24             Do you recall that?

25   A.   I remember -- I don't remember that exact language, but it
```



**Todd Courser**
01/28/2020                                            Page 148

1        sounds like the report.

2   Q.   Okay.  Do you recall the report saying that the evidence

3        demonstrates that both Representatives improperly used

4        State resources for political purposes?

5   A.   I think he made that allegation.  Yes.

6   Q.   Okay.  Do you recall it saying that the evidence

7        demonstrates both Representatives improperly used State

8        resources for personal purposes?

9   A.   No.  I don't remember that.

10  Q.   Okay.  Well, then they went on to give examples.  One such

11       example is:  There is testimony on audio evidence that

12       Representative Courser and Representative Gamrat required

13       their staff to meet during normal working hours to discuss

14       their affair in spite of numerous requests by the staff to

15       end the meeting and return to work.

16            Do you recall that statement?

17            MR. DePERNO:  Objection also to the, to the

18       report --

19            MR. KOSTELLO:  Form or foundation, Matt.

20            MR. DePERNO:  Well, I'm trying to understand the

21       question.

22            MR. KOSTELLO:  I'm just asking if he remembers

23       reading that in the report.  It's a pretty easy question.

24            MR. DePERNO:  Okay.  I guess he's just asking if

25       you remember reading it.



**Todd Courser**
01/28/2020                                                    Page 149

1  A.   Yes.

2  BY MR. KOSTELLO:

3  Q.   Okay.  Also, the next example:  They were required to lie

4       about the Representatives' whereabouts, including to

5       family, to facilitate the secrecy of their romantic

6       meetings.

7            Do you recall reading that?

8  A.   **I remember after that, in that police audio recording,**

9       **that Bowlin stated that Allard was a liar --**

10 Q.   I'm just asking you if you remember reading that in the

11      report.

12 A.   **No.  I'm telling you the context of it.**

13 Q.   And I'm --

14 A.   **I'm telling you the fullness of it.**

15 Q.   It's really just a question of whether you --

16 A.   **Yes.  I remember reading it --**

17 Q.   Okay.

18 A.   **-- in the report.  But, no, he said Allard's a liar,**

19      **shouldn't be trusted.  He said he didn't believe anything**

20      **that Allard, Graham and Cline said, and told that to the**

21      **police.**

22 Q.   Do you recall the report saying:  The evidence

23      demonstrates that Representative Courser improperly used

24      State resources for business purposes?

25 A.   **Yes.  I remember the report saying that.**



Todd Courser
01/28/2020                                      Page 150

1   Q.   Okay.  Do you recall reading this portion:  Throughout

2        this investigation, Representative Courser and

3        Representative Gamrat both failed to appreciate that the

4        "blackmail" allegations have no bearing on whether they

5        engaged in misconduct or misused State resources?

6             Do you recall reading that?

7   A.   I do.

8   Q.   Do you understand what that means?

9   A.   I didn't know what he meant when he wrote it.

10  Q.   Okay.

11  A.   I know what it says.

12  Q.   Okay.  You ultimately resigned on September 11, 2015?

13  A.   That's correct.

14  Q.   And Ms. Gamrat was expelled shortly after you resigned?

15  A.   Yes.  That's correct.

16  Q.   Why is it you resigned?

17  A.   It was -- it -- there was no way that they were going to

18       stop, given that it was fourteen or sixteen hours of time

19       that we had been in the legislature.  They were refusing

20       to let me use the restroom, and I have a heart condition,

21       so I was having to lay down in the back, they refused

22       medical treatment, so it was time.

23  Q.   What conduct is it that led you to be in that position at

24       that point, facing that expulsion from the House of

25       Representatives?



Todd Courser
01/28/2020                                    Page 151

```
 1                   Was it anything you did?
 2   A.   I guess I'm not sure what you're saying.  If I'm facing
 3        that, what are you, what are you referring to?
 4   Q.   Yeah.  I'm sorry.  Was it any conduct, in your mind, was
 5        it any conduct on your part that led to those, that
 6        expulsion procedure that was instituted against you, that
 7        the House was trying to expel you from your position?
 8                   Was it any conduct on your part that led to
 9        that?
10   A.   I'm not, I'm not sure how to answer that.
11   Q.   You don't know?
12   A.   No, because I don't know what they were thinking when they
13        brought the report.  So if the report is what turned into
14        the committee hearings which turned into the votes on the
15        floor --
16   Q.   Let's assume that they were thinking what was contained in
17        the report, that is that you abused your office by trying
18        to cover up the fact that you were having an affair by
19        sending the, quote/unquote, false flag email, among other
20        things, that that's what they felt you did wrong.
21                   MR. DePERNO:  Objection to the form of the
22        question.
23   BY MR. KOSTELLO:
24   Q.   Did any of your conduct lead to that point --
25                   MR. DePERNO:  Objection to the form of the
```



**Todd Courser**
01/28/2020                                    Page 152

1     question.

2   BY MR. KOSTELLO:

3   Q.   -- or was this the fault of others?

4            MR. DePERNO:  You're requiring the witness to

5       make assumptions.

6   **A.   I, I mean I don't know -- you're saying what caused it or**

7       **what fault?**

8   BY MR. KOSTELLO:

9   Q.   Yeah.  Was any conduct on your part the reason why you are

10      no longer a State Representative?  How about that?

11  **A.   You're saying the reason why.  I'm not sure what you mean.**

12  Q.   Really?  Okay.  I'll make this, try to make this as easy

13      as possible.

14            Did you do anything that led to your being

15      removed or you losing your job as a State Representative?

16            Was it any fault of yours?

17  **A.   Do I have -- you're saying do I have some responsibility**

18      **in that?  Is that what you're asking for?**

19  Q.   I thought I was pretty clear when I was asking that

20      question.  Yeah.

21  **A.   I'm not, I'm not sure what you mean.**

22  Q.   Yeah?  Okay.

23            Whose fault was it that you're no longer a State

24      Representative?

25  **A.   I -- yeah -- I'm not sure.  I mean you can -- there's a --**



Todd Courser
01/28/2020                               Page 153

1         there were a lot of people involved in this.

2    Q.   Okay.

3    A.   So --

4    Q.   Who were those people that played a part in the fact that

5         you're no longer a State Representative?

6    A.   Well, I mean what I'm saying is you can, you can look at

7         the, the responsibility.  Do I have some personal

8         failings?  I do.  Did I have an affair?  We've already

9         covered that.  If you want to continue to badger that

10        fact, it doesn't, it doesn't somehow negate your, you

11        know, your hotel from denying me my privacy, sending out

12        the information related to me being in your hotel, my

13        hotel room, letting people into my hotel room, letting

14        them plant bugs.  You, you have some responsibility in

15        that as well.  You're asking me --

16   Q.   Okay.  Let me --

17   A.   No.  You're asking me who has responsibility.

18   Q.   Okay.

19   A.   I think I can answer that.  Stop cutting me off.

20   Q.   I'm not cutting you off.

21   A.   Well, stop rolling your eyes again.

22   Q.   I'm not rolling.  I haven't rolled my eyes once, so you

23        can stop with that; all right?

24             MR. DePERNO:  Excuse me.  Now you're yelling at

25        my -- now you're yelling at the witness and he's trying to



**Todd Courser**
01/28/2020                                    Page 154

1    answer the question.

2              MR. KOSTELLO:  No.  He's not trying to answer

3    the question.

4              MR. DePERNO:  You asked the question of who has

5    responsibility.  He's answering the question by telling

6    you that your hotel has responsibility.  You rolled your

7    eyes at him and then yelled at him.

8              MR. KOSTELLO:  I didn't roll my eyes.  You

9    weren't even looking, Matt.  Come on.

10             MR. DePERNO:  You then yelled at him and now

11   you're trying to cut him off from answering that question.

12   So let the witness finish answering the question of what

13   you asked.

14  BY MR. KOSTELLO:

15  Q.  Go ahead.  Go ahead.

16  **A.  Well, I'm assuming you're here representing the hotel, so,**

17  **you know, the hotel has some responsibility.  When you**

18  **look through your manuals that you guys gave to me, it**

19  **says you're not supposed to hand out that information.  It**

20  **says you're not supposed to give the information to anyone**

21  **that calls in.  It says you're not to email that**

22  **information.  It says you're not to give out the room**

23  **numbers of people and you're not to let them into the**

24  **rooms --**

25  Q.  How did that play a --



Todd Courser
01/28/2020                                    Page 155

1  A.    -- and you did.

2  Q.    How did that play a role in you losing your job?

3  A.    It assisted with the extortion.  It allowed for the

4        taping, it allowed for the planting of the recording

5        devices.

6  Q.    Okay.  I just read you a quote from the report that

7        indicated that in Mr. Bowlin's opinion, you failed to

8        appreciate that the blackmail attempt had nothing to do

9        with the fact of you being brought up on charges in the

10       House.

11              Do you remember me just reading that?

12 A.    Well, you're, you're reading from the report.  I can tell

13       you that when he talked about it with the police, and we

14       can bring up those transcripts as well, he says something

15       completely contrary to that.

16 Q.    What did the blackmail attempt, in your mind, the

17       quote/unquote blackmail or extortion attempt, how did that

18       play any role in the House of Representatives seeking to

19       remove you from office?

20 A.    I'm not sure I'm supposed to answer that, so do you wanna

21       rephrase that?

22 Q.    No.  It just doesn't sound like you have an answer to it.

23              MR. DePERNO:  Well, he did ask you to rephrase

24       it.

25 BY MR. KOSTELLO:



**Todd Courser**
01/28/2020                                      Page 156

1  Q.   I can repeat it because it was a really, really clear

2       question.

3  **A.   Go ahead and repeat it.**

4              MR. KOSTELLO:  You can reread it, please.

5              (At 2:45 p.m., record repeated by reporter as

6              follows: "Q. What did the blackmail attempt, in

7              your mind, the quote/unquote blackmail or

8              extortion attempt, how did that play any roll in

9              the House of Representatives seeking to remove

10             you from office?")

11 **A.   Well, obviously it was by their staff members that were**

12      **involved in it and they were providing the information.**

13      **We attempted to, to obviously get some correction from the**

14      **House Business Office.  We attempted to do that through**

15      **Tim Bowlin.  We attempted to let him know about the sexual**

16      **harassment.  We attempted to let him know about the**

17      **pornography.  So then all this happens with the extortion**

18      **texts from the information related to really Tim Bowlin's,**

19      **Tim Bowlin's employees.  So Tim Bowlin writes a report**

20      **that's pretty self-serving, you know?  Because he doesn't**

21      **really wanna confront the fact that he dropped the ball**

22      **on, on really reassigning these people, or addressing it.**

23             **So if you're asking me what my thinking is in**

24      **regards to that, that's how, you know, that's how that all**

25      **precipitated.  If this doesn't happen, this doesn't**



1      happen.  If that doesn't happen, then this doesn't happen

2      and the report doesn't happen.

3  BY MR. KOSTELLO:

4  Q.   If what doesn't happen?  What was the first thing you said

5       if that doesn't happen?

6  A.   **The extortion texts.**

7  Q.   Okay.

8  A.   **If you don't have people in my emails and in my hotel room**

9       **and you don't have your hotel giving up that information,**

10      **then you don't have recordings being made and you don't**

11      **have bugs being planted.  And if you don't have that,**

12      **there's no evidence or there's no information they can put**

13      **in extortion texts to try and get leverage on me.  They**

14      **can't do that.**

15           **Tim Bowlin left them in office, in that spot, so**

16      **that they would continue to do what they were doing.  Ann**

17      **Hill stated to Tim Bowlin these people are trying to,**

18      **they're trying to destroy you.**

19  Q.   Was the Radisson Hotel the only place that you and Ms.

20       Gamrat ever had sex?

21  A.   **No.  There was, I believe there was another hotel as well.**

22  Q.   Okay.  Where was that?

23  A.   **I don't remember.**

24  Q.   And so those two hotels are the only places you ever had

25       sex?



Todd Courser
01/28/2020                                          Page 158

1  A.  I, I can't remember.

2  Q.  Fair to -- safe to say there are probably other places?

3  A.  There, yeah, there may have been.

4  Q.  Yeah.

5  A.  I don't know.  It's been five years now.

6  Q.  Okay.  Let's talk about the audio recordings that you

7     claim were made at the Radisson.

8         Have you ever heard any such recording?

9  A.  I've not.  I only have the information from --

10 Q.  It's either --

11 A.  -- the extortion texts.

12 Q.  It's either yes or no.

13 A.  I have not.  I only have the information from Joe Gamrat,

14     and between Allard, Graham and Cline, where they say let's

15     wait until Joe gets video.  When Joe gets video, then

16     we'll come out with it.

17 Q.  So no one ever sent you a recording saying, hey, this is

18     what I've got on you; fair statement?

19 A.  They sent me a text message saying we have audio.

20 Q.  You know what?  This will go a lot, a lot quicker, really,

21     it'll go a lot quicker if you listen, if you listen.

22 A.  In your question --

23 Q.  I don't care what the text messages say.  That wasn't my

24     question, sir.  If you want to listen really closely to

25     what you're -- you're a bright guy, obviously.  So if you



Todd Courser
01/28/2020                           Page 159

1    want to listen to the question I've asked you and answer

2    that question, this will go a lot quicker.

**3   A.   Okay.**

4   Q.   So here's my question to you.  Were you ever sent -- by

5        text, by email, in the mail, by way of a CD or a flash

6        drive -- any recording that was purportedly taken at the

7        Radisson?

**8   A.   No.  I have --**

9   Q.   Okay.  There's your answer.

**10  A.   I have text messages that say there was a recording --**

11  Q.   Okay.

**12  A.   -- at the Radisson.**

13  Q.   Okay.  And so you just take that as they exist then?

**14  A.   And their conversations that say there was.**

15  Q.   Okay.  That's all?  Really?

**16  A.   Keep smiling and rolling your eyes.  Keep doing it.**

17  Q.   So that's it.  So you're basing this on, your idea that

18       there were recordings --

**19  A.   I'm gonna use the restroom.**

20  Q.   We just --

**21  A.   Yeah.**

22  Q.   So this is how we're gonna go?  We're gonna go ten

23       minutes, take a break?

**24  A.   Well, you can come in and make sure I'm going to the**

**25       bathroom, if you want.**



Todd Courser
01/28/2020                                    Page 160

1          MR. KOSTELLO:  Off the record.

2          (At 2:49 to 2:50 p.m. recess taken.)

3          MR. KOSTELLO:  Back on the record.

4  BY MR. KOSTELLO:

5  Q.   Okay.  So we established that you were never texted,

6       emailed or sent any recording that was purportedly taken

7       at the Radisson Hotel.

8              During the course of the investigation by the

9       Michigan State Police into your extortion complaint, did

10      they ever recover, from Mr. Gamrat or Mr. Horr, any

11      recordings that were made at the Radisson Hotel?

12 **A.   None that -- they never provided me with one.  I don't**

13      **know that they recovered it or not.**

14 Q.   Okay.  Did you see -- you've read the report, I take it?

15 **A.   Yes.**

16 Q.   Okay.  Is there anywhere, in that Michigan State Police

17      Report, any indication that they recovered any recording

18      that was taken at the Radisson Hotel?

19 **A.   I, I don't know.**

20 Q.   Okay.  Who exactly is it --

21 **A.   I think there were three reports, so you'd have to tell me**

22      **which report specifically.**

23 Q.   Any of the reports.

24 **A.   Not that I'm aware of.**

25 Q.   Okay.  Do you have any theory on exactly who it was that


HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 161

1    was planting recording devices inside of -- was it I take

2    it your rooms at the hotel?

3  A.   It was my room at the hotel.

4  Q.   Yeah.  And so who was planting those recording devices?

5  A.   Well, we have it from Joe Gamrat that he had the audio.

6       We also know that he had pictures from there as well.

7  Q.   Okay.  So was it Joe Gamrat that was planting the

8    recording devices?

9  A.   I don't know who planted it.  I wasn't there.

10 Q.   Okay.  So here's my question to you.  Who --

11 A.   You guys let him in.  You would have the keycards to know

12     that.  So why don't you just pull up the keycards, maybe

13     turn over the phone records, maybe turn --

14 Q.   Why don't you just listen to my question and answer my --

15 A.   -- and maybe turn over the emails, maybe turn over the

16     texts.

17 Q.   Why don't you answer my, why don't you answer my

18    questions; okay?

19 A.   We haven't been given the evidence from your hotel so if

20     you want to ask me questions about your hotel, you haven't

21     provided the evidence.

22          MR. DePERNO:  That's actually -- I'll interject

23    on that -- that's actually a fair objection by the witness

24    because we're proceeding in this objection or we're --

25          MR. KOSTELLO:  Matt, you cannot make speaking



Todd Courser
01/28/2020                                    Page 162

1    objections -- period, end of story.  That is the rules.

2    You know the federal rules.  It is form.  It is

3    foundation.  This is a discovery deposition.  It is form.

4    It is foundation.  It is not your place to put anything on

5    the record beyond that; okay?  So stop it.

6              MR. DePERNO:  Well, I --

7              MR. KOSTELLO:  Stop it.

8              MR. DePERNO:  -- I can make an objection.

9              MR. KOSTELLO:  You can make an objection to the

10   form of the question or the foundation.  That is all.

11             MR. DePERNO:  And I can explain my objection.

12   I'm objecting to the form of the question because you're

13   asking him about information that you have refused to

14   produce.

15             MR. KOSTELLO:  Absolutely not.

16             MR. DePERNO:  That's absolutely true.

17             MR. KOSTELLO:  I have asked him what is his

18   theory -- it was a real simple question -- of who does he

19   believe planted the recording devices.

20             **THE WITNESS:  You never asked me theory.**

21   BY MR. KOSTELLO:

22   Q.   I asked you who do you believe --

23   A.   **You asked who did it.**

24   Q.   Who did it?  Who do you believe did it?

25   A.   **I said I wasn't there.**



Todd Courser
01/28/2020                                    Page 163

1   Q.   Okay.  There you go.  Question answered.

2             How was it accomplished?

**3   A.   I said I wasn't there.**

4   Q.   Right.  So we don't -- you don't know who did it, you

5        don't know how it was accomplished, you never actually

6        heard any recordings.  That's what we've established so

7        far; right?

8             Have you seen a transcript of any recording

9        typed out like this is exactly what was said on the

10        recording?

**11  A.   No.  You're kind of badgering me again.  I said --**

12  Q.   I'm really not badgering you.

**13  A.   -- it was only between Joe Gamrat and the other people**

**14        involved where they discussed the recording, including**

**15        Allard, Graham and Cline and, and David Horr.  Those are**

**16        text messages that you already have.**

17  Q.   Right.  And we already established that Mr. Gamrat made

18        recordings by planting them, by planting recording devices

19        in Ms. Gamrat's vehicle; correct?

**20  A.   We established that he, he planted those in his -- in her**

**21        vehicle.**

22  Q.   Right.  And you were in her vehicle at times, I take it;

23        right?

**24  A.   Rarely.**

25  Q.   Okay.  Were you ever in her vehicle?



Todd Courser
01/28/2020                                    Page 164

1  A.    Yes.

2  Q.    Okay.  So it is possible, then, that you were captured on

3        recordings made by Joseph Gamrat in Cindy Gamrat's

4        vehicle; correct?

5  A.    Yes.

6  Q.    Okay.  By the way, were you ever involved in any effort to

7        place a GPS tracking device on Mr. Gamrat's vehicle?

8  A.    No.  I did not do that.

9  Q.    You didn't ask Ike Eickholdt to do that?

10 A.    Ike Eickholdt was not, to my knowledge, involved in any of

11       that.  I was aware of the fact that there was a tracking

12       device.  I was aware of the fact that Cindy was working to

13       get a tracking device to try and deal with the fact that

14       her husband was doing this to her.

15 Q.    But you weren't involved in that effort at all?

16 A.    As I said, I was aware that it happened.  I was aware that

17       -- I don't know where she purchased it.  I think it was a

18       place called Brick House Security, but I don't know the

19       details of how that all, how that all transpired.

20              There was some allegation that I was the one

21       that planted a tracking device on his vehicle, and that

22       wasn't true.

23 Q.    Michigan State Police interviewed Emanuel Eickholdt, Ike

24       Eickholdt, and the report says this:  Eickholdt advised

25       that a few years ago Courser had asked him to place a



**Todd Courser**
01/28/2020                                      **Page 165**

1       Spark Nano GPS unit on the boyfriend of Melissa

2       Caminetti's car.

3                       Did you ever do that?

4   A.  **We had a discussion about that.**

5   Q.  And did he do it?

6   A.  **I believe he did, but I'm not sure.**

7   Q.  What was the, what was the purpose of placing a Spark Nano

8       GPS unit on Melissa Caminetti's boyfriend's car?

9   A.  **I don't know.  You'd have to talk to Ike about that.**

10  Q.  Well, you asked him to do it.

11  A.  **No.  I didn't ask him to do it.  I said we had a**

12      **discussion about that.**

13  Q.  Okay.  So when he said that you asked him to do it, he's

14      lying to the Michigan State Police?

15  A.  **No.  I'm not saying he's lying.  I don't know his**

16      **recollection.  I'd have to talk to him.  That's been a**

17      **long -- that's been at least twelve years ago, maybe**

18      **longer.**

19  Q.  Okay.  Eickholdt advised that Courser contacted him in

20      late June 2015 about getting the Spark Nano up and running

21      again and Eickholdt sent Courser the information; is that

22      true?

23  A.  **I don't remember that, but it might be.**

24  Q.  Okay.  So why would you have been asking him, in June of

25      2015, to get the GPS unit up and running again?



Todd Courser
01/28/2020                                      Page 166

 1  A.  I don't know.  I would have to --

 2  Q.  Was it to track Mr. Gamrat?

 3  A.  No.  There was no -- I didn't use any tracking device on

 4      Joe Gamrat.

 5  Q.  So who would you have been tracking in June of 2015?

 6  A.  Tracking devices are used for all sorts of reasons.

 7  Q.  Like what?

 8  A.  Like putting it on your own extra vehicle, putting it on

 9      your own vehicle.

10  Q.  Well, why would you be doing -- why would you be tracking

11      your own vehicle?

12  A.  Well, maybe you want somebody else to know where you're

13      at.

14  Q.  Okay.  So in June of 2015, who did you want to track;

15      yourself?  Were you tracking yourself?

16  A.  No.  I didn't place that on anybody's vehicle.

17  Q.  Okay.  So, again, why were you asking him to get it up and

18      running again in June of 2015?

19  A.  I'm not sure.

20  Q.  You can't remember?

21  A.  No.  But it wasn't -- that one was not used on Joe

22      Gamrat's vehicle.

23  Q.  It was another one, just coincidentally, another tracking

24      device?

25  A.  I think that's already been established, in depositions,



Todd Courser
01/28/2020                                   Page 167

1        how that went down.  Do you have anything to suggest that

2        I did?  Do you have a picture or anything that shows that

3        I put it on his vehicle or something?

4   Q.   I'm not here answering questions.

5   A.   Well, I'm just asking.  If you're gonna say that I did it,

6        at least provide some evidence to show that I did it.

7   Q.   I'm not saying you did it.  I'm asking you about it.  You

8        obviously asked Mr. Eickholdt to get the GPS unit up and

9        running and then, all of a sudden, there's one found, less

10       than a month later, on Mr. Gamrat's vehicle in July of

11       2015.

12  A.   And so if that was found on his vehicle, are you saying

13       that I did it?

14  Q.   I'm not saying anything.  I'm asking you about it.  It

15       seems just coincidental to me.  Maybe it is.

16  A.   Yeah.  That's what it is.

17  Q.   Okay.  Sure.

18            So going back to the recording, did you ever

19       find, during any of your stays at the Radisson Hotel,

20       evidence of any recording devices in any of your rooms?

21  A.   No.

22  Q.   Okay.  Did you see anyone coming in and out of your rooms

23       at any time that looked suspicious?

24  A.   No.

25  Q.   Okay.  When did you start staying at the Radisson Hotel



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 168

1    for business purposes?

2  A.   I believe they had a stay there for an orientation I think

3       in November or December, and I think that started the

4       process of me staying at the Radisson.

5  Q.   Okay.

6  A.   And if rooms were available, then I would stay there; if

7       they weren't, I wouldn't.

8  Q.   And then, I'm sorry, where would you stay if you couldn't

9       stay at the Radisson?

10  A.   Wherever you could get it.  I mean obviously Lansing has a

11       lot of hotels, but if games are happening or whatever,

12       it's difficult sometimes to get rooms --

13  Q.   Well, where was your --

14  A.   -- near the Capitol.

15  Q.   Where was your next go-to after the Radisson?

16  A.   There wasn't one.  I don't think I stayed at another place

17       twice.

18  Q.   Okay.

19  A.   It was just if I could find a room to sleep is how that

20       went down.

21  Q.   So you went to that orientation after your election, I

22       take it?

23  A.   Yes.

24  Q.   And that was still in 2014, sometime shortly after the

25       election?



Todd Courser
01/28/2020                                    Page 169

 1  A.   I, like I said, I think it was in November or December.

 2  Q.   Okay.  So then the next time you would have been up there

 3       was after you took office, I take it?

 4  A.   I don't know.

 5  Q.   Okay.  Well --

 6  A.   You have the records.  I mean you could, you could show us

 7       when I was there.

 8  Q.   I'm asking you.

 9  A.   Well, if you had the records and you put it in front of

10       me, I'd be happy to review it.

11  Q.   I'm just asking you your recollection.

12  A.   If you have the reservations, we could look at that.

13  Q.   I'm asking you your recollection.

14  A.   I'm trying to tell you if you could refresh my memory with

15       your records, it would help.

16            MR. DePERNO:  Well, they don't wanna give you

17       the records, so we're proceeding in this deposition before

18       they give you the records --

19            MR. KOSTELLO:  It really --

20            MR. DePERNO: -- so that then they can sanitize

21       the records based on what you say.

22            THE WITNESS:  Don't be so cynical.

23            MR. KOSTELLO:  Yeah.  Everything's a conspiracy

24       theory; huh?

25            MR. DePERNO:  Well, if it wasn't, you would give



**Todd Courser**
01/28/2020                                      Page 170

1    us the records before the deposition, but you wanted to do

2    the deposition today before you gave us all the records,

3    because you don't want him to have all the information

4    when he testifies.

5              MR. KOSTELLO:  That's exactly it.  You got it.

6    You've, you're really hit the nail on the head.  You are

7    so brilliant.

8              MR. DePERNO:  Well, I don't know whether -- I've

9    never seen someone not give records that are pretty, I

10   guess, in your view, inconsequential unless they're

11   consequential.

12             MR. KOSTELLO:  You were given the opportunity, a

13   Protective Order was sent to you by Mr. Hicks, and my

14   understanding is you never made revisions to it to send it

15   back to him to get it signed.

16             MR. DePERNO:  False.  But regardless, do you

17   think --

18             MR. KOSTELLO:  I'm not having this conversation

19   with you.  I'm asking questions.

20             MR. DePERNO:  Do you think that you can withhold

21   documents --

22             MR. KOSTELLO:  I'm not here to answer questions.

23             MR. DePERNO:  -- because you want a Protective

24   Order?  What court rule says that?

25             MR. KOSTELLO:  I'm not here to debate you.



Todd Courser
01/28/2020                                    Page 171

1              MR. DePERNO:  Give me a court rule.

2              MR. KOSTELLO:  I'm not here to debate you; okay?

3       I'm here to ask questions, so you and I aren't talking.

4              MR. DePERNO:  Well, we are.  I'm asking you what

5       court rule.

6              MR. KOSTELLO:  I'm not answering any questions.

7       I am taking my deposition; okay?  Good Lord.

8  BY MR. KOSTELLO:

9  Q.   At some point -- how often -- you were at the Radisson as

10      much as you could be; that was your go-to hotel; correct?

11 A.   I didn't prefer that hotel, but sure.

12 Q.   Well, which one did you prefer?

13 A.   Not that one.  I didn't really care for that spot.

14 Q.   Okay.  So where else?  Where did you prefer?

15 A.   Well, no.  It was just, it was just too, it was too

16      Lansing.  I'm not really -- I don't really like the city

17      so much.

18 Q.   So why'd you stay there then?

19 A.   Well, because they gave you a great rate and it was right

20      next to the, the, the House Business -- what do they call

21      that -- the HOB, I think it was, the House Business

22      Office, I think is what it's called.

23 Q.   So it's fair to say, though, that when you stayed there

24      for business purposes, you stayed at the Radisson?

25 A.   Well, that isn't what you asked, but yes, that's true.



Todd Courser
01/28/2020                                    Page 172

 1  Q.  It is kinda what I asked, but whatever.

 2  A.  **You did it again.  You're rolling your eyes.  It's just**

 3      **unprofessional; okay?**

 4  Q.  If you'd answer a question straight and actually listen to

 5      my questions and answer them -- okay -- then maybe I

 6      wouldn't --

 7  A.  **Well, ask them straight.**

 8  Q.  I've asked them very straight, sir.  You just are

 9      incapable of answering anything straight.  Let's move on;

10      okay?

11               At some point --

12  A.  **It's unprofessional to do it.**

13  Q.  That's great.  That's great.

14  A.  **It is.**

15  Q.  Fine.  That's great; okay?

16  A.  **Okay.**

17  Q.  All right?

18  A.  **Just ask the question.  All you gotta do is ask it and**

19      **I'll answer it.**

20  Q.  I've been asking the questions.  Answer the questions that

21      I'm asking rather than some --

22  A.  **Okay.  Okay.**

23  Q.  Okay?

24  A.  **Try to, try to answer [sic] it specifically and then I'll**

25      **try to answer it specifically --**



hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                              Page 173

 1  Q.  Okay.

 2  **A.  -- or ask it specifically and then I'll answer it**

 3     **specifically.**

 4  Q.  During the course of your time staying at the Radisson,

 5     did you get to know any of the, the hotel management?

 6  **A.  I believe there were two or three hotel managers.**

 7  Q.  Okay.  And did you know any of them by name?

 8  **A.  I don't know them by name.**

 9  Q.  Was there anyone that you saw or dealt with more often

10     than the others?

11  **A.  I actually met with I believe all three of them about the**

12     **issues related to the hotel.**

13  Q.  And what were the issues related to the hotel that you --

14  **A.  I mean you could tell me the names of the hotel managers.**

15  Q.  I'm not here to answer your questions, sir.  Again, if you

16     just answer the questions, okay?  If you don't know the

17     names, you know what your answer is?  I don't know; okay?

18     Or I don't remember or maybe his name was Bob, you know,

19     maybe I remember seeing it was Steve.  I don't know.  Just

20     answer it; okay?  If it's I don't know, then it's I don't

21     know; okay?

22            So here's the next question; okay?  If you want

23     to get through this, can you just answer the questions

24     that I'm asking you?

25  **A.  Yeah.  I'm good.**



Todd Courser
01/28/2020                                    Page 174

1   Q.   Okay.  So what were the issues that you raised with hotel

2        management during the course of your stays there?

3   A.   **Well, the issues were that they were sending my -- they**

4        **revealed to me that they were sending my invoices first to**

5        **the House of Representatives, which was incorrect.**

6        **Apparently there was some confusion related to the House**

7        **of Representatives paying the bill because they paid for**

8        **the first -- the --**

9   Q.   The initial stay for the orientation?

10  A.   **(Nodding head affirmatively.)  So they had, they had --**

11  Q.   Correct?

12  A.   **Yes, the initial stay for the orientation.**

13  Q.   Okay.

14  A.   **So they had connected to me as the payor being the House**

15       **of Representatives.**

16  Q.   Okay.  So that stay was arranged -- was it arranged for by

17       the House of Representatives and they paid for it?

18  A.   **I don't know who arranged it, but --**

19  Q.   But they paid for it, nonetheless?

20  A.   **My understanding was they paid for it.**

21  Q.   So the Radisson, the hotel billed the House of Representatives

22       directly for that stay in November/December of 2014?

23  A.   **I believe so.**

24  Q.   Okay.  So then in your subsequent stays after that, a fair

25       statement that there may have been some confusion on the



Todd Courser
01/28/2020                                        Page 175

1    part of the hotel as to who the bill should go to, the

2    House of Representatives like it was the first time versus

3    yourself personally?

**4  A.  Correct.**

5  Q.  Were your hotel stays reimbursed as part of some expense

6    reimbursement by the House of Representatives?

**7  A.  No.  From that point on, then they were billed to me.**

8  Q.  And you were responsible for -- so if you were coming up

9    here to Lansing or coming up to Lansing to stay for any

10    given period of time to attend sessions at the House, you

11    had to pay for that out of your pocket?

**12  A.  We did.  And that's what the expense account was for that**

**13    I already explained to you.**

14  Q.  The $10,000?

**15  A.  Yes.  I believe it was $10,000.**

16  Q.  It was meant to reimburse for those sort of things?

**17  A.  Yes.**

18  Q.  But it was up to you to keep track of it and not go over

19    that amount, or if you did go over that amount, it came

20    out of your pocket?

**21  A.  That's correct.**

22  Q.  Okay.  So after that initial stay in November or December,

23    the next stay, did the invoice go to the House of

24    Representatives instead of you?

**25  A.  Well, I don't know.  You'd have to check your invoicing.**



Todd Courser
01/28/2020                                    Page 176

```
 1          I don't know if it was the next stay or not.

 2   Q.   Okay.  At some point you realized that invoices were going

 3        to the House of Representatives instead of you?

 4   A.   Tim -- I believe it was Tim Bowlin contacted me, saying

 5        they're getting invoices for me, I believe that's how it

 6        went, and I was supposed to contact the hotel to

 7        straighten that out.

 8   Q.   Were you not also getting invoices handed to you when you

 9        checked out?

10   A.   I can't remember.  I believe I got invoices.  I don't know

11        if they gave me a physical invoice or not because you

12        don't leave or you just kinda leave -- you just -- you

13        know?  When you walk out of the hotel, you, you close your

14        door and your bags, you take your bags down to your car

15        and you get in.  You don't say, hey, I'm checking out.

16   Q.   Well, that's an option.

17              Another option is to stop at the desk and get an

18        invoice --

19   A.   Yeah.

20   Q.   -- if one's not placed under your door, which sometimes

21        happens in hotels; agreed?

22   A.   Yeah.  They put it under your door each night.

23   Q.   Yeah.  So if I don't get one when I stay at a hotel, if I

24        don't get one under the door, I'll generally stop by, when

25        I'm leaving, hand them the keys and ask for an invoice.
```



Todd Courser
01/28/2020                                          Page 177

1  A.   If I remember correctly, the invoice --

2              MR. DePERNO:  Objection.  I don't think we care

3        what counsel does when he's checking out.

4              MR. KOSTELLO:  No.  I was gonna ask him if that

5        was his practice.  He just started talking.

6  BY MR. KOSTELLO:

7  Q.   So is that something you would do if you didn't get one

8        under the door?

9  A.   Do what?

10 Q.   Stop by the front desk and get one or were there times you

11       just walked out of there without an invoice?

12 A.   I believe the invoices were under the door.

13 Q.   Okay.  But then they were getting emailed, apparently, to

14       the House of Representatives for a period of time?

15 A.   That's my, yes, that's my understanding.

16 Q.   And you learned of that because Tim Bowlin told you that?

17 A.   I, I believe it was the House Business Office.  Yes.

18 Q.   So then I take it one of the times you had an occasion to

19       meet with a manager or managers there was to ask them why

20       that was happening and ask that it be changed?

21 A.   Yes.  I believe that's how that went.

22 Q.   And do you recall what the substance of that conversation

23       was?

24 A.   That there was, there was an issue related to that.  I

25       don't remember the substance of it other than I think you



Todd Courser
01/28/2020                                    Page 178

1        have the wrong billing on that, let's change the credit

2        card.

3    Q.  And was it rectified at that point?

4    A.  **Yes, I believe it was.**

5    Q.  So you had to give them some new credit card information?

6    A.  **No.  It seemed like there was actually still some**

7        **confusion, like they attempted to bill the House even**

8        **after that.**

9    Q.  Okay.

10   A.  **Because I think I spoke to Kevin Cotter after that, on the**

11       **House floor, and he said that there was still an issue**

12       **with that.**

13   Q.  Okay.  At some point did it get changed?

14   A.  **Yes, I believe so.**

15   Q.  Okay.  And did you start receiving invoices to your email?

16   A.  **No.  I gave them my email and they were sending the, the**

17       **invoices to another email.**

18   Q.  What email were they sending the invoices to?

19   A.  **Joe Gamrat.**

20   Q.  Okay.  So they -- and how do you know that?

21   A.  **Because Joe Gamrat says it in his deposition.**

22   Q.  Did you know that at the time?

23   A.  **No.  I did not know that at the time.**

24   Q.  Did they ever tell you that, hey, here's the email address

25       we have on file?



Todd Courser
01/28/2020                                    Page 179

1   A.   No.  They refused to tell me the email address, even

2        though I gave them the correct one.  I said you're sending

3        my invoices and my credit card information to someone, and

4        they refused to give me the information.

5   Q.   And what was -- why did they tell you they wouldn't give

6        you the information?

7   A.   They just said for privacy, they can't but it's corrected;

8        but it wasn't corrected.

9   Q.   Okay.  Did it get corrected at some point?

10  A.   It did.  They, they attempted to put my name, is what they

11       told me, and then I met with them again, because obviously

12       it was after that February 12th incident, and I said, hey,

13       somebody knows my hotel room and they're getting that

14       information and so somebody here at the hotel is giving

15       out that information.

16            And they said no, that doesn't happen, nobody

17       gets your hotel information, nobody gets your room

18       information, and so then we found out that they were still

19       sending my stuff to a different email.

20            So I met with, met with them in the back.  I can

21       even remember the office.  And they said that they were

22       gonna place my actual profile under some sort of assumed

23       name.  They were going to give me a fictitious name.  That

24       way somebody that called in wouldn't be able to access and

25       find out what room I was in, which I said okay, that's



1      fine.  And then it still continued to happen.

2             And then obviously those emails were going to

3      what Joe Gamrat says, he just called in and had them

4      change my, my profile so that they were sending the emails

5      to an email address he set up.

6  Q.  Okay.  Did it get corrected to where you were, in fact,

7      receiving emails with your hotel information?

8  A.  Yeah.  She sent the whole -- your -- somebody from your

9      service or from the hotel service, excuse me, sent a whole

10     batch of them because I had not received any of those, and

11     then she sent all of them, I believe, and it was really

12     like on a day, she sent all of them.

13 Q.  Were you enrolled in any sort of Radisson Rewards Program

14     where you were getting points?

15 A.  Yes.  I had some sort of portfolio thing portal and

16     apparently that had been compromised as well.

17 Q.  Okay.  So did you ever contact anyone to try to get that

18     issue resolved?  For example, I don't know, like --

19 A.  That was the multiple times that I met with the hotel

20     manager.  The first manager got moved out East, then they

21     brought in a new manager, and they said, well, they rotate

22     these managers, because obviously they're, you know,

23     moving them up, I mean however that works, and so then

24     they brought in another manager.

25             So you kinda had one person dealing with it, you



Todd Courser
01/28/2020                            Page 181

1       think you got it straight, and then the new management

2       came in and, and now it's back to being screwed up again.

3   Q.  Okay.  Did you ever -- were you ever directed to call a

4       phone number, to talk to someone centrally?

5   A.  I think that's how I ended up getting the actual, the

6       actual receipts or the invoices.

7   Q.  And they were ultimately all sent to you?

8   A.  I don't know about all of them but the batch that I had,

9       the ones that were sent to me are the ones with my name on

10      them, not the ones that they did under some sort of

11      fictitious name.  So I don't know if they corrected all

12      that to make it just with my name or how the portfolio --

13      I don't know what your system does with that.

14  Q.  How many meetings did you have with the managers or a

15      manager at the Radisson Hotel?

16  A.  It was actually a hotel manager.  It was not the lines

17      manager or the desk manager.  And I believe there were

18      five different times that I met with them.  Cindy met with

19      them my understanding was -- I don't know if she met with

20      the hotel manager -- but she met with managers as well and

21      they placed her name under a different name, Susan Dey --

22  Q.  Or Sally Fields?

23  A.  -- Sally Fields, and I think one other that was some other

24      name that they had for her.

25  Q.  Okay.  The five times that you believe you met with a



Todd Courser
01/28/2020                                    Page 182

1    manager or managers at the Radisson, were the

2    conversations all about the same issues, that is this

3    issue about your account, the email being incorrect?

4  A.  Well, and the fact that by that point we knew that someone

5    was accessing my hotel room and that somebody was in my

6    hotel room, but it wasn't until later, with the texts,

7    that we realized that somebody was in my hotel room and

8    taking pictures of the hotel room and giving some sort of

9    feedback.  That all came later.

10  Q.  So let's go back to the, let's go to the first time you

11    raised an issue about your account with a manager there.

12        Did you tell me that was sometime after the

13    February incident where Joe Gamrat was found at the hotel?

14  A.  Well, we already discussed that at the beginning of the

15    deposition, that he was found at the hotel on February

16    12th, and that's where you were trying to say, well, when

17    did he know.  Well, I don't know when he knew, but he

18    obviously was at the hotel on February 12th and had a

19    confrontation with her.

20  Q.  Presumably because he believed she was having an affair?

21  A.  So prior to that is probably when he knew.

22  Q.  Right.  That wasn't my question though.

23  A.  Well, I know, but you're asking me, you're asking me --

24  Q.  My question is the first meeting you had with a manager --

25    again, just let me finish; okay?



Todd Courser
01/28/2020                                    Page 183

1  A.   Yeah.  Okay.

2  Q.   The first meeting you had with a manager at the hotel

3       regarding your account information occurred after that

4       February incident with Mr. Gamrat?

5  A.   **No.  I don't, I don't think so.  I think that it was right**

6       **around that same time, it might've been before that, but**

7       **it was related to the issues not with that, it was related**

8       **to the issues with the billing for the House of**

9       **Representatives.**

10 Q.   Oh, okay.

11 A.   **So you're trying to say it wasn't till after that.  I'm**

12      **trying to tell you that there was a time before that that**

13      **we had an issue, then we had the issues with Joe Gamrat**

14      **where he clearly was getting information from the hotel,**

15      **then I had a series of meetings with the hotel management.**

16 Q.   That's all I'm trying to establish here.  I got it.  Okay.

17           So the first, the first meeting was about the

18      House of Representatives being billed; okay?

19 A.   **Billed.**

20 Q.   Billed.  Yes.

21           So then the incident in February with Mr. Gamrat

22      happens; then you have a second meeting with a hotel

23      manager after that point?

24 A.   **Yes.**

25 Q.   Okay.  And the purpose of that meeting was to discuss your



Todd Courser
01/28/2020                                    Page 184

1    account information and whether or not the email that they

2    had was correct and whether someone else was getting

3    information regarding your stays; is that fair?

4  A.   So, no, it's not fair.  If you want me to explain, I'm

5       just trying to explain; okay?

6  Q.   All right.

7  A.   So at that initial meeting, I say, hey, look, get the

8       bills to me so I can pay them.  I don't want them going to

9       the House of Representatives.

10  Q.  Yeah.  Got that.  Tell me about the second meeting.

11  A.  So then they say we'll email to ya, we're gonna send them

12      to ya; okay?  I'll have somebody take care it, they'll

13      compile them, they'll get it straightened out with the

14      House of Representatives and they'll redo them so that

15      they're gonna bill you.  I said okay, wonderful.

16          They went to an email that wasn't mine.  That's

17      when we started to figure out they're not coming to my

18      email; they're going to someone else's email.

19  Q.  Okay.

20  A.  So they had somebody else's email on my account which was

21      telling them the reservation information, apparently the

22      check-in information, he got there at 7:51 a.m., he left

23      at such-and-such a time.  All of that information we saw

24      later in the texts that said that somebody or somehow they

25      were getting that information from the hotel.  Those



Todd Courser
01/28/2020                              Page 185

1      meetings -- I didn't have any of that information.  I just

2      knew that my, my statements were being emailed to someone

3      that wasn't me.  They wouldn't tell me who.  But I did

4      know on February 12th that they were giving out my room

5      number at that point.  So --

6  Q.  Well, how do you know that?

7  A.  Well, because it says in the text messages.

8  Q.  That he got the room number from the hotel?

9  A.  Yeah.  That he called up and you guys gave him the, the

10     room number.

11 Q.  It says in the text messages from Joe Gamrat's phone?

12 A.  He says it in the deposition that he would just call up

13     and ask.

14 Q.  You said it said it in the text messages.

15 A.  Well, excuse me.  In the text of the deposition.

16 Q.  The text messages -- okay.

17 A.  I'm gonna go to the restroom again.  So --

18             (At 3:18 to 3:21 p.m. recess taken.)

19             MR. KOSTELLO:  Back on the record.

20 BY MR. KOSTELLO:

21 Q.  So of the five total meetings you had, the first one was

22     about the House of Representatives being invoiced, the

23     next three may have been about the email situation about

24     someone else getting these invoices or information, and

25     then the last one was after the text messages started



Todd Courser
01/28/2020                          Page 186

1    coming and you believe that someone was getting access to

2    your room?

3  A.   Yeah.  I believe, yeah, somebody was getting --

4  Q.   Okay.

5  A.   But it wasn't really -- because there was some confusion

6       with management because there were multiple hotel managers

7       as well.

8  Q.   Okay.  Yeah.  I mean, well, when you say confusion, what

9       was the confusion in your mind?

10 A.   Well, they didn't know, apparently, that we were having

11      that issue, so there should've been a report, but the

12      stuff you guys delivered didn't have the reports in it,

13      from when I had the incidents with, you know, when we

14      discussed it with hotel management.  So, so, you know,

15      those reports obviously would have told us who those

16      managers were that I met with.

17 Q.   Okay.  The last, the last meeting where you spoke to a

18      manager about, you know, people getting access to your

19      room, do you recall when specifically that took place?

20 A.   No, I don't.  It was obviously after the texts were

21      coming.

22 Q.   So sometime after May 19 of 2015?

23 A.   Well, I believe so, but I mean at that point I thought

24      that they had addressed it because they were saying they

25      were gonna put it under some sort of protection with the



Todd Courser
01/28/2020                                    Page 187

1    hotel and nobody's gonna know and, you know, so they would

2    have no access to my portal and, you know, but they

3    changed the email multiple times.  So there were a lot of

4    issues related to somebody getting access to the

5    information, so it wasn't just about the idea of somebody

6    getting access to my room.  It was the idea that they were

7    getting access to the portfolio at the hotel, my

8    information, and the invoices were being sent to, you

9    know, to obviously people that shouldn't have them, and

10   that the hotel staff is actually giving out information

11   they shouldn't be.

12   Q.  Okay.  Do you specifically -- do you remember anything

13       specific about what you were told during that last

14       conversation that you had sometime after May of 2015?

15   A.  That was a new person at that point.

16   Q.  Okay.

17   A.  They didn't know really anything that -- they seemed

18       unaware or I mean your stuff says don't give up any

19       information, so they may have been totally aware of what

20       was going on but just didn't tell me, but your, you know,

21       your manual tells your manager on duty to not give up any

22       information.  So they may have known but they acted as

23       though, you know, all of this is just news to them.

24   Q.  Okay.  We had talked, before, about audio recordings that

25       may have been made at the hotel and you told me you've



**Todd Courser**
01/28/2020                                                    Page 188

1    never actually heard any and you're not in possession of

2    any.

3              I want to jump to photographs, though.  I think

4    there was some reference to photos being taken inside the

5    rooms you were staying in; is that true?

6              Do you believe that photographs were taken

7    inside the rooms?

8  **A.   Yes.**

9  Q.   Okay.  Have you ever seen any of those photographs?

10 **A.   I don't know if we could pull them up, but we could see**

11      **the thumbnails of the photographs.  So I only had Joe**

12      **Gamrat's phone, which had the thumbnails of those pieces**

13      **where there were photos that went along with the words**

14      **where he said things like, hey, the shower curtain's out,**

15      **hey, what do you think about this, both beds are messed**

16      **up, you now, the heat is the way that she likes it,**

17      **there's nothing in the trash.  But there were photos**

18      **there, you couldn't open them, from his phone.**

19 Q.   So, here, I'll ask the question again.

20             Have you actually seen any photographs taken

21      inside of your room?

22 **A.   I saw those photo thumbnails.  I could not increase them**

23      **to see what was there.**

24 Q.   No one ever sent you any photographs, did they, taken

25      inside of the hotel room?



**Todd Courser**
**01/28/2020**                                                **Page 189**

1   A.   No, they did not.

2   Q.   Either by way of text, email, CD, thumb drive?

3   A.   No, not that I'm aware of.

4   Q.   Same question with any videos.

5             Have you ever seen any videos taken purportedly

6        inside your room?

7   A.   No.

8   Q.   Have you ever been sent any videos by way of text, email,

9        CD, DVD, thumb drive?

10  A.   Well, yeah.  I've been sent videos.

11  Q.   Purportedly taken inside of your room?

12  A.   No.

13  Q.   Okay.  Fair statement that Joe Gamrat probably knew when

14       his wife was going to Lansing on any given week; right?

15  A.   Yeah.  That's a fair statement.

16  Q.   Okay.

17  A.   He was tracking her and he was audio recording her.  He

18       was planting listening devices.

19  Q.   Well, he simply had to ask her like, hey, where are you

20       going, if she was leaving the homestead to go away for a

21       few days; right?

22  A.   Well, the text messages indicate he was communicating with

23       Allard and Graham and Cline and they would tell him.  He

24       would tell them when she left and they would tell him.

25  Q.   How is that in any way an answer to my question?



Todd Courser
01/28/2020                                    Page 190

1  A.  Well, you said would he know.  Well, he would know.

2  Q.  No.  I asked you this:  Can you assume that Cindy probably

3       told Joe, hey, I'm going to Lansing for the next two or

4       three days?

5  A.  That's not what you said.

6  Q.  That's exactly what I said.

7  A.  That's not what you said at all.

8  Q.  Yeah.

9            MR. DePERNO:  That's not what the question was.

10  BY MR. KOSTELLO:

11  Q.  I said it's fair to say that Cindy told her husband when

12       she was going to Lansing.  That's exactly what I said.

13  A.  Well, I don't think it's fair to say that.  They were,

14       they were estranged at that point.  They weren't speaking.

15  Q.  Were they living together?

16  A.  Yeah, but he, he lived on the road.  He was gone all week.

17  Q.  Okay.

18  A.  He actually worked out of state and around the state.  So

19       where he was, I don't know.

20  Q.  Okay.

21  A.  If you're asking me to assume, I don't know what the -- is

22       it fair to say?  I have no idea.

23            (At 3:28 p.m., Deposition Exhibit Number 6 was

24            marked.)

25  BY MR. KOSTELLO:



**Todd Courser**
01/28/2020                                      **Page 191**

1  Q.   I show you what I've marked as Exhibit 6.

2          Have you seen that document before?

3  **A.   Yes.**

4  Q.   Is it the Complaint in this matter?

5  **A.   Yes.  I believe it is.  I haven't read through what you've**

6       **handed to me but it looks like it.**

7  Q.   Okay.  This isn't the first time you've seen this though;

8       correct?

9  **A.   No.  This isn't the first time.**

10 Q.   Okay.  Can you turn to Page 3, Paragraph 9?

11 **A.   Okay.**

12 Q.   The last part of that, it says you were a member of the

13      House of Representatives "until he was unlawfully forced

14      to resign his position on September 11, 2015."

15          What do you mean by unlawfully forced?

16 **A.   Well, because it's very specific in the Constitution, the**

17      **criteria by which they can remove someone from office, and**

18      **they didn't meet that criteria.**

19 Q.   Okay.  So you're meaning that the House, the House of

20      Representatives unlawfully forced you to resign?

21 **A.   They failed to provide any due process, they failed to**

22      **provide fair and just treatment under the Fair & Just**

23      **Treatment Clause, and they failed to meet the criteria for**

24      **impeachable offense under the Constitution.**

25 Q.   The decision to resign, though, was yours; correct?



Todd Courser
01/28/2020                                    Page 192

1   A.   Yes.

2   Q.   Okay.  Who is Vincent Krell?

3   A.   **Vincent Krell is a person that worked with Joseph Gamrat.**

4   Q.   Okay.  And he was named as a Defendant originally in this

5        lawsuit; correct?

6   A.   **That is correct.**

7   Q.   But he was dismissed; correct?

8   A.   **That is correct.**

9   Q.   Okay.  What involvement do you think, if any, do you think

10       Vincent Krell had in any of this?

11  A.   **I only have the text messages and what Vincent Krell**

12       **shared with us in the affidavit that he signed.  The text**

13       **messages showed that he was involved in, in -- and it**

14       **appeared that he was actually in the hotel room, from the**

15       **text messages.  He denied that, but the text messages**

16       **showed that.**

17  Q.   Okay.  What text messages are you referring to?

18  A.   **The text messages between Joseph Gamrat and Vincent Krell,**

19       **from Joseph Gamrat's phone.**

20  Q.   Okay.  So then why was he dismissed from this lawsuit?

21  A.   **I think a decision was made to, to, to dismiss him from**

22       **the lawsuit because -- I have to ask.  That's been a long**

23       **time ago.**

24              THE WITNESS:  Didn't he provide an affidavit,

25       Matt?



1  A.   I have to ask my -- I believe he signed an affidavit as to

2       the -- to -- as to the case.

3  BY MR. KOSTELLO:

4  Q.   Okay.  Asserting what?

5            MR. DePERNO:  Well, hang on a second.  I am

6       looking for a -- can we go off the record?

7            MR. KOSTELLO:  Sure.

8            (At 3:31 to 3:32 p.m.  discussion held off the

9            record.)

10           MR. KOSTELLO:  Back on.

11  BY MR. KOSTELLO

12  Q.   It was your understanding that Mr. Krell actually asserted

13       that he didn't even live in Michigan or wasn't in Michigan

14       at any of the times relevant to your Complaint?

15  A.   **He, he asserted that he was living in Kentucky during that**

16       **time, but he worked for the same company and they moved**

17       **around a lot.**

18  Q.   Okay.  So Paragraph -- let's go to Page 5 of your

19       Complaint.  Paragraph 25 asserts that:  The Radisson

20       Defendant, employees of the Radisson Defendants allowed

21       unauthorized agents, including Mr. Krell, to repeatedly

22       enter your rooms at the Radisson Hotel.

23           Do you see that?

24  A.   **I do see that.**

25  Q.   What evidence do you have that Mr. Krell ever entered one



**Todd Courser**
01/28/2020                                              **Page 194**

1    of your rooms?

2  **A.   We had the text messages between Joe Gamrat and Vincent**

3  **Krell.**

4  Q.   Okay.  In those text messages, Mr. Krell asserts that he's

5       standing in your room at some point?

6  **A.   He asserts a whole host of surveillance stuff.**

7  Q.   Paragraph 26 alleges:  Mr. Krell entered rooms at the

8       Radisson to install surveillance equipment in the rooms

9       you were staying in.

10            What evidence do you have that he did that?

11 **A.   The text messages.**

12 Q.   Okay.  Would you go to Page 7, please?  Paragraph 36 says:

13      The Radisson Defendants allowed unauthorized access to

14      Courser's hotel room for recordings to be made of Courser.

15      These recordings caused irreparable harm to Courser.

16            So these are the recordings that -- the

17      recordings referred to in Paragraph 36 were the same

18      recordings that you've never heard and don't have

19      possession of; correct?

20 **A.   They're the recordings.  Yes.**

21 Q.   Okay.  So what irreparable harm have those recordings, no

22      one can verify exist, caused you?

23 **A.   They're used as the basis for the extortion texts.**

24 Q.   And the extortion texts caused what sort of harm to you?

25 **A.   Well, ultimately, it resulted in removal from office.**



Todd Courser
01/28/2020                                    Page 195

1  Q.  How did the extortion texts result in removal from office?

2  A.  It related to the, the publishing of that, that recording

3      between myself and Graham from May 19th, the partial

4      release of that recording.

5  Q.  The partial release of that recording was the result of

6      your false flag email; was it not?

7  A.  No.  The partial release of the recording is because Ben

8      Graham took it and then with the Detroit News' lawyers,

9      they edited out twenty minutes of it and then they used it

10     to run the story, which was then the basis for the House

11     of Representatives committee.  It was also then the basis

12     of the removal from office and then it was the basis for

13     the criminal charges.

14 Q.  The text messages have nothing do with that chain of

15     events though.

16 A.  That's your opinion.  Are you asking me a question or are

17     you telling me something?

18 Q.  The House of Representatives' action was based on your

19     attempts to cover up your affair with Miss Gamrat.

20 A.  Is that a question?

21 Q.  Fair statement or not?

22 A.  That's not a question.

23 Q.  Okay.  You disagree with that?

24 A.  Yes.  I disagree with that.

25 Q.  Do you disagree with Mr. Bowlin's statement in the House



Todd Courser
01/28/2020                                    Page 196

```
 1      report that the alleged blackmail attempt had absolutely

 2      nothing to do with your -- the investigation into you?

 3  A.  Yes.  I disagree with that.

 4  Q.  Okay.

 5  A.  It played a part but it played a part with all the other

 6      pieces.

 7  Q.  Okay.

 8              MR. BYE:  Tony, could I talk to you for a

 9      second?

10              MR. KOSTELLO:  Yes.  A quick break.

11              (At 3:37 to 3:39 p.m. recess taken.)

12              MR. KOSTELLO:  Back on the record.

13  BY MR. KOSTELLO:

14  Q.  As we sit here today, do you still believe that Vincent

15      Krell gained access to your rooms at the Radisson?

16  A.  I believe that the text messages show he was involved in

17      the extortion and that he had a lot of back and forth with

18      Joe Gamrat --

19  Q.  Do you believe he --

20  A.  -- but he claims he was in, in Kentucky.  So --

21  Q.  So what's the answer to my question then?

22              Do you believe he was involved in gaining access

23      to your hotel rooms; yes or no?

24  A.  That's a different question.  Do you believe he was

25      involved or --
```



Todd Courser
01/28/2020                                              Page 197

 1  Q.   That the same exact question that I asked you before.

 2  A.   **I understand what you said.  Let me state it.  Do you**

 3       **believe that he was involved in gaining access to your**

 4       **hotel room?**

 5  Q.   Did he gain access?  Was he, was he physically in your

 6       hotel rooms?

 7  A.   **That's not what you said.**

 8  Q.   I'll ask you that question.  Was he physically in your

 9       hotel rooms?

10  A.   **I don't know.**

11  Q.   Okay.

12  A.   **I know, I know the text messages show that it was back and**

13       **forth.**

14  Q.   What does that mean?

15  A.   **Between he and Joe Gamrat discussing the inside of my**

16       **hotel room.**

17  Q.   Do you believe Joe Gamrat was physically inside your hotel

18       rooms?

19  A.   **Yes.  He said he was, in the deposition.**

20  Q.   Do you believe anyone else was physically inside your

21       hotel rooms?

22            MR. DePERNO:  Objection to the form of the

23       question as to anyone.

24  BY MR. KOSTELLO:

25  Q.   Anyone else that was part of this alleged conspiracy?



Todd Courser
01/28/2020                                    Page 198

```
 1  A.   Yes.  I believe there were other people involved.

 2  Q.   Like who?

 3  A.   I don't know.  I believe that there are other people

 4       involved.  I mean we have, we have enough text messages to

 5       show that.

 6  Q.   Mm-hmm.  Do you believe that anyone at the Radisson wanted

 7       you removed from office?

 8  A.   I don't know that.  I mean there could've been.  There was

 9       clearly somebody who was working with these people to

10       provide that information.

11  Q.   To what end?

12  A.   I don't know.  In the text messages, it says that they're

13       being paid to provide the information, so there might've

14       been a monetary reason for doing it.  Oh, you haven't

15       provided -- the other thing is you haven't provided who

16       the actual owners are of the hotel --

17  Q.   Yeah, we did.

18  A.   -- who the beneficial owners are.

19  Q.   Yeah, we did.

20            MR. DePERNO:  No, you didn't.

21            MR. KOSTELLO:  We did.

22            MR. DePERNO:  You didn't.

23            MR. KOSTELLO:  We did.  We absolutely did.

24  A.   No.  I have not seen that, so if you provided it and you

25       could provide it again, we'd appreciate it.
```



Todd Courser
01/28/2020                                          Page 199

1   BY MR. KOSTELLO:

2   Q.   You can go back and look at my discovery responses and --

3   A.   **I've looked through every, every page of your discovery**

4        **responses.  So --**

5   Q.   Do you have -- strike that.

6             So go to Page 11, please, Paragraph 50.  It

7        says:  As described in this Complaint, some Defendants

8        started the scheme to violate federal and state laws and

9        then spy on Courser in order to dig up dirt on him in

10       violation of federal and state laws.

11            Which Defendants are you referring to there?

12  A.   **Well, we have -- we know that Graham, at least, and Joe**

13       **Gamrat were accessing my emails.**

14  Q.   I know, but are Mr. Graham or Mr. Gamrat Defendants in

15       this case?  This is referring to Defendants, capital D,

16       the Defendants in this case.

17            Which Defendants are being referred to in

18       Paragraph 50?

19  A.   **Yeah.  At that point, at that point we had Krell, for**

20       **sure, and we had people in the Radisson providing that**

21       **information to other people.**

22  Q.   "Some Defendants started the scheme."

23            Which Defendants started the scheme?

24  A.   **Well, I mean when you're asking did it violate -- let's**

25       **go, let's go back.**



Todd Courser
01/28/2020                              Page 200

1   Q.   I'm asking you what Defendants started the scheme, that

2        you're referring to there?

3   A.   **Well, I don't know which employees you had that were**

4        **involved in it.  You would have to provide that**

5        **information to us.**

6             MR. DePERNO:  Which paragraph are you looking

7        at?

8             MR. KOSTELLO:  Paragraph 50.

9             **THE WITNESS:  50.**

10  BY MR. KOSTELLO:

11  Q.   So are you saying -- are you suggesting that the scheme to

12       spy on you was started by either the Radisson Defendants

13       or employees of the Radisson?

14  A.   **Well, I don't know why they would have provided the**

15       **information if they weren't involved in it, because it was**

16       **illegal for them to do it and it's against your own,**

17       **against your own -- when I read through your own handbook,**

18       **your own manual, it says these are things that should not**

19       **happen, should not happen, should not happen and --**

20  Q.   What does "started the scheme" mean?

21  A.   **Well, let me finish.**

22  Q.   You're not answering my question.

23  A.   **I am answering the question.**

24  Q.   No, you're not at all.

25  A.   **Yes, I am.**



Todd Courser
01/28/2020                                    Page 201

1  Q.  Not remotely.

2  A.  You're trying to cut me off because I'm actually pointing

3      out the fact that your hotel was involved in it.

4  Q.  Yeah.

5  A.  There's no reason for your hotel to do that other than

6      they had some sort of other purpose.  Why would they

7      provide those, those emails?  Why would they provide

8      access to the portal?  Why did they continue to give out

9      the information?  Why would they allow somebody that calls

10     in to get my room number?  What would be the reason?

11 Q.  What does "started the scheme" mean?

12 A.  That sounds like, to me, it's starting the scheme.  There

13     was a reason for that.

14 Q.  So it was their idea to start spying on you?  They started

15     it?

16 A.  Well, I don't, I don't --- it doesn't say it was their

17     idea.

18 Q.  So what does "started the scheme" mean?

19 A.  They were involved in it.

20 Q.  Okay.  Do you think -- now, Paragraph 51 says:  Defendants

21     conspired to earn a profit through a process of fraud and

22     misrepresentations.

23          Do you -- are you really alleging that the

24     Corporate Defendants in this action conspired to earn a

25     profit from Mr. Gamrat?



1           MR. DePERNO:  Objection to the form of the

2       question.  It doesn't say that the Defendants conspired to

3       earn a profit from Gamrat.

4  BY MR. KOSTELLO:

5  Q.    Okay.  A profit at all.  I don't care from whom.

6           Do you really think that the Corporate

7       Defendants here were conspiring in order to make some sort

8       of profit off of spying on you?

9  A.    Well, the corporation at the Radisson or Hammons &

10      Winegardner and, you know, the rest, they have employees,

11      and those employees were involved in this.  So, you know,

12      you can say, oh, the corporation, the Corporate Defendant

13      as though somehow it's some austere group that would never

14      stoop to having some sort of profit motive, but that's

15      totally different from the employees of the Radisson Hotel

16      in Lansing.  They clearly provided the information, and

17      the texts say that they were being paid.  If they weren't

18      being paid, why would they have done it?

19 Q.    Page 14, Paragraph 66, what false or misleading actions or

20      statements did the Defendants make?

21 A.    Hold on.  Let me read through this because you didn't read

22      it to me.  Well, I discussed with them, by telephone, I

23      discussed both with the portal people, your online folks,

24      I discussed via telephone, and they said, hey, nothing has

25      happened in regards to information being shared from the



Todd Courser
01/28/2020                                        Page 203

1        hotel --

2   Q.   Okay.

3   A.   -- and, and that wasn't true.  It just wasn't true.

4   Q.   Page 18, Paragraph 100:  After obtaining private

5        information from surveillance and listening devices,

6        Defendants -- capital D -- used that information to

7        directly blackmail, extort, and threaten Courser or

8        advance the conspiracy to blackmail, extort, and threaten

9        Courser.

10              Are you alleging that the Defendants in this

11       matter directly blackmailed or extorted you or threatened

12       you?

13  A.   Well, what I'm saying is the employees of the Defendants.

14       That is -- are you saying that the employees are separate

15       than the Corporate Defendants?

16  BY MR. KOSTELLO:

17  Q.   Did the employees directly blackmail you?

18  A.   Well, they provided the information to do it.

19  Q.   What does directly blackmail mean?

20  A.   They're the ones who were providing the information to do

21       it.  If they hadn't allowed access to my hotel room and

22       access to my information, the blackmail couldn't have

23       occurred.

24  Q.   Okay.  You're an attorney.  So when someone says directly

25       blackmail, to me that means you're alleging that they



Todd Courser
01/28/2020                                    Page 204

1     actually did the blackmailing.

2              MR. DePERNO:  Objection to the form of the

3     question.  That's your --

4  BY MR. KOSTELLO:

5  Q.  Would you disagree with me or that's not what that means?

6              You're not truly alleging -- okay.  Let me ask

7     it this way.  Are you alleging that any of the Defendants

8     were actually the ones sending you the text messages?

9  A.  No.  No.  We already, we already discussed that.  We

10    discussed that.  But you don't have to be involved in

11    sending the text messages to be the people who were

12    providing the information to do it.

13 Q.  Do you think --

14 A.  That's direct.

15 Q.  Do you think there was any intent on any employees or the

16    Corporate Defendants themselves to extort or blackmail

17    you, that they intended that that would happen?

18 A.  I guess I'll go back to direct.  What do you mean by

19    direct?

20 Q.  You used the word direct.  It's your word in your

21    Complaint.

22 A.  You're the one that said it.  You obviously have a

23    different meaning to direct than I do.

24 Q.  You put it in the Complaint, sir.

25 A.  I'm saying direct meaning they were directly involved.



Todd Courser
01/28/2020                                    Page 205

```
 1   Q.   Okay.

 2   A.   Are you saying they weren't directly involved?  We just,

 3        we just talked about all that information was provided

 4        over and over to them to do it, that you won't provide.

 5   Q.   You knew you were having an affair; right?

 6   A.   Yes.

 7   Q.   And Mr. Gamrat knew you were having an affair with his

 8        wife; correct?

 9              MR. DePERNO:  Objection.  Objection.  We've

10        already gone over this.  Now you're badgering the client.

11              MR. KOSTELLO:  No, I'm not.

12   BY MR. KOSTELLO:

13   Q.   You knew you were having an affair; correct?

14   A.   I did.

15   Q.   Mr. Gamrat knew you were having an affair; correct?

16   A.   Yes.

17   Q.   The text messages that were sent by Mr. Horr at

18        Mr. Gamrat's direction were allegations related to the

19        affair that he knew you were having and you knew you were

20        having; correct?

21   A.   Not only.  There's all kinds of other information in

22        there.

23   Q.   Okay.  What, beyond the affair of itself, did you care

24        about coming out?

25              Did it matter to you, beyond the affair, that
```



Todd Courser
01/28/2020                                         Page 206

1       someone may have seen you in a room with her on a certain

2       date?

3               Why is that any worse than the affair itself?

4   A.  **I'm not sure what you're asking.**

5   Q.  Okay.  What I'm asking you is this.  Is any of the

6       information that supposedly was provided to Mr. Gamrat, by

7       the Radisson, what did it add to anything?

8               When you received that text message on May 19 or

9       some days before, from Mr. Horr or Mr. Gamrat, okay, you

10      knew you were having an affair with Cindy, right, and

11      Mr. Gamrat knew you were having an affair with Cindy, and

12      your mother and your brother knew you were having an

13      affair with Cindy.

14              So what was the fact that someone may have seen

15      you there on a certain date with her, what did that add to

16      anything?

17              MR. DePERNO:  Objection.  I still don't --

18  BY MR. KOSTELLO:

19  Q.  The fact that, the fact that you were having an affair,

20      you knew it, so what did it matter?

21              What did it matter that someone said, hey, I saw

22      you on this last Tuesday at the hotel with Cindy?

23              MR. DePERNO:  Objection to the form.  I still

24      don't understand the question.

25  A.  **I don't understand the question either.**



Todd Courser
01/28/2020                                      Page 207

1  BY MR. KOSTELLO:

2  Q.   Okay.

3  **A.   So --**

4  Q.   Did it matter?

5              Were you, were you scared that someone -- that,

6       that specific information about you being in a hotel room

7       with Cindy Gamrat on, let's say, Tuesday, April 26 was

8       gonna come out versus the fact that you were just having

9       an affair in general?

10 **A.   You're, you're going through hypotheticals.  I don't know**

11 **     what --**

12 Q.   Right.  My point is what did any of that information that

13      supposedly was gathered from the Radisson Hotel?

14              What did it matter?

15 **A.   I, I, I -- is there a question in there?**

16 Q.   Yep.  What did it matter?  Why did it matter?

17 **A.   That information was the basis for the extortion texts.**

18 Q.   The basis for the extortion texts was the fact that you

19      were having an affair with Cindy, which Mr. Gamrat knew.

20              Mr. Gamrat was the one behind the extortion

21      texts.  He already knew that.  So my --

22              MR. DePERNO:  You are arguing with the witness.

23              MR. KOSTELLO:  No.  I'm asking him.

24              MR. DePERNO:  No.  You're arguing with him.

25              MR. KOSTELLO:  Nope.



Todd Courser
01/28/2020                                    Page 208

1  BY MR. KOSTELLO:

2  Q.   What did it matter?

3              MR. DePERNO:  I'll argue then.  Does it matter

4         that someone drilled a hole --

5  BY MR. KOSTELLO:

6  Q.   What did it matter?

7              MR. DePERNO: -- in a hotel room to see Erin

8         Andrews naked?  We know she's naked sometimes; right?  So

9         what does that add?

10             MR. KOSTELLO:  That's, that's -- that is not

11        even remotely the same thing.

12             MR. DePERNO:  Sure, it is.

13             MR. KOSTELLO:  Well, you can believe that.

14             MR. DePERNO:  You are providing access to

15        someone's room in a similar manner.

16 BY MR. KOSTELLO:

17 Q.   To provide information which Mr. Gamrat already knew, the

18        fact that you were having sex with his wife behind his

19        back; right?

20 **A.   I'm still not understanding what the basis of your**

21 **      question is.**

22 Q.   All right.

23 **A.   If you wanna say -- what you're trying to say is that my**

24 **      privacy is no longer valuable at your hotel and you have**

25 **      no obligation to actually protect my privacy and,**


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

Todd Courser
01/28/2020                                              Page 209

1       therefore, you can give out my text messages, my emails,

2       you can let people into my hotel room because there's an

3       affair.

4   Q.  What I'm saying is --

5   A.  I guess, I guess everybody should know that about the

6       Radisson Hotel -- come stay here, we're gonna give all

7       your information out, you have no privacy, we're not going

8       to, we're not going to in any way protect you in your

9       privacy in the hotel room, expect people to come in and

10      take pictures and plant listening devices in the hotel

11      room.  That's what we're about.

12  Q.  What I'm asking you, sir, is in your -- you have alleged

13      that there's some direct connection between the fact that

14      perhaps Mr. Gamrat obtained some information at the hotel

15      and you're no longer a State Representative.

16              My overriding point is you want to believe that,

17      that's fine, but you're claiming damages because that

18      information got out that led to your expulsion.

19              And what I'm asking you is what led to your

20      expulsion was the fact you were having an affair, you

21      tried to cover it up with this email that you sent out and

22      then were trying to cover that up, in the aftermath of

23      that, which led to the House of Representatives seeking

24      your expulsion.  And I'm trying to ask you --

25              MR. DePERNO:  Objection.  Now you're badgering



**Todd Courser**
01/28/2020                                    Page 210

1      the witness.

2  BY MR. KOSTELLO:

3  Q.   I'm trying to ask you what any information about when you

4       may have been at the hotel --

5  **A.   Throw your head around.**

6  Q.   I'm not even throwing my head around.

7              MR. DePERNO:  Objection.  You're being

8       argumentative now with the witness.  You're not even

9       asking a question.

10             MR. KOSTELLO:  I'm not trying to ask a question.

11             MR. DePERNO:  Exactly.  You're not even trying

12      to ask a question.

13 BY MR. KOSTELLO:

14 Q.   What did any of that information have to do with you

15      losing your job in the House of Representatives?

16             MR. DePERNO:  Objection.  He's already answered

17      this question --

18             MR. KOSTELLO:  No, he hasn't.

19             MR. DePERNO:  -- five times.

20             MR. KOSTELLO:  He has not even remotely answered

21      it.

22 **A.   I think you made a statement.  I'm not sure what you**

23      **asked.**

24 BY MR. KOSTELLO:

25 Q.   No.  I asked you a question.  If you can't answer it,



Todd Courser
01/28/2020                                    Page 211

1      that's fine --

2                   MR. DePERNO:  Objection.

3    BY MR. KOSTELLO:

4    Q.   -- because I'm not sure, I'm not sure, I'm not sure

5         there's an answer to it.

6    **A.   It was a fifteen-minute question.**

7                   MR. DePERNO:  Objection.  It wasn't a question;

8         it was an argumentative statement with a "is that correct"

9         at the end.

10                  MR. KOSTELLO:  Nope.  I asked him --

11                  MR. DePERNO:  Not even a question.

12                  MR. KOSTELLO:  I asked him what did it have to

13        do with it, so that is a question.

14   **A.   Well, what it has to do with it is that you guys violated**

15        **a federal wiretapping and eavesdropping statute and --**

16   BY MR. KOSTELLO:

17   Q.   And that had to do with what related to you losing your

18        job?

19   **A.   You're interrupting me again.**

20   Q.   Because you're not answering the question.

21                  MR. DePERNO:  Just --

22   **A.   I'm trying to answer the question.**

23   BY MR. KOSTELLO:

24   Q.   No.  You haven't tried to answer any of my questions

25        really.



Todd Courser
01/28/2020                              Page 212

1   A.   I am.

2              MR. DePERNO:  Let's not --

3   A.   Hold on.  No.  I think I can.  It has to do with the fact

4        that --

5   BY MR. KOSTELLO:

6   Q.   Page 23, Paragraph 131:  Defendants' publication of the

7        misleading and defamatory articles constituted an invasion

8        into Courser's private matters.

9              What defamatory articles were published by the

10       Defendants?

11  A.   Well, obviously this information that was placed in here

12       (pointing).  This was published.

13  Q.   But to who?

14  A.   It ended up being published to the whole world.

15  Q.   Okay.  What's defamatory in there?  What's not, what's not

16       true?

17  A.   Well, the defamatory part is -- you're dealing with the

18       issues of published, misleading and defamatory articles.

19  Q.   Yeah.  What articles were published by the Defendants?

20             Do you know what published means?

21  A.   Well, that information was, was transmitted to Joe Gamrat.

22  Q.   Uh-huh.  And what was defamatory about the information

23       that was supposedly transmitted to Mr. Gamrat?

24             What was untrue about it?

25  A.   Well, I mean you can go through his texts and you can see it.



Todd Courser
01/28/2020                                    Page 213

1   Q.   You were staying at the hotel.  You were having sex with

2        his wife in the hotel.

3             What exactly was untrue about any of the

4        information that Mr. Gamrat supposedly obtained?

5   A.   In violation of my privacy --

6   Q.   That's not what that paragraph says.

7   A.   Well, that's what you're doing.  You're trying to say

8        because of the actions that I had --

9   Q.   Do you know what defamatory means?

10  A.   Wait.  You're trying to say because of the actions I had,

11       somehow that absolves you from your responsibilities

12       legally.

13  Q.   What does defamatory mean?

14  A.   Well, I don't know.  You have a definition of it.  You can

15       give it to me.

16  Q.   It's in your Complaint, sir.

17  A.   Well, give it to me.  I mean you want to, you want to --

18  Q.   I'm asking you what it means in your Complaint.

19  A.   Well, I'd have to go and look it up.

20  Q.   Okay.  That's fine.

21  A.   I'm not gonna get into hypotheticals with you on that.

22  Q.   It's not a hypothetical.  It's in your Complaint.  You

23       made the allegation and you're an attorney.

24  A.   I don't know.  It seems like you're, you're pretty

25       argumentative today.



Todd Courser
01/28/2020                                          Page 214

1  Q.  Okay.  Page 27, Paragraph 160:  This concerted action was

2      intended to, among other things, in order to defame

3      Courser.

4              How did the Defendants attempt to defame you?

5  A.  **What page are you on?**

6  Q.  27, Paragraph 160.

7  A.  **Well, they provided, to other co-conspirators, this**

8      **information which contributed to, you know, to, to --**

9  Q.  What was untrue about it?

10 A.  **What do you mean what was untrue about it?**

11 Q.  Okay.  What's a defamatory statement?

12 A.  **Again, you're going back to that.  I asked you.  If you**

13     **wanna read the definition to me --**

14 Q.  It's in your Complaint.  How did we try to defame you?

15             What was untrue about anything in any of those

16     text messages?

17 A.  **It's just outrageous the way that you're doing this.**

18     **That's what I'm saying.**

19 Q.  Oh, it is?

20 A.  **It is.**

21 Q.  Okay.  Asking you about the claims that you made in your

22     Complaint, that's outrageous?

23             MR. DePERNO:  Objection.  It's not the --

24 BY MR. KOSTELLO:

25 Q.  Asking you what you meant as an attorney?



Todd Courser
01/28/2020                                    Page 215

 1  A.    You're very unprofessional again.

 2             MR. DePERNO:  It's the way you're asking the

 3       questions.  It's the argumentative nature, the, the

 4       hostile way that you're acting.

 5             MR. KOSTELLO:  Mm-hmm.

 6             MR. DePERNO:  You're really badgering the

 7       witness and attacking him.

 8             MR. KOSTELLO:  I'm asking him about the claims

 9       he's made in this lawsuit.

10             MR. DePERNO:  Come on.  You know the way you're

11       acting today.

12             MR. KOSTELLO:  Mm-hmm.

13             MR. DePERNO:  You're very argumentative.  You're

14       very unprofessional today.

15             MR. KOSTELLO:  Okay.  You can keep on saying

16       that.

17  BY MR. KOSTELLO:

18  Q.    Who is Ray Cline?

19  A.    **I don't know Ray Cline, but I think Ray Cline is the**

20       **cousin to Joshua Cline.  I believe that's the connection**

21       **there.**

22  Q.    You, in making your extortion report with the Michigan

23       State Police, told the officer that:  Ray Cline had

24       approached him on Facebook Messaging.  Cline wanted to sit

25       down with Courser and meet with him.  Cline purportedly



Todd Courser
01/28/2020                                         **Page 216**

1     had sensitive information about Courser.

2                 Do you recall telling the police that?

3  **A.   Yeah.  You're, you're smiling again and you're rolling**

4  **your eyes again.**

5  Q.   I'm not smiling.  I'm asking you a question.

6  **A.   I just said yes.**

7  Q.   I'm sitting here asking you a question.  I literally did

8       not smile and I did not roll my eyes.

9  **A.   And I said yes.**

10 Q.   Okay.  So what did you mean by that?

11 **A.   I said that he reached out through Facebook.**

12 Q.   And why was that relevant to anything that you were

13      reporting to the police officer at that point?

14 **A.   Because they were asking me questions about who was**

15 **involved or who I thought might be involved.**

16 Q.   Okay.  Why did you think Ray Cline was involved?

17 **A.   Because he reached out to me, claiming to have information**

18 **related to the extortion --**

19 Q.   Mm-hmm.

20 **A.   -- and to the affair, and he was the cousin to Joshua**

21 **Cline.**

22 Q.   And you never talked to him or contacted him back?

23 **A.   I don't know if there was a back-and-forth by Facebook.**

24 **I'm not sure.**

25 Q.   Who is Larry Moyer, M-o-y-e-r?



Todd Courser
01/28/2020                                    Page 217

1  A.   I don't remember that name.

2  Q.   You said -- you told the officer:  Courser stated that

3       another person named Larry Moyer had done the same as

4       Cline.

5            Do you recall that?

6  A.   **Probably did.  There was a lot of back and forth, but I**

7       **don't remember the name.**

8  Q.   You don't remember who that is?

9  A.   **I do not.  Not that I'm aware of.  I knew a lot of people,**

10      **but I can't place that person.**

11 Q.   You told the police officer -- well, this is in his

12      report:  Courser noted that his phone number was pretty

13      well-known worldwide.

14           Why was your phone number pretty well-known

15      worldwide?

16 A.   **My phone number was pretty well-known worldwide?  What do**

17      **you mean why was it known pretty worldwide?**

18 Q.   It just seems like an odd statement to me.

19           Why would your phone number be pretty well-known

20      worldwide?

21 A.   **Well, I had an email list for my -- my email distribution**

22      **list for my newsletter was I think some 40-some thousand**

23      **people and that was all over the country, and so my**

24      **connections ran all over the country.**

25 Q.   When did your affair with Miss Gamrat end?



Todd Courser
01/28/2020                                    Page 218

1   A.   I don't know the exact date.

2   Q.   Well, you told the police officer that the affair ended on

3        May 19, 2015.

4   A.   I don't remember that.

5   Q.   You don't remember saying that or you don't remember that

6        being the date?

7   A.   I don't remember either one, actually.  I don't remember

8        saying that to a police officer and I don't remember that

9        being the date, because I don't know that I saw her on May

10       19th.  I'm not sure.

11  Q.   Okay.  It's mentioned in the report, on at least two

12       occasions, that you told him that the affair was over as

13       of May of 2015.

14  A.   Yeah.  I don't remember that.  Sorry.

15  Q.   Okay.  Did it go past that?

16  A.   I don't know when the date, the last date you'd say there

17       was an affair.  I haven't seen Cindy in -- I've only seen

18       Cindy at court hearings pretty much for the last five

19       years.  We had a couple times where she was, where she was

20       called as a witness, and then she was, in the '16, she was

21       actually in the preliminary in June, and then she's been

22       called as a witness a couple of other times and she came

23       to a couple of the actual hearings that I had criminally.

24  Q.   Did it end in 2015?

25  A.   Yes.  Yeah.



Todd Courser
01/28/2020                                   Page 219

```
 1  Q.  Was it still going on in the summer June/July of 2015?

 2  A.  I would say so.  I don't know, I don't know physically

 3      when.  You're asking me when did the physical relationship

 4      end with her.  I can't put a date on that.

 5  Q.  The Police Report, in talking about the email that was

 6      sent on May 20, 2015, says:  Courser advised that there

 7      are probably a "kernel" of truth in the email but for the

 8      most part it is a lie.

 9          Do you remember telling the police officer that?

10  A.  No, I don't.  I think that was maybe five years ago,

11      five-and-a-half years ago, something like that.

12  Q.  So I mean you were suggesting, though, that -- I mean is

13      it fair to say that his recollection of your conversation

14      is probably accurate?

15  A.  No.  There were a lot of inaccuracies in the, in the

16      Police Report.

17  Q.  Okay.  It just seems he put kernel in quotes, meaning that

18      it came directly out of your mouth.  I'm just wondering

19      what may have been true in that email.

20  A.  I have no idea.  You'd have to talk to the officer on

21      that.

22  Q.  Who is Wendy Day?

23  A.  Wendy Day is -- she ran for State Representative and she

24      almost came to work for us.  She lost her race.  She was a

25      activist as well.  She's out of Livingston County.  I
```



 1        believe she's in real estate now.

 2   Q.   Did you ever have a gentleman by the name of Randy Bishop

 3        contact the investigating officer from the Michigan State

 4        Police?

 5   A.   Randy was -- Randy kinda gets involved in lots of stuff.

 6        I don't know that I had him contact anyone, but it

 7        wouldn't necessarily be Randy Bishop's, out of his

 8        character to contact whoever.  He worked with the Attorney

 9        General Schutee and he's very involved in campaigns

10        throughout the Republican Party.  He's a radio host up

11        north.

12   Q.   Does your brother, Dan, still live on Skelton Road in

13        Columbiaville?

14   A.   He does.

15   Q.   Was Cindy's cell phone number (269) 491-3600?

16   A.   I think that's her current number.  I don't think that was

17        the number back in that time.  Somewhere in there, she

18        changed it.

19   Q.   Was that number associated with text messages that were

20        occurring back in August of 2015?

21             Does that sound right, that it would have been

22        hers back then?

23   A.   I would think so.

24   Q.   Okay.

25   A.   But, yeah, I don't know.  I don't know when she got a new



Todd Courser
01/28/2020                                              Page 221

1      phone.

2   Q.   Fair enough.  Do you have any idea where Joseph Gamrat

3        currently resides?

4   A.   **Oh, yeah.  We're just buddies.  He hangs out at my house**

5        **and -- you know, you know.**

6   Q.   A simple no would have been fine.

7   A.   **No.  How, how would I know that?**

8   Q.   I don't know.  Just asking the question.

9   A.   **No.**

10              MR. KOSTELLO:  Give me thirty seconds.

11              That's all the questions I have for you, sir.

12        Thank you for your time.

13              **THE WITNESS:  Yeah.**

14              MR. KOSTELLO:  I appreciate it.

15              **THE WITNESS:  Thank you.**

16                        EXAMINATION

17   BY MR. DePERNO:

18   Q.   I'm showing you two pages marked Plaintiff's 1141 and

19        1142.

20              Do you recognize those pages?

21   A.   **Yes, I do.**

22   Q.   What are those pages?

23   A.   **They are a transcript of the, of the meeting between**

24        **Detective Britvec and Brock Swartzle and the Speaker of**

25        **the State House.**



Todd Courser
01/28/2020                                        Page 222

1    Q.    What does Detective Britvec conclude near the bottom of

2          Page 20?

3    A.    You mean Page 23, 20 of 23?

4    Q.    20 of 23.

5    A.    He says, and he's speaking in regards to Graham: "Now

6          there's that, I also think, it just looking at it, I've

7          been coming more and more, I really don't like the guy, I

8          think he's sneaky.  But I believe that he was probably

9          talked into doing these recordings by Josh Cline because,

10         the second that, and I'm not positive that he didn't know

11         about the texting.  Because the second that Courser

12         contacts him to "get over here, I need your help."  He

13         calls Josh Cline and he tells me that.  And him and Josh

14         Cline decide together that this should, this should

15         probably be taped."

16               And then there's a statement that continues from

17         there and it says:  "Well, that sounds like a setup to me.

18         The text has been sent.  He contacts you hey -- he

19         contacted me.  You know, hey, let's record this and then

20         we'll have it on tape that they probably have no idea the

21         email crazy shit about to come down.

22               That was Detective Britvec at Pages 20 and 22 --

23         20 and 21, rather.

24   Q.    And what does Brock Swartzle say about Keith Allard in

25         that sentence?



HANSON RENAISSANCE    hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

1  A.   He says:  "Keith Allard is just a piece of crap."

2              MR. DePERNO:  Can we mark this as the next

3        exhibit, please?

4              MR. KOSTELLO:  Both pages together?

5              MR. DePERNO:  Yeah.

6              (At 4:15 p.m., Deposition Exhibit Number 7 was

7              marked.)

8  BY MR. DePERNO:

9  Q.   When you met with Ben Graham at your office, was that

10       April 19th, 2015?

11 A.   I don't know if I met with him on April 19th but I did

12       meet with him related to the May 19th.

13 Q.   Oh, May -- I'm sorry -- May 19th.

14              On May 19th, what was your understanding of Ben

15       Graham's intention regarding the number of people that

16       that email would be sent to?

17              MR. KOSTELLO:  Form and foundation.

18 A.   My understanding was it was going to be very few people, a

19       very limited run.

20 BY MR. DePERNO:

21 Q.   And why would it be very few people?

22 A.   That was just his, his -- that was the conversation we had

23       about that.

24              MR. KOSTELLO:  Same objection.

25 A.   He didn't want to send it to every person.  You wanted it



Todd Courser
01/28/2020                                    Page 224

1     just to go out to see, from that limited pool, if the

2     extortionist found out about the email going out.  That

3     was the purpose of the email.

4  BY MR. DePERNO:

5  Q.   And was that successful then?

6  A.   Well, it wasn't intended that it would go out to all the

7       people that it went out to.  Somehow there was some

8       confusion with that, between myself and Ike, the next day,

9       and he continued to send it out.

10 Q.   Did you try to stop him from sending it?

11 A.   Well, we had a conversation about it and he was having

12      some technical difficulties and I said just hold off on

13      it, and I think that he -- I think the way that that

14      worked is he held off until he figured out how to make it

15      run and then he made it run.

16 Q.   Regarding the pornography pictures that you found in your

17      office -- and when I say your office, I mean Lansing --

18 A.   Yes.

19 Q.   -- you took that information to the House Business Office?

20 A.   Yes.

21 Q.   And did you make a complaint about it?

22 A.   Yes.

23 Q.   And did you expect the people at the House Business Office

24      would properly categorize that complaint and properly make

25      a complaint?



Todd Courser
01/28/2020                                        Page 225

```
 1  A.   Yes.

 2  Q.   Did you do the same regarding Allard, Graham and Cline's

 3       work ethic?

 4  A.   Yes.

 5  Q.   And at that point did you have any control over what the

 6       House Business Office did?

 7  A.   No.

 8  Q.   Could you directly fire Allard, Graham or Cline?

 9  A.   No.

10  Q.   When Joshua Cline quit your office, was it true that it

11       had been exposed that he was a member of a dating site?

12            MR. KOSTELLO:  You mean at the time he quit in

13       April of 2015?

14            MR. DePERNO:  Yes.

15  BY MR. DePERNO:

16  Q.   When he quit in April 2015, was that known?

17  A.   It wasn't exposed until I believe that came out in September,

18       August or September of 2015, but he had already -- he had

19       told me that he had issues with homosexuality even though

20       he was married.

21  Q.   Do you think that had a factor in his resignation from

22       your office?

23  A.   I, I, I don't know if that had a factor or if he

24       recognized that we were -- that I, you know, that I was

25       going to the House Business Office and registering my
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1     complaints concerning their work efforts.

2               The issue with Joshua Cline came to a head

3     because he was in charge of my scheduling and had

4     scheduled me to meet with the Veterans Affairs over in

5     Muskegon, and so I got up, it was a snowstorm and I drove

6     over to Muskegon.

7               And when I got to Muskegon, they informed me

8     that it had been canceled and that they had already

9     contacted my staff at the, at the House of Representatives

10    and I should have been informed the whole event had been

11    canceled.  And Joshua, that was kind of the head of the

12    whole thing.  And so he just, he just wasn't willing to be

13    or able to be an administer, to administrate the office,

14    for the constituents, the constituents' calls.  And me

15    being where I was supposed to be, you have to have staff

16    members handle that, and he just wasn't up to the task.

17              And I think because they were hearing the texts

18    and listening to the conversations, there was a lot of

19    conversation about the fact that, you know, we were very

20    unhappy with his work, his work performance, and then

21    finally, you know, the House Business Office had been

22    contacted.

23  Q.  You brought some papers with you today, which I think were

24      in response to the Notice of Deposition?

25  A.  Yes.



Todd Courser
01/28/2020                                    Page 227

1  Q.   I'm gonna hand these to you and you can explain to me why

2       you brought them.  The first is this stack.  It's labeled

3       552 through 570.

4  A.   **Yeah.  I mean I can read the whole thing or not, but this**

5       **-- there were -- I was obviously reviewing the evidence,**

6       **and there's a lot of evidence, and this was a handbook**

7       **from Winegardner & Hammons, which I believe is the**

8       **management of the Radisson Hotel.  And it just went**

9       **through kind of their training or the way that they handle**

10      **-- and it just said keep control and guest privacy and it**

11      **said that Winegardner & Hammons, the safety and security**

12      **of our guests is priority, our guests have choices, and**

13      **this is what separates us from other hotels, it's our**

14      **responsibility to refrain from giving out information**

15      **about the identity, room number and activities of our**

16      **guests.**

17 Q.   And did the Defendants follow those privacy guidelines?

18                  MR. KOSTELLO:  Form and foundation.

19 A.   **No, they did not.**

20 BY MR. DePERNO:

21 Q.   Did they make it a priority to ensure your safety and

22      security?

23                  MR. KOSTELLO:  Form and foundation.

24 A.   **In my opinion, no, they did not.**

25 BY MR. DePERNO:



Todd Courser
01/28/2020                                    Page 228

1  Q.   Did the Defendants give out information about your

2       identity?

3             MR. KOSTELLO:  Same objection.

4  **A.   Yes, they did.**

5  BY MR. DePERNO:

6  Q.   Did they give out information about your room number?

7             MR. KOSTELLO:  Same objection.

8  **A.   Yes, they did.**

9  BY MR. DePERNO:

10 Q.   Did they give out information about the activities of

11      their guests?

12            MR. KOSTELLO:  Same objection.

13 **A.   Yes, they did.**

14          **And when you continue down, it says our guests**

15      **want to be safe and it is our job to provide that service.**

16      **And then it goes very specifically, it's a good handbook,**

17      **guest room numbers, employees, most often operators and**

18      **front-desk operators, are often asked in which room a**

19      **particular guest is staying.  The proper response is to**

20      **politely decline to give out this information.**

21 BY MR. DePERNO:

22 Q.   Did the Defendants follow that rule?

23            MR. KOSTELLO:  Same objection.

24 **A.   No, they did not.**

25          **And then it goes on and says you can offer to**



Todd Courser
01/28/2020                                    Page 229

1        put the caller through to the guest's room instead.  If

2        the person makes the request in person, you can either

3        direct the person to the house phone or put through a call

4        to the guest room and advise the guest that he or she has

5        a visitor at the front desk.

6   BY MR. DePERNO:

7   Q.   Anything else of relevance in that document?

8   A.   Well, yes.  The guest rooms, I mean that goes to Joe

9        Gamrat in his deposition is very clear that he simply

10       called up to the hotel and got the information and that he

11       placed the email, that he called up and placed the emails

12       on my account and that they were giving him that

13       information.

14               It goes on in the next one, Winegardner &

15       Hammons, allowing guests to enter the room, it goes on to

16       say guests oftentimes find themselves locked out of their

17       room and need to be let in.  In these situations, it is

18       imperative that we do not let the guest in a room without

19       following the proper lost key procedure.  Even if you see

20       a guest leave the room, do not let them back in without

21       having them verify their identity at the front desk.

22  Q.   So did the Defendants verify the identity of Joe Gamrat

23       when they allowed him into your room?

24               MR. KOSTELLO:  Same objection.

25  A.   I, I don't know if they verified his identity allowing him



Todd Courser
01/28/2020                          Page 230

1        into the room or not.  It wouldn't make sense that they

2        would and then still allow him because he wasn't on the

3        room reservation.  So my belief is no, they did not.

4   BY MR. DePERNO:

5   Q.   So in your, in your opinion, following up on the questions

6        opposing counsel asked you, if you had an affair and

7        you're staying at the Radisson, do you lose all your

8        rights to privacy?

9   A.   No, you should not.  I mean they have a responsibility to

10       their guests.  They say that they have that responsibility

11       and it's pretty clear that, legally, they have that

12       responsibility.

13  Q.   But did they treat you that way?

14  A.   No, they did not.

15  Q.   Okay.

16  A.   There is one other point on this is that it says if they

17       enter the room while it's being cleaned with the door

18       open, have the guest enter their room key into the door

19       before letting that person into the room.

20  Q.   Do you believe that policy was followed?

21            MR. KOSTELLO:  Same objection.

22  A.   No, it was not.

23  BY MR. DePERNO:

24  Q.   Anything else relevant in that document?

25  A.   There was, yeah, there was.  I think there was -- it was


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020                                    Page 231

1        -- it just talks about the idea of ensuring the actual

2        room number is not given out, even if a person claims that

3        they've forgotten the room number.

4                    MR. DePERNO:  All right.  Let's mark this as

5        next exhibit, 8.

6                    MR. KOSTELLO:  Okay.

7                    MR. DePERNO:  I can do that if you've got a

8        sticker.

9                    MR. KOSTELLO:  Here.

10                   (At 4:26 p.m., Deposition Exhibit Number 8 was

11                   marked.)

12  BY MR. DePERNO:

13  Q.   You also brought Pages 513 through 532.  This is labeled

14       Radisson Training Manual.

15                   What was the purpose of bringing that?

16  A.   The training manual, inside of this is is they gave it to

17       me and this discusses the manager on duty functions and

18       the manager's duty as far as their responsibility.  And I

19       just found it interesting to go through this because it's

20       pretty clear that the manager on duty has a responsibility

21       to maintain, you know, obviously the security and privacy

22       of the guests, in the, in the job description itself, and

23       they have procedures related to those, you know, to those

24       possibilities and those incidents.

25                   And so it does say, it says MOD, so manager on



Todd Courser
01/28/2020                                    Page 232

1   duty, you know, obviously their accountability, but it

2   says, it also says prepare reports as requested to ensure

3   appropriate corrective actions may be taken and develop

4   more informative database for improved management

5   decisionmaking and critical evaluation of work activities

6   and guest service in such areas.

7           It says guest complaints --

8   Q.  Let me stop you there.

9   A.  Yep.

10  Q.  Do we have any of those reports or complaints that were

11      created by the Radisson regarding you?

12  A.  We do not.

13  Q.  Go on.

14  A.  And, and it says that there's -- that the manager on

15      duty's responsibility is to, you know, obviously check

16      premises, monitor the operations; but it says in Number 4

17      on Page 4, it says respond, resolve and take appropriate

18      action on guest complaints or problems to ensure excellent

19      guest service while safeguarding the hotel's interests;

20      represents the hotel in contact with the general public.

21          So, you know, then it goes on to those sub

22      things to do with guest complaints and creating those

23      reports, and those have not been provided to us.

24          MR. DePERNO:  All right.  We'll mark this one as 9.

25          (At 4:29 p.m., Deposition Exhibit Number 9 was



Todd Courser
01/28/2020                                    Page 233

1                    marked.)

2   BY MR. DePERNO:

3   Q.    You brought another stack of documents.  I don't know if

4         these are all tied together or separate.

5   A.    **They were pieces.  I can go through, if you want, what**

6         **they were about.**

7   Q.    Okay.  Let's start.

8   A.    **Some of them he may have already covered.  These were --**

9         **this is from the Police Report, talking about the**

10        **extortion, and it shows the involvement, you know, and**

11        **the, the Police Report connects the idea of the**

12        **communications between Joshua Cline and Keith Allard.**

13               **What we found from the phone records is that**

14        **Joseph Gamrat spoke to Keith Allard's hundreds of times**

15        **during the extortion, and he notes that it happened**

16        **before, during and after each extortion text.**

17               **So it also says that Joseph Gamrat had four**

18        **video recordings on his, on his phone that looked like**

19        **they had been sent to, sent to him from someone else.**

20        **That was that one.**

21  Q.    Did we ever receive those four video recordings?

22  A.    **We did not, not that I'm aware of.**

23  Q.    Was the next page part of that first page?

24  A.    **These were the deleted texts --**

25  Q.    From whom?



Todd Courser
01/28/2020                                      Page 234

1   A.   -- from Joe Gamrat's deleted texts, that he was attempting

2        to delete them.  It says:  "By the way, he obviously

3        didn't take a shower this a.m. as the shower curtain was

4        out of the tub.  Must have had a bath last night."

5   Q.   How would Joe Gamrat know that your shower curtain was out

6        of the tub?

7             MR. KOSTELLO:  Form and foundation.  How can he

8        possibly answer that?

9   A.   Well, the only way he would know that is if he was in the

10       hotel room.

11  BY MR. DePERNO:

12  Q.   And who gave him access to the hotel room?

13            MR. KOSTELLO:  Form and foundation.

14  A.   That happened through the hotel.  He said that he was in

15       the hotel room.

16  BY MR. DePERNO:

17  Q.   Did you give Joe Gamrat access to your hotel room?

18  A.   I did not.  Joe Gamrat also gained access to the, to the

19       reservation information and other email and political

20       databases through Allard, Graham and Cline.

21  Q.   Okay.

22  A.   Hold on.  There was one other, I think, where there was

23       Allard passing back and forth that she's -- you know,

24       meeting times and, and just very specific stuff.  They

25       were coordinating between him and Joe Gamrat.



Todd Courser
01/28/2020                                           Page 235

1           And the issue was is that Cindy obviously was

2       estranged from her husband, she had told that to the

3       hotel, she had told them there had been physical

4       altercations, she had asked for them to place, you know,

5       place her, her information in a protective spot so he

6       wouldn't know about those reservations.

7           And she'd also told the staff at the House and

8       she told Allard, Graham and Cline not to provide any

9       information in communication with her husband at all.  And

10      of course after that, I believe there is 244 phone calls

11      between himself and Allard.

12  Q.  What's the second line up here state?

13  A.  It says:  "Hotel room is considered private" was the first

14      one; the second text says, "Hotel has now told me that his

15      reservation is for Tuesday and Wednesday, not Monday and

16      Tuesday."

17  Q.  So does that give you an indication that the hotel was

18      giving out your information about your reservations?

19  A.  Yes.

20  Q.  Is the hotel allowed to do that?

21          MR. KOSTELLO:  Form and foundation.

22  A.  No.

23          MR. DePERNO:  We'll mark this as 10.

24          (At 4:33 p.m., Deposition Exhibit Number 10 was

25          marked.)



Todd Courser
01/28/2020                                    Page 236

1  A.   The text message --

2  BY MR. DePERNO:

3  Q.   Hold on.

4  A.   Oh, go ahead.

5  Q.   The next page, what is that a page of?

6  A.   The page is, this is a series of texts, the actual texts,

7       the extortion texts that were received from May 29th on --

8       or I'm sorry -- May 19th on.  And there's one that I

9       highlighted that says, "I pay them better for info,

10      Radisson."

11 Q.   And who is this text message -- this is a text message

12      from the extortionist?

13 A.   Yes.  And it says, "Pay people better to keep quiet."  And

14      we obviously see from the other information from Joe, he

15      was getting information related to, to my stay.

16 Q.   So the extortionist is actually telling you that he pays

17      people for information hashtag Radisson?

18 A.   That's correct.

19           MR. DePERNO:  Will you mark that as 11?

20           (At 4:34 p.m., Deposition Exhibit Number 11 was

21           marked.)

22 BY MR. DePERNO:

23 Q.   What's the next two pages?

24 A.   These next two pages are the extortion texts where the

25      Radisson is mentioned in the burner phone.  And it says --



1     let me see if I can find it here.  It's on -- this one's

2     on 5-28 where he discusses that he followed -- he had

3     sexual intimacy dialogue, so he could clearly understand

4     who -- so he had provided this information to a man named

5     Tim Skubick.  And Tim Skubick is a political reporter in

6     Lansing.  And it says:  "I drove up to the island

7     yesterday on your dime.  I shared 17 minutes of audio, 9

8     to 11 minutes of sexual intimacy, and 5 to 6 minutes of

9     dialogue so he could clearly understand who he was

10    listening to.  He's going to label me as an anonymous

11    source, a credible anonymous source, complete with

12    photographic and video evidence from DC and from the

13    Radisson."

14  Q.   So this is the extortionist sending you this text message?

15  A.   That's correct.

16  Q.   And he's referencing, in this extortion text message, that

17       he has talked to Tim Skubick?

18  A.   That is correct.

19  Q.   And that he's provided Tim Skubick with information?

20  A.   That is correct.

21  Q.   And that that information includes photographic and audio

22       evidence; is that correct?

23  A.   Yes.

24  Q.   And from the Radisson?

25  A.   Yep.



Todd Courser
01/28/2020                                    Page 238

1  Q.   Okay.

2            MR. DePERNO:  We'll label this as 12.

3            (At 4:36 p.m., Deposition Exhibit Number 12 was

4            marked.)

5  A.   This, this is a little different, a series of chats, and

6       so this is again from, from Joe Gamrat's phone, and it was

7       in, in series, so I just printed each one of them out.

8       I'll just read them and then, if you have questions, you

9       can stop me:  "What would you make of this?  Normal or

10      abnormal?"  There was a picture, a thumbnail to it.  And

11      so the --

12 BY MR. DePERNO:

13 Q.   Who's that one from?

14 A.   This is, this is from Joe Gamrat.

15 Q.   To who?

16 A.   It's from Joe Gamrat to another number.  I believe that

17      number was Vincent, Vincent Krell.

18 Q.   So this is a conversation between Joe Gamrat and Vincent

19      Krell?

20 A.   That's correct.

21 Q.   And Joe Gamrat starts the information by saying what?

22 A.   "What would you make of this?  Normal or abnormal?"

23 Q.   And you say there was a picture?

24 A.   Yes.  There was a thumbnail on the other versions that I

25      talked about, there was a picture of it that he's saying



Todd Courser
01/28/2020                                   Page 239

1       went with that.  I couldn't open it though.

2   Q.  Okay.  And what does Vincent Krell say?

3   A.  **What the, you know, basically saying, "What the F her**

4       **room?"  He writes "his" room.**

5   Q.  So hold on a second.

6   A.  **Okay.**

7   Q.  So the conversation is a picture of something and they're

8       talking about what do you make of this, Vincent Krell asks

9       if that's her room, and Joe Gamrat replies his room?

10  A.  **Yes.**

11  Q.  Okay.  Go on.

12  A.  **And then he writes, Vincent Krell writes, "His clothes are**

13      **still there."**

14  Q.  How does Vincent Krell know if your clothes are still in

15      the room?

16          MR. KOSTELLO:  Form and foundation.

17  A.  **I mean I don't know how he knows but he's saying his**

18      **clothes are still there.  He's making that statement.**

19  BY MR. DePERNO:

20  Q.  Is there any way for Vincent Krell to see through walls?

21          MR. KOSTELLO:  Form and foundation.

22  BY MR. DePERNO:

23  Q.  Do you know if he has that ability?

24  A.  **I do know that in their job -- I'm having now more**

25      **understanding of what they did for work -- that they**



Todd Courser
01/28/2020                                    Page 240

1    planted a lot of surveillance equipment for the company

2    that they worked for, which was called, I think it was

3    called Buckman Chemicals.  And so in the plants where they

4    worked, they planted video surveillance to make sure that

5    the things that they were working on were not tampered

6    with by their competition.

7   Q.   Okay.

8   A.   So both of them had a lot of experience related to

9        surveillance, both it looked like audio, video, still

10       pictures, that sort of thing.

11  Q.   Nevertheless, Vincent Krell makes mention that your

12       clothes are still in the room?

13  A.   He does.

14  Q.   What does Joe Gamrat say?

15  A.   Joe Gamrat said, "He hasn't checked out yet."

16  Q.   How would Joe Gamrat know if you checked out?

17            MR. KOSTELLO:  Form and foundation.

18  A.   That information, that information would've had to have

19       been provided to someone, from someone to him, from

20       someone at the hotel to him.  He says, "But he is

21       scheduled to check out."

22  BY MR. DePERNO:

23  Q.   Okay.  That's from Joe Gamrat?

24  A.   This is from Joe Gamrat.

25  Q.   How would Joe Gamrat know what your schedule is to check


HANSON RENAISSANCE
COURT REPORTERS & VIDEO     hansonreporting.com
                            313.567.8100

1      out?

2                     MR. KOSTELLO:  Same objection.

3   A.   It's being provided, it's being provided to him on

4        February 12th that I had not yet, I had not yet checked

5        out, and I believe that I mean that's from the Radisson

6        because that's where you'd let him know what time you're

7        checking out.

8                     Normally, on Thursday, we'd check out late

9        because you had what was called -- you had session until

10       sometimes noon, sometimes 3:00 or 4:00, so they would

11       allow State Representatives to check out after session

12       ended.

13  BY MR. DePERNO:

14  Q.   But did you tell Joe Gamrat when you were checking out?

15  A.   No.

16  Q.   What's the next one?

17  A.   It says, it says -- and then Vincent Krell writes,

18       "Thought you were going home," and then the response.  So

19       it looks like it's continuing.  There seems to be

20       something missing in there.  But he says, "I am on my way

21       now.  Was looking for potential evidence like trash or

22       wrapper.  Nothing -- which doesn't say a whole lot

23       though."

24  Q.   So Joe Gamrat's looking for trash or a wrapper in your

25       room?



Todd Courser
01/28/2020                                    Page 242

 1  A.    That's --

 2              MR. KOSTELLO:  Form and foundation.

 3  A.    This conversation happens one after another over, in this

 4        situation, it's over about nine minutes.

 5  BY MR. DePERNO:

 6  Q.    How does Joe Gamrat get into your room to look for trash

 7        or a wrapper?

 8              MR. KOSTELLO:  Same objection.

 9  A.    Someone obviously gave him access.

10  BY MR. DePERNO;

11  Q.    What kind of wrappers might he be looking for?

12  A.    My guess is it would be he's looking for some sort of

13        confirmation of, of sexual activity.

14  Q.    Okay.

15  A.    And then he writes:  "I just think it's strange that both

16        beds are used.  I typically sleep in one and put my

17        suitcase or bag on the other.  You?  Heat was high too

18        which is just the way Cindy likes it."

19  Q.    So how does Joe Gamrat know which beds were used?

20              MR. KOSTELLO:  Same objection.

21  A.    He would -- he obviously was in the room and also was able

22        to know that the heat was, that the heat was up.

23              And then Krell responds to that and says, "Yeah

24        someone was in both of those beds."

25              (At 4:41 p.m. Attorney Bye left proceedings.)



Todd Courser
01/28/2020                                              Page 243

1  BY MR. DePERNO:

2  Q.   So how does Vincent Krell know that someone was in both

3       beds?

4                MR. KOSTELLO:   Same objection.

5  A.   Obviously, he's, he's looking at the room.

6  BY MR. DePERNO:

7  Q.   Okay.   And if Vincent Krell says he was in Kentucky, then

8       how is he looking in the room?

9                MR. KOSTELLO:   Same objection.   I mean

10      seriously?

11 A.   Obviously either he's in the room and he's home, because

12      his family does live here in Michigan, actually lives not

13      too far from here, and I believe he even owned a house at

14      that time here.   Either he was here and actually was home

15      for that time or there was some sort of still or video

16      pictures.

17 BY MR. DePERNO:

18 Q.   Or is it possible Joe Gamrat's telling him what's in the

19      room?

20               MR. KOSTELLO:   Same objection.

21 A.   That's, that's true.

22               Joe Gamrat then says from -- this is from Joe

23      Gamrat, rather, and it says, "Odd right?", and "He checked

24      in at 7:51 Tuesday morning."

25 BY MR. DePERNO:



Todd Courser
01/28/2020                                    Page 244

1   Q.   How does he know you checked in at 7:51?

2              MR. KOSTELLO:  Same objection.

3   A.   The hotel had to be providing that information to him.

4   BY MR. DePERNO:

5   Q.   That's a pretty specific number.

6   A.   It is.  And he's pretty specific about the fact that he

7        was getting that information from the hotel.  In his

8        deposition, he states that.

9              And then Joe Gamrat, this one's from Joe Gamrat,

10       "I'll show you one of these days.  We could be Krell

11       Gamrat Bureau of Investigation or KGB!"  So they're

12       talking about doing surveillance, you know.  Obviously

13       they're, they're obviously -- exclamation point.

14             So -- and then he -- Krell then says, "Private

15       investigators.  We could make a killing.  No pun in

16       intended."

17  Q.   A killing of who?

18             MR. KOSTELLO:  Same objection.

19  A.   Yeah.  He's stating he could make a killing.  Yeah.

20       Sounds like they -- there was some sort of plan for that,

21       so -- pun something.  I'm not sure.

22             MR. DePERNO:  For the record, opposing counsel

23       is laughing at the pun.

24  BY MR. DePERNO:

25  Q.   What's next?



Todd Courser
01/28/2020                                           Page 245

 1  A.   And then Joe Gamrat states in the next one:  "Don't know

 2       for certain.  When I called that morning they said there

 3       were two reservations.  And I know that his vehicle was

 4       there by 9 which is understood due to the start time for

 5       work.  But???  He also said last night at the meeting that

 6       his day started at 4:30 a.m.  Cindy called him at 7:21

 7       a.m. for 4 minutes, so maybe he got up at 4:30, got to

 8       Lansing around 7ish and checked in, calling Cindy from the

 9       hotel phone?  Had breakfast?  Anyways, still smells bad."

10  Q.   So who's that from again?

11  A.   This is from Joe Gamrat.

12  Q.   How does Joe Gamrat know that there are two reservations?

13            MR. KOSTELLO:  Same objection.

14  A.   That information's being provided to him from the hotel.

15  BY MR. DePERNO:

16  Q.   Okay.

17  A.   But Joseph Gamrat, in this last one in this section, and

18       this is on 2-11:  "I was thinking of sometime in the

19       middle of the night.  That way if he answers the phone

20       after being awakened from sleep in her room, then bingo.

21       After all, someone could be calling him, Cindy answers?

22       That would be suspicious too (from someone else's

23       perspective) since the room is in his name."

24  Q.   How does Joe Gamrat know the room was in your name?

25            MR. KOSTELLO:  Same objection.



**Todd Courser**
01/28/2020                                                    **Page 246**

 1  A.   The hotel was providing that information to him.

 2            MR. DePERNO:  Okay.  We'll mark these as

 3       whatever's next.

 4            (At 4:46 p.m., Deposition Exhibit Number 13 was

 5            marked.)

 6  BY MR. DePERNO:

 7  Q.   So if you're having an affair and staying at the Radisson,

 8       do you give up your rights to privacy?

 9  A.   No.

10  Q.   And if the Radisson gives out your private information to

11       someone, would they be violating your privacy?

12  A.   Yes.

13  Q.   Opposing counsel asked you earlier if you had any evidence

14       of any recording device in any of your rooms at the

15       Radisson.

16            Do you recall that?

17  A.   Yes.

18  Q.   The information that we just went over, isn't that

19       evidence of recording devices in your room?

20            MR. KOSTELLO:  Form and foundation.

21  A.   Yes.

22  BY MR. DePERNO:

23  Q.   Okay.

24  A.   Yes.  There were plenty of text messages.  As a matter of

25       fact, there was a conversation between David Horr and



Todd Courser
01/28/2020                                    Page 247

1    Joseph Gamrat where they discussed the editing of that

2    recording and that they're having someone do the work on

3    it and they need it done ASAP.

4              MR. DePERNO:  Okay.  Give me a couple minutes.

5              THE WITNESS:  Just you and me?

6              MR. KOSTELLO:  Just you and me.

7              (At 4:48 to 4:50 p.m. recess taken.)

8              MR. DePERNO:  I don't have any other questions.

9    However, I don't think we identified the name of the

10   person who was here from Block 100?

11             MR. KOSTELLO:  Jonathan Bye.

12             MR. DePERNO:  Jonathan Bye.  All right.  I have

13   no other questions.

14             MR. KOSTELLO:  I'm all set.

15             (At 4:50 p.m., deposition concluded.)

16

17

18

19

20

21

22

23

24

25



Todd Courser
01/28/2020                                            **Page 248**

1   STATE OF MICHIGAN          )
                               )   SS
2   COUNTY OF KENT             )

3

4

5           I certify that this transcript, consisting of 248 pages,

6   is a complete, true and correct record of the testimony of said

7   witness held in this case on Tuesday, January 28, 2020.

8           I also certify that prior to taking this deposition, the

9   witness was duly sworn to tell the truth.

10

11        Date:  02-08-2020

12

13

14

15

16        _____

17        Diane Murray, CSR-4019, RPR

18        County of Kent, State of Michigan

19        My Commission expires:  10-12-2025

20

21

22

23

24

25



Todd Courser
01/28/2020

1

---

**$**

---

**$10,000** 175:14,15

---

**-**

---

**--no** 7:18

---

**0**

---

**02** 8:3

**03** 14:7,8 16:12

**04** 13:25 14:7,8 16:12

**05** 9:6

**06** 23:7

**07** 17:16

**08** 23:8

---

**1**

---

**1** 65:9,10 97:8,15 100:5 108:20,21 137:13

**10** 17:16 141:17 235:23,24

**10,000** 30:13

**100** 203:4 247:10

**102** 119:15

**10:00** 111:2 119:10

**10:09** 4:2

**11** 150:12 191:14 199:6 236:19,20 237:8

**112** 119:16

**1141** 221:18

**1142** 221:19

**11:28** 64:23

**11:30** 61:3

**11:38** 64:23

**12** 17:16 26:11,21,22 32:14, 16,17 33:5 36:11,12,13 71:22

238:2,3

**1235** 97:19

**1239** 97:19

**129** 147:17

**12:25** 97:8

**12:26** 97:12

**12:46** 97:12

**12th** 7:24 71:21 79:16 179:12 182:16,18 185:4 241:4

**13** 35:23 36:12,13 246:4

**131** 212:6

**13th** 79:16

**14** 28:16 29:12 32:23 35:14,22 36:4,5,11 40:25 41:1,18 43:14,23 48:22 52:24 53:6 100:8 202:19

**15** 36:4 64:19 71:22 78:3 85:13 90:18 94:15,16 101:10 106:18

**15th** 71:21 83:7

**16** 76:4 218:20

**160** 214:1,6

**17** 82:15 237:7

**17th** 6:25

**18** 82:14 203:4

**19** 72:9 73:2 83:5 100:5 106:18 110:22 113:16,21 119:10 120:22 121:11 186:22 206:8 218:3

**1972** 5:25

**1990** 9:18

**1997** 6:15

**1998** 6:4

**1999** 6:25

**19th** 72:12,17 98:7 110:24 129:23 195:3 218:10 223:10, 11,12,13,14 236:8

---

**1:01** 110:8

**1:07** 119:18 120:8,19

**1:12** 118:11

**1:24** 121:23 122:13 126:11

**1:30** 138:15

**1:40** 139:23

**1:41** 140:12

---

**2**

---

**2** 110:8,11 130:5

**2-11** 245:18

**20** 20:15 115:14 119:18 120:8, 19 121:23 132:23 219:6 222:2,3,4,22,23

**20/20** 48:4

**2000** 51:15

**2003** 10:25 13:25 16:21

**2004** 16:21

**2007** 18:20

**2008** 23:3

**2010** 18:20 24:22

**2012** 28:3 32:2,6 49:1

**2013** 33:5

**2013-ish** 32:3

**2014** 37:1,23 168:24 174:22

**2015** 21:8 34:2 35:13 65:2,6 67:4 69:1 72:1,5,10 79:6,13 80:20 82:1,24 83:5 88:9,22 94:5,6 97:23 99:11 100:5,6,8 101:5,13,24 103:6,8,23,24 104:3 106:1,14,15 110:23 119:18 126:24 127:9 132:24 136:24 140:25 141:2,15,17 150:12 165:20,25 166:5,14,18 167:11 186:22 187:14 191:14 218:3,13,24 219:1,6 220:20 223:10 225:13,16,18

**2016** 21:1 76:4



**Todd Courser**
**01/28/2020**

2

**2017** 20:22

**2018** 20:19 76:8 81:13

**2019** 20:7

**2020** 4:2

**209** 126:15

**21** 126:23 134:5 136:24 222:23

**213** 118:15,25

**215** 118:16 119:17

**22** 134:5 222:22

**23** 212:6 222:3,4

**235** 13:6

**23rd** 29:21

**244** 235:10

**24th** 29:22

**25** 193:19

**25,000** 20:16

**26** 127:9 194:7 207:7

**269 491-3600** 220:15

**27** 214:1,6

**28** 4:2

**29th** 236:7

**2:25** 140:12,14

**2:45** 156:5

**2:49** 160:2

**2:50** 160:2

**2nd** 5:25 9:1

---

**3**

**3** 118:11,14 191:10

**31** 141:15

**3110** 6:2

**313** 99:16

**35** 57:18,20

**36** 194:12,17

**37** 57:20

**3:00** 142:2 241:10

**3:18** 185:18

**3:21** 185:18

**3:28** 190:23

**3:31** 193:8

**3:32** 193:8

**3:37** 196:11

**3:39** 196:11

---

**4**

**4** 126:11,14 232:16,17 245:7

**40,000** 57:18

**40-some** 217:22

**42** 27:23

**455** 13:21 14:15

**48760** 6:2

**4:00** 241:10

**4:15** 223:6

**4:26** 231:10

**4:29** 232:25

**4:30** 245:6,7

**4:33** 235:24

**4:34** 236:20

**4:36** 238:3

**4:41** 242:25

**4:46** 246:4

**4:48** 247:7

**4:50** 247:7,15

---

**5**

**5** 140:14,18 193:18 237:8

**5-19-2015** 98:3

**5-28** 237:2

**50** 199:6,18 200:8,9

**51** 201:20

**513** 231:13

**532** 231:13

**552** 227:3

**570** 227:3

**5:00** 140:5,10

---

**6**

**6** 88:24 190:23 191:1 237:8

**60,000** 57:17

**66** 202:19

---

**7**

**7** 88:24 100:6 132:24 140:25 141:2 194:12 223:6

**76,000** 30:12

**7:21** 245:6

**7:51** 184:22 243:24 244:1

**7ish** 245:8

**7th** 88:25

---

**8**

**8** 231:5,10

**800** 146:7

**82nd** 23:7 28:23

**8:00** 61:7

**8:56** 126:24

**8th** 88:25

---

**9**

**9** 191:10 232:24,25 237:7 245:4

**90** 9:19 14:24

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

3

94 10:9

95 10:10

96 12:21 14:25

97 12:21

98 6:4 12:21 15:1

99 10:17 51:15

9th 98:7

---

**@**

@gmail.com 70:1

---

**A**

A-D-O-N-I-R-A-M 8:10

**a.m.** 4:2 64:23 119:18 120:8, 19 121:23 122:13 142:2 184:22 234:3 245:6,7

Aah 137:10

ability 92:1 239:23

abnormal 238:10,22

absolutely 134:10 162:15,16 196:1 198:23

absolves 213:11

abused 147:22 151:17

access 69:19 73:8,14 76:3,4 179:24 186:1,18 187:2,4,6,7 194:13 196:15,22 197:3,5 201:8 203:21,22 208:14 234:12,17,18 242:9

accessed 70:17

accessing 70:19,21 71:13,17, 18 87:5 182:5 199:13

accomplished 120:5 163:2,5

account 68:21 69:17 70:3,20 71:2,3,5,14 87:6 115:7 175:12 182:3,11 183:3 184:1,20 229:12

accountability 232:1

accounting 10:15 12:15,24 15:23 17:1,4 18:1 20:1 21:20 49:24

accounts 40:11 70:5,17

accurate 112:21,24 144:22 146:2 219:14

accusing 123:12

acquire 12:13

act 110:5 137:3

acted 187:22

acting 215:4,11

action 81:14,15 195:18 201:24 214:1 232:18

actions 105:22 202:19 213:8, 10 232:3

activist 33:20,21 219:25

activities 40:15 227:15 228:10 232:5

activity 242:13

actual 21:17 27:16 32:20 37:8 48:20 52:22 55:4 64:5 65:16 94:12 104:11 111:21 113:14 114:6,9 120:25 121:3,21 124:16 179:22 181:5,6 198:16 218:23 231:1 236:6

acuses 124:20

add 206:7,15 208:9

addict 66:14

addition 54:24

address 6:1 13:24 68:7,17,25 69:6,8 71:1 86:25 121:6 178:24 179:1 180:5

addressed 186:24

addresses 68:10

addressing 119:6 156:22

administer 56:8 57:3 226:13

administrate 226:13

administration 10:8 21:20 44:24 55:5 93:6

administrative 56:13 91:3 92:20 94:22 95:5

administrators 54:15

admitted 11:13 15:17 130:21

Adoniram 8:10

advance 203:8

advice 122:3

advise 229:4

advised 164:24 165:19 219:6

affair 35:8 77:24 79:6 80:17 82:3,4,18,20 83:14 84:4 85:15 87:15,22 88:4,9 101:15 103:10 104:1 106:1,3,5,16 107:1,5,18 111:12 112:5 123:3 125:14 138:14 144:20, 24,25 145:7,12,25 146:15 147:1,20 148:14 151:18 153:8 182:20 195:19 205:5,7,13,15, 19,23,25 206:3,10,11,13,19 207:9,19 209:3,20 216:20 217:25 218:2,12,17 230:6 246:7

Affairs 226:4

affidavit 119:13 192:12,24 193:1

affirmatively 5:7 42:2 83:14 84:5 86:2 103:25 117:3 174:10

aftermath 209:22

afterward 124:15

age 52:4

agents 193:21

aggregates 69:14

agree 136:1 145:13

agreed 176:21

ahead 9:9,14 42:12,15 119:8 135:3 146:22 154:15 156:3 236:4

aide 57:8

aides 56:15 93:12



Todd Courser
01/28/2020

4

aisle 44:23

Alen 46:16

Allard 34:10 39:13,21 40:16, 22 43:20 44:9,16 45:22 53:20 56:8,20 65:19 67:13 68:3 70:19 73:12 74:19,21 75:9,20 76:5,10 81:19 86:21 88:19 90:22 91:6 92:23 93:1,12 94:5 96:4 101:23 102:6,8,9,12,19 103:4 104:12 106:24 108:18 109:9,15 110:2,5 116:18,24 117:23 123:17 129:6 132:13 133:24 136:22 149:9,20 158:14 163:15 189:23 222:24 223:1 225:2,8 233:12 234:20, 23 235:8,11

Allard's 40:16 91:23 149:18 233:14

allegation 148:5 164:20 213:23

allegations 150:4 205:18

alleged 196:1 197:25 209:12

alleges 194:7

alleging 201:23 203:10,25 204:6,7

allowed 35:4 155:3,4 193:20 194:13 203:21 229:23 235:20

allowing 229:15,25

altercation 79:24 80:1

altercations 78:19 235:4

Amash 39:23 41:6,10

amount 30:13 175:19

and/or 75:24

Andrews 208:8

angry 139:16

Ann 67:9,10,11,12,13 89:3,15, 16,24 90:12,13,14 91:19 95:18 157:16

Anne 6:23

anonymous 73:19 107:6 237:10,11

answering 136:8,15 154:5,11, 12 167:4 171:6 172:9 200:22, 23 211:20

answers 4:23 5:10 136:6 245:19,21

Anthony 4:7,9

anticipated 53:4

anticipating 42:13

anybody's 166:16

anymore 13:17

anytime 6:5

apparently 34:2 86:22 101:22 174:6 177:13 180:16 184:21 186:10

appeared 76:20,21 192:14

appears 97:22

approach 47:15,16

approached 106:24 107:8,12, 18 111:25 215:24

April 7:24 63:6,19,21 64:19 65:2,6 67:4 78:2 79:6 82:24 83:10 88:12 90:18 106:17 207:7 223:10,11 225:13,16

Arbor 7:13,15,16

archive 68:8

archives 87:2 123:21

area 32:10,11

areas 232:6

arguable 84:5

argue 208:3

arguing 207:22,24

argumentative 210:8 211:8 213:25 215:3,13

arranged 174:16,18

arrogant 137:4

article 140:18,22

articles 48:19 130:19 212:7,9, 18,19

artwork 91:21 96:25

as-needed 50:11

ASAP 247:3

asks 239:8

asleep 80:10

asserted 193:12,15

Asserting 193:4

asserts 193:19 194:4,6

assignments 17:9

assist 59:3 113:12

assistant 95:5,13,15

assistants 56:13

assisted 155:3

associate' 10:1

Associates 16:19,23

assume 5:5 22:22 106:22 119:7,8 144:9 151:16 190:2, 21

assumed 106:20 130:8 179:22

assuming 127:17 154:16

assumption 128:13,16

assumptions 152:5

attacking 215:7

attempt 108:22 142:14 144:1 155:8,16,17 156:6,8 196:1 214:4

attempted 156:13,14,15,16 178:7 179:10

attempting 43:15 90:20 124:1 138:5 143:22 147:22 234:1

attempts 146:14,25 195:19

attend 9:22 175:10

attention 39:25 108:15 126:21

attitude 139:15

attorney 4:16 28:12 203:24 213:23 214:25 220:8 242:25



**attorneys** 17:20

**audio** 37:21 148:11 149:8 158:6,19 161:5 187:24 189:17 237:7,21 240:9

**August** 5:25 26:13,21,22 28:18,19 29:10 72:5 99:11 100:6,8 101:10,13 131:12 132:24 136:24 140:25 141:2, 15 220:20 225:18

**August-ish** 131:4

**austere** 202:13

**authorized** 130:4

**awakened** 245:20

**aware** 6:6 37:9 40:14 41:25 51:4 63:8 80:10 82:2,11 113:24 117:5 118:2 125:9 126:9 129:17 160:24 164:11, 12,16 187:19 189:3 217:9 233:22

**B**

**Bachelor's** 10:8

**back** 11:17 35:1,20 36:10 37:22 40:21 42:23 43:19 46:3 51:14 55:9,11 56:9 57:3 58:6 60:7,8,14,17,18,19,20,21,22 61:8,15 62:12 64:24 72:4 73:11,22 76:13 107:21 109:5 116:25 119:23 123:1 126:5,18 128:18 132:17 140:13 142:12 150:21 160:3 167:18 170:15 179:20 181:2 182:10 185:19 193:10 196:12,17 197:12 199:2,25 204:18 208:19 214:12 216:22 217:6 220:17, 20,22 229:20 234:23

**back-and-forth** 88:6 216:23

**backed** 31:22

**background** 9:15 44:7

**backup** 20:11

**bad** 25:22,23 245:9

**badger** 84:2 153:9

**badgering** 163:11,12 205:10 209:25 215:6

**bag** 88:9 242:17

**bags** 77:5 176:14

**ball** 156:21

**bankruptcy** 46:21 50:24

**Bar** 11:2,13,15 15:17 16:5,9

**based** 76:9 119:12 142:25 169:21 195:18

**basement** 77:18

**basically** 35:24 39:3 89:13 130:10 239:3

**basing** 159:17

**basis** 50:11 60:25 194:23 195:10,11,12 207:17,18 208:20

**batch** 77:17 180:10 181:8

**Bates** 97:18 118:15 126:15

**bath** 234:4

**bathe** 54:5

**bathed** 94:9

**bathroom** 77:18 159:25

**bearing** 150:4

**bedroom** 77:18

**beds** 188:15 242:16,19,24 243:3

**began** 36:25

**begging** 41:21

**beginning** 34:1 40:20 101:24 182:14

**behalf** 114:3

**belief** 230:3

**believed** 114:3 182:20

**believing** 142:25

**Bellwether** 47:5,6 48:14,16 51:1 53:3

**Ben** 39:17 46:24 47:9 49:6,14 52:3,20 54:5 56:12 57:14,21 59:6 61:21 69:4,5 90:22 94:8 110:22 113:14,16 114:1,4 115:19 116:17 118:22 119:3, 6,7,18,23 120:8,10,15,21 121:4,5,10 123:16,19,22 124:2,6,9,12,14 125:10 126:23,24 127:5,15,17,21 128:14,15 129:15 131:14 195:7 223:9,14

**Ben's** 127:21 128:7

**beneficial** 198:18

**benefit** 139:11

**Benjamin** 39:13 46:10,13 56:5 101:23 110:21 114:23

**Bens** 127:25

**big** 33:15 35:7 45:3 49:3 58:13 146:7

**bill** 174:7 175:1 178:7 184:15

**billed** 174:21 175:7 183:18,19, 20

**billing** 178:1 183:8

**billion** 137:25

**bills** 184:8

**bingo** 245:20

**birth** 5:24 6:24 7:22 8:11,25

**birthday** 7:24

**Bishop** 220:2

**Bishop's** 220:7

**bit** 9:14,15 18:7 26:4 35:5 60:24 136:2,8 139:14

**blackmail** 126:2 150:4 155:8, 16,17 156:6,7 196:1 203:7,8, 17,19,22,25 204:16

**blackmailed** 203:11

**blackmailer** 126:25 128:19 129:1

**blackmailing** 204:1

Todd Courser
01/28/2020

6

blanks 42:18

**Block** 247:10

blow 122:1

blowing 120:1,15

**board** 26:12 32:6 33:18 49:1 53:22 56:24 142:10,12

**Bob** 30:22 127:9,10,11,14,21 128:13 173:18

**Bobby** 27:15,16

**Bolin** 141:10,11

boo 98:10 103:18

born 10:18

boss 91:25

bother 98:11,16

**bottom** 27:7,8 119:1 126:22 128:19 222:1

**Bowlin** 92:5,6,7 93:5 94:19,23, 25 95:13 143:20 144:14 146:12,19,20,21 147:2,8,13, 20 149:9 156:15,19 157:15,17 176:4 177:16

**Bowlin's** 94:20 146:24 155:7 156:18,19 195:25

box 68:15

**Boy** 8:15

boyfriend 165:1

boyfriend's 165:8

**Branch** 6:21

**Brandon** 132:9 133:25

**break** 5:19 63:10 64:18 65:1 138:15 139:4,6,21 140:7 159:23 196:10

breakfast 245:9

breaking 63:14

breaks 140:1

breeder 25:19,20

**Brick** 164:18

bright 158:25

brilliant 170:7

**bring** 30:21 58:25 101:17 105:21 155:14

bringing 231:15

brings 69:15

**Britvec** 221:24 222:1,22

**Brock** 221:24 222:24

broke 145:11,24

broken 120:12 141:4

broker 12:10

brokerage 12:2

**brother** 85:11,14,17 86:3,13, 20 87:13 106:2 206:12 220:12

brother-in-law 14:11,16

**Brothers** 27:17

**brought** 27:13 35:3 55:12 63:1 80:16 89:10,17,24 90:16,17 91:2 111:24 120:4,16 151:13 155:9 180:21,24 226:23 227:2 231:13 233:3

brush 54:6

bucket 69:15

**Buckman** 240:3

buddies 221:4

bug 40:14

bugged 73:24,25 74:17 75:16

bugging 76:18,21

**bugs** 74:22 75:2,9,11 153:14 157:11

building 14:14

**bunch** 27:20 90:21 123:2 132:6

**Bureau** 58:8 244:11

burner 98:11,16 236:25

**business** 10:8 12:5 19:8,13,25 49:20 52:7 65:23 66:2 70:11,

13 71:6 91:13 92:3,4,9,17 141:11 144:11 149:24 156:14 168:1 171:20,21,24 177:17 224:19,23 225:6,25 226:21

**businesses** 19:8 20:8,17

**Bye** 196:8 242:25 247:11,12

---

**C**

---

C-O-U-T-U-R-E 15:11

calendar 58:11

calendaring 92:18

calendars 58:3

**call** 26:8 58:1 67:16 86:10 112:1 114:6 127:17 171:20 181:3 185:12 229:3

**called** 4:4 12:3,4,7,8 47:3 48:14 57:10 59:25 92:2,3 93:5 136:4 164:18 171:22 179:24 180:3 185:9 218:20,22 229:10,11 240:2,3 241:9 245:2,6

caller 229:1

calling 56:15 245:8,21

**calls** 54:18,20,23 57:13 64:8 72:15 80:24 129:4 135:21 154:21 201:9 222:13 226:14 235:10

CAM 12:8

Caminetti's 165:2,8

**campaign** 23:23 26:2,3 36:19 38:7 49:6 52:23 53:2,6 78:14

**campaigns** 47:2 51:5,11 81:20 220:9

canceled 226:8,11

cancellations 81:4

candidate 24:4

candidates 51:8

capital 199:15 203:6

**Capitol** 104:8 107:21 168:14

Todd Courser
01/28/2020

7

captured 164:2

car 77:1,10 165:2,8 176:14

card 178:2,5 179:3

care 36:22 54:21 55:4 57:1
61:14 62:3,4,7 81:21 84:25
85:2 89:25 139:1,12,18
158:23 171:13 177:2 184:12
202:5 205:23

carefully 106:13 121:9

case 38:2 55:17 59:21 75:25
81:18 115:1 193:2 199:15,16

casual 45:15

categorize 224:24

caused 152:6 194:15,22,24

CD 159:5 189:2,9

Cedarville 47:14

cell 220:15

centrally 181:4

ceremony 29:24

Chad 44:19 45:5 132:3 140:18

chain 195:14

chair 27:12,13,14 30:17,19
32:1 33:10,24 60:22

chairman 27:12

chairman's 36:9

challenge 27:13 30:21 31:1

chance 107:25

change 19:1 22:12 178:1
180:4

changed 58:19 177:20 178:13
187:3 220:18

channels 105:20,21 144:12

character 220:8

charge 226:3

charges 155:9 195:13

charging 49:9

chat 91:5

chats 238:5

check 15:2 175:25 232:15
240:21,25 241:8,11

check-in 184:22

checked 176:9 240:15,16
241:4 243:23 244:1 245:8

checking 176:15 177:3 241:7,
14

Chemicals 240:3

Cheryl 46:17

chief 57:10 109:10

child 6:22 8:23

children 6:8 22:15

Chloe 6:23 7:20 10:17

choices 227:12

Christmas 20:12

chronological 120:12

Cindy 30:15 37:22 41:25 43:8,
23 53:17,25 62:13 74:5 77:1,
23 78:22 79:5,22 80:2 81:15,
16 82:3,17,23 85:15 87:15
88:4 89:8,14 91:10,19 92:24
94:7 95:17 99:22 103:7
108:16 111:15 122:4 123:9
147:10 164:3,12 181:18
190:2,11 206:10,11,13,22
207:7,19 218:17,18 235:1
242:18 245:6,8,21

Cindy's 55:21 220:15

circumstances 82:2

city 7:4 13:8 29:15 171:16

civil 4:11 81:18

claim 96:6 158:7

claimed 37:21 52:17 67:16
80:8 81:22

claiming 102:9 209:17 216:17

claims 196:20 214:21 215:8
231:2

Clair 24:25 25:24

Clarence 12:18

clarify 71:16

Clark's 130:23

class 51:7

classes 7:13

Clause 191:23

cleaned 230:17

clear 4:24 18:17 45:21 117:8
152:19 156:1 229:9 230:11
231:20

clerk 144:13,16

client 20:15 69:24 205:10

clients 15:24 52:1

Cline 26:4 31:19 34:10 39:13,
17,18,19 47:7,8 49:4,5 51:2,
13 52:6 56:7 64:20 65:2,19
66:17 67:4 68:3 70:19 73:13
75:9,20 76:10 81:19 86:21
93:13 96:4 101:23 102:6,8,9,
13,19 103:5 104:13 106:25
108:18 109:9,16 110:2,5
116:18,24 117:23 123:17
125:23 126:6,22,24 128:20,24
129:5,7,12,17,24 130:1
131:14 132:14 133:24 136:22
149:20 158:14 163:15 189:23
215:18,19,20,23,24,25
216:16,21 217:4 222:9,13,14
225:8,10 226:2 233:12 234:20
235:8

Cline's 74:19 119:13 225:2

Clinton 27:20

close 114:23 124:1,12 176:13

closely 158:24

closure 86:7,19 87:13

clothes 239:12,14,18 240:12

clue 41:15 48:2

CM 12:8

CMA 12:8



Todd Courser
01/28/2020

8

**co-conspirators** 214:7

**cochair** 30:20 32:2

**coffee** 5:22 18:15

**coincidental** 167:15

**coincidentally** 166:23

**cold** 87:20

**collective** 144:7

**collectively** 144:5,6

**college** 6:9 7:5,7,8,14,19,20
9:22,23 11:20 47:9,13

**Columbiaville** 220:13

**combination** 92:25

**combined** 34:3,4

**commenting** 135:13

**committed** 147:15

**committee** 58:23 141:22
146:18 147:16 151:14 195:11

**committees** 58:24

**common** 43:15

**communicating** 45:22 131:6,8
189:22

**communication** 81:9 85:23
132:13 235:9

**communications** 76:6 81:24
126:5 233:12

**community** 7:14 9:23 31:15
46:23 101:4

**company** 12:3,5 13:3,10,14
14:22 15:3 47:4 51:1 52:15
193:16 240:1

**competition** 240:6

**compile** 184:13

**complaint** 37:13 72:4 93:15
94:12 100:13 117:20 160:9
191:4 193:14,19 199:7
204:21,24 213:16,18,22
214:14,22 224:21,24,25

**complaints** 94:19 96:10 97:3

226:1 232:7,10,18,22

**complete** 10:19 237:11

**completely** 112:23 155:15

**completing** 7:15,18

**complicit** 115:19 121:20

**compound** 82:6 103:19
115:24 133:4

**comprehend** 33:16 59:1

**compromised** 180:16

**computer** 49:15 50:10 72:5
76:19 85:10 91:5 105:15
114:8 115:6

**computers** 65:22 97:2

**concern** 66:2 105:11 111:11

**concerned** 84:21 96:25
108:13

**concerns** 54:2,4 56:20 62:13,
15 63:2,17

**concerted** 214:1

**conclude** 222:1

**concluded** 247:15

**conclusion** 117:22

**conclusions** 73:19

**condition** 150:20

**conduct** 150:23 151:4,5,8,24
152:9

**conducted** 144:13

**confirmation** 242:13

**confirmed** 65:6 66:10 75:11
77:9,10 115:1 124:6

**confirms** 81:2,9

**confront** 156:21

**confrontation** 182:19

**confronted** 91:12 123:22

**confronting** 82:3 123:19

**confusing** 82:6

**confusion** 130:6 174:6,25
178:7 186:5,8,9 224:8

**Congressman** 41:12,13

**connected** 44:18,19,20
123:16 129:19,20 132:14
141:13 174:14

**connection** 209:13 215:20

**connections** 50:25 103:4
217:24

**connects** 233:11

**consecutive** 60:6,8

**consequential** 170:11

**conservative** 31:16

**considered** 235:13

**conspiracy** 169:23 197:25
203:8

**conspired** 201:21,24 202:2

**conspiring** 101:25 202:7

**constituents** 58:2 70:12 90:4
103:11 226:14

**constituents'** 226:14

**constituted** 212:7

**Constitution** 142:21 191:16,
24

**constructed** 114:11

**consultant** 125:22

**consulted** 83:18

**consulting** 47:3,4

**contact** 36:14,18 42:2 76:23
79:9 92:10 102:10 176:6
180:17 220:3,6,8 232:20

**contacted** 42:3 43:7 165:19
176:4 216:22 222:19 226:9,22

**contacts** 222:12,18

**contained** 110:14 151:16

**context** 88:6 149:12

**continuation** 120:14

Todd Courser
01/28/2020

9

**continue** 89:22 153:9 157:16 201:8 228:14

**continued** 89:21 130:11 180:1 224:9

**continues** 222:16

**continuing** 241:19

**continuously** 14:7 58:24

**contrary** 155:15

**contributed** 214:8

**contributes** 19:25

**control** 93:3 137:14 144:14 225:5 227:10

**convention** 26:11,19,21 28:14,15

**conversant** 42:21

**conversation** 31:7 45:16 46:3 67:7,23 74:3,4,5,6,13,22 75:14 77:15 83:20 86:6,19 90:11 100:20 101:2,6 112:6,7 113:5,8 114:16 122:10 129:22 170:18 177:22 187:14 219:13 223:22 224:11 226:19 238:18 239:7 242:3 246:25

**conversations** 62:19,24 74:1, 20,23 75:7,8,10,16 76:11,15, 17 89:8,14 94:11,14 95:19 114:25 117:2 159:14 182:2 226:18

**conversed** 46:5,6,8

**cooked** 20:11

**Cooley** 9:25 10:19

**coordinated** 31:18,19

**coordinating** 234:25

**coordinator** 31:17

**copy** 131:20,21,22,25

**Corporate** 201:24 202:6,12 203:15 204:16

**corporation** 16:16 202:9,12

**correct** 25:14 30:2 32:23 34:3 35:8 39:15 55:7,8 59:7 61:13,

19,23 63:20 68:9 75:24 78:16 87:6,7,9,16 88:22 89:16,18 98:1,2,4,8,25 99:1,15 100:8,9 101:10,11,22 106:11,12 109:14 110:23 111:6,7,11 117:20 119:7 120:22 121:5,12 126:19 130:20,25 131:1 140:25 141:1,5,11,19 143:12 146:15 147:1 150:13,15 163:19 164:4 171:10 174:11 175:4,21 179:2 184:2 191:8, 25 192:5,6,7,8 194:19 205:8, 13,15,20 211:8 236:18 237:15,18,20,22 238:20

**corrected** 179:7,8,9 180:6 181:11

**correction** 156:13

**corrective** 232:3

**correctly** 26:5 47:14 52:19 98:12 113:9 122:7 127:2 128:22 136:15 177:1

**costs** 92:18

**Cotter** 141:3 143:7 144:11,13 178:10

**cough** 5:16

**could've** 23:7 115:9 198:8

**counsel** 69:24 71:10 109:10 177:3 230:6 244:22 246:13

**counted** 60:1

**counties** 25:2

**countless** 37:14

**country** 54:22,23 217:23,24

**county** 24:25 31:20 100:15 219:25

**couple** 12:2 26:7,14 29:22 47:2 54:20 72:23 73:19 83:8 98:7 122:11 218:19,22,23 247:4

**Courser** 4:3,7,9,14 6:23 7:23 8:24 13:2,3,10,14 14:22 15:3 16:19,23 69:19,21 97:14 119:1 140:17 147:9,14 148:12 149:23 150:2 164:25 165:19,

21 194:14,15 199:9 203:7,9 214:3 215:25 216:1 217:2,12 219:6 222:11

**Courser's** 194:14 212:8

**courser72** 68:22

**Courserlaw@gmail** 69:25

**courserlaw@gmail.com** 71:2

**courserlaw@gmail.com.** 68:21 69:13 71:11 115:10

**court** 4:21 5:8 28:12 43:1,4 170:24 171:1,5 218:18

**cousin** 215:20 216:20

**Couture** 15:9 89:24

**cover** 64:9 122:1,3 146:14 147:1,23 151:18 195:19 209:21,22

**covered** 58:9 153:9 233:8

**covering** 55:3 58:5

**crafted** 110:19,20,21

**Cranes** 45:12

**crap** 223:1

**crazy** 20:15 28:7 222:21

**create** 111:9

**created** 15:1 44:20 57:23 232:11

**creating** 232:22

**credible** 147:10 237:11

**credit** 178:1,5 179:3

**credits** 10:2

**criminal** 75:25 195:13

**criminally** 218:23

**criteria** 142:22,24 191:17,18, 23

**critical** 232:5

**crossed** 103:17

**current** 6:1 220:16

**curtain** 234:3,5

**curtain's** 188:14

**customer** 22:3 54:17

**cut** 35:1 129:3 154:11 201:2

**cute** 25:20

**cuts** 31:13

**cutting** 153:19,20

**cycle** 24:20,22 31:18 40:25 41:1,18 49:5

**cynical** 169:22

---

**D**

**D-A-L-E-Y** 24:7

**d/b/a** 13:1 48:18

**dad** 46:14 50:24 51:14,17

**dad's** 51:19

**Daley** 24:3,6 29:1

**damages** 209:17

**Dan** 85:17,18 106:2 126:25 128:20 220:12

**Daniel** 7:23

**data** 49:14 50:10 72:16 74:19

**database** 232:4

**databases** 234:20

**date** 5:24 6:24 7:22 8:11,25 35:12 36:3 72:12 93:16 206:2, 15 218:1,6,9,16 219:4

**dated** 98:3 126:23 127:8 140:25 141:15

**dating** 66:18 225:11

**David** 68:4 101:24 102:4,20 103:5 109:14 116:18 125:21 126:1,7 163:15 246:25

**Davison** 21:18

**day** 28:17 38:18,22 54:18,21 59:25 60:15 61:5 64:4 79:24 80:1 85:4 91:4,11 94:8 115:13

126:25 128:20 134:5 141:2,6 142:10 180:12 219:22,23 224:8 245:6

**day-to-day** 92:10,22

**days** 30:7,9 38:20,21 57:6 58:21,22,23 59:17,18,23 60:2, 3,6,9 64:5,7,12 83:7 124:8 131:18 189:21 190:4 206:9 244:10

**DC** 237:12

**deal** 12:13 33:15 49:18 91:14 111:18 116:12 125:12 164:13

**dealing** 22:13 180:25 212:17

**dealt** 173:9

**Dean** 12:4

**debate** 170:25 171:2

**December** 9:1 62:23,25 168:3 169:1 175:22

**decide** 124:19 222:14

**decided** 34:8 86:13

**decision** 34:2,7 89:17 115:19, 22 119:5 122:16 191:25 192:21

**decisionmaking** 232:5

**decline** 228:20

**defamatory** 212:7,9,15,17,18, 22 213:9,13 214:11

**defame** 214:2,4,14

**defend** 122:2

**Defendant** 192:4 193:20 202:12

**Defendants** 4:15 193:20 194:13 199:7,11,14,15,16,17, 22,23 200:1,12 201:20,24 202:2,7,20 203:6,10,13,15 204:7,16 212:10,19 214:4 227:17 228:1,22 229:22

**Defendants'** 212:6

**definition** 213:14 214:13

**degree** 10:1,5,7,19 21:20 52:16

**delete** 234:2

**deleted** 72:23,25 83:8 100:1 233:24 234:1

**delivered** 186:12

**Democrat** 24:4 29:17

**Democrats** 27:21

**demonstrates** 148:3,7 149:23

**denied** 130:15,19 192:15

**dental** 21:15

**deny** 38:2

**denying** 153:11

**Department** 11:24

**depended** 61:12

**depending** 17:6 60:20

**Deperno** 42:4,8,10,13,16 45:13,18 49:25 63:10,13 82:5 96:17,21 97:10,16 103:14 112:19,25 115:23 116:3,14 127:4 133:3,8,14,20,22 134:6 135:5,9,20 136:1,4 138:15,18, 25 139:6,9,15,23 140:2,7 143:2,23 144:21 145:14 146:1 148:17,20,24 151:21,25 152:4 153:24 154:4,10 155:23 161:22 162:6,8,11,16 169:16, 20,25 170:8,16,20,23 171:1,4 177:2 190:9 193:5 197:22 198:20,22 200:6 202:1 204:2 205:9 206:17,23 207:22,24 208:3,7,12,14 209:25 210:7, 11,16,19 211:2,7,11,21 212:2 214:23 215:2,6,10,13 221:17 223:2,5,8,20 224:4 225:14,15 227:20,25 228:5,9,21 229:6 230:4,23 231:4,7,12 232:24 233:2 234:11,16 235:23 236:2,19,22 238:2,12 239:19, 22 240:22 241:13 242:5,10 243:1,6,17,25 244:4,22,24 245:15 246:2,6,22 247:4,8,12

**deposition** 4:9,16,18 80:24

81:10,12 97:8 110:8 118:11
126:11 135:22 138:23 140:14
162:3 169:17 170:1,2 171:7
178:21 182:15 185:12,15
190:23 197:19 223:6 226:24
229:9 231:10 232:25 235:24
236:20 238:3 244:8 246:4
247:15

**depositions** 166:25

**Describe** 56:23

**description** 56:25 231:22

**designated** 16:25

**designates** 93:4

**desire** 67:1 109:22

**desk** 56:6,7 176:17 177:10
181:17 229:5,21

**desks** 66:12

**destroy** 157:18

**detail** 81:10

**details** 36:22 63:24 164:19

**Detective** 221:24 222:1,22

**Detroit** 15:15 45:7 140:19
195:8

**develop** 232:3

**device** 164:7,12,13,21 166:3,
24 246:14

**devices** 77:1,4,11 155:5
161:1,4,8 162:19 163:18
166:6 167:20 189:18 203:5
209:10 246:19

**Dey** 181:21

**dialogue** 237:3,9

**difference** 117:1

**difficult** 82:9 168:12

**difficulties** 130:9 224:12

**dig** 199:9

**digital** 20:21

**dime** 237:7

**direct** 92:2 102:10 204:14,18,
19,20,23,25 209:13 229:3

**directed** 181:3

**direction** 205:18

**directly** 102:16 174:22 203:7,
11,17,19,24 204:25 205:2
219:18 225:8

**director** 94:20

**dirt** 199:9

**disagree** 195:23,24,25 196:3
204:5

**disagreed** 142:24

**discovered** 55:6 71:13,15

**discovery** 97:16 102:17 103:3
135:22 138:23 162:3 199:2,3

**discuss** 110:23 111:8 148:13
183:25

**discussed** 98:6,9 103:13
111:16 121:8 140:21 163:14
182:14 186:14 202:22,23,24
204:9,10 247:1

**discusses** 231:17 237:2

**discussing** 67:6 85:11,15 89:9
197:15

**discussion** 165:4,12 193:8

**discussions** 22:14 122:22

**disease** 108:11

**disgusted** 104:5

**dismiss** 104:22 192:21

**dismissed** 88:20 96:7 104:21,
24 192:7,20

**dispute** 119:12

**dissemination** 130:2

**distance** 101:4

**distinction** 117:1

**distract** 112:4 123:2

**distribution** 217:21

**district** 23:7 24:5,21 28:23
30:10 59:11 60:14,18,19,20,
21 61:15 62:12 93:9,10

**districts** 58:6

**diversion** 111:10

**divorce** 6:16 81:17

**document** 57:23 97:15,17,18,
22 110:12,15 112:25 118:15,
17 126:15 142:17 145:16,19
191:2 229:7 230:24

**documentation** 96:5

**documented** 83:5

**documents** 20:24 37:14,16
170:21 233:3

**dog** 25:19,20

**dollars** 20:16 50:9 137:25

**donated** 27:19

**door** 80:4 176:14,20,22,24
177:8,12 230:17,18

**doors** 36:21 55:24

**Downriver** 15:14

**dozen** 77:12

**dozens** 54:18

**drafting** 58:11

**draw** 73:19

**drew** 66:10

**drilled** 208:4

**drive** 20:11 60:18 61:4,8 159:6
189:2,9

**dropped** 156:21

**drove** 226:5 237:6

**drug** 123:12 124:20

**due** 191:21 245:4

**duly** 4:4

**dumps** 69:19

**duty** 58:6 187:21 231:17,18,20
232:1

**duty's** 232:15

**DVD** 189:9

**dying** 108:11

---

**E**

**E-L-I-J-A-H** 7:21

**ear** 134:4

**earlier** 72:13 100:15 122:12,21
140:18 246:13

**early** 32:2 33:5 35:13 36:12,13
48:6 61:4,7

**earn** 201:21,24 202:3

**earth** 122:2

**East** 9:21 180:20

**easy** 148:23 152:12

**eavesdropping** 211:15

**Ed** 120:24

**edited** 195:9

**editing** 247:1

**Education** 26:13 33:18 49:1

**educational** 9:15

**Edward** 12:3

**effort** 22:16 28:10 164:6,15

**efforts** 226:1

**Eickholdt** 111:25 113:10,17,
22 114:2 115:3 130:7,12,15,
17 164:9,10,23,24 165:19,21
167:8

**Eighth** 9:8

**eighty** 30:7,9 59:23

**elected** 19:6 33:25

**election** 26:15 28:18 32:7,21
35:20 43:14 48:22 49:2
168:21,25

**electronically** 19:22

**Elijah** 7:21,23 8:9

**else's** 105:10,17,18 184:18,20
245:22

**email** 62:2 67:18 68:6,10,16,
22,25 69:5,8 70:3,5,17 71:1,
14 85:10,13,22 86:5,18,24,25
87:6,12,13,19 95:2 110:18,20,
23 111:9,17 112:2,4 113:17,
23 114:7,11 115:7,11,20,21
121:20,21 123:1,12 124:4,15,
16,19,23 125:13 129:18
130:4,5,25 131:13,15,19,21,
22 132:1,2,12,23 133:18,25
134:5 136:24 140:20 151:19
154:21 159:5 178:15,16,17,
18,24 179:1,19 180:5 182:3
184:1,11,16,18,20 185:23
187:3 189:2,8 195:6 209:21
217:21 219:5,7,19 222:21
223:16 224:2,3 229:11 234:19

**email's** 86:7

**emailed** 71:12 160:6 177:13
185:2

**emailing** 69:23 71:5

**emails** 54:24 56:14 57:4 66:16
67:25 68:1,4,6,8,18 70:20
73:14 80:25 81:3 85:9 86:23
87:2 113:12 123:19,20,21
157:8 161:15 180:2,4,7
199:13 201:7 209:1 229:11

**Emanuel** 164:23

**employed** 16:9 19:11 21:12,23
65:18 93:10

**employee** 15:4 17:2 144:11,14

**employees** 15:3 16:23 17:12,
19 18:1,19,22,25 19:2,16
38:15 65:11 105:22 118:2
156:19 193:20 200:3,13
202:10,11,15 203:13,14,17
204:15 228:17

**employing** 15:25 74:22

**employment** 11:25 15:16
21:5,8,9 65:17 93:20 96:3

**end** 23:16 29:18 32:19 64:14
76:4 86:6 90:17 119:11 122:2
141:21 148:15 162:1 198:11

211:9 217:25 218:24 219:4

**ended** 10:14 24:2 27:3,10,11
32:22 41:19 50:14,21 53:9
65:1 181:5 212:14 218:2
241:12

**endurance** 5:18

**energy** 49:16

**engaged** 150:5

**enrolled** 180:13

**ensure** 227:21 232:2,18

**ensuring** 231:1

**enter** 193:22 229:15 230:17,18

**entered** 193:25 194:7

**entry** 81:5

**episode** 93:17

**equipment** 194:8 240:1

**equipped** 53:13

**Erin** 208:7

**essentially** 19:19 34:23 35:6
40:6 44:8 87:14 93:2

**establish** 183:16

**established** 160:5 163:6,17,20
166:25

**establishment** 29:7 31:12
44:15,16

**estate** 18:9 220:1

**estranged** 78:6,17 84:20
190:14 235:2

**ethic** 225:3

**evaluation** 232:5

**evening** 60:17,18 115:2
120:22 121:11 122:21

**evenings** 60:15

**event** 43:25 82:16 83:13 88:8
127:12,14,19 128:18 226:10

**events** 58:4,5 90:6 195:15

**Everything's** 20:21 169:23

Todd Courser
01/28/2020

13

evidence 82:10,11,12 116:6
117:5 141:13 148:2,6,11
149:22 157:12 161:19,21
167:6,20 193:25 194:10
227:5,6 237:12,22 241:21
246:13,19

exact 36:3 67:23 111:4 147:25
197:1 218:1

exam 130:23

EXAMINATION 4:12 221:16

examples 148:10

excellent 232:18

exclamation 244:13

excuse 18:15 93:18 153:24
180:9 185:15

exhibit 97:8,14 100:5 110:8,11
118:11,14 126:11,14 130:5
137:13 140:14,17 190:23
191:1 223:3,6 231:5,10
232:25 235:24 236:20 238:3
246:4

exhibits 141:14 146:8,11

exist 69:16,18 144:15 159:13
194:22

existed 85:13 96:6

existence 16:21 68:25 70:1

existing 27:13,14

exists 117:5,15

exit 81:6

expect 139:2 209:9 224:23

expected 59:12,13

expel 142:15 143:1,17,22
144:1 151:7

expelled 143:15 144:25
150:14

expense 175:5,12

expenses 30:14 35:5

experience 38:25 39:1,15,21
47:19 51:3 57:2 240:8

experienced 94:2

explain 60:11 162:11 184:4,5
227:1

explained 175:13

exploded 66:18

exposed 140:20 225:11,17

expressed 43:24

expulsion 141:18 150:24
151:6 209:18,20,24

extent 135:6

extort 137:9 203:7,8 204:16

extorted 108:5 125:17 203:11

extorting 114:21

extortion 37:13 71:19 72:4,8
74:2 83:1 87:3,4 98:1 102:1,3
106:4 107:9,24 108:23 109:6
111:14,19 112:5 116:15,20
117:4,20 118:3 121:16 123:7,
9 126:2 128:24 129:10,13,20,
21 133:15 134:7 136:17,20,23
137:12,17,19 155:3,17 156:8,
17 157:6,13 158:11 160:9
194:23,24 195:1 196:17
207:17,18,20 215:22 216:18
233:10,15,16 236:7,24 237:16

extortionist 123:6,14 135:7
224:2 236:12,16 237:14

extra 49:12 166:8

extramarital 145:7

eyes 134:14,19 136:5 138:6,7
153:21,22 154:7,8 159:16
172:2 216:4,8

---

# F

Facebook 40:9 215:24 216:11,
23

facilitate 149:5

facing 150:24 151:2

fact 15:25 61:15 67:5 81:5
82:10,19 83:6,24 87:15,22

88:3,8 90:8 91:4 95:21 123:19
124:18 129:17 145:25 146:14
147:1 151:18 153:4,10 155:9
156:21 164:11,12,13 180:6
182:4 201:3 206:14,19 207:8,
18 208:18 209:13,20 212:3
226:19 244:6 246:25

factor 225:21,23

failed 11:10 150:3 155:7
191:21,23

failings 153:8

fair 56:21 60:9,24 61:11,22
63:3 76:9 80:17,22 82:20
86:18 105:25 106:15 111:13
118:22 128:16 132:19 158:2,
18 161:23 171:23 174:24
184:3,4 189:13,15 190:11,13,
22 191:22 195:21 219:13
221:2

fake 40:9

fall 10:17 33:19 81:13

false 130:5 151:19 170:16
195:6 202:19

familiar 143:12

familiars 55:14

families 63:23

family 22:17 27:18 84:7 85:6,
24 101:18,19 103:7 122:5
149:5 243:12

Farm 58:8

fast-food 48:9

fault 152:3,7,16,23

FBI 99:2,5,7 100:24 101:2,8

February 32:20 63:6,18 66:6
79:13,16 80:20 82:1 179:12
182:13,15,18 183:4,21 185:4
241:4

fed 71:2

federal 4:11 162:2 199:8,10
211:15

feedback 182:9


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

14

feel 120:3 122:6,15 138:24

felt 120:3 142:23 143:3 151:20

female 65:21

fictitious 179:23 181:11

fielded 54:21,23

Fields 181:22,23

fifteen-minute 211:6

fight 75:5 89:21

figure 82:19 116:11 121:16,17 128:12 184:17

figured 124:3 130:10 224:14

file 28:17 93:14,15,20 94:7 97:6 178:25

filed 28:17 46:21 48:18 50:23

files 18:2 96:4

filings 6:16

fill 42:18 95:3,4

filled 39:9

filling 95:19

finally 76:3 226:21

find 64:11 76:25 77:3 90:20 118:6 123:8 124:1 144:19 145:5 167:19 168:19 179:25 229:16 237:1

finding 105:6 145:24

findings 143:14 145:10

fine 87:11 118:7 135:14 139:5, 8,21 172:15 180:1 209:17 211:1 213:20 221:6

fingers 103:17

finish 4:24 103:14 133:21 139:3,20 154:12 182:25 200:21

finished 23:20 50:1

finishing 8:6

fire 65:15 89:15 90:9 92:1 105:19 225:8

fired 47:17,22 48:9 88:21 89:2 94:6

fires 93:3

firms 12:3

fits 108:5

five-and-a-half 219:11

flag 130:5 151:19 195:6

flash 159:5

Flint 9:24 10:5,13 11:18,19,22 12:14 108:6,8,10 138:3

floor 58:20 107:6 131:17 141:24 151:15 178:11

fluid 60:24

flush 123:6,13 124:18

flyers 52:9

focused 138:3

folks 202:23

follow 91:7 100:22 128:2 227:17 228:22

force 114:20,21

forced 191:13,15,20

Ford 52:14

forefront 126:10

forgive 19:15

forgotten 33:17 231:3

form 82:5 95:3,4 112:19 115:23 118:17 135:11,12,14, 15 144:21 145:20 146:1 148:19 151:21,25 162:2,3,10, 12 197:22 202:1 204:2 206:23 223:17 227:18,23 234:7,13 235:21 239:16,21 240:17 242:2 246:20

formal 93:14 95:20

formally 53:18

formed 147:16

Forsmark 125:21 126:1,7

forty 62:2 139:24

forward 19:3 27:22 31:13 59:1 100:23 119:5

forwarding 124:7,9

found 27:19 66:13,19 67:24 77:11,14,16,17,21 85:1 87:5 103:6,7 104:18 105:8 120:23 129:5 143:12 146:13,24 167:9,12 179:18 182:13,15 224:2,16 231:19 233:13

foundation 127:6 135:12,16 145:20 148:19 162:3,4,10 223:17 227:18,23 234:7,13 235:21 239:16,21 240:17 242:2 246:20

fourteen 9:3,4 141:25 150:18

fourth 8:23 34:24 66:5

frame 17:19

frankly 37:19

fraud 201:21

frequently 79:2

Fridays 59:13

friends 44:23 125:23

friendships 63:22

front 39:3 56:6,7 169:9 177:10 229:5,21

front-desk 228:18

frontrunner 29:7

full 4:5

full-time 59:6,9,12

fullness 149:14

fully 42:5

functions 231:17

funeral 91:7,9

future 6:5

---

G

gain 197:5



Todd Courser
01/28/2020

15

**gained** 196:15 234:18

**gaining** 196:22 197:3

**game** 137:2

**games** 168:11

**Gamrat** 30:15 35:8 36:7 37:21
68:3 75:10,21 76:1,25 77:3
88:11 101:19,22 102:7,14,18
103:5,6 106:1,25 109:14,17
110:1 116:18 117:2 129:5,6
136:18 141:5,18 143:22 144:2
147:10,14 148:12 150:3,14
157:20 158:13 160:10 161:5,7
163:13,17 164:3 166:2,4
178:19,21 180:3 182:13
183:4,13,21 189:13 192:3,18
194:2 195:19 196:18 197:15,
17 199:13,14 201:25 202:3
205:7,15 206:6,9,11 207:7,19,
20 208:17 209:14 212:21,23
213:4 217:25 221:2 229:9,22
233:14,17 234:5,17,18,25
238:14,16,18,21 239:9
240:14,15,16,23,24,25 241:14
242:6,19 243:22,23 244:9,11
245:1,11,12,17,24 247:1

**Gamrat's** 36:24 40:18 74:20
77:1 109:19,22 145:6 146:25
163:19 164:3,7 166:22 167:10
185:11 188:12 192:19 205:18
234:1 238:6 241:24 243:18

**Gary** 31:19

**gather** 31:20 82:4

**gathered** 207:13

**gathering** 130:2

**gave** 67:15 74:18 81:12,13
96:23 119:13 133:25 154:18
170:2 171:19 176:11 178:16
179:2 185:9 231:16 234:12
242:9

**gavel** 59:24

**gay** 66:17 123:12 124:20

**general** 27:1 28:12 29:14,18
43:14,23 53:2,10 207:9 220:9
232:20

**generally** 4:17,20 176:24

**Genesee** 13:6

**genitalia** 65:21

**gentleman** 26:8 90:9 120:24
220:2

**gentleman's** 92:4

**Georgeann** 85:20,21 106:2

**gestures** 136:6,7

**get-go** 96:6

**Gilbert** 25:6,8

**girl** 8:15

**gist** 87:22 132:16

**give** 4:25 5:5 53:13 55:15 57:9
59:2 120:2 148:10 154:20,22
169:16,18,25 170:9 171:1
178:5 179:4,5,23 187:18,21
201:8 209:1,6 213:15,17
221:10 228:1,6,10,20 234:17
235:17 246:8 247:4

**giving** 81:1 157:9 179:14
182:8 185:4 187:10 227:14
229:12 235:18

**gmail** 68:21

**go-round** 33:2

**go-to** 168:15 171:10

**goal** 132:21 133:1,19 134:3
136:16

**God** 120:4,16

**Godaddy** 69:17 71:2

**good** 44:9 63:14 120:6 123:10
171:7 173:25 228:16

**goodness** 46:16

**gotcha** 18:4 22:18 25:13 27:9
31:25 32:22 33:22 50:10 72:2
107:24 110:3

**gotta** 172:18

**government** 62:5,10 65:11,22
105:20,21

**Governor** 28:12

**GPS** 164:7 165:1,8,25 167:8

**grade** 9:8,10

**graduate** 9:16,20 47:11

**graduated** 50:22

**graduating** 10:13 11:17

**Graham** 39:13,17 46:10,13,16,
17,24 47:9 56:5 65:19 66:13
67:14 68:3,18 69:4,5 70:19
73:13 74:19 75:9,20 76:5,10
81:19 86:21 88:19 90:22 91:6
93:13 94:5 96:4 101:23 102:6,
8,9,13,19 103:4 104:12
106:25 108:18 109:9,16
110:2,5,21,22 111:6 112:16
113:6,10,15,16,22 114:1,23
115:19 116:13,17,18,20,23
117:23 118:22 119:7,9,18
121:4,5,10,19 123:16,19,22
124:2,6,9,12,14 126:6,23,24
127:5 128:15,24 131:14
132:14 133:24 136:22 149:20
158:14 163:15 189:23 195:3,8
199:12,14 222:5 223:9 225:2,
8 234:20 235:8

**Graham's** 68:13 112:3 127:18
223:15

**Grand** 41:8

**Granholm** 39:24 44:24

**graphics** 52:8

**grassroots** 31:15

**great** 96:8 135:22 171:19
172:13,15

**greater** 107:25

**group** 51:6 69:20 202:13

**guess** 20:11,15,20 23:21
40:15 41:9 44:12 45:3 48:3
55:9 65:9 67:19 71:16 81:25
95:25 96:3,17,19 100:4
116:25 117:1 132:4 137:12
139:24 140:2 143:7 148:24
151:2 170:10 204:18 209:5
242:12



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

16

**guest** 227:10 228:17,19 229:4, 8,18,20 230:18 232:6,7,18,19, 22

**guest's** 229:1

**guests** 227:12,16 228:11,14 229:15,16 230:10 231:22

**guidelines** 227:17

**gun** 58:7

**guns** 51:7

**guy** 20:10 25:17 48:5 52:9 127:11 158:25 222:7

**guy's** 12:17 25:6

**guys** 25:24 35:17 38:11,14 45:13 54:14 62:20 65:23 90:2, 3 104:4 154:18 161:11 185:9 186:12 211:14

---

**H**

**hacked** 131:15

**Hager** 25:17

**Hale** 21:17

**half-hour** 139:21

**hall** 127:15 128:15 132:9 133:25

**hallway** 107:21

**Hammons** 202:9 227:7,11 229:15

**hand** 87:20 95:4 154:19 176:25 227:1

**handbook** 200:17 227:6 228:16

**handed** 176:8 191:6

**handle** 49:19 53:15 58:11 119:4 226:16 227:9

**handled** 64:8 70:15 92:19

**handles** 38:22,23

**handling** 34:17 65:24

**hands** 86:21

**hang** 193:5

**hangs** 221:4

**happen** 22:10 60:14 80:9 156:25 157:1,2,4,5 179:16 180:1 200:19 204:17

**happened** 18:21 26:15 32:21 42:1 43:9 52:16 59:1 67:8 75:14 80:11 84:10 85:3,9,16 88:7 93:16 94:11,22 101:6 107:19 113:8 124:2 164:16 202:25 233:15 234:14

**happening** 17:6 38:24 39:6 74:13 75:7 76:24 80:14 91:6 108:12,21 168:11 177:20

**happy** 58:2 169:10

**harassment** 97:1 105:11 156:16

**hard** 20:11

**harm** 194:15,21,24

**hashtag** 236:17

**hastily** 147:4

**hate** 54:9

**HBO** 91:17 93:14,22 94:11,14, 18 95:1,11 104:4,10,11,12,15, 25 105:1

**head** 5:7,10,14 134:17,18 136:6 170:6 174:10 210:5,6 226:2,11

**health** 51:22

**heard** 58:24 67:6 74:6 76:16 158:8 163:6 188:1 194:18

**hearing** 226:17

**hearings** 147:7 151:14 218:18,23

**heart** 150:20

**heat** 188:16 242:17,22

**heavily** 52:22

**heck** 124:21

**held** 20:12 32:25 102:4 193:8 224:14

**hell** 72:25 120:1,15

**helped** 26:4 122:12

**helpers** 24:1

**helpful** 49:14,17

**helping** 78:14

**hey** 62:20 65:23 79:8 93:15 94:7 98:15 104:4 119:23 120:8,10,14 158:17 176:15 178:24 179:12 184:7 188:14, 15 189:19 190:3 202:24 206:21 222:18,19

**Hicks** 170:13

**hidden** 121:25

**high** 8:1,5 9:16,20,21 47:1 50:18,19,23 242:17

**highlighted** 236:9

**Hill** 67:10,11,12,13 89:3,24 95:18 157:17

**Hillary** 27:20

**hindsight** 109:5

**hindsight's** 48:4

**hire** 65:14 89:9,21 90:9 92:1

**hired** 40:1 51:7 53:18 90:14,19 91:4

**hires** 93:3

**hiring** 41:19 50:14,21 54:2 91:1

**hit** 170:6

**HOB** 171:21

**Hoekstra** 49:5

**hold** 42:4 48:2 127:20 130:8 202:21 212:3 224:12 234:22 236:3 239:5

**hole** 208:4

**home** 6:8 8:8,19 9:12 22:6,15 61:3 241:18 243:11,14

**homestead** 189:20

**homosexuality** 225:19

Todd Courser
01/28/2020

17

honestly 29:4,8 73:10 83:23 139:12,18

hooky 55:3

hope 103:17

hoped 106:20

hoping 106:4,16 147:6

Horr 68:4 101:24 102:4,10,12, 20 103:5 109:14 116:18 160:10 163:15 205:17 206:9 246:25

host 44:20 194:6 220:10

hostile 136:2 139:16 215:4

hotel 40:15,19 44:22 74:2,4,13 76:24 80:4 81:2,6,7 153:11, 12,13 154:6,16,17 157:8,9,19, 21 160:7,11,18 161:2,3,19,20 167:19,25 171:10,11 173:5,6, 12,13,14 174:1,21 175:1,5 176:6,13,23 179:13,14,17 180:7,9,19 181:15,16,20 182:5,6,7,8,13,15,18 183:2, 14,15,22 184:25 185:8 186:6, 14 187:1,7,10,25 188:25 192:14 193:22 194:14 196:23 197:4,6,9,16,17,21 198:16 201:3,5 202:15 203:1,21 206:22 207:6,13 208:7,24 209:2,6,9,10,14 210:4 213:1,2 227:8 229:10 232:20 234:10, 12,14,15,17 235:3,13,14,17, 20 240:20 244:3,7 245:9,14 246:1

hotel's 232:19

hotels 157:24 168:11 176:21 227:13

hour 50:9 64:4

hours 17:3 39:10 52:8,10 58:19 62:2 64:6 93:18 113:18, 21 122:11 139:24 140:3 141:25 148:13 150:18

house 13:9,11,21 14:1 19:7 24:8 33:25 35:4 36:15 37:11, 13,20,25 50:22 57:12 59:21 65:12,14,17 75:24 77:20

88:21 91:13 92:3,4,9,17 93:4, 5 107:6 108:19 109:9 118:1,8 131:17 141:2,4,17,23 142:15 143:8,14 144:3,5,6,8,10,17,19 145:12,24 146:3,13 147:16 150:24 151:7 155:10,18 156:9,14 164:18 171:20,21 174:5,6,14,17,21 175:2,6,10, 23 176:3 177:14,17 178:7,11 183:8,18 184:9,14 185:22 191:13,19 195:10,18,25 209:23 210:15 221:4,25 224:19,23 225:6,25 226:9,21 229:3 235:7 243:13

housed 17:23

huge 31:17 33:15

hundred 54:20 146:7

hundreds 233:14

hung 56:1

Huron 25:7

husband 77:23 79:5 84:4,5 164:14 190:11 235:2,9

husband's 36:6

hypothetical 213:22

hypotheticals 207:10 213:21

---

**I**

idea 23:20 44:17 47:22,23 48:24 51:23 53:5 77:21 80:14 111:23 112:4,7,11,12,13,17 113:3 115:21 121:20 122:12 123:5,7 132:7,22 138:3 142:18,20 143:4 159:17 187:5,6 190:22 201:14,17 219:20 221:2 222:20 231:1 233:11

identified 247:9

identity 227:15 228:2 229:21, 22,25

Ike 111:25 113:10,16,22,24 114:2 115:3,13 125:9 164:9, 10,23 165:9 224:8

illegal 200:16

imagine 142:18

Imlay 29:15

immediately 11:9 27:11 28:5,6 40:22 53:23 55:23 56:22 61:21 62:14 66:9 91:3 114:24 124:5 129:16,18,24 131:7 133:1,19

impeachable 191:24

impeachment 142:20

imperative 229:18

implicated 117:6

important 47:24

impression 87:14

improperly 148:3,7 149:23

improved 232:4

in-district 90:6

inaccuracies 219:15

Inbox 70:16 123:20 124:16 129:18

incapable 172:9

incident 80:14,16 82:1 179:12 182:13 183:4,21

incidents 186:13 231:24

inclined 105:14

includes 237:21

including 93:12 149:4 163:14 193:21

income 19:9,24,25 20:4,5,7

inconsequential 170:10

incorporated 14:22

incorrect 109:15 174:5 182:3

increase 35:2 108:22 188:22

increased 34:21

increases 138:1

incumbent 25:3 28:25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

18

indicating 17:18

indication 37:19 128:10
160:17 235:17

individuals 65:15 92:10
109:13 126:19

inefficiencies 19:5

info 236:9

information 40:7,10 44:8,10
49:18 51:9 68:19,23 72:6 82:4
87:4,5,11 90:7 92:16 102:5,7,
12,18,25 103:1,25 106:5,16
108:9 109:15 111:12 112:20
117:3 123:25 124:7,9 129:25
130:3 132:7 133:18,25 137:22
147:7 153:12 154:19,20,22
156:12,18 157:9,12 158:9,13
162:13 165:21 170:3 178:5
179:3,4,6,14,15,17,18 180:7
183:3,14 184:1,3,21,22,23,25
185:1,24 187:5,8,10,19,22
198:10,13 199:21 200:5,15
201:9 202:16,25 203:5,6,18,
20,22 204:12 205:3,21 206:6
207:6,12,17 208:17 209:7,14,
18 210:3,14 212:11,21,22
213:4 214:8 216:1,17 224:19
227:14 228:1,6,10,20 229:10,
13 234:19 235:5,9,18 236:14,
15,17 237:4,19,21 238:21
240:18 244:3,7 246:1,10,18

information's 245:14

informative 232:4

informed 226:7,10

initial 74:1 115:21 174:9,12
175:22 184:7

initially 81:22 130:21

inside 43:16 44:8,14 62:4
161:1 188:4,7,21,25 189:6,11
197:15,17,20 231:16

install 194:8

instituted 151:6

insubordination 93:18

intended 204:17 214:2 224:6

244:16

intending 132:15

intent 204:15

intention 223:15

interest 43:24

interested 138:3

interesting 231:19

interestingly 27:10

interests 232:19

interject 96:17 161:22

Internet 131:10

interrupt 54:9 66:1

interrupting 211:19

interview 130:22

interviewed 90:20 164:23

interviews 90:24

intimacy 237:3,8

introductory 98:15

invasion 212:7

investigating 220:3

investigation 75:23,24
100:21,25 116:23 141:3,9
144:12,15 147:16 150:2 160:8
196:2 244:11

Investigations 144:15

investigators 244:15

invoice 175:23 176:11,18,25
177:1,11

invoiced 185:22

invoices 174:4 176:2,5,8,10
177:12 178:15,17,18 179:3
181:6 185:24 187:8

invoicing 175:25

involved 36:23 51:9 66:14,17,
23 109:6 117:3,23 118:2
122:17 123:8,23 126:2,8
128:24 129:8,11,13 130:2,16

153:1 156:12 163:14 164:6,
10,15 192:13 196:16,22,25
197:3 198:1,4 200:4,15 201:3,
19 202:11 204:10,25 205:2
216:15,16 220:5,9

involvement 192:9 233:10

Iowa 51:16

irreparable 194:15,21

island 237:6

Israel 8:24

issue 17:23 33:20 74:8 84:3
85:24 97:1 105:11,17 112:4
177:24 178:11 180:18 182:3,
11 183:13 186:11 226:2 235:1

issued 141:10 144:10

issues 33:20,21 34:18 51:22
61:20 62:3 63:21 65:25 66:9
67:22 70:10 72:14 84:6 85:12
93:11 94:25 108:8 173:12,13
174:1,3 182:2 183:7,8,13
187:4 212:18 225:19

---

## J

J.D. 10:25

Jacob 8:24

Jan 29:6

January 4:2 29:22 32:17,20
34:1 54:1 55:7,12 62:23 63:18
64:14 65:9,10,18 66:5 69:1
89:20 94:4,15 96:7

jerk 134:23,24,25 137:4

job 11:19 41:3 48:2,9,11 54:17
56:25 57:23 59:3,6 63:2,25
65:6 92:23 93:11,19 94:8
108:7 139:18 152:15 155:2
210:15 211:18 228:15 231:22
239:24

jobs 12:12

Joe 36:6 40:18 68:3 74:20
75:10,20 76:1 79:8,9 80:20
81:15,16,19 82:2 88:11
101:19,22 102:7,14 103:5,6



Todd Courser
01/28/2020

19

106:1,25 109:14,17,19,21
110:1 116:18 117:1 126:25
127:1 128:19,21 129:1,5,6
136:18 158:13,15 161:5,7
163:13 166:4,21 178:19,21
180:3 182:13 183:13 185:11
188:11 189:13 190:3 194:2
196:18 197:15,17 199:12
212:21 229:8,22 234:1,5,17,
18,25 236:14 238:6,14,16,18,
21 239:9 240:14,15,16,23,24,
25 241:14,24 242:6,19
243:18,22 244:9 245:1,11,12,
24

**Joe's** 110:4

**John** 27:20 45:1,2

**joint** 89:22

**jointly** 114:10

**joke** 25:22,23

**Jonathan** 247:11,12

**Jones** 12:3

**Joseph** 36:6,7 39:17 76:25
77:3 164:3 192:3,18,19 221:2
233:14,17 245:17 247:1

**Josh** 26:4 57:21 129:3,7
222:9,13

**Josh/joshua** 51:2

**Joshua** 34:10 39:13,18,19
47:7,8 49:4 51:13 52:3,6,20
56:6 57:14 59:6 61:21 64:20
65:2 67:3 90:18 101:23
119:13 123:17 125:23 126:22,
24 128:20 129:12,16,24 130:1
131:14 215:20 216:20 225:10
226:2,11 233:12

**Joshua's** 56:12

**judge** 29:23 130:22

**judgment** 62:17

**July** 76:7 88:22,23 94:6,16
96:7 167:10

**jump** 42:4 188:3

**June** 28:18 67:14 76:7 90:17

100:18 101:5,13 104:3
165:20,24 166:5,14,18 218:21

**June/july** 219:1

**junior** 8:5,6

**Justin** 39:23 41:6,10,16 90:9

---

## K

**Kalamazoo** 78:23,24

**Karen** 15:9 16:25 17:12 19:17,
20 89:10,24 90:16,17 91:2,4,
10,19

**Keith** 34:10 39:13,21 40:16,22
41:18 44:16 56:7 59:6 61:21
90:22 101:22 123:17 222:24
223:1 233:12,14

**Kentucky** 193:15 196:20
243:7

**kernel** 219:7,17

**Kerry** 27:20

**Kevin** 24:3,6 141:3 143:7
144:11,13 178:10

**key** 108:24 229:19 230:18

**keycards** 161:11,12

**keys** 176:25

**KGB** 244:11

**kick** 142:19

**killing** 244:15,17,19

**kind** 15:6 27:10 29:7 30:25
47:25 50:20 52:8 53:8 56:25
58:13 67:23 86:5 92:20 93:2
98:14 103:17 121:6,25 123:10
163:11 226:11 227:9 242:11

**kinda** 17:23 18:25 26:19 31:7,
12 35:3 36:19 42:8 44:3 49:16
50:10 51:6,7 54:8,19 56:9
58:25 64:1 69:20 71:16 82:9
86:19 128:11 134:13 140:19
172:1 176:12 180:25 220:5

**kinds** 28:11,13 205:21

**Kings** 7:8,19,20

**knew** 30:16 31:5,24 33:4,21
46:14,22 48:9 50:13,16,18,20
51:14,23,25 55:14 71:17 75:8
81:2 84:12 88:11,15 101:18,
19,21 106:1,6 107:5 114:23
124:13 182:4,17,21 185:2
189:13 205:5,7,13,15,19
206:10,11,12,20 207:19,21
208:17 217:9

**knock** 36:21

**knowing** 84:21 87:21

**knowledge** 102:2 164:10

**Kohl's** 21:24,25

**Kostello** 4:5,8,13,14 5:9
42:20,23,25 43:6 45:20 50:3
63:11,14,16 64:21,24,25 82:7
96:19 97:4,11,13 103:16
110:10 112:23 113:2 115:25
116:8,22 118:13 126:13 127:7
133:6,10,12,16,21,23 134:10,
11 135:8,11,18,21,24 136:3,9
138:23 139:1,8,12,17 140:1,6,
9,13,16 143:5,25 144:23
145:18,23 146:5 148:19,22
149:2 151:23 152:2,8 154:2,8,
14 155:25 156:4 157:3 160:1,
3,4 161:25 162:7,9,15,17,21
169:19,23 170:5,12,18,22,25
171:2,6,8 177:4,6 185:19,20
190:10,25 193:3,7,10,11
196:10,12,13 197:24 198:21,
23 199:1 200:8,10 202:4
203:16 204:4 205:11,12
206:18 207:1,23,25 208:1,5,
10,13,16 210:2,10,13,18,20,
24 211:3,10,12,16,23 212:5
214:24 215:5,8,12,15,17
221:10,14 223:4,17,24 225:12
227:18,23 228:3,7,12,23
229:24 230:21 231:6,9 234:7,
13 235:21 239:16,21 240:17
241:2 242:2,8,20 243:4,9,20
244:2,18 245:13,25 246:20
247:6,11,14

**Krell** 192:2,3,10,11,18 193:12,
21,25 194:3,4,7 196:15

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

199:19 238:17,19 239:2,8,12, 14,20 240:11 241:17 242:23 243:2,7 244:10,14

**Kyle** 107:13

---

## L

**label** 237:10 238:2

**labeled** 227:2 231:13

**ladies** 90:1 97:3

**lady** 29:6,15 30:22 66:12 94:23

**lady's** 95:15

**Lake** 6:2

**landlord** 14:9

**language** 111:22 114:9 147:25

**Lansing** 34:3 45:4 48:11 50:15 52:21 53:11 54:1,10,16,19 55:6,12,19 59:9,11,17 60:4 61:4,8 62:18,21,25 63:1,2 64:2,14 65:10 66:4 69:1 89:13 168:10 171:16 175:9 189:14 190:3,12 202:16 224:17 237:6 245:8

**Lapeer** 9:21 12:6 13:9,22 22:1 23:6 24:25 28:21 46:18 48:12 54:10,11 99:3,4 110:25 127:13

**large** 141:10

**Larry** 216:25 217:3

**Las** 92:7

**lasted** 119:15

**late** 32:2 33:5 35:14 36:5,10, 12,13 61:2 93:18 111:2 113:21 165:20 241:8

**laughing** 244:23

**Lauren** 25:17

**law** 9:25 10:11,17 17:1,5,12,22 18:6 19:8,13 21:6,10 30:1 49:23 50:4 52:7 69:9,12,19,21 110:25

lawoffice@toddcourser.com 69:12

**laws** 199:8,10

**lawsuit** 138:20 192:5,20,22 215:9

**lawyers** 195:8

**lay** 150:21

**lead** 151:24

**leaked** 133:1 136:22

**learn** 103:11,12 139:9

**learned** 83:25 177:16

**leave** 176:12 229:20

**leaving** 67:21 96:24 176:25 189:20

**led** 141:9 150:23 151:5,8 152:14 209:18,19,23

**left** 17:3 20:4,5 65:20 66:12 122:8 157:15 184:22 189:24 242:25

**legal** 15:16 16:2,9 18:2 20:3 37:10 69:22 109:10

**legally** 213:12 230:11

**legionnaires'** 108:11

**legislation** 29:24 30:8 58:14, 16 108:24 137:25

**legislative** 56:15 57:8 92:16 93:12

**legislator** 142:22

**legislature** 30:6 62:4,11 142:23 150:19

**letter** 67:15,18

**letters** 58:12

**letting** 49:12 67:8 89:9 125:12 153:13 230:19

**leverage** 108:16 137:6 138:4,9 157:13

**liar** 149:9,18

**liberty** 31:16

**license** 52:16

**licensing** 12:1,13

**lie** 149:3 219:8

**Lieutenant** 28:12

**light** 111:12 131:2

**lightning** 54:19

**lights** 55:25

**likes** 188:16 242:18

**limited** 25:11 223:19 224:1

**lines** 18:12 68:12 91:8 94:10 95:22 96:12 111:3 137:15 181:16

**link** 116:23

**linking** 132:1

**list** 125:10 217:21,22

**listen** 106:13 121:9 158:21,24 159:1 161:14 172:4

**listening** 74:12,22 89:7,14 90:10 189:18 203:5 209:10 226:18 237:10

**literally** 36:21 54:22 216:7

**litigation** 128:8

**live** 13:18 14:18 15:13 51:16 74:13 75:14 193:13 220:12 243:12

**lived** 6:3 190:16

**Livengood** 44:19 45:5,22,24 132:3 140:19

**Livengood's** 45:6

**lives** 14:19 243:12

**living** 14:20 190:15 193:15

**Livingston** 219:25

**LLC** 13:4,10,14 14:11,12,14, 15,23 15:3

**LLM** 18:11

**lobbyist** 45:3,4

**local** 99:3,4 101:3

Todd Courser
01/28/2020

21

locally 29:23

located 13:5 55:20

location 13:6

locked 55:24 229:16

logistically 38:14

logs 114:6

long 6:3,14 12:11,12,19 13:14,
24 21:21,22 22:4 24:10 27:11
30:15 48:24 50:4 70:1 88:6
118:3 142:9 165:17 192:22

longer 12:5,17 129:3 141:25
152:10,23 153:5 165:18
208:24 209:15

looked 167:23 199:3 233:18
240:9

loose 88:17

Lord 171:7

lose 27:24 230:7

loses 27:4

losing 27:3 152:15 155:2
210:15 211:17

loss 8:12 33:9

lost 27:7,23 41:1 63:7,19
219:24 229:19

lot 4:23 22:22 24:20 30:8 31:3
33:11 35:16,18,21,24 38:25
43:5 51:5,22 53:7 81:22,24
108:15 118:23 124:21 136:5,
6,7 153:1 158:20,21 159:2
168:11 187:3 193:17 196:17
217:6,9 219:15 226:18 227:6
240:1,8 241:22

lots 44:23 66:14,15 220:5

loud 5:8

love 96:8

luggage 77:5

lunch 138:16,19 140:8

lying 165:14,15

## M

M-O-Y-E-R 216:25

made 22:12 29:10 34:2,7
37:13 52:9 57:17,18 72:4 74:8
89:1,5,17,19 91:21 111:25
113:5 114:14 122:16,24
125:19 132:25 134:2 136:16,
21 148:5 157:10 158:7 160:11
163:17 164:3 170:14 187:25
192:21 194:14 210:22 213:23
214:21 215:9 224:15

mail 159:5

main 13:21 14:15 39:11
109:13

maintain 231:21

majority 18:10

make 5:4 18:16 23:18 25:25
34:13 42:5 51:12 57:14 58:9
59:4 65:15 94:18 100:13
103:25 105:10 106:23 116:3
119:24 125:14 133:11,14,17
136:6,7,15 145:20 152:5,12
159:24 161:25 162:8,9 181:12
202:7,20 224:14,21,24 227:21
230:1 238:9,22 239:8 240:4
244:15,19

makes 229:2 240:11

making 58:2,3 89:11 91:9
119:5 215:22 239:18

man 25:16 101:23 102:4
110:21 111:25 237:4

manage 39:4

management 173:5 174:2
181:1 183:15 186:6,14 227:8
232:4

manager 26:2,3 93:5 177:19
180:20,21,24 181:15,16,17,20
182:1,11,24 183:2,23 186:18
187:21 231:17,20,25 232:14

manager's 231:18

managers 173:6,14 177:19
180:22 181:14,20 182:1

186:6,16

managing 58:3

manner 208:15

manual 187:21 200:18 231:14,
16

manuals 154:18

March 63:6,18 66:7 78:2 79:6
82:23 83:10 85:9,13 87:19
88:9,12 103:6,23 104:16
105:25 106:14,17

mark 223:2 231:4 232:24
235:23 236:19 246:2

marked 97:9,14 110:9,11
118:12,14 126:12,14 140:15,
17 190:24 191:1 221:18 223:7
231:11 233:1 235:25 236:21
238:4 246:5

married 6:14,20 22:14 84:4
225:20

mass 113:17

master 125:5

material 105:8

math 7:25

Matt 42:7 135:11 139:12
148:19 154:9 161:25 192:25

matter 4:15 15:25 81:4 91:4
97:16 125:2 147:21 191:4
203:11 205:25 206:20,21
207:4,14,16 208:2,3,6 246:24

matters 212:8

meaning 191:19 204:23,25
219:17

means 58:15 150:8 203:25
204:5 212:20 213:9,18

meant 150:9 175:16 214:25

Meat 11:24

mechanism 105:19

media 132:5

medical 150:22



Todd Courser
01/28/2020

22

**meet** 36:8 59:22 148:13
177:19 191:18,23 215:25
223:12 226:4

**meeting** 58:7,8,10 59:21,25
60:17,19,21 61:2,7,14 62:11
86:11 104:9 110:22,25 111:5,
8 112:1 113:14,21 119:9,15
120:21 121:11 123:17 148:15
182:24 183:2,17,22,25 184:7,
10 186:17 221:23 234:24
245:5

**meetings** 57:4 58:23 64:12
90:5 124:14 149:6 181:14
183:15 185:1,21

**meets** 30:6

**Megie** 14:17

**Meijer** 11:20

**Melinn** 107:13

**Melissa** 165:1,8

**member** 38:25 90:23 191:12
225:11

**members** 34:14,16 38:24
39:8,11 63:19 156:11 226:16

**memory** 16:15 169:14

**mentally** 21:2

**mention** 240:11

**mentioned** 18:19 39:14 45:5
51:19 59:16 69:13 73:22,24
218:11 236:25

**meshed** 62:9,10

**message** 40:12 46:8 71:22
113:20 119:3 127:15 131:13
158:19 206:8 236:1,11
237:14,16

**messages** 40:12 55:2 66:25
71:19 72:15 75:20,22 76:5,10,
11,20,22 80:23 83:1,2,11
90:11 97:22 103:3 104:12
109:11,14 110:7 113:25
114:5,24 117:16 118:21,24
120:24 121:3 124:14 126:9,18
127:25 128:1 129:18,23 131:6
158:23 159:10 163:16 185:7,

11,14,16,25 189:22 192:11,
13,15,17,18 194:2,4,11
195:14 196:16 197:12 198:4,
12 204:8,11 205:17 209:1
214:16 220:19 246:24

**Messaging** 215:24

**messed** 188:15

**met** 89:15 109:9 111:14
142:24 173:11 179:11,20
180:19 181:18,19,20,25
186:16 223:9,11

**Metamora** 14:19

**method** 93:13,21

**Michigan** 4:1 6:2,21 9:24 11:2,
13 15:18 19:7 27:12 37:12
70:4,6 75:23 76:1 99:7 100:7
117:6 160:9,16 164:23 165:14
193:13 215:22 220:3 243:12

**mid** 48:6

**middle** 23:21 83:9 245:19

**midnight** 142:12

**might've** 66:6 69:4 72:13
88:12 183:6 198:13

**mind** 55:1 135:6 143:14 151:4
155:16 156:7 186:9

**mine** 56:1,6 68:13 184:16

**Minus** 140:1

**minute** 59:3

**minute-by-minute** 81:5

**minutes** 113:7 114:15 119:14,
16 123:18 139:24 140:3
159:23 195:9 237:7,8 242:4
245:7 247:4

**MIRS** 107:14,15,16

**misconduct** 144:20 145:5
146:13,16,24 147:15 150:5

**misgivings** 53:22,24 55:10
56:20 122:23

**misleading** 202:19 212:7,18

**misremembering** 72:22

**misrepresentations** 201:22

**missing** 114:16 119:14 123:18
241:20

**mistaken** 112:17

**misused** 150:5

**Mitt** 27:22

**mixed** 118:24

**Mm-hmm** 109:17 110:3
111:16 114:7 118:10 125:11
130:24 198:6 215:5,12 216:19

**MOD** 231:25

**mom** 46:14 50:24 51:14,17
106:2

**mom's** 51:15,21

**moment** 31:22 54:20 62:7

**Monday** 235:15

**Mondays** 59:13

**monetary** 198:14

**money** 34:13 51:12

**monitor** 232:16

**month** 79:3,4 83:11 167:10

**months** 21:22 22:5 100:10
101:12

**months'** 118:2

**morning** 60:16,23 61:9,10
130:7 243:24 245:2

**mortgage** 12:5,8,10

**mother** 22:19 85:11,14,19
86:3,13,20 87:13 206:12

**motivation** 109:17,19 110:4

**motive** 202:14

**Motor** 52:14

**Mott** 7:14 9:23 10:1

**mouth** 4:24 219:18

**move** 88:17 91:14 139:3 172:9

**moved** 12:4 13:25 15:12,15
89:12 90:12 92:7 180:20

Todd Courser
01/28/2020

23

193:16

**movement** 33:14,19

**moving** 6:5 180:23

**Moyer** 216:25 217:3

**multiple** 39:9 70:5 118:9
180:19 186:6 187:3

**Murphy** 6:2 127:9,10,11,14,21
128:13

**Muskegon** 226:5,6,7

**N**

**N-A-M-F-O-N** 6:11,12

**nail** 170:6

**naked** 208:8

**name's** 4:14

**named** 6:22 25:17 90:9 101:23
102:4 110:21 111:25 192:4
217:3 237:4

**names** 46:15 173:14,17

**Nano** 165:1,7,20

**nature** 18:6 109:7,8 215:3

**necessarily** 144:19 220:7

**needed** 47:19 50:11 54:25
58:4,8,10,18 110:6

**Needless** 105:25

**negate** 153:10

**news** 45:7 140:19 187:23

**News'** 195:8

**newsletter** 217:22

**newspaper** 130:19 131:10

**newspapers** 132:5

**night** 60:20 61:4,8 80:15 111:2
112:8,15 113:10,21 129:23
176:22 234:4 245:5,19

**nightclubs** 123:13

**Ninth** 9:10

**nobody's** 187:1

**nodding** 5:7 174:10

**nods** 5:10,14

**nomination** 26:12,16

**nonetheless** 53:16 174:19

**noon** 241:10

**normal** 54:17 93:19 144:12
148:13 238:9,22

**north** 6:21 220:11

**note** 95:20

**noted** 76:23 217:12

**notes** 95:21,23 233:15

**notice** 4:10 127:16 226:24

**noticing** 55:11

**noting** 76:22

**November** 6:25 27:1 34:8
53:22 55:10,11 62:23,25
168:3 169:1 175:22

**November/december** 174:22

**number** 11:15 18:22 74:9
97:8,18 98:22 99:15,16,19,25
110:8 118:11,15 119:2 125:8
126:11,15 128:11 140:14
181:4 185:5,8,10 190:23
201:10 217:12,14,16,19
220:15,16,17,19 223:6,15
227:15 228:6 231:2,3,10
232:16,25 235:24 236:20
238:3,16,17 244:5 246:4

**numbers** 57:19 154:23 228:17

**numerous** 148:14

**nursing** 52:15

**O**

**object** 127:4 135:15,16 145:14

**objecting** 162:12

**objection** 82:5 112:19 115:23
133:3,20 134:6 135:14,15,17,
20,23 143:2 144:21 145:20

146:1 148:17 151:21,25
161:23,24 162:8,9,11 177:2
197:22 202:1 204:2 205:9
206:17,23 209:25 210:7,16
211:2,7 214:23 223:24 228:3,
7,12,23 229:24 230:21 241:2
242:8,20 243:4,9,20 244:2,18
245:13,25

**objections** 135:11,13 162:1

**obligation** 208:25

**obtain** 10:1

**obtained** 102:6 209:14 213:4

**obtaining** 102:18 117:2 203:4

**obvious** 65:19

**occasion** 55:17 177:18

**occasionally** 15:4

**occasions** 218:12

**occupant** 14:5

**occupying** 48:16

**occurred** 183:3 203:23

**occurring** 220:20

**odd** 217:18 243:23

**offense** 191:24

**offensive** 27:21 134:14,20
136:7

**offer** 48:11 228:25

**offered** 53:16

**office** 13:19 21:15 23:2 24:13,
18,19 26:6 27:9 31:21 32:25
34:3,4,16 35:5,11,23 36:20
38:12,17,23 40:23,24 41:5,8,
18,20,21 43:15,18 44:13
45:25 46:11,25 47:3,15,21
48:11,12,17,20 49:7,10 51:3
52:21 54:7,10,11,16,17 55:21,
22 56:1,6,7 64:3,4,6 65:23
66:2 69:9,12 73:25 74:16,23
75:2,17 76:12,15,18 78:13,15
90:3,12 91:13,15,18 92:3,4,9,
15,17 93:1 94:20,21 100:20
101:7 109:20 110:25 116:21

Todd Courser
01/28/2020

24

118:4 122:10 123:9 125:17
129:4,15,16 132:18 134:3
136:17,21 137:8,20 141:11
142:1,3,22 144:11 146:16
147:15 151:17 155:19 156:10,
14 157:15 169:3 171:22
177:17 179:21 191:17 194:25
195:1,12 198:7 223:9 224:17,
19,23 225:6,10,22,25 226:13,
21

**officer** 104:6 215:23 216:13
217:2,11 218:2,8 219:9,20
220:3

**offices** 34:18 39:24 56:9 76:21
90:1 147:22

**official** 56:12 57:7 62:5,11
144:12,16 147:21

**oftentimes** 229:16

**oldest** 6:22

**one's** 176:20 237:1 244:9

**ongoing** 22:14

**online** 22:22 202:23

**open** 25:10 29:1 50:22 80:4
93:19 96:4 188:18 230:18
239:1

**operate** 13:14 34:17

**operating** 13:10 30:1 51:10

**operation** 94:24

**operations** 232:16

**operators** 228:17,18

**opinion** 155:7 195:16 227:24
230:5

**opportunities** 53:14 55:15

**opportunity** 170:12

**opposed** 109:21 136:18,24

**opposing** 51:8 69:24 71:10
230:6 244:22 246:13

**opposite** 30:20

**option** 176:16,17

**order** 111:9 120:13 124:18
170:13,24 199:9 202:7 214:2

**ordered** 141:3

**organization** 31:20 48:19

**organized** 17:11

**orientation** 168:2,21 174:9,12

**original** 112:13

**originally** 125:11 192:4

**originator** 12:10

**Outbox** 124:16

**outrageous** 214:17,22

**overriding** 209:16

**overstating** 56:17

**owned** 243:13

**owner** 19:4

**owners** 198:16,18

**owners'** 58:7

**owns** 14:12,14

---

**P**

**p.m.** 97:12 110:8 111:2 118:11
119:10 126:11,24 140:12,14
156:5 160:2 185:18 190:23
193:8 196:11 223:6 231:10
232:25 235:24 236:20 238:3
242:25 246:4 247:7,15

**P69829** 11:16

**pages** 37:14,16 117:11,17
118:18,19 141:12 146:7,9
221:18,20,22 222:22 223:4
231:13 236:23,24

**paid** 34:13,14 53:2,5 62:6 93:1
174:7,17,19,20 198:13
202:17,18

**panel** 141:17

**paper** 92:17 93:14 127:16

**papered** 94:7 97:6

**papers** 226:23

**paragraph** 191:10 193:18,19
194:7,12,17 199:6,18 200:6,8
201:20 202:19 203:4 212:6
213:6 214:1,6

**parents** 50:17

**part** 19:2 22:16 33:17 50:14
77:7 103:19,21,22 109:18
122:14 144:20 145:5,6 146:25
151:5,8 152:9 153:4 175:1,5
191:12 196:5 197:25 212:17
219:8 233:23

**part-time** 30:5 65:21

**part-timers** 39:9

**partial** 195:3,5,7

**parties** 76:6

**partnership** 14:10

**parts** 129:9

**party** 26:12 27:12,13 30:17,19,
25 31:1,11,16 32:1 33:10
43:17 44:3,15 127:11,13
220:10

**Party's** 26:16

**pass** 11:6 109:1 125:18

**passed** 11:9 16:5,8

**passing** 15:16 40:11 102:19
234:23

**password** 73:9

**past** 218:15

**paused** 130:7

**Pavlov** 25:18

**pay** 175:11 184:8 236:9,13

**pay-for-sex** 66:18

**paying** 50:8 174:7

**payor** 174:14

**payroll** 49:20 50:4 52:6 53:20,
21

**pays** 236:16

Todd Courser
01/28/2020

25

**Peabody** 29:6

**pending** 5:20

**penises** 66:11

**people** 15:25 23:15 25:15,16
27:22 29:8 31:6,16 33:16
34:15 35:3 44:6,20,21,22 46:4
51:6,10 53:13 55:13,15 70:10
73:20 86:17 90:21 106:23
108:10 115:1,12 123:2 124:2
125:6 128:12 131:7 133:5,15
153:1,4,13 154:23 156:22
157:8,17 163:13 186:18 187:9
198:1,3,9 199:20,21 202:23
204:11 209:2,9 217:9,23
223:15,18,21 224:7,23
236:13,17

**percentage** 19:25

**performance** 63:3,25 92:23
93:11 94:8 104:13,15 226:20

**period** 83:17 162:1 175:10
177:14

**person** 23:22 34:15,22 35:6
39:3 49:15 86:11 90:22 92:24
93:3 94:22 95:1 114:20,22
121:17 180:25 187:15 192:3
217:3,10 223:25 229:2,3
230:19 231:2 247:10

**personal** 54:8 68:8 69:11
71:3,7 102:25 109:8 147:21
148:3 153:7

**personally** 33:4,6,7 175:3

**perspective** 92:22 245:23

**Phil** 25:18

**Phoenix** 92:8

**phone** 32:4 35:21,25 58:1
70:16 72:4,6,14 73:20 74:4,20
76:19 79:2,3 80:24 86:10
98:10,16 99:15 100:2,23
101:1 102:4 112:1 119:2
128:11,14 129:4 161:13 181:4
185:11 188:12,18 192:19
217:12,14,16,19 220:15 221:1
229:3 233:13,18 235:10
236:25 238:6 245:9,19

**phones** 74:19

**photo** 188:22

**photographic** 237:12,21

**photographs** 188:3,6,9,11,20,
24

**photos** 188:4,13,17

**phraseology** 114:14

**phrases** 114:14

**physical** 36:2,25 37:3,8,22
55:21 64:4,6 78:18 176:11
219:3 235:3

**physically** 38:12 55:20 56:4
197:5,8,17,20 219:2

**pick** 64:21

**picture** 167:2 238:10,23,25
239:7

**pictures** 65:20,22 66:11,21
81:8 91:8,20 96:23,24 105:14
161:6 182:8 209:10 224:16
240:10 243:16

**piece** 108:24 223:1

**pieces** 49:3,18 77:22 87:4
110:6 120:25 123:25 188:12
196:6 233:5

**piped** 129:7,14

**place** 75:24 76:12 88:22
101:25 110:25 157:19 162:4
164:7,18,25 166:16 168:16
179:22 186:19 217:10 235:4,5

**places** 10:15 157:24 158:2

**placing** 165:7

**Plaintiff's** 97:18 118:15
126:15 221:18

**plan** 56:4 125:5,13 129:14
244:20

**planning** 18:9 30:3 140:6,9

**plans** 6:5 97:10

**plant** 40:2,3,4,15 44:11,16
153:14 209:10

**planted** 44:12 157:11 161:9
162:19 163:20 164:21 240:1,4

**planting** 155:4 161:1,4,7
163:18 189:18

**plants** 240:3

**play** 154:25 155:2,18 156:8

**played** 153:4 196:5

**playing** 55:3

**plenty** 246:24

**PLLC** 16:19,20,23

**plot** 116:24 117:4,7,24 118:3
123:9 128:25 129:20 132:17,
21 136:17,20

**plotters** 134:7

**ploy** 137:23

**pocket** 175:11,20

**point** 15:24 16:1,2,12 18:21
19:3,6 23:4 28:11 29:1 30:24
31:14 33:8,11,23 36:14,15
37:3 41:12,13 48:6 49:6 56:19
61:24 63:10,14 72:7 73:17
74:16 75:1 77:24 78:17 80:12
84:23 85:23 86:3,14 89:18
94:5 101:18 104:23 105:12,17
107:3,22 108:9 114:4,18,20
117:12 121:15 122:21 123:24
125:16 126:1 129:3 130:24
139:9 141:16 143:7 150:24
151:24 171:9 172:11 175:7
176:2 178:3,13 179:9 182:4
183:23 185:5 186:23 187:15
190:14 194:5 199:19 207:12
209:16 216:13 225:5 230:16
244:13

**pointing** 71:12 121:7,8 125:3
201:2 212:12

**points** 80:13 142:6 180:14

**police** 37:12,20 38:1 72:3,22
74:18 75:23 76:1 78:20 98:25
99:3,4,7 100:8,11 101:9
104:2,3,6,8 116:23 117:7,19,
25 124:19 125:12,15 130:22
147:3 149:8,21 155:13 160:9,

16 164:23 165:14 215:23 216:2,13 217:11 218:2,8 219:5,9,16 220:4 233:9,11

**policy** 230:20

**politely** 228:20

**political** 26:7 43:17 51:7 62:7, 10,12 69:10 101:3 109:7 125:22 132:18 137:2 148:4 234:19 237:5

**politics** 44:6 47:20 108:6

**pool** 224:1

**porn** 66:14,15

**pornographic** 65:20 96:23 104:19,20 105:8,14

**pornography** 91:20 156:17 224:16

**Port** 25:7

**Portage** 4:1 78:24

**portal** 180:15 187:2 201:8 202:23

**portfolio** 180:15 181:12 187:7

**portion** 113:6 150:1

**position** 30:18 32:1 44:7 45:24 46:11 47:15 65:13 67:4 105:9 115:18 150:23 151:7 191:14

**positions** 53:16 54:15 88:20

**positive** 222:10

**possession** 128:7 188:1 194:19

**possibilities** 31:13 231:24

**possibility** 37:24

**possibly** 58:16 234:8

**post** 105:6

**potential** 241:21

**powerful** 44:7

**practice** 10:15 12:14,15,24 15:17,21 16:2 17:1,5,12 18:6 19:13 21:6,10 43:16 49:23,24

50:4 52:7 177:5

**practices** 30:1

**practicing** 16:6

**prayed** 122:6,15

**precipitated** 83:13 156:25

**prefer** 139:22 171:11,12,14

**preliminary** 130:23 218:21

**premises** 232:16

**prep** 11:12

**prepare** 232:2

**presented** 112:21

**Press** 103:11 130:24 131:10 136:23

**pressure** 108:17

**pretty** 15:22 22:21 33:15 43:15 52:22 65:18 83:9 84:3 112:15 117:8 130:1 145:19,21 146:23 148:23 152:19 156:20 170:9 213:24 217:12,14,16, 17,19 218:18 230:11 231:20 244:5,6

**previously** 140:21

**primarily** 58:23 60:3 68:19 69:23 71:7 129:4,6 147:21

**primary** 23:11,12,13,15,18 25:9,15,16,25 28:19 29:3,10 52:22

**Primo** 120:24

**printed** 238:7

**prior** 72:16 112:1 182:21

**priority** 227:12,21

**privacy** 153:11 179:7 208:24, 25 209:7,9 213:5 227:10,17 230:8 231:21 246:8,11

**private** 87:6 203:4 212:8 235:13 244:14 246:10

**probate** 18:9

**problem** 32:16 55:23 63:13 105:10,13,18,19 108:10 128:9

137:1

**problems** 53:23 65:18 96:6 232:18

**procedure** 4:11 151:6 229:19

**procedures** 231:23

**proceed** 119:5

**proceeding** 161:24 169:17

**proceedings** 242:25

**process** 4:16 93:24,25 95:9 123:1 132:16 133:7 138:7 168:4 191:21 201:21

**produce** 162:14

**produced** 56:25 97:15 128:1, 8,10

**Production** 97:19 118:15 126:15

**profession** 16:10

**professional** 16:16 54:14

**professionally** 50:20

**profile** 179:22 180:4

**profiles** 40:10

**profit** 201:21,25 202:3,5,8,14

**program** 10:3 180:13

**project** 17:11 40:6,8 52:12

**promises** 59:5

**Prop** 108:20,21

**proper** 228:19 229:19

**properly** 224:24

**property** 89:4

**proposed** 34:9,10

**proposing** 34:12

**prostitutes** 124:21

**protect** 122:4 208:25 209:8

**protection** 186:25

**protective** 170:13,23 235:5

**provide** 167:6 191:21,22

192:24 198:10,13,25 200:4 201:7 205:4 208:17 228:15 235:8

**provided**  99:13 160:12 161:21 198:15,24 200:14 202:16 203:18 205:3 206:6 214:7 232:23 237:4,19 240:19 241:3 245:14

**providing**  156:12 199:20 203:20 204:12 208:14 244:3 246:1

**public**  23:2 24:17,19 26:6 32:25 106:5,7,8,9,10,17,21,24 107:3,23 108:1,4,9 125:15 232:20

**publication**  212:6

**publicly**  114:17

**published**  212:9,12,14,18,19, 20

**publishing**  195:2

**pull**  72:6 161:12 188:10

**pun**  244:15,21,23

**purchased**  164:17

**purportedly**  159:6 160:6 189:5,11 215:25

**purpose**  109:7 136:20 165:7 183:25 201:6 224:3 231:15

**purposes**  4:10 69:10 71:6,7 148:4,8 149:24 168:1 171:24

**purses**  77:5

**pursuant**  4:10

**pushed**  44:3 45:24 115:6

**put**  30:25 48:13 93:14 121:1 127:16 134:4 135:6 142:12 144:18 157:12 162:4 167:3 169:9 176:22 179:10 186:25 204:24 219:4,17 229:1,3 242:16

**putting**  27:22 49:16 101:25 166:8

### Q

**quarter**  20:1

**question**  4:25 5:3,4,5,20 42:5, 17 53:4 55:10 59:19 63:15 64:18 65:4 67:3 71:17 82:6,16 87:17 91:24 94:4 96:3 100:4 103:15,19 106:13 112:11,20 115:24 120:23 121:10 127:4 133:3 134:2,9,15,16,21 135:19,25 136:10,11 137:1 144:22 145:10,16,21 146:2 148:21,23 149:15 151:22 152:1,20 154:1,3,4,5,11,12 156:2 158:22,24 159:1,2,4 161:10,14 162:10,12,18 163:1 172:4,18 173:22 182:22,24 188:19 189:4,25 190:9 195:16,20,22 196:21,24 197:1,8,23 200:22,23 202:2 204:3 206:24,25 207:15 208:21 210:9,10,12,17,25 211:6,7,11,13,20,22 216:5,7 221:8

**questions**  4:23 45:14,18 138:19,22 139:3,10 146:23 161:18,20 167:4 170:19,22 171:3,6 172:5,20 173:15,16, 23 211:24 215:3 216:14 221:11 230:5 238:8 247:8,13

**quick**  26:14 196:10

**quicker**  158:20,21 159:2

**quiet**  103:10 236:13

**quit**  64:19 65:6,7,13 67:19 225:10,12,16

**quitting**  65:2

**quote**  118:9 155:6

**quote/unquote**  72:8 98:1 151:19 155:17 156:7

**quotes**  219:17

### R

**race**  23:10 33:18 36:9 51:9,10

219:24

**radio**  220:10

**Radisson**  79:13 80:25 138:21 157:19 158:7 159:7,12 160:7, 11,18 167:19,25 168:4,9,15 171:9,24 173:4 174:21 180:13 181:15 182:1 193:19,20,22 194:8,13 196:15 198:6 199:20 200:12,13 202:9,15 206:7 207:13 209:6 227:8 230:7 231:14 232:11 236:10,17,25 237:13,24 241:5 246:7,10,15

**raised**  174:1 182:11

**ran**  23:2 24:17,19,20,24 25:9 26:6 27:9 28:16,21 30:17 31:19 32:16 33:6,23 35:23 40:24 41:2,3,18 48:22 61:2 94:24 217:24 219:23

**Randy**  220:2,5,7

**Rapids**  41:8

**Rarely**  163:24

**rate**  171:19

**rationale**  34:12 142:25

**Ray**  215:18,19,23 216:16

**Raymond**  14:17,18

**re-ask**  5:4

**reach**  84:22 86:2

**reached**  43:8,14,23 52:20 113:11,16,22 114:1,4 216:11, 17

**reaching**  115:1

**reaction**  84:16,24

**read**  58:18 87:20,24 88:1,5 98:12 117:8,9,14,19 122:7 125:4 127:2 128:11,22 137:24 143:8 145:22 146:10,11 147:2 155:6 160:14 191:5 200:17 202:21 214:13 227:4 238:8

**reading**  58:15 67:24,25 68:6 70:20 76:9 118:19 120:7,11 128:4 147:8,11,12,13 148:23, 25 149:7,10,16 150:1,6



Todd Courser
01/28/2020

28

155:11,12

**real** 121:9 162:18 220:1

**realize** 79:8 107:4 119:3

**realized** 64:16 73:12 89:13
  107:25 176:2 182:7

**realtor** 14:21

**realty** 27:18

**reason** 34:12 60:4 67:5,20
  69:6 90:23 111:5,8 142:14
  143:15,21 144:1,4 152:9,11
  198:14 201:5,10,13

**reasons** 96:20,22 132:18
  166:6

**reassign** 93:24

**reassigned** 105:1

**reassigning** 105:12 156:22

**recall** 79:25 118:19 126:16
  147:8,11,13,18,24 148:2,6,16
  149:7,22 150:1,6 177:22
  186:19 216:2 217:5 246:16

**receipts** 181:6

**receive** 10:5 34:19,20 99:24
  233:21

**received** 10:25 34:21 71:19,22
  72:13,15 82:11,12 97:23
  98:19 99:21,22 106:14,18
  107:9 180:10 206:8 236:7

**receiving** 73:12 80:24 81:3
  99:14 111:15 114:25 116:16
  123:7 178:15 180:7

**recess** 64:23 97:12 140:12
  160:2 185:18 196:11 247:7

**recognize** 221:20

**recognized** 225:24

**recollection** 51:24 72:21 84:8
  165:16 169:11,13 219:13

**recommendation** 89:2 141:21

**recommendations** 65:16
  114:14

**recommended** 141:18

**record** 4:6,8,24 18:17 64:22,
  24 67:2 97:11,18 105:21
  135:14 136:1 140:11,13 156:5
  160:1,3 162:5 185:19 193:6,9
  196:12 222:19 244:22

**recording** 73:23 77:1,4,10
  81:9 89:5 90:13 120:25 121:1,
  2 149:8 155:4 158:8,17 159:6,
  10 160:6,17 161:1,4,8 162:19
  163:8,10,14,18 167:18,20
  189:17 195:2,4,5,7 246:14,19
  247:2

**recordings** 37:21 40:19
  157:10 158:6 159:18 160:11
  163:6,18 164:3 187:24
  194:14,15,16,17,18,20,21
  222:9 233:18,21

**records** 161:13 169:6,9,15,17,
  18,21 170:1,2,9 233:13

**recover** 20:10,13 160:10

**recovered** 100:1 160:13,17

**recovery** 73:9

**rectified** 178:3

**redacted** 113:7 119:2

**redo** 184:14

**reduce** 19:4

**reduced** 18:21

**refer** 137:12 142:16 145:4,8
  146:4,12

**reference** 74:8 76:11 88:3
  188:4

**referenced** 73:23 74:2

**references** 122:24

**referencing** 237:16

**referred** 97:24 140:18 194:17
  199:17

**referring** 87:19 113:1 146:19
  151:3 192:17 199:11,15 200:2

**reflect** 4:8

**refrain** 227:14

**refresh** 169:14

**refreshes** 72:20

**refused** 105:2 150:21 162:13
  179:1,4

**refusing** 90:4 150:19

**registering** 225:25

**reimburse** 175:16

**reimbursed** 175:5

**reimbursement** 175:6

**related** 40:10 108:8 132:7
  146:13,25 153:12 156:18
  173:12,13 174:6 177:24 183:7
  187:4 195:2 205:18 211:17
  216:18 223:12 231:23 236:15
  240:8

**relationship** 36:2,25 37:2,8
  52:2 62:16 80:21 140:20
  219:3

**release** 137:22 195:4,5,7

**released** 113:6 114:16 133:17
  134:4

**relevance** 229:7

**relevant** 51:3 138:24 193:14
  216:12 230:24

**remain** 22:13

**remarried** 15:15

**remember** 16:25 17:2 20:24
  26:5,8,10,13 29:4,9,15,16
  33:12 35:12 36:3,17 37:25
  38:8 47:14 49:3,4,8 50:5,8
  51:15,22 52:18 53:7 65:3
  67:22 68:22 71:24 75:13
  83:15,17,19,23 84:1,10,17,23
  85:3,4,8 86:12 88:2,5 95:14,
  24 99:24 100:17 101:6 104:7
  107:11 111:24 112:13 113:9
  125:14 147:2,12,19,25 148:9,
  25 149:8,10,16,25 155:11
  157:23 158:1 165:23 166:20
  173:18,19 176:10 177:1,25
  179:21 187:12 217:1,7,8



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

218:4,5,7,8,14 219:9

**remembers** 148:22

**remotely** 15:12 201:1 208:11 210:20

**removal** 146:16 194:25 195:1, 12

**remove** 109:20 118:3 123:9 125:17 137:8,19 138:2 141:22 142:1,21 155:19 156:9 191:17

**removed** 80:5 90:3 91:18 123:25 132:17 152:15 198:7

**rent** 14:3,4 49:9

**rep** 25:17

**repeat** 87:17 156:1,3

**repeated** 156:5

**repeatedly** 109:10 129:9 193:21

**rephrase** 5:4 155:21,23

**replace** 62:20 89:10 90:19

**replies** 239:9

**reply** 121:23

**report** 37:12,14,20,25 38:1 43:19 91:25 94:25 100:11 117:19,22,25 131:2,9 132:1, 11 141:10,12,14 143:8,14,20 144:3,10,19 145:2,4,5,8,11,22 146:4,7,9,10,11,13,17,18,20, 21,22,24 147:3,8,13 148:1,2, 18,23 149:11,18,22,25 151:13,17 155:6,12 156:19 157:2 160:14,17,22 164:24 186:11 196:1 215:22 217:12 218:11 219:5,16 233:9,11

**reported** 78:20

**reporter** 5:8 43:1,4 45:6 107:11 156:5 237:5

**reporter's** 4:21 134:4

**reporters** 106:24 107:4,7 124:13 130:20 131:17

**reporting** 125:11 130:24 216:13

**reportings** 147:3

**reports** 37:11 128:9 146:3 160:21,23 186:12,15 232:2, 10,23

**represent** 4:14

**representative** 23:5 28:17 29:20 30:4,11 32:23 37:11 41:10 58:9 60:23 62:8 101:14, 15 105:13 147:9,10,14 148:12 149:23 150:2,3 152:10,15,24 153:5 209:15 219:23

**Representatives** 19:7 24:8 34:1 36:16 37:13 57:12 93:9 118:4 147:22 148:3,7 150:25 155:18 156:9 174:5,7,15,17, 21 175:2,6,24 176:3 177:14 183:9,18 184:9,14 185:22 191:13,20 195:11 209:23 210:15 226:9 241:11

**Representatives'** 149:4 195:18

**representing** 154:16

**represents** 232:20

**reprimands** 96:11

**Republican** 23:13,15 24:4,5 25:3 27:12 32:1 41:8 44:3,14 220:10

**reputation** 31:24

**request** 229:2

**requested** 232:2

**requests** 92:17 148:14

**required** 90:5,6 148:12 149:3

**requirement** 30:19

**requiring** 152:4

**reread** 145:8 156:4

**reservation** 184:21 230:3 234:19 235:15

**reservations** 81:3 169:12 235:6,18 245:3,12

**reside** 6:7 78:22

**residents** 46:18

**resides** 221:3

**resign** 137:20 191:14,20,25

**resignation** 225:21

**resigned** 67:4 90:18 142:2 150:12,14,16

**resigning** 122:4

**resistance** 90:25

**resolution** 18:10 147:17

**resolve** 232:17

**resolved** 180:18

**resources** 148:4,8 149:24 150:5

**respond** 5:11 114:22 232:17

**responded** 54:25 122:9

**responding** 58:1 90:4

**responds** 242:23

**response** 226:24 228:19 241:18

**responses** 124:5,6 199:2,4

**responsibilities** 57:24 62:5,7 213:11

**responsibility** 152:17 153:7, 14,17 154:5,6,17 227:14 230:9,10,12 231:18,20 232:15

**responsible** 133:2 175:8

**rest** 30:9 81:11 102:7 113:6 141:13 202:10

**restroom** 5:23 150:20 159:19 185:17

**result** 75:22 112:10 141:21 195:1,5

**resulted** 194:25

**retained** 90:18

**retired** 92:5

**return** 121:23 148:15

**reveal** 114:22

revealed 174:4

review 145:4 147:16 169:10

reviewing 227:5

revisions 170:14

Rewards 180:13

rights 230:8 246:8

rise 55:16

road 6:2 108:14 190:16 220:12

rods 54:19

role 155:2,18

roll 138:6 154:8 156:8 216:8

rolled 153:22 154:6

rolling 134:14,17,18,19 136:5
138:7 153:21,22 159:16 172:2
216:3

romantic 149:5

Romney 27:2,22

Ron 51:14,19

room 74:13 76:24 79:23 80:7,
12,13 81:2,7 153:13 154:22
157:8 161:3 168:19 179:13,
17,25 182:5,6,7,8 185:4,8,10
186:2,19 187:6 188:21,25
189:6,11 192:14 194:5,14
197:4,16 201:10 203:21 206:1
207:6 208:7,15 209:2,9,11
227:15 228:6,17,18 229:1,4,
15,17,18,20,23 230:1,3,17,18,
19 231:2,3 234:10,12,15,17
235:13 239:4,9,15 240:12
241:25 242:6,21 243:5,8,11,
19 245:20,23,24 246:19

rooms 154:24 161:2 167:20,
22 168:6,12 188:5,7 193:22
194:1,7,8 196:15,23 197:6,9,
18,21 229:8 246:14

rotate 180:21

rough 112:15

roughly 32:9

routed 70:16

routes 69:20

rude 18:16

rule 170:24 171:1,5 228:22

rules 4:11,20 141:4 145:12,24
162:1,2

run 23:4 26:10 28:16,17 30:19,
21 31:21 78:14 90:12 120:3
195:10 223:19 224:15

running 19:19 23:22 25:15,16
27:11 28:11 31:25 32:2,19,22
35:22 36:20 41:5 43:13 47:3
48:12 51:10 78:13,15 165:20,
25 166:18 167:9

S

safe 158:2 228:15

safeguarding 232:19

safety 227:11,21

salaries 34:19

salary 30:11 34:21,24

Sally 181:22,23

Sanilac 25:1

sanitize 169:20

sat 9:13 114:8,10 132:22

save 34:15 35:4

saving 73:2

scale 35:3

scared 207:5

scenarios 111:21

schedule 61:12 240:25

scheduled 226:4 240:21

scheduling 226:3

scheme 129:7 199:8,22,23
200:1,11,20 201:11,12,18

Schneider 108:22

school 7:1,3 8:1,5,7 9:16,20,
21,25 10:11,17 11:10 17:22

47:1 50:18,19,23

schooled 8:8,19 9:12

schools 22:15

Schostak 27:15,16 30:22

Schutee 220:9

score 58:18

scoring 58:14

screwed 181:2

season 10:24 12:20 15:6

Seasonal 15:6

seat 24:2 25:10 28:21 29:1,25
36:15 53:9 61:9 94:2

seats 28:15

seconds 221:10

secrecy 149:5

secret 35:7

section 245:17

securities 12:1

security 80:5 164:18 227:11,
22 231:21

seek 45:24

seeking 142:19 143:17 155:18
156:9 209:23

seemingly 83:11

select 147:16

selected 76:6

self-directed 22:24

self-serving 156:20

semester 10:18,23

Senate 24:24

Senator 24:21 41:11

send 19:22 111:17,23 112:2,4
115:3,6,20,22 116:24 117:4,7
121:20 122:13 123:2,5,8
124:19 125:5,13 130:18
170:14 184:11 223:25 224:9



Todd Courser
01/28/2020

31

sending 40:10 109:22 110:23
111:9 113:17,22 114:18
116:19 117:13 121:15,18,21
123:11 124:4 129:11,13
130:11,16 132:2 151:19
153:11 174:3,4 178:16,18
179:2,19 180:4 204:8,11
224:10 237:14

sense 107:22 108:23 119:24
123:16 124:11 125:15,16,19
126:6 129:2 132:25 133:11,
15,17 134:3 136:16,21 230:1

sensitive 216:1

sentence 222:25

separate 68:10 89:18,19 104:8
144:16 203:14 233:4

separated 56:2

separately 91:19

separates 227:13

separations 6:18

September 21:8 141:17
150:12 191:14 225:17,18

series 57:3 183:15 236:6
238:5,7

serve 93:8,10

server 20:9,10 69:16,21

service 22:3 54:17 180:9
228:15 232:6,19

session 241:9,11

sessions 175:10

set 68:18,23 69:5 90:24 91:4
127:15 128:14 130:10 180:5
247:14

setting 69:3

setup 222:17

seven-way 23:10

seventeen 8:2

seventy 38:21 59:22

seventy-something 60:2

sex 30:20 40:13 91:10 109:23
123:12 136:19 157:20,25
208:18 213:1

sexual 76:23 96:25 105:11
156:15 237:3,8 242:13

shakes 5:14

share 38:12

shared 22:16 34:4,5 38:11
62:13 192:12 202:25 237:7

sharing 38:15 51:9

she'd 235:7

she'll 19:22,23

sheriff 100:15

shit 222:21

shock 67:23

shocked 26:20

shop 48:13

short 12:2 27:11 39:23 65:1
74:24

shortly 121:10 150:14 168:24

shot 120:2 138:17

should've 41:14 48:2 53:13
186:11

show 46:3,7 54:5 55:3 66:25
75:18 80:23 81:24 97:14
102:21 110:7,11 118:14
124:10,15 126:14 129:19
140:17 145:17,18 167:6 169:6
191:1 196:16 197:12 198:5
244:10

showed 76:5 79:12,14 99:15
131:16 192:13,16

shower 188:14 234:3,5

showing 64:17 221:18

shows 80:24 81:7 103:4 167:2
233:10

sic 80:2 172:24

side 17:2 20:3 43:20 64:13

sides 44:23

sign 95:21 96:1

signatures 31:21

signed 170:15 192:12 193:1

significant 84:3

signing 56:14 95:24

Silverwood 6:2

similar 208:15

simple 145:10,21 162:18
221:6

simply 109:22 136:18 145:6,
12,24 189:19 229:9

single 117:12

sir 131:23 158:24 172:8
173:15 204:24 209:12 213:16
221:11

sisters 22:19

sit 94:21 196:14 215:24

site 66:18 109:10,11 225:11

sitting 116:20 216:7

situation 44:21 67:7,11 86:20
93:19 121:7 125:16 138:2
185:23 242:4

situations 229:17

sixteen 8:18 150:18

sixty 30:7,9 59:22

Skelton 220:12

Skubick 237:5,17,19

sleep 168:19 242:16 245:20

sleeping 54:6

slow 42:16

small 18:5

smells 94:9 245:9

smile 216:8

smiling 134:13,19 159:16
216:3,5



sneaky 222:8

snowstorm 226:5

soliciting 124:20

solve 105:13

someone's 208:15

someplace 91:14 105:1 108:19

son 8:16

sophomore 8:21

sort 40:11 42:21 53:8 55:11 57:24 58:18 68:18 81:4 84:3 92:21 93:20 98:15,17 108:15 111:10 142:18 175:16 179:22 180:13,15 181:10 182:8 186:25 194:24 201:6 202:7,14 240:10 242:12 243:15 244:20

sorta 31:16 42:13 64:9

sorts 166:6

sound 56:16 57:20 72:9,11 73:3 155:22 220:21

sounded 77:11

sounds 44:21 61:17 73:4 86:18 87:12 111:4 132:15 148:1 201:12 222:17 244:20

source 112:20 237:11

sources 19:9

South 13:21 14:15 15:14

space 14:3,4,5 38:12 48:17 49:9,12

Spark 165:1,7,20

speak 79:2 93:14 115:11

Speaker 65:12,14,17 88:21 93:4 108:18 118:1,8 141:3 144:17 221:24

Speaker's 109:9,10

speaking 33:24 107:1 135:13, 17 145:19 161:25 190:14 222:5

speaks 127:1 128:21

special 17:9

specialists 72:5

specialize 18:8

specific 67:2,5 74:8 76:17 110:13 142:22 187:13 191:16 207:6 234:24 244:5,6

specifically 68:22 75:13 76:23 160:22 172:24,25 173:2,3 186:19 187:12 228:16

speculate 134:7

speculation 132:8 135:20,22 143:2

speculative 133:4

spell 15:10,11

spend 55:24 61:3 81:22

spending 35:17

spent 35:16,17 81:24

spit 4:23

spite 120:6 148:14

splitting 34:24

spoke 35:23 79:1 95:11,12,17, 18 100:15 113:9,10 178:10 186:17 233:14

spoken 79:2 114:4

sporadically 47:2

spot 157:15 171:13 235:5

spots 82:12 118:9

spring 7:13,14,15 10:25 22:11

spy 199:9 200:12

spying 201:14 202:8

St 24:25 25:24

stack 227:2 233:3

staff 34:4,5,9,14,16 36:21 38:11,22,23,24,25 39:8,11 50:15 57:10 61:14,20 62:4,6, 14 63:17,19 70:15 89:18,19, 23 90:23 148:13,14 156:11 187:10 226:9,15 235:7

staffers 65:21 66:12 101:21

stamps 92:17

stand 130:17,22

standing 194:5

standpoint 19:24

Starbucks 52:18

start 16:2,14,16 31:5 35:10,17 36:1 48:16 62:19 66:4 100:5 167:25 178:15 201:14 233:7 245:4

started 10:15,17 12:1,24 13:1 14:25 15:24,25 16:5,11 17:17 35:11 36:1 37:7 38:8 41:5 51:2 56:19 61:21 62:24 73:1, 11 83:1,7,12 103:8,24 106:3 107:24 109:2 119:10 120:11 130:24 168:3 177:5 184:17 185:25 199:8,22,23 200:1,12, 20 201:11,14,18 245:6

starting 33:4 138:21 201:12

starts 98:10 120:14 238:21

state 4:5 15:2,17 23:5 24:21, 24 26:12 27:5,12 28:16 29:20 30:4,11,17,19 31:20 32:6,22 33:9,15,17,23 35:4 37:12,20 38:1 41:10,11 43:21 49:1 58:9 64:13 70:4,6,11,13 72:3 74:18 75:23 76:1 89:4 93:8 99:7 100:7 101:9,14,15 107:21 117:6 118:1,3,8 147:3,20 148:4,7 149:24 150:5 152:10, 15,23 153:5 160:9,16 164:23 165:14 190:18 197:2 199:8,10 209:15 215:23 219:23 220:3 221:25 235:12 241:11

stated 62:2 120:24 132:21 133:1,19 134:3 136:16,20 142:14 143:21 144:1,4,18 149:9 157:17 217:2

statement 38:3 80:18 82:20 105:25 112:22 148:16 158:18 174:25 189:13,15 195:21,25 210:22 211:8 214:11 217:18 222:16 239:18

Todd Courser
01/28/2020

33

statements 91:21 185:2
202:20

states 146:17 244:8 245:1

stating 244:19

stationed 38:16 56:4

statute 211:15

stay 33:9 60:20 61:8 80:12,13
89:22 168:2,6,8,9 171:18
174:9,12,16,22 175:9,22,23
176:1,23 209:6 236:15

stayed 168:16 171:23,24

staying 79:17,22 167:25 168:4
173:4 188:5 194:9 213:1
228:19 230:7 246:7

stays 121:25 167:19 174:2,24
175:5 184:3

step 40:21 116:25

steps 82:3,19,22 95:8,10

Steve 173:19

sticker 231:8

stint 12:2

stipend 30:13

stoop 202:14

stop 31:3 43:4 45:15 61:25
109:23 134:17,23 136:19
150:18 153:19,21,23 162:5,7
176:17,24 177:10 224:10
232:8 238:9

stopped 64:12

storm 26:19

story 27:11 132:3 162:1
195:10

straight 10:11 172:4,7,8,9
181:1

straight-ticket 27:5

straighten 176:7

straightened 184:13

straightforward 146:23

strange 242:15

Strategies 47:6 48:14 51:1
53:3

stream 91:5

street 13:7,21 14:15 74:10

strike 144:18 199:5

strung 105:2

student 7:11

study 11:10

studying 52:15

stuff 15:5,6 19:23 20:15 22:22
26:8 28:13 49:7,14,19 50:10,
11 54:8 55:6,15 58:25 60:14
75:8 76:1 92:18,21 104:19,20
108:11,15 121:25 123:10,20
124:21,23 139:11 179:19
186:12 187:18 194:6 220:5
234:24

subsequent 174:24

substance 177:22,25

Subway 47:17,22

successful 224:5

such-and-such 184:23

sucks 94:8

sudden 167:9

sugar's 138:17

suggest 28:9 91:9 167:1

suggested 36:24 100:24
101:2 136:18

suggesting 200:11 219:12

suing 81:16

suitcase 242:17

suited 55:18

summer 26:9 37:1,23 100:17
219:1

summers 59:23

super 61:2

supervisor 91:23,24 92:2

supplies 92:20

supposed 30:10 38:18 39:4
56:2 59:10 61:15 62:8 93:8
144:15 154:19,20 155:20
176:6 226:15

supposedly 27:22 38:25
39:22 56:11 105:8 206:6
207:13 212:23 213:4

Supreme 28:12

surrounded 37:10

surveillance 129:9 194:6,8
203:5 240:1,4,9 244:12

Susan 181:21

suspect 78:5

suspected 73:13

suspecting 80:17

suspicions 80:21 82:18

suspicious 167:23 245:22

Swartzle 221:24 222:24

swearing 29:21

sworn 4:4 29:20,22,23,24
64:15

system 181:13

<hr>

T

TA 13:2

takes 62:4

taking 4:21 55:4 62:7 82:3,18
89:25 95:20 171:7 182:8

talk 28:11,13 30:7 100:24
117:12 137:13 146:21 158:6
165:9,16 181:4 196:8 219:20

talked 35:21 83:4,6 155:13
187:24 205:3 216:22 222:9
237:17 238:25

talking 23:11 32:9 40:12,18
42:8,9 45:13 52:24 70:18
74:6,7 83:9,20 115:14 121:2,3

Todd Courser
01/28/2020

128:12 129:10 140:22 171:3
177:5 219:5 233:9 239:8
244:12

**talks** 231:1

**tampered** 240:5

**tape** 67:6 113:5 114:16
119:12,15 123:18 124:1
222:20

**taped** 222:15

**taping** 123:24 155:4

**task** 226:16

**tax** 10:15,23 12:14,24 13:17
15:5,6,22 18:2,10 19:8,13
20:1 21:6,10 30:1 49:20 52:1,
6 108:14,22 137:25

**taxpayers** 34:15

**Tea** 31:16 127:11,13

**teachers** 22:17,19

**technical** 130:9 224:12

**technically** 30:5,8 57:8,12
62:8 64:14

**teenagers** 22:21

**teeth** 54:6

**telephone** 202:22,24

**telling** 43:2 83:14 86:7 99:18
102:20 122:11 138:8 149:12,
14 154:5 184:21 195:17 216:2
219:9 236:16 243:18

**tells** 187:21 222:13

**ten** 50:9 52:10 70:2 87:2
159:22

**tenure** 37:10

**term** 24:15 25:11 34:1

**terms** 24:8,9,10

**test** 5:18

**testicles** 65:21 66:12

**testifies** 170:4

**testify** 133:5

**testimony** 58:24 66:15 112:3
148:11

**text** 40:12 46:8 55:2 66:25
71:19,22 72:8,15 74:10,15
75:20,22 76:5,9,11,20,22
80:23 83:1,2,11 90:11 97:22
98:10,19 102:20 103:3 104:11
106:15,19 107:9 109:11,14
110:6,14,17,18 113:20,25
114:5,7,24 117:12,16 118:21,
24 119:17 120:23 121:3,10,
14,22 122:14,19 124:14,16
125:13 126:9,18,22 127:8,14,
25 128:1 129:18,23 131:5,13
158:19,23 159:5,10 163:16
185:7,11,14,15,16,25 189:2,8,
22 192:11,12,15,17,18 194:2,
4,11 195:14 196:16 197:12
198:4,12 204:8,11 205:17
206:8 209:1 214:16 220:19
222:18 233:16 235:14 236:1,
11 237:14,16 246:24

**texted** 46:7 160:5

**texting** 128:14,25 129:15
222:11

**texts** 40:17,18 46:1,3,7 73:12,
19 74:2 81:11 83:10 87:3,4
98:1,21,25 99:14,21,24 100:1,
4,11,14 102:1,3,21,23,24
103:9,24 106:4,10 107:6,24
109:6,19 110:1 111:14,19
112:5 114:21 116:15,20
117:4,7,8,11,13 120:9,12
121:17 123:7 124:11 126:2,25
127:18,21 128:7,20,25 129:8,
10,13,20,22 137:12,17,19
156:18 157:6,13 158:11
161:16 182:6 184:24 186:20
194:23,24 195:1 202:17
207:17,18,21 212:25 226:17
233:24 234:1 236:6,7,24

**theory** 160:25 162:18,20
169:24

**thing** 19:12 36:19 37:17 40:11
53:9 58:13 81:4 93:2 98:17
109:18 157:4 180:15 198:15
208:11 226:12 227:4 240:10

**things** 18:25 55:11 57:1,3,24
58:8 62:9 64:8 67:2,17 88:17
93:20 146:17 151:20 175:16
188:14 200:18 214:2 232:22
240:5

**thinking** 96:22 133:5 134:8
135:10 137:16,24 143:4
151:12,16 156:23 245:18

**thirty** 221:10

**Thomas** 9:24

**thought** 74:16 83:6 98:6
109:2,4 116:7,9,11 123:1
132:16 133:6 137:16 146:23
152:19 186:23 216:15 241:18

**thousand** 125:8 217:22

**thousands** 36:21 37:16
117:11,17

**threaten** 203:7,8

**threatened** 89:4 108:2 203:11

**threatening** 90:13

**three-quarters** 20:3

**thriving** 15:22

**Throw** 210:5

**throwing** 210:6

**thumb** 189:2,9

**thumbnail** 238:10,24

**thumbnails** 188:11,12,22

**Thursday** 60:16 241:8

**ticket** 27:3,4 33:7

**tie** 88:17

**tied** 233:4

**till** 49:25 79:24 140:5,10
183:11

**Tim** 92:6,7 93:5 94:19,20,22
141:11 143:20 144:14 146:12,
19,20,21,24 147:2 156:15,18,
19 157:15,17 176:4 177:16
237:5,17,19

**time** 5:2,18,21 11:6,9,11 12:4

14:24 15:21,23 16:8 17:14,19,
24 18:20,24 23:2 24:13,17,19
25:3 26:6 27:4,9,14 28:25
29:25 30:9,18 33:18 35:16,18
38:6 39:23 41:2,3,10 45:9
49:16 52:15,18 54:7 55:24
58:25 60:23 63:7 67:20 71:25
72:3 75:13 76:18 78:5 79:1,7,
12,18 81:22,24 83:17,25
84:16 87:8,15 92:18 96:7
99:13 100:19 102:23,24
104:14 106:3,14 107:16
108:21 109:2,4 111:4,17
113:24,25 115:16 116:5 122:9
125:20 129:25 132:23 135:10
136:13 140:20 141:7 147:7
150:18,22 167:23 169:2 173:4
175:2,10 177:14 178:22,23
182:10 183:6,12 184:23
191:7,9 192:23 193:16 220:17
221:12 225:12 241:6 243:14,
15 245:4

**timecards** 92:15

**times** 5:23 11:8 29:23 51:8
60:5 75:15 76:22 77:4 94:6
117:21 137:19 141:23,24
142:5,6,7 145:15 163:22
177:10,18 180:19 181:18,25
187:3 193:14 210:19 218:19,
22 233:14 234:24

**title** 57:7

**titles** 56:12 57:9

**today** 73:6 127:16 170:2
196:14 213:25 215:11,14
226:23

**Todd** 4:3,7,9 13:2,3,10,14
14:22 15:3 16:19,23 119:1
147:9

**todd@toddcourser.com**
68:20 69:8 70:24 71:14 86:25
115:9

**todd@toddcourser.com.**
70:23

**toddcourser.com** 69:16

**toddcourser72@gmail.com**

68:11,16 73:5

**Toddcourserandcompany**
70:22

**told** 67:14 72:20,22 76:14 79:5
80:1,3 82:17,23 83:3,10 84:5,
10,11,12 85:3,7,8 87:8 93:23,
24 99:7 106:2 121:19 129:12
133:24 146:9 149:20 177:16
179:11 186:15 187:13,25
190:3,11 215:23 217:2,11
218:2,12 225:19 235:2,3,7,8,
14

**Tons** 37:15

**Tony** 4:14 196:8

**top** 27:2,3 35:3 119:21 120:9
121:22 127:8

**total** 20:7 53:5 64:7 185:21

**totally** 187:19 202:15

**touch** 33:9

**tower** 38:13

**town** 15:14 18:5 127:15
128:15

**township** 58:7

**trace** 98:16

**track** 166:2,14 175:18

**tracking** 164:7,11,13,21
166:3,5,6,10,15,23 189:17

**training** 227:9 231:14,16

**transcript** 163:8 221:23

**transcripts** 155:14

**transfer** 7:11,12 10:3

**transition** 89:11

**transmitted** 212:21,23

**transpired** 164:19

**trash** 188:17 241:21,24 242:6

**treat** 230:13

**treatment** 150:22 191:22,23

**trouble** 43:3,5,17

**true** 37:1 52:17 100:12 106:6
122:2 124:22,23,24 125:2,3
162:16 164:22 165:22 171:25
188:5 203:3 212:16 219:19
225:10 243:21

**Truscott** 44:19,25 45:1,2,23

**trusted** 55:13 149:19

**truth** 124:25 125:2 219:7

**tub** 234:4,6

**Tuesday** 4:2 60:15,16,17
127:16 206:22 207:7 235:15,
16 243:24

**turn** 126:21 161:13,15 191:10

**turned** 9:4 55:25 66:23 94:12
97:2 151:13,14

**twelve** 52:10 165:17

**twenties** 48:6

**twenty** 55:14 119:14 123:18
140:3 195:9

**twenty-five** 48:7

**twenty-four** 48:7

**twenty-something** 113:7
114:15

**Twitter** 40:11 132:6,8

**two's** 80:21

**two-thirds** 20:2

**two-year** 24:15,16

**type** 98:18

**typed** 115:2 163:9

**typically** 242:16

---

### U

**Uh-huh** 103:2 143:9 212:22

**Uh-uh** 18:13

**ultimate** 96:3

**ultimately** 50:14 72:5 88:19
98:24 108:1 109:13 112:5
132:17 141:9 143:15 150:12

Todd Courser
01/28/2020

36

181:7 194:25

**unauthorized** 193:21 194:13

**unaware** 79:23 130:13 187:18

**uncle** 91:10

**unclear** 123:14

**undermining** 90:2

**understand** 4:15,16 5:2 38:11
60:12 82:8 89:12,16 108:6
116:4,5,12,17 127:20 130:15
136:25 137:2,23 138:9,10,25
139:1,13,16 148:20 150:8
197:2 206:24,25 237:3,9

**understanding** 44:2 78:6,9,18
79:15,17 81:20 84:19 87:9,10
105:7 114:2 115:18 141:8
145:16 170:14 174:20 177:15
181:19 193:12 208:20 223:14,
18 239:25

**understood** 5:6 53:8 116:5
245:4

**unhappy** 226:20

**unit** 89:22 165:1,8,25 167:8

**University** 7:13,16 9:24

**unlawfully** 191:13,15,20

**unprofessional** 136:8 172:3,
12 215:1,14

**untrue** 212:24 213:3 214:9,10,
15

**unusual** 54:20

**updates** 81:1

**upwards** 77:12 125:8

**user** 123:12 124:20

**V**

**vague** 5:3 113:9

**valuable** 208:24

**vast** 18:9

**Vegas** 92:7

**vehicle** 163:19,21,22,25
164:4,7,21 166:8,9,11,16,22
167:3,10,12 245:3

**verbal** 5:10

**verified** 229:25

**verify** 194:22 229:21,22

**versions** 238:24

**versus** 38:17 116:5 117:3
175:2 207:8

**veterans** 74:8,9,12 226:4

**vetted** 53:17

**video** 66:15 158:15 233:18,21
237:12 240:4,9 243:15

**videos** 66:22 189:4,5,8,10

**view** 170:10

**Vincent** 192:2,3,10,11,18
194:2 196:14 238:17,18
239:2,8,12,14,20 240:11
241:17 243:2,7

**vintage** 52:3

**violate** 199:8,24

**violated** 211:14

**violating** 246:11

**violation** 199:10 213:5

**visitor** 229:5

**voice** 66:2

**voiced** 67:20,22

**volunteer** 31:19 51:11

**vote** 58:16,20 108:23 137:8,
13,14 138:1 142:6

**voted** 141:22,23,24

**voters** 59:5

**votes** 27:23 108:14 142:8
151:14

**voting** 58:17 59:4

**W**

**wait** 49:25 96:1 103:14 158:15
213:10

**waited** 101:12

**waiting** 138:19

**wake** 61:4

**walk** 43:7 74:10 123:11 176:13

**walked** 177:11

**walking** 80:6

**walls** 239:20

**wanna** 13:25 17:16 57:17 70:2
71:21 73:18 78:2 79:3 87:9
115:8 116:6 134:15,20 137:6
146:21 155:20 156:21 169:16
208:23 214:13

**wanted** 53:12 89:19 94:25
100:22 101:4 104:22,24 105:1
136:19 137:6,7 144:13 147:5
170:1 198:6 215:24 223:25

**wanting** 137:13,14 142:16

**warning** 93:15

**warnings** 96:12

**warrants** 147:15

**watch** 56:10

**watching** 92:23 124:15

**water** 108:6,8,10 138:4

**ways** 121:6,7 122:22

**website** 15:2

**wedding** 50:23

**Wednesday** 60:15 235:15

**week** 57:6 58:15,22 59:17,18
60:7 62:2 64:6 66:5 71:23
189:14 190:16

**week-to-week** 60:25

**weekend** 59:2

**weekends** 59:14

HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Todd Courser
01/28/2020

**weeks** 19:20,21 26:15 59:20 60:12 64:16 131:18 147:4

**weird** 93:2

**well-known** 217:13,14,16,19

**Wendy** 219:22,23

**west** 13:6 43:20

**what'd** 101:1

**whatever's** 246:3

**whatnot** 22:23

**Where'd** 9:20

**whereabouts** 124:10 149:4

**Who'd** 27:24

**why'd** 171:18

**wife** 6:8 21:12 84:22 85:1,3,7 103:12 109:23 136:19 138:14 189:14 205:8 208:18 213:2

**wife's** 6:10 22:8

**win** 41:19 44:16

**wind** 90:8

**Winegardner** 202:10 227:7,11 229:14

**winning** 24:2 29:18 53:9

**wiretapping** 40:16 67:7 211:15

**withhold** 170:20

**witnessed** 80:6

**witnesses** 147:10

**Witter** 12:4

**wizard** 91:3

**woman** 84:4

**won** 29:25 36:15 43:25

**wonderful** 184:15

**wondering** 67:19 117:14 219:18

**word** 97:22 114:14 125:4 204:20

**words** 6:23 75:18,19 122:25 188:13

**work** 12:13 15:4,6 17:4 19:21, 22,23 21:14 22:4 33:14,19 36:22 38:14 39:7 41:19,21 46:24 47:19,20 48:1 49:1,17 51:3,8 52:10,14,21 53:5,10 54:5 55:2,22 56:20 59:13 63:24 65:8,11,24 69:22 89:20 90:24 104:13,15 105:2,4,6 123:15 125:24 142:4 148:15 219:24 225:3 226:1,20 232:5 239:25 245:5 247:2

**worked** 10:14,21 11:17,20,21, 24 18:1,2 21:21,24 39:22,23 40:22,24 41:4,5 44:17,24 47:1,3 48:12,19 51:5,6 52:14, 18,22 53:19,21 60:11,25 65:12 76:19 92:3 190:18 192:3 193:16 220:8 224:14 240:2,4

**working** 35:3 36:18 40:20,23 43:24 49:5 54:16 64:1 93:25 101:24 116:17 129:4 148:13 164:12 198:9 240:5

**works** 15:12 17:3 19:20 21:15 44:6 45:12 89:13 137:3,5 180:23

**world** 43:10 212:14

**worldwide** 217:13,15,16,17,20

**worse** 206:3

**would've** 16:12 25:20 69:3 92:2 106:20 110:4 120:21 240:18

**wranglings** 37:10

**wrapper** 241:22,24 242:7

**wrappers** 242:11

**write** 122:12

**writes** 156:19 239:4,12 241:17 242:15

**writing** 58:11 115:20,21 121:20 122:13

**written** 94:12 96:10,11 114:8

**wrong** 69:17 75:4 89:16 111:11 151:20 178:1

**wrote** 67:18 87:25 114:7 132:3 146:19,20,21 150:9

---

**Y**

---

**ya** 68:20 184:11,12

**year** 7:9,10,15,18,24 8:6 9:1 10:23 22:11 26:14,20 29:22 30:7,9 32:5 33:12 48:24 50:6, 13,20 57:17,18 59:20 78:11 119:13

**years** 6:16 10:20 17:13 21:4 26:7 38:10 46:16 48:24,25 50:6 55:14 70:2 73:21 87:2 158:5 164:25 165:17 218:19 219:10,11

**yelled** 154:7,10

**yelling** 153:24,25

**yesterday** 237:7

**York** 7:4

Extortion Texts:

5-19-15

Boo!

The phone is a burner…dont bother trying.

Cindy sounds like she's great in the sheets. You however, have no stamina.

Silence in this case can be VERY detrimental. Careers, political arena and of course families, Georgeann, Joe, Fon, Dan….whew, it could be disastrous really, and of course the kids.

5-20-15

DC sucked, thought you two would be alone but you dragged family along…cost me 1200.00 that trip.

Todd…have your phone swept. Why do you only know 4 vets, we're everywhere. "Courser's a 'NO' on 4408"? Still think I'm bluffing?

What are they going to do to defeat you when you're an incumbent? They won't need 150k….they have me.

Messages will come from a different number soon. This ones getting dumped.

Nobody's asked what my intentions are, what I want. Odd?



EXHIBIT
Courser 1
1·29·20  DM

Plaintiff's Document Production 01235

I have no agenda per se. I have no desire to destroy families. I give a rats ass about politics. Vaupel sucks though. You both now know I hold significant evidence of your affair. Career suicide, can't show your face, empty your office shit. Stay tuned...have a splendid Pure Michigan day!

Relax. I'm not leaking anything...yet. Pay people better to keep quiet. I pay them better for info. #Radisson

Let me make this CRYSTAL CLEAR. I need some open dialogue I've heard from you Cindy...better tell Todd to man-up. As long as I'm appeased, my cargo will never reach port so to speak. Can I please get a confirmation.

5-21-15

I can show your whereabouts when not in session, meetings, or together. Those whereabouts DO NOT include seedy alleys in Lansing having sex with men Todd

Grow up. I sell non-fiction...you however spin fairy tales and fiction. That email can't find another inbox....oh, change your passwords too. Dumb shit

Good afternoon. Contrary to what you may think, I have other cases I'm working. Todd, go to your weekend retreat...enjoy this last holiday as a state employee. Big changes next week kids, as I change the political landscape.

You both can prevent this really....you've never asked how?

5-22-15

Hello?

Cindy, Todd, Dan..we all on here?

5-23-15

I'm letting everybody off the hook....on 1 condition only. You resign Todd,

Tuesday. Mention your health, your new found family bond. DO NOT mention

Cindy. AT ALL. Call me karma....this is for the others too!

5-26-15

Rise and Resign day....Good morning Todd....hope you found your soul-searching

weekend peaceful.

5-27-15

I've reached out to an old friend with a little teaser. He's been fact-finding since

11am or so yesterday, building the puzzle, piece by piece. I told him I WILL NOT

confirm the names of the woman/women. Rest assured, Tim Skubick will be in

touch with you. Confirm the affair(s). NO NAMES.

5-28-15

517.643.0013

Plaintiff's Document Production 01237

Call it....go ahead, do it. It's a personal cell.

Skubick questioned the authenticity of some of the audio. Not the story per se, rather how either of you let this happen. Not the affair....getting bugged. I drove up to the island yesterday, on your dime. I shared 17 minutes of audio. 9-11 of sexual intimacy and 5-6 of dialogue so he could clearly understand who he was listening too. He's going to label me as an anonymous source, a credible anonymous source. Complete with photographic and video evidence from DC and the Radisson, it was any easy sell. Let Joe and Fon know whats coming please.

6-9-15

Uh oh...good luck. I just got back in the states and heard the news.

7-8-15

Wow! Firing staff...be careful, the boys have A TON on you...they know everything. I saw you recently, Flint then near Great Lakes Crossing later. You guys are easy but idiots. Oh, the Speaker is meeting with me on 8/3.

7-17-15

I was off the last few days and was offered the opportunity to do some surveillance...little did I know you'd drag me all the way to Flint...I used to work out of that Target strip mall and often frequented Barnes/Noble...Keith and Ben

Plaintiff's Document Production 01238

were right, as was Joe…the inevitable WILL happen. Careers, families,

homes…shattered. We simply have too much on you, the server and police

involvement notwithstanding.

7-21-15

I've been digging. How was camping Cin? Todd, your wife had an affair before,

but then again, so have you…before Cindy. I may need some funding? Offers to

help?

7-22-15

I came across this number in this file; 260-504-6649. its not Dans or Tims or either

of yours? Whos is it? Nevermind, I'll text it myself…

8-7-15

Amazing what would have happened had you simply listened. Too late.

KABOOM!

It went global fast. Resign NOW Todd as Candy has…ASKED. You too Cindy,

spare the kids and Joe. Resign, both of you. TODAY. Chad has scratched the

surface….Ben has lots of audio…intriguing, damning. I have steamy audio, pics,

video from DC. Resign, or Chad gets it all.

Plaintiff's Document Production 01239

From: georgerathburn520@gmail.com
Sent: 5/20/2015 11:36:36 A.M. Eastern Daylight Time
Subj: Breaking Scandal - Todd Courser

## *Breaking Scandal!*
## *State Rep Courser Caught behind a Lansing nightclub!*
## *Christian conservative or Godless Addicted Monster!*
## *Truth!!!! Courser secretly Removed from Caucus several weeks ago due to male on male paid for sex behind a prominent Lansing nightclub! Action soon coming to remove Courser!*

## *He is a bi-sexual porn addicted sex deviant!  All over Lansing since the election and that is why he was thrown out of caucus!*
## *He is a FREAK! He is a gun toting bible thumping cock sucking freak! His whole personalit is a sham! He is a tool pawn of establishment*
## *In past election he was accused of child molestation! And he done things that should have him in jail!*
## *He doesn't work in Lansing he is just there feeding his habit of alcohol drugs and illicity*

EXHIBIT
Courser  2
1-28-20

sex! Most days he is high stoned on drugs and alcohol while he is supposed to be voting at the state house!

Rep Gamrat Gamrat knew about it all along and has helped cover for his actions! has played along and been complicit in his sorted activities and has covered for him over and over and over and her involvement is the real reason she was thrown out! She shouldn't have ever been trusted as state rep or national committeewoman she is a tramp, a lie, and a laugh for this bi-sexual cock sucking monster!

This Teabagger takes his title seriously! Moaning and groaning fucking and screwing man on man man on woman and whoever he can pay! Pictures and video youtube tell the hoel story and of all of his exploits behind night clubs and hotels at some of the best and worst places in Lansing with all the grinding hot and sweaty sex and drug use – it is too much to hide anymore he is a scam!

| Inbox | From ████ David Forsmark Direction: Incoming | 5/21/2015 8:49:45 AM(UTC-4) | Network: 5/21/2015 8:49:57 AM(UTC-4) | Read | As in keep your... | | |
|---|---|---|---|---|---|---|---|

| 1487 | SMS Messages | | | | Responsive | 3/21/2018 9:36:42 PM | 3/21/2018 9:36:42 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Sent | To ████ David Forsmark Direction: Outgoing | 5/21/2015 8:49:06 AM(UTC-4) | | Sent | Lol what? | | |

| 1488 | SMS Messages | | | | Responsive | 3/21/2018 9:36:39 PM | 3/21/2018 9:36:39 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ David Forsmark Direction: Incoming | 5/21/2015 8:48:49 AM(UTC-4) | Network: 5/21/2015 8:49:00 AM(UTC-4) | Read | Chin up. | | |

| 1489 | SMS Messages | | | | Responsive | 3/21/2018 9:36:58 PM | 3/21/2018 9:36:58 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ Todd Courser Direction: Incoming | 5/21/2015 8:36:23 AM(UTC-4) | Network: 5/21/2015 8:36:18 AM(UTC-4) | Read | Thanks | | |

| 1490 | SMS Messages | | | | Responsive | 3/21/2018 9:35:49 PM | 3/21/2018 9:35:49 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Sent | To ████ Todd Courser Direction: Outgoing | 5/21/2015 8:23:16 AM(UTC-4) | | Sent | You have education meeting. Just testimony. No veterans committee. I'll be in a bit late. Maybe 10ish | | |

| 1491 | SMS Messages | | | | Responsive | 3/21/2018 9:35:17 PM | 3/21/2018 9:35:17 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ Todd Courser Direction: Incoming | 5/20/2015 6:44:07 PM(UTC-4) | Network: 5/20/2015 6:44:07 PM(UTC-4) | Read | chat further on it feel free to call me or if you want to sit down with Cindy and I on what changes are being made heading forward I know we both would be open | | |

| 1492 | SMS Messages | | | | Responsive | 3/21/2018 9:35:11 PM | 3/21/2018 9:35:11 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ Todd Courser Direction: Incoming | 5/20/2015 6:44:05 PM(UTC-4) | Network: 5/20/2015 6:44:08 PM(UTC-4) | Read | to that. | | |

| 1493 | SMS Messages | | | | Responsive | 3/21/2018 9:35:06 PM | 3/21/2018 9:35:06 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ Todd Courser Direction: Incoming | 5/20/2015 6:44:02 PM(UTC-4) | Network: 5/20/2015 6:44:01 PM(UTC-4) | Read | Ben I realize that was probably not the way to handle that with you and I know you are now probably making a decision on how to proceed forward; if you want | | |

| 1494 | SMS Messages | | | | Responsive | 3/21/2018 9:34:44 PM | 3/21/2018 9:34:44 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |
| Inbox | From ████ Todd Courser Direction: Incoming | 5/20/2015 1:41:56 PM(UTC-4) | Network: 5/20/2015 1:41:52 PM(UTC-4) | Read | I am working to correct it all the best I can, and even though I may not take your advice I always appreciate it. I appreciate you Ben thanks! | | |

| 1495 | SMS Messages | | | | Responsive | 3/21/2018 9:34:36 PM | 3/21/2018 9:34:36 PM |
|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | **Deleted** |



EXHIBIT
Courser 3
1.28.20

213

| Inbox | From<br>Todd Courser<br>Direction:<br>Incoming | 5/20/2015<br>1:41:52 PM(UTC-4) | Network:<br>5/20/2015<br>1:41:45 PM(UTC-4) | Read | I want to thank you for your help on all that clerical stuff yesterday; I know it was a lot to take in and there are probably a few items to clean up on it, but |

| 1496 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:34:28 PM | 3/21/2018<br>9:34:28 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Steve Carra<br>Direction:<br>Incoming | 5/20/2015<br>1:29:04 PM(UTC-4) | Network:<br>5/20/2015<br>1:28:15 PM(UTC-4) | Read | Call when u can please | | | |

| 1497 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:34:13 PM | 3/21/2018<br>9:34:13 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Steve Carra<br>Direction:<br>Incoming | 5/20/2015<br>11:22:05 AM(UTC-4) | Network:<br>5/20/2015<br>11:22:18<br>AM(UTC-4) | Read | Oh I see. Figured u were around. U got voicemails, ya? What about Keith? Will he be around? How about Cindy and Todd? | | | |

| 1498 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:34:09 PM | 3/21/2018<br>9:34:09 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Sent | To<br>Steve Carra<br>Direction:<br>Outgoing | 5/20/2015<br>11:21:11 AM(UTC-4) | | | Sent | Lol I'm sorry buddy. I won't be in today. | | | |

| 1499 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:53 PM | 3/21/2018<br>9:33:53 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Steve Carra<br>Direction:<br>Incoming | 5/20/2015<br>9:25:41 AM(UTC-4) | Network:<br>5/20/2015<br>9:25:54 AM(UTC-4) | Read | Cody Mott just buzzed. Wants to know about Courser coffee hours and reminding you about 10am meeting u have. | | | |

| 1500 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:40 PM | 3/21/2018<br>9:33:40 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Sent | To<br>Keith Allard<br>Direction:<br>Outgoing | 5/20/2015<br>1:57:21 AM(UTC-4) | | | Sent | https://www.dropbox.com/s/5mhm1h8jpb3clt9/Voice%2000<br>2.m4a?dl=0 | | Yes | |

| 1501 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:32 PM | 3/21/2018<br>9:33:32 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Todd Courser<br>Direction:<br>Incoming | 5/20/2015<br>1:31:35 AM(UTC-4) | Network:<br>5/20/2015<br>1:31:31 AM(UTC-4) | Read | for all your help to this point. God bless you Ben. | | | |

| 1502 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:28 PM | 3/21/2018<br>9:33:28 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Todd Courser<br>Direction:<br>Incoming | 5/20/2015<br>1:31:34 AM(UTC-4) | Network:<br>5/20/2015<br>1:31:30 AM(UTC-4) | Read | crucifixion is in order here so I'll just keep praying on it and you may need to consider that and if you want to get out let me know. Thanks for listening and | | | |

| 1503 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:19 PM | 3/21/2018<br>9:33:19 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |
|---|---|---|---|---|---|---|---|---|
| Inbox | From<br>Todd Courser<br>Direction:<br>Incoming | 5/20/2015<br>1:31:29 AM(UTC-4) | Network:<br>5/20/2015<br>1:31:24 AM(UTC-4) | Read | Thanks I appreciate your help. Have a good night. No I don't think I feel resigning at this point is the way to go down if they have something I think a | | | |

| 1504 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:33:05 PM | 3/21/2018<br>9:33:05 PM |

| Folder | Party | Time | All timestamps | Status | Message | | | Deleted |

Plaintiff's Document Production 00214

214

| | | | | | | |
|---|---|---|---|---|---|---|
| Sent | **To**<br>Todd Courser<br>**Direction:**<br>Outgoing | 5/20/2015<br>1:24:40 AM(UTC-4) | | Sent | I don't know what the answer is but this isn't it. This kind of stuff never stays hidden... Its going to blow up and I can't help cover it up. If it wasn't true I would go to the end of the earth to defend you but I can't help you cover it up. My best advice consider resigning. You may be able to protect Cindy and her family and your family. I'm sorry I really am. I've prayed on it and I just dont feel right with it. | |

| 1505 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:59 PM | 3/21/2018<br>9:32:59 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Inbox | From<br>Todd Courser<br>**Direction:**<br>Incoming | 5/20/2015<br>1:07:41 AM(UTC-4) | Network:<br>5/20/2015<br>1:07:34 AM(UTC-4) | Read | God brought me here and had me here and maybe it hasn't accomplished anything but I have to believe it has done some good inspite of me. | | | |

| 1506 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:53 PM | 3/21/2018<br>9:32:53 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Inbox | From<br>Todd Courser<br>**Direction:**<br>Incoming | 5/20/2015<br>1:07:35 AM(UTC-4) | Network:<br>5/20/2015<br>1:07:33 AM(UTC-4) | Read | this from blowing all to hell then I would like to give it this shot. Maybe it's nothing and maybe I should not have ever run but I felt and still feel that | | | |

| 1507 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:47 PM | 3/21/2018<br>9:32:47 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Inbox | From<br>Todd Courser<br>**Direction:**<br>Incoming | 5/20/2015<br>1:07:31 AM(UTC-4) | Network:<br>5/20/2015<br>1:07:28 AM(UTC-4) | Read | Hey Ben if your not coming back please let me know, I know it doesn't make sense and maybe it doesn't if you see another way then let me know, but if I can keep | | | |

| 1508 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:31 PM | 3/21/2018<br>9:32:31 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Inbox | From<br>Todd Courser<br>**Direction:**<br>Incoming | 5/19/2015<br>10:00:57 PM(UTC-4) | Network:<br>5/19/2015<br>10:01:08<br>PM(UTC-4) | Read | I am sorry for that. | | | |

| 1509 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:19 PM | 3/21/2018<br>9:32:19 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Sent | To<br>Todd Courser<br>**Direction:**<br>Outgoing | 5/19/2015<br>9:52:13 PM(UTC-4) | | Sent | Yeah.... you're kind of freaking me out. | | | |

| 1510 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:07 PM | 3/21/2018<br>9:32:07 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Sent | To<br>**Direction:**<br>Outgoing | 5/19/2015<br>9:47:01 PM(UTC-4) | | Sent | Yeah I would say that's pretty likely | | | Yes |

| 1511 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:32:01 PM | 3/21/2018<br>9:32:01 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Inbox | From<br>**Direction:**<br>Incoming | 5/19/2015<br>9:46:46 PM(UTC-4) | Network:<br>5/19/2015<br>9:46:55 PM(UTC-4) | Read | Todd better not keep u all night | | | Yes |

| 1512 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:31:50 PM | 3/21/2018<br>9:31:50 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |
| Sent | To<br>**Direction:**<br>Outgoing | 5/19/2015<br>9:45:07 PM(UTC-4) | | Sent | I have to go. No choice. I don't want to argue about this | | | Yes |

| 1513 | SMS Messages | | | | Responsive | | 3/21/2018<br>9:31:43 PM | 3/21/2018<br>9:31:43 PM |
|---|---|---|---|---|---|---|---|---|
| **Folder** | **Party** | **Time** | **All timestamps** | **Status** | **Message** | | | **Deleted** |

| Folder | Party | Time | All timestamps | Status | Message | | |
|--------|-------|------|----------------|--------|---------|---|---|
| Sent | **To** Dan Couser **Direction:** Outgoing | 5/26/2015 7:45:33 AM(UTC-5) | | Sent | How was the weekend? Anything I should be aware of go down? Todd and Ron look like death in the family picture | | |

| 1451 | SMS Messages | | | | Responsive | 3/21/2018 6:42:12 PM | 3/21/2018 6:42:12 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Inbox | **From** Bob Murphy **Direction:** Incoming | 5/26/2015 7:30:13 AM(UTC-4) | Network: 5/26/2015 7:30:11 AM(UTC-4) | Read | Ben, are we all set for a Town Hall next Tuesday? We want to put notice in paper today. Please call me. | | |

| 1452 | SMS Messages | | | | Responsive | 3/21/2018 6:41:20 PM | 3/21/2018 6:41:20 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Inbox | **From** Matt Sowash **Direction:** Incoming | 5/22/2015 2:03:01 PM(UTC-4) | Network: 5/22/2015 2:02:57 PM(UTC-4) | Read | Just making sure you're okay. Hearing shits going to hit the fan with your office. | | |

| 1453 | SMS Messages | | | | Responsive | 3/21/2018 6:41:17 PM | 3/21/2018 6:41:17 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Sent | **To** Matt Sowash **Direction:** Outgoing | 5/22/2015 1:58:20 PM(UTC-4) | | Sent | Nope took th3 day off. What's up | | |

| 1454 | SMS Messages | | | | Responsive | 3/21/2018 6:41:13 PM | 3/21/2018 6:41:13 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Inbox | **From** Matt Sowash **Direction:** Incoming | 5/22/2015 1:48:53 PM(UTC-4) | Network: 5/22/2015 1:49:01 PM(UTC-4) | Read | You working today? | | |

| 1455 | SMS Messages | | | | Responsive | 3/21/2018 9:40:37 PM | 3/21/2018 9:40:37 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Sent | **To** Joshua Cline **Direction:** Outgoing | 5/21/2015 8:57:06 PM(UTC-4) | | Sent | Yeah I thought that was too much of a coincidence too | | |

| 1456 | SMS Messages | | | | Responsive | 3/21/2018 9:40:31 PM | 3/21/2018 9:40:31 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Inbox | **From** Joshua Cline **Direction:** Incoming | 5/21/2015 8:56:42 PM(UTC-4) | Network: 5/21/2015 8:56:53 PM(UTC-4) | Read | I think the black mailer is Joe. Dan gets texts the day he speaks with Joe... | | |

| 1457 | SMS Messages | | | | Responsive | 3/21/2018 9:40:22 PM | 3/21/2018 9:40:22 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Sent | **To** Joshua Cline **Direction:** Outgoing | 5/21/2015 8:55:13 PM(UTC-4) | | Sent | Lol yeah... Den and Ray were going to try and meet wtih Todd tonight. Dan got blackmail texts so he's going to ask about that and leave all of us out of it | | |

| 1458 | SMS Messages | | | | Responsive | 3/21/2018 9:40:10 PM | 3/21/2018 9:40:10 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |
| Inbox | **From** Joshua Cline **Direction:** Incoming | 5/21/2015 8:53:53 PM(UTC-4) | Network: 5/21/2015 8:54:05 PM(UTC-4) | Read | Everything go oK? You need a big tub of White Russians. All this is so crazy. | | |

| 1459 | SMS Messages | | | | Responsive | 3/21/2018 9:40:04 PM | 3/21/2018 9:40:04 PM |
|-------|--------------|--|--|--|------------|---------------------|---------------------|
| Folder | Party | Time | All timestamps | Status | Message | | Deleted |

EXHIBIT
Couser 4
1-28-20  7m



# Ex-aides and recordings: Mich. lawmaker asked aide to conceal relationship

Chad Livengood, Detroit News Lansing Bureau      Published 12:08 a.m. ET Aug. 7, 2015 | Updated 1:28 p.m. ET Aug. 7, 2015



(Photo: file)

Lansing — State Rep. Todd Courser planned the distribution of a fictional email alleging he had sex with a male prostitute in a bid to conceal his relationship with Rep. Cindy Gamrat, according to audio recordings obtained by The Detroit News (https://soundcloud.com/detroitnews/rep-courser-tells-aide-his-misdirection-plan/s-seWMM).

Courser, a Lapeer Republican, said on one recording the email was designed to create "a complete smear campaign" of exaggerated, false claims about him and Gamrat so a public revelation about the legislators' relationship would seem "mild by comparison."

Interviews with former House employees and the recordings show freshman lawmakers Courser and Gamrat, R-Plainwell, used their taxpayer-funded offices to maintain and cover up their relationship. Courser, 43, and Gamrat, 42, rose from the ranks of tea party activism, battled establishment Republicans to win seats in the House last year and formed their own legislative coalition (/story/news/politics/2015/01/18/firebrands-test-fellow-gop-lawmakers/21981025/).

(https://www.detroitnews.com/story/news/politics/2015/08/07/house-speaker-wants-investigation-courser-gamrat/31274709/)

A now-former House aide recorded Courser in mid-May directing him to send Republican activists and operatives an email that would appear to be from an anonymous political enemy that said Courser had been "caught behind a Lansing nightclub" having sex with a man.



detroitnews    SOUNDCLOUD
Rep. Courser tells aide his mis...

Cookie policy                                          27K

(On mobile devices, click here to hear audio of Rep. Courser telling his aide his plan.)
(https://soundcloud.com/detroitnews/rep-courser-tells-aide-his-misdirection-plan/s-seWMM)

After House aide Ben Graham rejected Courser's May 19 request to take a sick day on May 20 and send the mass email to Republicans across Michigan, he says he had duties removed in subsequent weeks. By early July, Courser fired Graham and Gamrat ended the employment of her aide, Keith Allard — about a month after giving them both pay raises — without explanation.

During the May 19 meeting, Courser instructed Graham to send rank-and-file Republicans across Michigan what he called "an over-the-top story that's obscene about me." It was designed, Courser said on the recording, to "inoculate the herd" — an apparent reference to Courser and Gamrat's followers in the tea party movement.

"It will make anything else that comes out after that — that isn't a video — mundane, tame by comparison," Courser, a married father of four, told Graham.



detroitnews
'This is a crazy way to deal wit...

Cookie policy                                                                                                    8K

(On mobile devices, click here to hear audio of more of Rep. Courser's conversation
with his aide.) (https://soundcloud.com/detroitnews/this-is-a-crazy-way-to-deal-with-
this-situation/s-n2duF)

"I need a controlled burn," said the lawmaker, who used the term three times during the meeting.

During two meetings recorded by Graham, Courser and Gamrat, who is also married and has three children, did not dispute the aide's characterization of their relationship as an extramarital affair. They acknowledged the aide's discomfort but neither directly confirmed nor denied having a sexual relationship.

Courser and Gamrat both declined to comment about whether the dismissals of Graham and Allard were related to their unwillingness to help hide their relationship.

"I'm not going to talk about any kind of staff-related issues," Gamrat said in a telephone interview Monday.

On Monday morning, Courser told a Detroit News reporter and photographer to leave his Lapeer law office after being asked whether he wrote the email to get ahead of revelations of an affair.

Courser initially declined to hear the recording, but confirmed "that's my voice" as a Detroit News reporter played the recording in his office lobby. He then disputed the legality of the recording.

"I'm not commenting on what happened in my office between Ben (Graham) and I inside here," Courser said. "... I don't have any comment at all."

### Socially conservative legislators

The pair are socially conservative legislators who often invoke their Christian faith (http://www.toddcourser.com/privatize_marriage_now) in pursuit of new legislation governing gun rights, abortion (/story/news/politics/2015/01/18/firebrands-test-fellow-gop-lawmakers/21981025/) and marriage (/story/news/politics/michigan/2015/06/19/gay-marriage-legislation-religion-michian/29018125/). Their political alliance dates back to Courser's unsuccessful 2013 race for Michigan Republican Party chairman when Gamrat ran as his vice chairwoman.



Rep. Cindy Gamrat, R-Plainwell, talks with Rep Todd Courser, R-Lapeer, on the first day of the Legislature's new session in January. The two lawmakers, in an unusual arrangement, combined their office operations, with three aides effectively working for both of them. *(Photo: Dale G. Young / The Detroit News)*

But since being sworn into office in January, the self-described tea party "gladiators" (/story/news/politics/2015/01/18/firebrands-test-fellow-gop-lawmakers/21981025/) have fought with Republican leaders. In an unusual move, Courser and Gamrat wrote a "liberty response" (http://www.toddcourser.com/liberty_response) to Republican Gov. Rick Snyder's State of the State address in January — the kind of retort that typically comes from Democrats.

In April, House Speaker Kevin Cotter kicked Gamrat out of Republican caucus meetings after she was caught leaking confidential discussions (/story/news/politics/2015/04/17/house-speaker-gamrat-ousted-gop-caucus-leaks/25955035/) among GOP members. In one of his lengthy emails to people involved in Michigan politics, Courser called the House speaker a "bully" (http://www.toddcourser.com/stand_w_rep_gamrat) who was waging a "witch hunt" and who was "dead set against (Gamrat's) efforts to advance liberty and freedom."

In an unusual arrangement, Courser and Gamrat combined their office operations, having three aides effectively work for both of them.

Graham, Allard and former aide Joshua Cline said they internally opposed the relationship between Courser and Gamrat and how it complicated the operations of their jointly run House office.

"Everything in the office was done and intertwined around their relationship — from time management to who's going to get what bills," said Cline, a former legislative director who quit working for Courser and Gamrat in April after he said he confronted them about their relationship and "unprofessional" office behavior.

**'This is a crazy way'**

Graham and Allard said their House work situation began rapidly deteriorating after Courser called Graham to his Lapeer law office at 10:30 p.m. on May 19 with an alarming request to "destroy me."

Not knowing whether Courser would become volatile, Graham said he recorded the 90-minute conversation without his boss' knowledge. He subsequently provided an audio copy to The News.

A Michigan Court of Appeals ruling says participants in a conversation may record a discussion without getting the permission of other participants. "A recording made by a participant is nothing more than a more accurate record of what was said," the court decided in a 1982 case.

During the meeting, Courser said earlier in the day, after the House adjourned, he and Gamrat received identical text messages from an unknown phone number with a message about their relationship.

At several points, the House aide can be heard on tape advising Courser against distributing the email and urging him to acknowledge the relationship with Gamrat.

"This is a crazy way to deal with this situation," Graham told Courser on May 19 (https://soundcloud.com/detroitnews/this-is-a-crazy-way-to-deal-with-this-situation/s-n2duF). "Normally, people just like front it off, head it off themselves and say 'Hey, this happened' or quietly resign and go away."

Written using the pseudonym George Rathburn, the sexually explicit email was received by Republicans on May 20 and 21, the two days following Courser's meeting with Graham. The missive claimed Courser was removed from the House GOP caucus after being caught having "paid male on male sex behind a prominent Lansing night club," among other claims.

During the May 19 meeting, Courser twice read aloud portions of a draft email to Graham. Most of the sentences Courser recited match copies of the email sent to Republicans and obtained by The News.

"Nobody's gonna believe any of that," Graham said about the draft email.

"Correct," said Courser, who then added: "No, they'll believe some of it. They'll believe some of it."

Courser does not explicitly say he wrote the letter, only telling Graham "it's already written" and that Gamrat "agreed" with sending it.

"It's what they won't expect," Courser said. "At that point, if they don't have some really, really, really offensive stuff ... it will be tough for them to bring it after this."

The mass email calls Gamrat "a tramp" and claims she "has covered" for Courser "and her involvement is the real reason she was thrown out" of the House Republican caucus in April.

"In a controlled burn, you do a little bit of truth mixed in with a lot of lies," Courser explained to Graham.

At one point, a cellphone began ringing and Courser identified the caller as Gamrat. The recording picked up Courser's end of the conversation.

"Ben and I are sitting here," Courser said. "He's trying to, trying to mentally process everything I just told him."

During the meeting, Courser wonders aloud whether someone has pictures, video or audio recordings of him and Gamrat.

## Aide rejects Courser's email request

After a 90-minute late night meeting, House aide Ben Graham responds to a text message in the early morning hours of May 20 from state Rep. Todd Courser, R-Lapeer, rejecting a request from his boss to take time off from his job to send an anonymous, salacious message about the lawmaker in a mass email to hundreds of Michigan Republicans.

**Todd Courser**

Hey Ben if your not coming back please let me know. I know it doesn't make sense and maybe it doesn't if you see another way then let me know, but if I can keep
1:07 AM

this from blowing all to hell then I would like to give it this shot. Maybe it's nothing and maybe I should not have ever run but I felt and still feel that
1:07 AM

God brought me here and had me here and maybe it hasn't accomplished anything but I have to believe it has done some good inspite of me.
1:07 AM

**Ben Graham**

I don't know what the answer is but this isn't it. This kind of stuff never stays hidden... its going to blow up and I can't help cover it up. If it wasn't true I would go to the end of the earth to defend you but I can't help you cover it up. My best advice consider resigning. You may be able to protect Cindy and her family and your family. I'm sorry I really am. I've prayed on it and I just dont feel right with it.
1:24 AM

**Todd Courser**

Thanks I appreciate your help. Have a good night. No I don't think I feel resigning at this point is the way to go down if they have something I think a
1:31 AM

crucifixion is in order here so i'll just keep praying on it and you may need to consider that and if
The Detroit News

**Aide refuses request**

Courser also told Graham to claim he was sick the next day — a Wednesday — after sending the email. "You're going to do this and then go home," Courser told the state employee.

Graham asked Courser for time to think about the assignment of sending the email. The meeting ended at about midnight and he left the law office, Graham said. An hour later, Courser asked for an answer in a text message to Graham, which he released to The News.

"If you see another way then let me know," Courser wrote. "But if I can keep this from blowing all to hell, then I would like to give it a shot."

Graham replied by text that he wouldn't participate in a "cover-up" and urged his boss to resign from office.

"This kind of stuff never stays hidden. It's going to blow up, and I can't help cover it up," Graham wrote. "... My best advice, consider resigning. You may be able to protect Cindy and her family and your family."

In a reply, Courser said he didn't plan to resign "at this point."

"If they have something, I think a crucifixion is in order," the lawmaker wrote in a text.

It's unclear who ultimately sent the email. But during the meeting, Courser said he has someone who does "this sort of thing" for him using "gmail accounts." The email came from a georgerathburn520@gmail.com (mailto:georgerathburn520@gmail.com) address.

## Anti-Courser email

This email attacking state Rep. Todd Courser, R-Lapeer, was sent to Republican activists around Michigan on May 20 and May 21. Most of the sentences in the email match what Courser recited May 19 to a House aide, captured on a recording, and said he wanted sent as a mass email to GOP operatives. What is shown is a small portion of the entire email, parts of which are sexually explicit.

From: George Rathbone <xxxxxxxx@gmail.xxx.xxxxx.xxx>
Date: Thursday, May 21, 2015 at 7:20 AM
Subject: Todd Courser, our State Rep

### *Breaking Scandal!*
### *State Rep Courser Caught behind a Lansing nightclub!*

### *Christian conservative or Godless Addicted Monster!*

*Truth!!!! Courser secretly Removed from Caucus several weeks ago due to male on male paid for sex behind a prominent Lansing nightclub! Action soon coming to remove Courser!*

*He is a bi-sexual porn addicted sex deviant! All over Lansing since the election and that is why he was thrown out of caucus!*

The Detroit News

### Staffer recorded meeting

Graham, a Lapeer native who worked on Courser's past campaigns for office and helped him build a political machine, said he took a vacation day the next day after rejecting the order to send the email and claim to be sick. On the following day, May 21, Graham recorded another meeting in Gamrat's House office in Lansing with both representatives present. Courser told Graham he wanted to "chat" about what took place two nights prior at his Lapeer office.

Courser and Gamrat can be heard apologizing to their 25-year-old aide, who made direct comments that they "are having an affair."

"How long has this been going on?" Graham asks on the recording. "A year? Two years?"

"No, I mean, I don't want to go through the circumstance of how that developed," Courser replied.

Graham then quizzed his bosses on when the relationship developed since the pair ran for state GOP leadership positions in 2013.

"It wasn't back to the beginning and it wasn't yesterday," said Courser, later adding "some things happened and shouldn't have happened."

At one point, Gamrat urged Graham to keep quiet about "a mistake that we made."

"I would ask you to just keep this private. This is not just about protecting me, it's also about protecting Joe and the kids," Gamrat said.

Graham repeatedly tries to steer the discussion back to legislative matters and reminds Courser he's late for a committee meeting. Courser was absent that day from a House Military and Veterans Affairs Committee meeting, committee records show.

In the following weeks, Courser and Gamrat relieved Graham of his duties, including his main job speaking to their constituents, Graham and Allard told The News.

On July 7, Courser and Gamrat terminated the employment of Graham and Allard, said Tim Bowlin, chief financial officer for the House business office.

Office staff for individual House members are at-will employees and the reason for the firings doesn't have to be given, Bowlin said.

But the dismissals occurred several weeks after Courser and Gamrat gave Allard and Graham each 6 percent pay raises, the maximum salary increase allowed, according to House payroll records.

### Aides worked for both reps

House members from neighboring districts or urban areas like Detroit sometimes share an employee for budgetary reasons, Bowlin said. But Courser and Gamrat's House districts are nearly 130 miles apart on different sides of the state; Gamrat represents the 80th District (http://house.michigan.gov/mhrpublic/2012DistrictMaps/080.pdf) in west Michigan's Allegan County, while Courser represents the 82nd District (http://gophouse.org/representatives/thumb/courser/districtmap/) in Lapeer County.

"In the past, when it's happened, it's usually happened in districts that share a county or share proximity," Bowlin said.

Cline, the former aide who quit in April, said the joint office was devised to give Courser and Gamrat more legislative muscle.

But within weeks of taking office, Cline said "everything was merged." Courser and Gamrat began sitting in on meetings with constituents and lobbyists who wanted to meet with just one of them, he said.

"It didn't matter if it was inside the office or outside the office, all meetings were held together," Cline said.

Courser and Gamrat would demand that no meetings be scheduled on Thursday afternoons after the House adjourned for the week and most representatives were driving home to their districts, Cline said.

The pair would frequently leave the office together for several hours on Thursday afternoons, asking the staff to stay in Lansing until they returned to the office for evening staff meetings that sometimes stretched on for hours, he said.

"It measurably affected the time management of the office, the efficiency of the office and constituent services," Cline said.

**Battle with Cotter**

During the May 19 recorded meeting, Courser speculated that Republican leaders may have been behind the anonymous text messages he and Gamrat received about their relationship.

"The speaker, he's got a wound in his side," Courser told Graham. "They want something from us. They want us dead."

In the meeting, Courser also told Graham he desired news reports about the email to inflame his on-going battle with Cotter.

"This is the best we came up with. Neither one of us want to be on somebody's leash," Courser later told Graham. "Neither one of us really want to be in Lansing if this is how we have to do it."

"You could just quit, you know," Graham suggested.

After a long audible pause, Courser replied: "I might have to."

clivengood@detroitnews.com

(517) 371-3660

Read or Share this story: http://detne.ws/1NdJh37

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



TODD COURSER

    Plaintiff

v.

RADISSON HOTELS INTERNATIONAL, INC.,
a Delaware corporation, RADISSON GROUP,
INC., a Minnesota corporation, CARLSON
REZIDOR HOTEL GROUP, an international
partnership, BLOCK 100 LIMITED
PARTNERSHIP, a Michigan limited partnership,
and WINEGARDNER & HAMMONS, INC., an
Ohio corporation, and WINEGARDNER &
HAMMONS HOTEL GROUP, LLC, a Delaware
limited liability company, and VINCENT KRELL

    Defendants.

Case No. _____

HON. _____

Matthew S. DePerno (P52622)
DePerno Law Office, PLLC
Attorney for Plaintiff
951 W. Milham Avenue
PO Box 1595
Portage, MI 49081
(269) 321-5064

---

**THERE ARE SIX (6) OTHER PENDING AND UNRESOLVED CIVIL ACTIONS ARISING OUT OF THE TRANSACTIONS OR OCCURRENCE ALLEGED IN THIS COMPLAINT:**

1. *Cindy Gamrat v Joshua Cline, Joseph Gamrat, and David Horr*, United States District Court for the Western District of Michigan, Southern Division, Case No. 1:16-cv-1094

2. *Todd Courser v Keith Allard, Benjamin Graham, and Joshua Cline*, United States District Court for the Western District of Michigan, Southern Division, Case No. 1:18-cv-00874

3. *Todd Courser v Michigan House of Representatives, Kevin G. Cotter, Tim L. Bowlin, Brock Swartzle, Norm Saari, Edward McBroom, and Hassan Beydoun*, United States District Court for the Western District of Michigan, Southern Division, Case No. 1:18-cv-00882

Case 1:18-cv-01232-GJQ-PJG  ECF No. 188-6,  PageID.5179  Filed 07/23/21  Page 305 of
394
Case 1:18-cv-01232  ECF No. 1 filed 11/02/18  PageID.2  Page 2 of 30

4.  *Todd Courser v Chad Livengood and The Detroit News, Inc.*, Washtenaw County
    Circuit Court, Case No. 18-831-CZ

5.  *Cindy Bauer v Michigan House of Representatives*, State of Michigan, Court of
    Claims, Case No. _____.

6.  *Todd Courser v Joseph Gamrat and David Horr*, Kalamazoo County Circuit Court,
    Case No. _____.

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, TODD COURSER ("COURSER"), by and through his
attorneys, DePERNO LAW OFFICE, PLLC and for his Complaint against RADISSON
HOTELS INTERNATIONAL, INC., a Delaware corporation, RADISSON GROUP, INC., a
Minnesota corporation, CARLSON REZIDOR HOTEL GROUP, an international partnership,
BLOCK 100 LIMITED PARTNERSHIP, a Michigan limited partnership, WINEGARDNER &
HAMMONS, INC., an Ohio corporation, WINEGARDNER & HAMMONS HOTEL GROUP,
LLC, a Delaware limited liability company, and VINCENT KRELL, a Michigan resident, states
the following:

## JURISDICTION and VENUE

1.  This is an action pursuant to 18 U.S.C. § 2511 and applicable state law.

2.  This action also arises out of Courser's claims to enforce their rights arising out of
the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*, as amended.

3.  This Court also has original jurisdiction pursuant to 28 U.S.C. Section § 1331 (as
this action involves a federal question and the laws of the United States).

4.  This Court also has diversity jurisdiction pursuant to 28 U.S.C. Section § 1332.
Some of the Defendants are citizens of different states and the amount in controversy is greater
than $75,000.

2

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Courser's state-law claims that are related to, and form part of, the same case or controversy. It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts as the federal claims. Therefore, the Court's exercise of supplemental jurisdiction will further economy, convenience, and fairness to the parties.

6.      The transactions that give rise to this cause of action occurred in the State of Michigan.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

8.      Plaintiff requests trial by jury, pursuant to Fed. R. Civ. P. 38.

## PARTIES

9.      Plaintiff TODD COURSER ("Plaintiff") is an individual residing in Lapeer County, Michigan. Plaintiff was the duly elected State Representative for the 82nd District and, as such, a member of the Michigan House of Representatives, until he was unlawfully forced to resign his position on September 11, 2015.

10.     Upon    information    and    belief,    Defendant    RADISSON    HOTELS INTERNATIONAL, INC. ("RHI") is a Delaware corporation with its headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. Radisson Hotels does business in Michigan and operates the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

11.     Upon information and belief, Defendant RADISSON GROUP, INC. ("RGI") is a Minnesota corporation with its headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. Radisson Group does business in Michigan and operates the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

3

12.     Upon information and belief, Defendant CARLSON REZIDOR HOTEL GROUP ("Carlson") in an international partnership with headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. Carlson does business in Michigan and operates the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

13.     Upon information and belief, Defendant BLOCK 100 LIMITED PARTNERSHIP ("Block 100") is a Minnesota limited partnership with headquarters located at 512 Nicollet Mall, Minneapolis, MN, 55402. W&H Inc. does business in Michigan and manages the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

14.     Upon information and belief, Defendant WINEGARDNER & HAMMONS, INC. ("W&H Inc.") is an Ohio corporation with its headquarters located at 4243 Hunt Road, Cincinnati, OH 45242. W&H Inc. does business in Michigan and operates the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

15.     Upon information and belief, Defendant WINEGARDNER & HAMMONS HOTEL GROUP, LLC. ("W&H Group") is a Delaware corporation with its headquarters located at 4243 Hunt Road, Cincinnati, OH 45242. W&H Group does business in Michigan and operates the Radisson Hotel Lansing at the Capitol, in Lansing, Michigan.

16.     RHI, RGI, Carlson, Block 100, W&H Inc. and W&H Group are hereinafter collection referred to as "The Radisson Defendants".

17.     Upon information and belief, Defendant VINCENT KRELL ("KRELL") is a resident of Kentucky or Michigan.

## COMMON ALLEGATIONS

18.     RHI, RGI, and Carlson operate guest lodging systems (commonly referred to as hotels) throughout the United States and abroad, including the Radisson Hotel Lansing at the

4

Capital, located at 111 North Grand Avenue, Lansing, Michigan 48933 (the "Radisson Hotel Lansing"). RHI, RGI, and Carlson also license the "Radisson" trade name, marks, and business systems in connection with the operation of their hotels.

19.    Block 100 owns the Radisson Hotel Lansing under a license agreement between RHI, RGI, and Carlson with respect to the Radisson Hotel Lansing.

20.    W&H Inc. and W&H Group manage the Radisson Hotel Lansing for Block 100, RHI, RGI, and Carlson.

21.    Upon information and belief, W&H Inc. and W&H Group employ the management-level personnel at the Radisson Hotel Lansing, which are leased, in some capacity, to Block 100, RHI, RGI, and/or Carlson.

22.    Upon information and belief, all other employees at the Radisson Hotel Lansing are employed by Block 100.

23.    In the winter of 2015, Courser stayed at the Radisson Hotel Lansing.

24.    It later became known that The Radisson Defendant employees and staff were granting and assisting unauthorized agents physical access to Courser's rooms at the Radisson Hotel Lansing.

25.    In fact, The Radisson Defendant employees and staff allowed and actively assisted unauthorized agents, including Krell, to secretly and repeatedly enter Courser's rooms at the Radisson Hotel Lansing.

26.    The Radisson Defendant employees and staff also allowed and actively assisted unauthorized agents, including Krell, to secretly enter Courser's hotel rooms to install illegal surveillance equipment in the Courser's hotel room at the Radisson Hotel Lansing.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 321-5164 (fax)

27.    The Radisson Defendant employees and staff passed surveillance information about Courser to agents, including Krell, who were conducting surveillance on Courser to gain leverage on Courser, extort him, and have him removed from office.

28.    The Radisson Defendant employees and staff allowed and actively assisted unauthorized agents, including Krell, to secretly and repeatedly access Courser's hotel account for reservation information and account statements.

29.    The Radisson Defendant employees and staff allowed and actively assisted unauthorized agents, including Krell, to secretly and repeatedly access Courser's hotel account by sending emails about Courser's account statements including reservation and billing information, as well as key card activity on Courser's hotel rooms at the Radisson Hotel Lansing.

30.    The Radisson Defendant employees and staff allowed and actively assisted unauthorized agents, including Krell, to secretly receive surveillance times of the arrival and departure of Courser's vehicle at the Radisson Hotel Lansing.

31.    Upon information and belief, the Radisson Defendants employees and staff were paid by unauthorized agents for their release of Courser's information electronically, physically and by allowing illegal access to Courser's hotel rooms at the Radisson Hotel Lansing.

32.    Courser met with the Radisson Defendant management regarding the status of Courser's account and the breach of Courser's account information.

33.    The Radisson Defendant management assured Courser that no further breaches would occur. The Radisson Defendant management claimed the access to Courser's hotel account was an accident and that no one had breached Courser's hotel rooms or Courser's personal data. This was untrue. The Radisson Defendant employees and staff were actively engaged in assisting unauthorized agents to access Courser's electronic information at the

6

Radisson Hotel Lansing, provide onsite surveillance through its personnel, and finally allow access to the Courser's hotel rooms.

34. The Radisson Defendants allowed for continued access to electronic accounts and to Courser's hotel rooms even after the Defendant management promised that no one who was unauthorized could enter Courser's hotel rooms.

35. Defendant Krell, did in fact, with the help of the Radisson Defendants, access Courser's electronic accounts and Courser's hotel rooms at the Radisson Hotel Lansing.

36. The Radisson Defendants allowed unauthorized access to Courser's hotel room for recordings to be made of Courser. These recordings caused irreparable harm to Courser.

37. Defendant Krell, did in fact, with the help of the Radisson Defendants, access to Courser's hotel room for recordings to be made of Courser. These recordings caused irreparable harm to Courser.

38. All Defendants broke numerous laws as The Radisson Defendants allowed access to Courser's hotel accounts and Courser's hotel rooms and Defendant Krell did access Courer's hotel account and Courser's hotel rooms to further the surveillance of the conspiracy and the extortion plot to remove Courser from office. This included, but is not limited to:

a. Fictitious email addresses were added to Courser's personal Radisson Hotel Lansing accounts by Defendants and The Radisson Defendants' staff several times, compromising statements and giving access to Courser's personal information.

b. An extortion text sent to Courser revealed The Radisson Defendants' employees and staff were being paid to provide information, monitor Courser's hotel rooms and provide physical access to Courser's hotel rooms.

c. Text messages from different co-conspirators, of the extortion plot to remove Courser from office, revealed that the Defendants had provided information to the co-conspirators allowing access to Courser's information from Defendants, physical access to the rooms and updates from The Radisson Defendants' employees and staff on the rooms themselves. This happened even after Courser met with The Radisson Defendants' management and was assured no information

7

about Courser's stay at the Radisson Hotel Lansing was being broadcast out. The information and access was still being provided to the co-conspirators, of the extortion plot to remove Courser from office.

d.  All Defendants and The Radisson Defendants' employees and staff were actively providing private information illegally to unauthorized agents who were extorting Courser and allowing hotel room access to unauthorized agents. Updates provided to the unauthorized agents involved in the extortion plot, by the The Radisson Defendants' employees and staff, included emails to the unauthorized agents regarding Courser's hotel accounts, temperature of Courser's hotel rooms, lights on or off in Courser's hotel rooms, shower curtain placement in Courser's hotel rooms, luggage placement in Courser's hotel rooms, listening devices in Courser's hotel rooms, audio and video from Courser's hotel rooms, as well as physical entry and exiting the hotel time stamps of Courser  and arrival and departure of Courser's vehicle at the hotel.

e.  Courser was told by The Radisson Defendants' employees and staff that Courser's personal information including reservations information, room number, and payment information were automatically sent to the unauthorized email addresses attached to Courser's account.

f.  Upon information and belief, later through a Michigan State Police ("MSP") investigation of the extortion plot to remove Courser from office, it was determined that the co-conspirators were gaining illegal access to Courser's Radisson Hotel Lansing rooms and hotel information via The Radisson Defendant's employees and staff.

g.  Defendant Krell was, in fact, one of the co-conspirators who gained illegal access to Courser's Radisson Hotel Lansing rooms and hotel information via The Radisson Defendant's employees and staff.

h.  Texts between some of the known unauthorized agents and others clearly show that the unauthorized agents had access to Courser's personal information, hotel account, reservations, time stamps on Courser's arrival and departure, room numbers and payment information.

(1)  "I just think it's strange that both beds are used. I typically sleep in one and put my suitcase or bag on the other. You? Heat was high too which is just the way Cindy likes it."

(2)  "Housekeeping usually makes both beds when they clean each day so both beds used yesterday?"

(3)  "FYI She checked in at 1:29a and he checked in at 7:51a Tuesday morning."

(4)  "And he checked in at 7:51 Tuesday morning."

8

Case 1:18-cv-01232-GJQ-PJG   ECF No. 188-6,  PageID.5186   Filed 07/23/21   Page 312 of
394
Case 1:18-cv-01232   ECF No. 1 filed 11/02/18   PageID.9   Page 9 of 30

(5)    "Hotel room is considered private."

(6)    "Hotel has now told me that his reservation is for Tuesday and Wednesday, not Monday and Tuesday."

(7)    "By the way, he obviously didn't take a shower this am as the shower curtain was 'out' of the tub? Must have had a bath last night?"

(8)    "Yeah some one was in both of those beds."

(9)    "His clothes are still there."

(10)    "Have you checked if ass is staying there this week?"

(11)    "when I called that morning they said there were two reservations"

(12)    "He hasn't checked out yet."

(13)    "But he is scheduled to check out."

(14)    "What the f@$& her room?" "His"

(15)    "Was looking for potential evidence like trash or a wrapper. Nothing – which doesn't say a whole lot though."

(16)    "What would you make of this? Normal or abnormal?

(17)    "the room is in his name."

(18)    "Next to each other?" "Under todds name again?" "Don't know and yes."

(19)    "Todd turned off his light around 6:20"

i.    Courser met several times with The Radisson Defendant managers to share concerns about the breach of security of Courser's privacy.

j.    Courser was assured by The Radisson Defendant management that the failures and security breaches would not be repeated, but unbeknownst to Courser that his personal information was continuing to be released by all Defendants to the unauthorized agents who then used this information in the extortion plot to remove Courser from office.

39.    The information received from Defendants was used in an extortion plot, to remove Courser from office, for nearly 5 months in a series of anonymous texts that resulted in a worldwide scandal that ended with Courser resigning from office.

9

40.     The above deleted texts taken from Defendants' phones taken by the Michigan
State Police ("MSP") reveal the connection with the Radisson surveillance:

41.     The illegal access to Courser's hotel room, Courser's hotel account, Courser's
personal information stored at the Radisson Hotel Lansing, and the physical surveillance done by
Defendants, that was allowed by Defendants, did irreparable harm to Courser.

## COUNT 1
## VIOLATIONS OF RICO: 18 U.S.C. § 1962(a), (b), and (c)

42.     Courser restates and incorporates as if set forth fully herein all preceding
allegations contained in this Complaint.

*CULPABLE RICO PERSONS*

43.     All Defendants in this matter are RICO persons.

*RICO ENTERPRISE*

44.     The RICO enterprise consists of all Defendants who, associated in fact, worked
through the enterprise to commit a pattern of racketeering, which includes the specific predicate
acts alleged herein.

*INTERSTATE OR FOREIGN COMMERCE*

45.     Defendants' racketeering activity affected interstate commerce.

46.     Telephone   conversations,   correspondence,   documentation,   and   other
communication, as described herein, was used the U.S. Mail and interstate wires.

47.     Also, the pattern of racketeering crossed state lines when Defendants provided
financing, payments, U.S. Mail, and interstate wires in an effort to remove Courser from office
and to damage his livelihood, all with the intent to engage in illegal wiretapping and
eavesdropping and to promote a sensational story for profit.

10

48.     Therefore, the activity of the enterprise and the predicate acts of racketeering affect interstate commerce.

## PATTERN OF RACKETEERING

49.     Defendants have engaged in a long-term pattern of racketeering activity, which has benefitted the criminal RICO enterprise and harmed Courser.

50.     As described in this Complaint, some Defendants started the scheme to violate federal and state laws and then spy on Courser in order to "dig up dirt" on him in violation of federal and state laws. This scheme involved illegal wiretapping and eavesdropping and purchasing favors and information from The Radisson Defendants through Defendant Krell, as a co-conspirator. Information obtained was then used to extort Courser. The illegally obtained information was then provided to The Detroit News for broadcast around the world. The information was then disseminated to the State of Michigan agencies, including the Michigan State Police, Michigan House of Representatives, and Michigan Attorney General in order to remove Courser from office, extort, and bring criminal charges..

51.     Defendants conspired to earn a profit through a process of fraud and misrepresentation of material facts, to advance their own agendas and to harm Courser.

## RACKETEERING ACTIVITY

52.     Defendants engaged in a pattern of racketeering activity that harmed Courser, including additionally incurred legal costs, the inability to earn money, the loss of property rights and profits, and a violation of his due process, equal protection, and other Constitutional rights and in violation of various federal and state laws.

11

Case 1:18-cv-01232-GJQ-PJG   ECF No. 188-6,  PageID.5189   Filed 07/23/21   Page 315 of
394
Case 1:18-cv-01232   ECF No. 1 filed 11/02/18   PageID.12   Page 12 of 30

### *VIOLATIONS OF MCL § 750.539C, 539D, 539E AND 750.540*

53.     Defendants violated MCL 750.540 when they conspired to and did (in order to aid the conspiracy) willfully and maliciously tape or otherwise make unauthorized connections to an electronic medium of communication of Courser.

54.     Defendants violated MCL 750.539c when they conspired to and did (in order to aid the conspiracy) willfully use a device to eavesdrop upon the conversations of Courser without the consent of all parties to the conversation.

55.     Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) install listening devices in a private place without the consent of Courser (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds and events in that place.

56.     Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) distribute and disseminate or transmit for access a recording they knew to be obtained in violation of such section.

57.     Defendants violated MCL 750.539e when they conspired to and did (in order to aid the conspiracy) use or divulge information they knew or reasonably knew or should have known was obtained in violation of MCL 750.539b, 539c, or 539d.

### *VIOLATIONS OF 18 U.S.C. § 2511*

58.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally intercept, endeavor to intercept, or procure other people to intercept or endeavor to intercept, wire, oral, and electronic communications of Courser.

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (Phone) ● (269) 321-5164 (Fax)

59.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally use, endeavor to use, or procure other people to use or endeavor to use an electronic, mechanical or other device to intercept oral communications of Courser.

60.     Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) know or have reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

61.     Defendants violated 18 U.S.C. 2511 because (a) their actions to record and/or transmit conversations of Courser took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of Courser where obtained for the purposes of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

62.     Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

63.     Defendants violated 18 U.S.C. 2511 when they intentionally used or endeavored to use the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

64.     Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose the contents of the wire, oral, or electronic communications intercepted by authorized means but knowing or having reason to know that the information was obtained

13

through the interception of such a communication in connection with a criminal investigation, having obtained or received the information in connection with a criminal investigation, and with intent to improperly obstruct, impede, or interfere with a criminal investigation.

### MAIL AND WIRE FRAUD – 18 U.S.C. §§ 1341, 1343

65.    Defendants committed mail fraud when they sent any correspondence, documents, recordings, or funds, throughout the commission of their fraudulent scheme, through the U.S Mail or through other wired communications, such as telephones, emails, and text messages.

66.    These actions and statements sent by U.S. Mail or by telephones, emails, and text messages were not only false, but misleading in such ways as to the Defendants' illegal benefit and to Courser's detriment.

67.    Further, the Defendants' correspondence, to include recorded conversations, is fraudulent and part of a greater scheme to defraud Courser because of the Defendants unethical desire for unilateral benefit.

68.    Thus, by sending correspondence, recordings, emails, and text message to through the U.S. Mail and wires, Defendants intended to mislead, defraud and extort Courser and citizens of the world into believing the truth of their correspondence and documents in order to mislead, defraud, and extort Courser.

69.    The aforementioned records, emails, and text messages were false, fraudulent, and misleading. They were sent in an attempt to conceal the on-going RICO enterprise and was part of a greater "scheme or artifice to defraud" Courser out of his rights to his office, property, business, and livelihood.

14

70.     The recordings, emails, and text messages were transmitted over the wires electronically via electronic mail and facsimile.

71.     Defendants knowingly transmitted their lies through the U.S. Mail and electronically via electronic mail and facsimile.

72.     Defendants' correspondence and documents were and are false, fraudulent, and misleading.

73.     Defendants utilized the mail and wires to perpetuate their misdeeds.

74.     Upon information and belief, Defendants engaged in other acts in furtherance of the schemes that involved use of interstate wire and the U.S. Mail, as identified in this Complaint

### *VIOLATIONS OF 42 U.S.C. § 1983 AND*

75.     Defendants, through the conspiracy, engaged in actions that violated COURSER's civil rights under 42 U.S.C. § 1983 and 1985, as described in this Complaint.

### *VIOLATIONS OF MCL § 445.61, ET SEQ (INCLUDING MCL § 445.65, 445.67, 445.67A, 445.69, 445.71)*

76.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's Identity Theft Protection Act as described in this Complaint.

### *VIOLATIONS OF MCL § 752.791, ET SEQ*

77.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act as described in this Complaint.

### *VIOLATIONS OF COMMON LAW INVASION OF PRIVACY*

78.     Defendants, through the conspiracy, engaged in actions in violation of Michigan's common-law tort of invasion of privacy as described in this Complaint.

15

*VIOLATIONS OF MCL § 750.213; EXTORTION AND BLACKMAIL*

79.    Defendants, through the conspiracy, engaged in actions of extortion and blackmail, in violation MCL 750.213 as described in this Complaint.

*INJURY*

80.    Courser is a person who sustaining injuries to his business, property, and livelihood by reasons of the Defendants' violation of RICO and Defendants' commission of the predicate acts.

81.    Courser has been harmed because, as a result of Defendants' actions, he has, to this day been deprived of business, property, and livelihood.

82.    Courser has been harmed because he has been forced to incur substantial attorneys' fees in order to enforce his rights in the face of Defendants' predicate actions.

83.    Courser has been harmed because he was forcibly removed and constructively expelled from office as a result of Defendants' predicate actions, causing him hardship, embarrassment, and loss of income and livelihood.

84.    Courser has been harmed because he has suffered mental and emotional distress and attorneys' fees caused by Defendants actions against them.

85.    As a direct and proximate cause of the violations described in this Complaint, Courser has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

## COUNT 2
## CONSPIRACY TO VIOLATE RICO: 18 U.S.C. § 1962(d)

86.    Courser restates and incorporates the preceding paragraphs as though set forth fully herein.

16

87.     Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b) or (c) of Section 1962. 18 U.S.C. § 1962(d).

88.     Each Defendant was a co-conspirator that knowingly joined the conspiracy and involved him or her, directly or indirectly, in the commission of at least two predicate offenses, including but not limited to the predicates of extortion, mail fraud and wire fraud, as alleged herein.

89.     Defendants were each aware of their role as co-conspirators because they have been engaged in a quid-pro-quo relationship with the other Defendants.

90.     Defendants knowingly and willingly involved themselves in a greater scheme to defraud, and commit the predicate acts alleged above, when they conspired to create a mutually beneficial business relationship whereby they attempted to deprive Courser of his businesses, property, profits, livelihood, and value.

91.     Defendants also knowingly and willingly committed the predicate acts of fraud, mail and wire fraud, illegal wiretapping and eavesdropping, extortion, blackmail, and other crimes and violations as described in this Complaint. Defendants also engaged in monetary transactions derived from unlawful activity of their conspiracy.

92.     Defendants were each aware of their role as co-conspirators.

93.     Defendants knowingly participated in a greater scheme to defraud, and commit the predicate acts alleged herein.

94.     As a result of their conspiracy, the predicate acts and greater scheme to defraud, Courser was harmed.

95.     As a direct and proximate cause of the violations described in this Complaint, Courser has suffered and continues to suffer from, including but not limited to, severe and

17

permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

## COUNT 3
## VIOLATION OF FEDERAL WIRETAPPING ACT AND MICHIGAN'S EAVESDROPPING STATUTE

96.     Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

97.     Throughout the aforementioned time frame, Defendants and other non-named parties, acting as co-conspirators, had been spying on Courser.

98.     Upon information and belief, Defendants were working with Joe Gamrat and David Horr and other unidentified co-conspirators to conduct surveillance activities, record conversations, and send extortive text messages to Courser.

99.     Among other things, Defendants and/or their agents at their direction, unlawfully placed (or allowed to be placed) listening devices, tracking devices, and engaged in other inappropriate and illegal surveillance activities.

100.    After obtaining private information from surveillance and listening devices, Defendants used that information to directly blackmail, extort, and threaten Courser or advance a conspiracy to blackmail, extort, and threaten Courser.

101.    Upon information and belief, Defendants spoke regularly with Joe Gamrat, David Horr, and other co-conspirators before, during, and after the surveillance and blackmail was occurring.

102.    Defendants violated MCL 750.540 when they, in conjunction with others and in order to aid the conspiracy described herein, willfully and maliciously tapped or otherwise made an unauthorized connection to an electronic medium of communication of Courser; or allowed others to do so.

18

103.    Defendants violated MCL 750.539c when they, in conjunction with others and in order to aid the conspiracy described herein, willfully used a device to eavesdrop upon the conversations of Courser without the consent of all parties to the conversation; or allowed others to do so.

104.    Defendants at one time or another, knowingly aided, requested, or employed others to eavesdrop on the conversations of Courser without the consent of all parties to the conversation; or allowed others to do so.

105.    Defendants violated 18 U.S.C. § 2511 when they intentionally intercepted, endeavored to intercept, or procured other people to intercept or endeavor to intercept, wire, oral, and electronic communication of Courser; or allowed others to do so.

106.    Defendants further violated 18 U.S.C. § 2511, when they intentionally used, endeavored to use, or procured other people to use or endeavor to use an electronic, mechanical, or other device to intercept oral communications of Courser and did so when they placed recording devices (or authorized the placement of recording devices) in Courser's hotel rooms and then transmitted those communications through a wire, cable, or other connection.

107.    Defendants violated 18 U.S.C. § 2511, because they knew or had reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

108.    Defendants also violated 18 U.S.C. § 2511, because (a) their actions to record and/or transmit conversations of Courser took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of Courser where obtained for the purposes of obtaining

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (phone) ● (269) 321-5164 (fax)

information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

109.    Defendants violated MCL 750.539d when they installed listening devices in a private place without the consent of Courser (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds events in that place.

110.    Defendants violated MCL 750.539d when they distributed and disseminated or transmitted for access a recording they knew to be obtained in violation of such section, or allowed such activity on their business premises.

111.    Defendants violated MCL 750.539d when they distributed and disseminated or transmitted for access the same recordings they knew to be obtained in violation of such section, or allowed such activity on their business premises.

112.    Defendants violated MCL 750.539e when they used or divulged information they knew or reasonably should have known was obtained in violation of MCL 750.539b, 539c, or 539d, or allowed such activity on their business premises. Defendants further violated 18 U.S.C. § 2511, when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511, or allowed such activity on their business premises.

113.    At all relevant times, the Defendants listed herein acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Courser.

114.    As a direct and proximate cause of the violations described in this Complaint, Courser has suffered and continues to suffer from, including but not limited to, severe and

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (Phone) • (269) 321-5164 (Fax)

permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 4
## CIVIL STALKING UNDER MCL 600.2954

115.    Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

116.    Defendants' actions as described above were prohibited by MCL 750.411h and constituted stalking as defined by Michigan law.

117.    Specifically, Defendants' actions were willful and directed toward Courser.

118.    Defendants' course of conduct involved repeated and continuous harassment directed toward Courser, including, among other things, coordinating surveillance, following Courser, reporting her whereabouts, and sending extortion texts-that caused her emotional distress and mental anguish,

119.    Defendants' repeated and continuous harassment of Courser would cause a reasonable person to feel terrorized, threatened, frightened, intimidated, harassed, and molested.

120.    Defendants' conduct has actually made Courser feel terrorized, threatened, frightened, intimidated, harassed, and molested.

121.    Courser was the targeted victim of Defendants' continued harassment.

21

122. Courser did not consent to any of the actions described above.

123. As a direct and proximate result of Defendants' stalking, Courser has suffered mental anguish, physical and emotional distress, humiliation, embarrassment, and the loss of her employment.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 5
## INVASION OF PRIVACY and INTRUSION UPON SECLUSION

124. Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

125. Courser has a privacy interest in his personal life and business relationships.

126. Defendants' wiretapping and surveillance constituted an unwarranted intrusion upon Courser's seclusion or solitude, or into his private affairs.

127. The intrusions by Defendants were and are objectionable and offensive to a reasonable person, including Courser. The disclosure of the information would be highly offensive to a reasonable person.

128. "Michigan has long recognized the common-law tort of invasion of privacy." *Lewis v. LeGrow*, 258 Mich.App 175, 193; 670 NW2d 675 (2003).

129. Defendants' subsequent publication of the misleading and defamatory information constituted a public disclosure of false allegations that are now embarrassing to Courser.

22

130.    Defendants' subsequent publication of the misleading and defamatory information constituted publicity which place Courser in a false light in the public eye.

131.    Defendants' publication of the misleading and defamatory articles constituted an invasion into Courser's private matters.

132.    Courser has a right to keep his relationships private.

133.    The Defendants have obtained private information through a method objectionable to a reasonable person; to wit, by violating Michigan's wiretapping and eavesdropping statutes and engaging in a plot to send extortive texts to Courser demanding that he resign his elected office.

134.    At all relevant times, Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Courser.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

**COUNT 6**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

135.    Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

136.    Defendants were aware that they were publishing the misleading and defamatory articles.

137.    Courser has valid business relationship or expectancy with his clients.

23

138.    Defendants knew that Courser has contractual or business relationship with his clients. In fact, Defendants published information knowing it would reach Courser's clients.

139.    Defendants knew that the misleading and defamatory information could cause Courser's relationships to believe that Courser was a criminal.

140.    Defendants' act of publishing the misleading and defamatory information was an intentional interference by Defendants inducing or causing a breach of termination of the relationship or expectancy.

141.    Defendants' act of publishing the misleading and defamatory information is a per se wrongful act or the doing of a lawful act with malice or unjustified in law for the purpose of invading the contractual rights or business relationship of Courser.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of not less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 7
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

142.    Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

143.    The Defendants' conduct of wiretapping and surveillance was widely regarded as extreme and outrageous conduct.

144.    The Defendants' acts of wiretapping and surveillance was intentional and were done with reckless disregard to the harm that might be cause in Courser.

24

145.    As the result of wiretapping and surveillance and then publishing information, Courser has suffered severe emotional distress.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

### COUNT 8
### NEGLIGENCE and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

146.    Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

147.    The Defendants conducted wiretapping and surveillance and distributed misleading and false information in order to cause damage to Courser.

148.    Such conduct involves an unreasonable risk of harm.

149.    Such conduct violates the general duty to conform to the legal standard of reasonable conduct in the light of the apparent risk.

150.    Such conduct would foreseeably result in emotional harm and injury to Courser.

151.    Wiretapping and surveillance and distribution of misleading and false information has caused and continues to cause Courser great emotional distress and embarrassment.

152.    Defendants had a duty to exercise reasonable and ordinary care and caution in and about their conduct.

153.    Defendants were negligent in their acts and/or omissions by, amongst other things, engaging in wiretapping and surveillance and distribution of misleading and false

25

information based on false and unverified information, including a series of altered recording that were obtained in violation of the Michigan wiretapping and eavesdropping statutes.

154.    At all relevant times, Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Courser.

155.    As a direct and proximate cause of the conduct of Defendants as described in this Complaint, Courser has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

### COUNT 9
### CONSPIRACY and CONCERT OF ACTIONS

156.    Courser restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

157.    Defendants acted tortiously.

158.    Defendants acted pursuant to a common design.

159.    At all relevant times, Defendants engaged in concerted activities described in the preceding paragraphs by express or implied agreement.

26

160.     This concerted action was intended to, among other things, in order to defame Courser, embarrass Courser, cast Courser in a false and misleading light, and cause Courser harm and damages as described in this Complaint.

161.     Courser is not able to identify all of the activities of Defendants due to the generic similarity of such activities engaged in and promoted by Defendants and/or an agent thereof; but has provided details herein of the many activities engaged in and promoted by Defendants.

162.     As a direct and proximate result of Defendants' concerted activities, Courser has sustained, and will continue to sustain, severe injuries and damages.

163.     Due to the concert of action among Defendants and/or an agent thereof, each is liable to Courser for these injuries and damages even if there was no directed relation to the aforementioned activities conducted by any one particular person, party, or agent thereof.

164.     Defendants are jointly, severally, and/or alternatively liable to Courser for all of their injuries and damages.

165.     Courser is entitled to exemplary and punitive damages.

166.     As a direct and proximate cause of the violations described in this Complaint, Courser has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, Courser has suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual

DePERNO LAW OFFICE, PLLC ● 951 W. MILHAM AVENUE, PO BOX 1595 ● PORTAGE, MI 49081
(269) 321-5064 (PHONE) ● (269) 321-5164 (FAX)

attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

/s/ *Matthew S. DePerno*

Dated: November 2, 2018                Attorney for Plaintiff Todd Courser
951 W. Milham Avenue
PO Box 1596
Portage, MI 49081
(269) 321-5064

DePerno Law Office, PLLC ● 951 W. Milham Avenue, PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (Phone) ● (269) 321-5164 (Fax)

## VERIFICATION

I, TODD COURSER, being first duly sworn, deposes and says that I am the plaintiff in the above-entitled cause. I am familiar with the facts at issue in this case. I have read the foregoing Complaint and know its content, that to the best of my knowledge, information and belief, the contents thereof are true.

DATED: November 2, 2018        */s/ Todd Courser*
                                Todd Courser

29

Case 1:18-cv-01232-GJQ-PJG   ECF No. 188-6,  PageID.5207   Filed 07/23/21   Page 333 of
394
Case 1:18-cv-01232   ECF No. 1 filed 11/02/18   PageID.30   Page 30 of 30

## DEMAND FOR JURY TRIAL

Plaintiff, by and through his attorney DePERNO LAW OFFICE, PLLC, hereby demands a trial by jury in the above entitled matter as to all issues and claims for which a jury trial is allowed.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: November 2, 2018

/s/ *Matthew S. DePerno*
Attorney for Plaintiff Todd Courser
951 W. Milham Avenue
PO Box 1596
Portage, MI 49081
(269) 321-5064

30

**Detective Britvec:** That's my, I think you need to see that report.

**Brock Swartzle:** So I'm gonna tell them today, if you don't mind, that, um, you know, we, everybody knows that there's an active criminal investigation going on by the MSP and the AG. I don't think it's wise that we settle before that investigation is wrapped up, it is my understanding that, you know, it's being done.

**Detective Britvec:** It'll, it'll be soon.

**Brock Swartzle:** Um, and that I'm gonna ask that [00:39:00] they give us the tolling agreement to coincide with the end of that investigation. If they disagree and they file tomorrow, we'll come out and we'll basically say, you know, I'll basically tell them, or we'll say publicly, we never, you know, "We specifically never said that they were credible witnesses because we think they're not credible witnesses. Uh, Todd Courser and Cindy Gamrat were kicked out based on the Emails and the audio recordings, we never relied on the word of [00:39:30] Ben or Keith," just leave it at that and then whenever the report becomes public we can then say "See, this is what." Is that fine with you guys?

**Detective Britvec:** That's fine with me. And you know what? Hey, look, it is a free country. I was just looking for the truth. And the truth is, and I believe that, although there's not the smoking gun email of, of uh Allard or Cline, eh maybe there is, you might see [00:40:00] that, say "Ah." You might have some insight in there and go "Aha!" You know! But um,

**Speaker 2:** Yeah he's got other problems so ...

**Detective Britvec:** Yeah.

**Brock Swartzle:** What? What other problems.

**Speaker 2:** Well, I mean, I mean do, well I mean, I mean you're obviously you're trying to settle a litigation, you know, I don't know. There's a problem with them getting terminated and them, and them reaching out and saying you know "We have these [00:40:30] problems." And you know, obviously they failed to disclose this email. You know but... It' it's it's ugly, you know, I mean.

**Brock Swartzle:** With Graham. Ben Graham I've thought always had a [possibly culpable] action against us.

**Detective Britvec:** Now there's that, I also think, it just looking at it, I've been coming more and more, I really don't like the guy, I think he's sneaky. But I believe that he was probably talked into doing these recordings by Josh Cline because, the second [00:41:00] that, and I'm not positive that he didn't know about the texting. Because the second that Courser contacts him to "Get over here, I need your help." He calls Josh Cline and he tells me that. And him and Josh Cline decide together that this should, this should probably be taped. Well, that sounds like a

**Brock Swartzle**



Page 20 of 23

setup to me. The text has been sent. He contacts you "Hey-he contacted me. [00:41:30] You know, hey, let's record this and then we'll have it on tape that they probably had no idea the email crazy shit was about to come down.

**Brock Swartzle:** Yeah and I've always, I mean, between Keith Allard and Ben Graham, I don't ... This whole process... Keith Allard is just a piece of crap.

**Detective Britvec:** I think Ben Graham's a Christian believer, I think he's a Christian believer. I think he's a true believer and he was truly upset over the affair,

**Brock Swartzle:** What has ticked me off the whole time though is that they never came forward [00:42:00] with the audio recordings. That would have corroborated that they were actually on the right ... And Todd and Cindy were having an affair and they were trying to cover up, and they were acting inappropriately for staffers. That has always ticked me off. Unfortunately, I've learned, I've learned more about our whistleblower acts than I've ever knew before and apparently, you don't have to come forward with all the evidence you have.

**Detective Britvec:** Right.

**Brock Swartzle:** So they still, he still has an action. But I [00:42:30] don't have a problem with Ben having money. It ticked me off to no end that we might have to pay Keith Howard money. Um, and the amount of money that ... So I get, we do have problems with Ben and we'll pay, I'm happy to pay Ben.

**Detective Britvec:** Mm-hmm (affirmative)-

**Brock Swartzle:** Keith, it just upsets me. So. But we'll figure it out.

**Detective Britvec:** What you might do if that happens, if Ben gets a little bit and Keith doesn't.

**Brock Swartzle:** That would be great.

**Detective Britvec:** Well what would be great is if, uh, Keith just [00:43:00] came out and told the whole truth at that point and that Ben was involved. And that, you know, I've just got a feeling he was duped. I have a feeling Ben was actually duped by uh,

**Speaker 2:** Why are you saying that? Cuz, cuz, cuz we're gonna be interviewing those guys today. So we'll find out. Hopefully we'll all find out more. You're in no, no ...

**Brock Swartzle:** It's okay to reference that

**Speaker 2:** This is an ongoing criminal investigation, you guys are cooperating, we just want to. It would be ... You can refer to it. They, they have, we have an interview scheduled, you can ... [00:43:30] Don't tell them they have an interview scheduled but, you're cooperating with law enforcement, you want to see everything before you settle.

Brock Swartzle                                                                    Page 21 of 23

Plaintiff's Document Production 01142

# Key Control
# Training Overview

**WINEGARDNER & HAMMONS**

000882



EXHIBIT

Cowser  8

1.28.20

# Key Control and Guest Privacy

- At Winegardner & Hammons Hotel Group, the safety and security of our guests is priority

- Our guests have choices, and what separates us from other hotels is the quality of service that we deliver

- It is our responsibility to refrain from giving out information about the identity, room number, and activities of our guests

- Our guests want to be safe, and it is our job to provide that service

WINEGARDNER & HAMMONS
HOTEL GROUP

000553

# Guest's Room Numbers

- Employees, most often PBX operators and Front Desk Agents, are often asked in which room a particular guest is staying

- The proper response is to politely decline to give out this information

- You can offer to put the caller through to the guest's room instead

- If the person makes the request in person, you can either direct the person to a house phone and put through the call or call the guest room and advise the guest that he/she has a visitor at the front desk

WINEGARDNER & HAMMONS
HOTEL GROUP

000554

# Allowing Guests to Enter a Room

- Guests often times find themselves locked out of their room and need to be let in
- In these situations it is imperative that that we do not let the guest in a room without following the proper lost key procedure
- Even if you see a guest leave the room, do not let them back in without having them verify their identity at the front desk
- If they enter the room while it is being cleaned with the door open, have the guest enter their room key into the door before letting that person into the room

WINEGARDNER & HAMMONS

000655

# Identification Left in Room

- There are often times when guests can lock themselves out of their room with their ID still in the room
- Always have the MOD or Security hold the key and escort the guest to the room
- When in the room always make sure and verify their identification
- After ID is verified, it is ok to provide the guest the key
- Never let a guest into a room without following these steps

WINEGARDNER & HAMMONS

000556

# Assigning Rooms at Check In

- When assigning the guest a room at check in, remember to never orally tell the guest his or her room number

- Hand the guest the key folder and point to the room number

- If a guest asks to be placed in a room next to a certain guest, only do so if the guest they are requesting to be next to has given their permission (if in doubt ask your supervisor)

- Be sure to request identification to confirm that the guest is listed on the folio before issuing the guest a key if a guest asks for his/her room number at other times such as:
  - " I've forgotten my room number" or
  - "I've left my key in my room."

WINEGARDNER & HAMMONS

000857

# Scenario I

**A person approaches the front desk and says:**

**"I left my room in a hurry this morning
and forgot my key. Can I have another one?"**

*How should the Front Desk Agent Respond?*

WINEGARDNER & HAMMONS
HOTEL GROUP

000558

# Scenario I

## Front Desk Agent:

" Sure – what is your room number?" And issue the person a new key.

*Did the Front Desk Agent handle this request correctly?*



WINEGARDNER & HAMMONS

000559

# Scenario I

As the front desk agent you need to confirm that the person requesting a key is actually staying in that room.

The **proper response would be** "I am happy to assist you, may I please see your ID"

You then must check the name on the ID and make sure it matches the name on the room reservation- once you confirm that the person is in fact a guest staying in that room then you can issue him a new key.

WINEGARDNER & HAMMONS



000580

# Scenario II

## A PBX operator answers a call and a person asks,

"I was wondering if Mr. Kirwin is staying with you and if so what room is Mr. Kirwin in?"

*How should the PBX operator respond?*

WINEGARDNER & HAMMONS

800581

# Scenario II

The PBX Operator says:

"Yes Mr. Kirwin is a guest- he is in room 721, I will be happy to connect you."



The PBX Operator just gave a complete stranger a guests room number- be courteous but NEVER give out a guests room number.

*Let's review the correct way to handle this situation*

WINEGARDNER & HAMMONS

000582

# Scenario II

**PBX Operator :**
**"Good Morning , how may I direct your call?"**

**Caller :**
**"Mr. Kirwin's room please"**

**PBX Operator:**
**"Mr. Kirwin's first name please?"**

**Caller:**
**"Kevin Kirwin"**



**PBX Operator :**
**" Yes, it is my pleasure to connect you."**

WINEGARDNER & HAMMONS

000663

# Scenario III

**A room attendant is cleaning a room and a guest approaches her and asks:**

"Can you let me into my room I am locked out?"

*What should the room attendant do?*

WINEGARDNER & HAMMONS.
HOTEL GROUP

000564

# Scenario III

The Room Attendant should politely tell the
Guest that he/she will have to go down to the
front desk to get a new key.



The Front Desk Agent will then follow the Lost Key
procedures to ensure that the person is in fact a
Guest in that particular room, by checking the guests
Identification against the name listed in on the reservation for
that room. Once the identification is confirmed the Front
Desk Agent may issue a new room key.

WINEGARDNER & HAMMONS

000585

# Scenario IV

A person approaches an employee and says:

"I have been locked out of my room and my wallet is inside-can you issue you me a new key?"

## What should the Employee do?

WINEGARDNER & HAMMONS
HOTEL GROUP

000566

# Scenario IV

The Employee should call the front desk or security and have them escort the guest to the room, once at the room, check the guests identification versus the reservation.

*Great Job!*

Once the Front Desk Agent verifies that the guest is in fact staying in that particular room, then it is ok to re-issue the guest a new key.

WINEGARDNER & HAMMONS

000587

# Scenario V

A guest enters a room with it's door open while it is being cleaned:

"I forgot my laptop in my room, I just need to grab it and then I will be out of your hair."

What should the Employee do?

WINEGARDNER & HAMMONS

000568

# Scenario V

The Employee should have the guest enter their room key into the door and see if the lock accepts the key.

If it does not accept the key, tell the guest they will have to go down to the front desk and verify their room assignment.

If they present the proper identification at the desk for the room, the front desk will issue a new key to the guest so they will be able to enter the room.

WINEGARDNER & HAMMONS

000589

# Questions?

WINEGARDNER & HAMMONS

000570



LANSING
AT THE CAPITOL

## MOD Training Manual

### TABLE OF CONTENTS

Introduction ............................................................................................2
Manager On Duty Functions ....................................................................2
Job Description.........................................................................................4
Property Walks .........................................................................................5
MOD Report..............................................................................................6
Cash Handling Procedures .....................................................................11
Incident Reports .....................................................................................13
Guest Complaint Procedures..................................................................17
Noise Complaints ...................................................................................19
Alcohol Awareness Policy .......................................................................21
Crisis Communication Plan.....................................................................22
Security Test............................................................................................27
Systems Analysis....................................................................................33
   • Pool and Spa Readings....................................................................33
   • Elevator Controls .............................................................................34
   • Fire Panel and Shut Off Valves .......................................................34
   • Sprinkler Controls ...........................................................................34
   • Thermostats.....................................................................................35
   • Emergency Utility Contact Numbers...............................................35
Hotel Information and Background .........................................................36
Managers' Telephone List.......................................................................37
Emergency Communications Checklist ..................................................38

000613



## Introduction

This handbook has been prepared as a guideline for members of management who serve in the capacity of Manager on Duty (MOD).  This handbook is not intended to cover every situation that may occur, rather it is designed to answer general questions concerning policies to be followed by the MOD during a typical MOD shift.  You are always encouraged to seek guidance from subject matter experts if you are ever unsure regarding the appropriate actions during any given specific situation that may occur during your MOD shift.  The front desk has a complete listing of all telephone numbers for all members of management.  In addition, a list is included in this manual which is updated every three months.

The MOD is the hotel's representative of the General Manager and is expected to use common sense, tact, and diplomacy when handling any unusual situations that may arise during an MOD shift.  When neither the General Manager nor the Assistant General Manager is on property, the MOD is responsible for the entire operation of the hotel.

The Manager on Duty does not supersede or oversee the responsibilities of individual department heads.  When a problem arises in a specific area, it is expected those issues be handled by the manager of that area if he or she is available.  The MOD should not be called upon by other managers to complete action reports or handle complaints unless the department manager is unable to satisfactorily resolve a situation or requests additional management coverage.  If the MOD's role in a given situation is questionable, the General Manager will clarify and correct at a later date.  In the meantime, department managers and associates are expected to comply with all requests from the MOD until the issue in question is clarified.

## Manager on Duty Functions

The Manager on Duty shall have a daily routine, in addition to their daily job responsibilities, which efficiently fulfills the requirements of the MOD job description.  The primary responsibility of the MOD is to ensure a consistently excellent level of service and safety to guests and associates, and care for the hotel's physical plant and assets.

Since the hotel is open 24 hours a day, seven days a week, there should always be a Manager on Duty.  The A.M. MOD is typically scheduled from 7:00 or 8:00 a.m. until early to mid afternoon.  The P.M. MOD will relieve the A.M. MOD until the Night Auditor arrives at 10:30 or 11:00 p.m.  The Night Auditor is always the overnight (third shift) MOD.  While we attempt to maintain consistency in MOD scheduling, there may be times when an MOD shift may overlap or be absent altogether during periods of low occupancy and staff coverage.

The functions of the MOD during a typical MOD shift are as follows:

1. Obtain the MOD key ring from Night Auditor or previous MOD.   Notify the Guest Service Representative that you have the keys with you.

2. Determine the number and time of the evening's expected arrivals and room availability from the Guest Service Representatives.

3. Review the MOD report from the previous shift and note any items that may require follow-up.

4. Review the Making It Right (MIR) log and determine appropriate actions for follow-up. Ensure that each department it utilizing the MIR program during your property walk.

5. Make sure that you review the VIP list, mid-day forecast, and the daily event sheet for the day.  Check each ongoing and upcoming function to determine if the function is proceeding smoothly, if it is being properly serviced, and if the set will be completed well prior to the scheduled time.

6. Check for any VIP reservations.  Physically inspect the VIP rooms and determine whether the rooms are in order prior to the VIP's arrival and make any corrective actions as necessary.  Verify that all VIP amenities are in place with proper presentation and that all special requirements have been met.  Greet and escort the arriving VIPs when practical. Confirm reservation availability in the restaurant and when escorting the VIP to the guest room, inquire as to whether the VIP requires a reservation in the restaurant.  If you are unable to escort the VIP to room, call shortly after the VIP's arrival to verify that everything is in order.  At that time you may ask if the VIP requires a reservation in the restaurant as well as checking to see if there is anything else the VIP requires.

7. Check with the Bell/Valet staff during the MOD shift to ensure that they are fully staffed and prepared for the shift's expected arrivals and/or departures.

8. Completely tour the front and back of the hotel a minimum of two (2) times per shift, noting and correcting any discrepancies.

9. Complete maintenance request forms (MROs) for any items you observe that need the maintenance department's attention.   You may want to carry a couple of MRO forms around with you during your walk.

10. During times of high occupancy, we may be required to move guest with a confirmed reservation to another hotel in the area.  This process is referred to as "walking" a guest and only occurs when the hotel is oversold and there are no guest rooms available.  When the MOD is required to "walk" guests to other hotels, the MOD will be responsible for ensuring that the guest is given the proper documentation and that every guest we walk is absolutely necessary.

11. The MOD is responsible for properly receiving all alcohol deliveries during their MOD shift.  This includes reviewing the beverage requisition binder located in the beverage storeroom and comparing the order that is being delivered to the order that was placed.  If there is a variance, contact the restaurant manager or the AGM.  If neither is available, the MOD may deny the order.  The MOD is also responsible for providing payment as all alcohol purchases require cash on delivery (COD).  When receiving alcohol deliveries during an MOD shift, you must notify the bookkeeper that a delivery for alcohol has arrived and provide them with the invoice in order to provide payment.

12. The MOD is required to complete an MOD report for every MOD shift worked. This report should be completed throughout the shift and not be delayed until the end of the shift to complete this. At the end of the MOD shift the MOD report is emailed to the MOD distribution list.

## MOD Job Description

The MOD is accountable to the General Manager and/or Assistant General Manager. The primary objective of the MOD role is to ensure that established levels of quality and guest services are maintained throughout the hotel.

The job duties and accountability of the MOD during a typical MOD shift are as follows:

1. Cooperate with managerial personnel as required or requested and represent the General Manager and Assistant General Manager during their absence.

2. Monitor and coordinate the operations of all hotel departments in conjunction with or in the absence of supervisory personnel within each department.

3. Check hotel premises for security of property and safety of persons. Conduct routine inspections of guest rooms, service areas, public areas, and function rooms and communicate any deficiencies to the appropriate departments so corrective actions can be taken.

4. Responds, resolve, and take appropriate action on guest complaints or problems to ensure excellent guest service while safeguarding the hotel's interests; represents the hotel in contacts with the general public.

5. Greet arriving VIPs (hotel, restaurant, and function/meeting planners) when possible; be visible and in contact with guests in a public relations capacity.

6. Handle emergencies, guest and associate accidents, security incidents. Coordinate with appropriate departments, agencies and notifies management.

7. Ensure the availability of operating supplies and foodstuffs by providing authorized personnel access to secured storage areas on an emergency only basis.

8. Prepare reports as requested to ensure appropriate corrective actions may be taken and to develop a more informative data base for improved management decision making and critical evaluation of work activities and guest service in such areas as:

   a. Guest complaints and services utilizing Radisson's *Yes I Can!* "Making It Right" service recovery process
   b. Staffing adequacies
   c. Cleanliness and safety hazards
   d. Associate violation of hotel or departmental policies
   e. Public liability/associate accident reports
   f. Incidents, emergencies

      g.  Room inspections
      h.  MOD report

9.  Performs all accountability items in a timely and efficient manner, following established company policy and projecting a favorable image of Winegardner and Hammons, Inc. and Radisson Hotels.

10. Alter staffing levels if business demands deem it necessary.

## Property Walk

One of the main priorities of the MOD is to ensure all parts of the hotel are clean and organized.  Following is the suggested walk pattern.  This walk should be completed at least once during your MOD shift.

- Start with the exterior of the building.  Walk completely around the entrance making sure that trash is picked up and ash urns are clean.
- Re-enter the building from the main entrance and check the lobby area for cleanliness. Ensure that all the lights are on and that tables and chairs are clean and organized. Also check to ensure that the carpet is clean.
- Ride the elevator to the 11th floor and check the Concierge Lounge to determine if it clean and stocked.  Review the rest of the 11th floor to note any cleanliness or condition issues that need to be addressed.
- Proceed down floors ten (10) through three (3) noting cleanliness and condition issues that need to be addressed.
- Upon reaching the second floor, check the banquet meeting rooms, making sure they are set according to the BEOs and making sure all rooms are locked and secured.
- From the second floor, go down the back stairwell into the docking area noting its cleanliness and making sure the trash compactor area is free of debris.
- Upon returning from the dock area, check the bottle and package cages, making sure they are secure.
- Check the maintenance shop to ensure it is clean and organized.
- Walk down the back hallway noting whether the floors are dry and clear of debris. Also make sure all storerooms are locked.
- Enter the back housekeeping area ensuring it is clean and organized.
- Walk through the kitchen, checking that everything is in order. Check coolers for proper food storage and temperature and note whether temperature logs are completed timely and correctly.
- Check the room service area to determine if it is clean, organized, and well stocked.
- Enter in the restaurant from the server aisle.  Make sure the music is on at an appropriate channel and volume, that the lighting level is appropriate, that the buffet is clean and that tables and chairs are lined up properly.  Please also ensure the carpet is cleaned/vacuumed and note any upcoming reservations.  Note any specials and soup of the day.
- Check the bar area to ensure it is clean and that all televisions are broadcasting either sports or news channels.
- Exit the restaurant and enter the restroom outside the restaurant exit.  This restroom is

often used by non-guests who wander in off the street so it is important that these restrooms are monitored regularly to ensure its cleanliness and that there are no unauthorized visitors in the hotel.

- Check the gift shop to make sure it is presentable.
- Move down the corridor towards the guest room tower and inspect the coffee/dinner special credenza.
- Visit the fitness room to make sure the televisions are on news or sports channels and that the volume is muted.  Check to make sure the trash is empty and that all equipment is in working order.
- Enter the pool area to make sure it is clean, organized, and that the pool towels are stocked. Be sure that the floor is as dry as possible.

As you inspect every department, check to make sure associates are in proper uniform including name tag, *Yes I Can!* pin, and that staffing levels are appropriate given the business demands of the shift.

## MOD Report

It is the responsibility of every MOD to completely and accurately fill out an MOD report for each MOD shift.  As soon as the MOD starts an MOD shift they should gathering and completing information on the report, keeping in mind that this report may eventually serve as a legal document for any incident that may occur during the shift.  WHI and their attorneys have relied on these reports in various legal matters, therefore, this report must be taken very seriously.

At the conclusion of the MOD shift, the departing MOD is expected to email the MOD report to the MOD report distribution list.  The original copy is placed on the clipboard in the bank room with previous reports.  The following pages include sample reports that are currently in use.

## *MOD Checklist*
### MOD Shift:

**Name:** _Scott Kovalick_     **Date:** _3/1/11_ _____

**Shift: AM / PM**                     **Replaced by:** _____

At start of your shift pick up MOD radio AND keys
Email to:   MOD EMAIL
Any Lost & Found inquiries refer them to housekeeping or MOD.
**Important Phone Numbers:**
Gus Pine, General Manager:  (517) 410-1940
Scott Kovalick, Assistant General Manager:  (517) 974-5595
Matt Avram, Executive Chef:  (989) 213-8438
Carly Bauknecht, Front Desk Manager:  (989) 621-6023
Marlon Carter, Valet Manager:  (517) 402-0264
Kimberly DeBrabander, Sales Account Manager:  (517) 410-3017
John Hazzard, Maintenance Manager:  (517) 719-8986
Courtney Lundeen, Front Desk Supervisor:  (517) 993-4353
Jodi Maslowski, Sales & Catering Account Manager:  (228) 224-4862
Michelle Miller, Human Resources Manager:  (517) 896-2969
Judy Nash, Executive Housekeeper:  (517) 580-4522
Sonia Schumitsch, Banquet Manager:  (225) 726-0709
Kate Venn, Sales Account Manager:  (517) 449-5989
Karen Wilson, Restaurant Manager:  (517) 525-0762
Aimee Wright, Sales & Catering Account Manager:  (517) 775-4588

| DATE: | | SHIFT | |
|---|---|---|---|
| Occupied Rooms | 93 | Arrivals | 53 |
| Occupancy percent | 36.33 | Departures | 185 |

| Person Receiving Bank | Bank Received From | Amount Received | Amount Turned Over |
|---|---|---|---|
| | | 1900 | 1900 |
| | | 1900 | 1900 |
| | | 1900 | 1900 |

### *CAPITAL CITY GRILLE SALES*

| | | | |
|---|---|---|---|
| RESTAURANT $ | | COVERS | |
| LOUNGE $ | | COVERS | |
| ROOM SERVICE $ | | COVERS | |

**FRONT DRIVE**     Time: _____
YES    NO
☐    ☐    Front drive area clean – no trash.
☐    ☐    Ash urns clean, trash empty, all plants good condition.
☐    ☐    Front entrance glass clean, no finger prints.
☐    ☐    Signs, lights in working order

Comments: _____

---

**LOBBY AREA / FRONT DESK**          Time: _____

| YES | NO | |
|-----|----|--|
| ☐ | ☐ | Lobby floor clean no stains / trash |
| ☐ | ☐ | Lobby furniture clean, dust free and placed to standard |
| ☐ | ☐ | Front Desk area neat, clean and organized |
| ☐ | ☐ | Bellman present in proper uniform with nametag |
| ☐ | ☐ | Manager on Duty |
| ☐ | ☐ | Front Desk Staff present in proper uniform with nametag/pin |
| ☐ | ☐ | Lobby bathrooms clean and stocked |

Comments: _____

---

**CAPITAL CITY GRILLE**          Times: _____ / _____

| First Tour | | Second Tour | | |
|-----|----|-----|----|--|
| YES | NO | YES | NO | |
| ☐ | ☐ | ☐ | ☐ | Hostess stand neat, clean and organized. |
| ☐ | ☐ | ☐ | ☐ | Restaurant manager on duty |
| ☐ | ☐ | ☐ | ☐ | Floor clean |
| ☐ | ☐ | ☐ | ☐ | Bar area clean |
| ☐ | ☐ | ☐ | ☐ | Bartender/wait staff present in proper uniform with name tag/pin |
| ☐ | ☐ | ☐ | ☐ | Furniture clean, placed to standard. |

Comments: _____

---

**KITCHEN**
KITCHEN / BACK OF HOUSE AREA          Times: _____ / _____

| First Tour | | Second Tour | | |
|-----|----|-----|----|--|
| YES | NO | YES | NO | |
| ☐ | ☐ | ☐ | ☐ | Dishwasher area clean. |
| ☐ | ☐ | ☐ | ☐ | Kitchen utility (dishwasher) present in proper uniform. |
| ☐ | ☐ | ☐ | ☐ | Prep areas clean. |
| ☐ | ☐ | ☐ | ☐ | Chef on duty _____ |
| ☐ | ☐ | ☐ | ☐ | Associate restrooms clean and stocked. |

Comments: _____

---

**ROOM SERVICE AREA** Time: _____

| YES | NO | |
|-----|----|--|
| ☐ | ☐ | Neat, clean and organized. |
| ☐ | ☐ | Staff present in proper uniform with name tag. |
| ☐ | ☐ | **Business Level ROOM SERVICE AREA** Time: _____ / _____ |

Comments: _____

*BANQUET AREA*     *Time:* ____ / ____

| YES | NO | |
|-----|-----|-----|
| ☐ | ☐ | Floors clean. |
| ☐ | ☐ | Banquet signage inserted and correct |
| ☐ | ☐ | Doors locked or in use |
| ☐ | ☐ | Glass near escalators cleaned |
| ☐ | ☐ | Second floor restrooms clean and stocked |

**Comments:** _____

_____

*POOL / FITNESS CENTER*     *Times:* ____ / ____

*First Tour*   *Second Tour*
| YES | NO | YES | NO | |
|-----|-----|-----|-----|-----|
| ☐ | ☐ | ☐ | ☐ | Pool area clean, furniture placed to standard |
| ☐ | ☐ | ☐ | ☐ | Pool and spa clean |
| ☐ | ☐ | ☐ | ☐ | Shepherd's hook and life preservers in place |
| ☐ | ☐ | ☐ | ☐ | Pool restrooms clean and stocked.  Towels stocked. |
| ☐ | ☐ | ☐ | ☐ | Music on and at appropriate volume |

*First Tour*   *Second Tour*
| YES | NO | YES | NO | |
|-----|-----|-----|-----|-----|
| ☐ | ☐ | ☐ | ☐ | <u>Workout room clean</u> |
| ☐ | ☐ | ☐ | ☐ | Workout machines clean and working properly |
| ☐ | ☐ | ☐ | ☐ | TVs clean and working properly |
| ☐ | ☐ | ☐ | ☐ | Mirrors clean |
| ☐ | ☐ | ☐ | ☐ | Lighting working properly |
| ☐ | ☐ | ☐ | ☐ | Floor clean |

**Comments:** _____

_____

**GENERAL COMMENTS**

| *GUEST ROOM INSPECTION   ROOM #* | *TIME* |
|---|---|
| **STANDARD** | **COMMENTS** |
| Room must be clean and well maintained | |
| Floors & Carpets | |
| Ceiling & Vents | |
| Walls & Vinyl | |
| Doors & Framing | |
| Window & Sills | |
| Drapery & Hardware | |
| Furnishings & Casegoods | |
| Cases pieces, desk, tables, chairs, sofa, mirrors are in good condition, well maintained and neatly arranged. | |
| Lighting | |
| All lights are off.  Switches are operable.  Cover plates on switch plates are clear.  Lamp shades are clean. | |
| Bed & Bedding | |
| Bed Spread is even. | |
| Bed Spread is clean and without holes. | |
| Mattress appears firm.  Sleeper Sofa is clean. | |
| HVAC | |
| HVAC is set on  68 in winter 70 in summer | |
| HVAC is quiet and odor free. | |
| TV/Radio | |
| Good quality picture and sound.  Remote. | |
| Channel Guide.  All controls operable. | |
| Clock is set at correct time and alarm off. | |
| Telephone | |
| Good condition and clean.  Dial plate is clean and extension is typed and easy to read. | |
| Security | |
| Entry lock mechanism, deadbolts and connecting doors locks are in good working condition.  Smoke detectors are operable. | |
| Guest Supplies | |
| All of the required supplies are present and in good condition.  All amenities are neatly arranged. | |
| Room Structure | |
| Floors, walls, doors, mirrors, and vents are clean in good condition.  Smell s fresh & smoke free. | |
| Vanity Areas | |
| Sinks, fixtures, mirrors, and counter tops are clean and in good condition.  Area is not stained and free of streaks and hair. | |
| Toilet | |
| Porcelain seat and lid are clean and in good condition.  Flush mechanism is in proper working order. | |
| Tub and Shower Area | |
| Soap dish, Tile Chrome, drain and curtains are clean and in good condition.  Tub is free of hair. | |
| Coffee Service | |
| Coffee maker clean & unplugged, (2) coffee cups | |

10
000822

## Cash Handling

It is the responsibility of the MOD to ensure that all banks are accounted for on a daily basis. The MOD must count not only the MOD bank, but every bank that is being used by any front desk, restaurant, or banquet associate during the MOD shift.

Below are the cash handling procedures for the different banks.

### Assuming Responsibility for the MOD Bank:

1. As soon as you report to work as the MOD, go to the bank out room, which is the office located behind the front desk.
2. Locate the MOD keys from the previous MOD and let them know that you are ready to take over MOD responsibilities.
3. Use the MOD keys to open the designated MOD bank.
4. In the presence of the former MOD, count the contents of the bank using a tape calculator, making sure a tape is running while the money is being added.
5. The bank contents should total the exact amount that it was at the start of the previous MOD shift.  Make sure that you are completely counting all of the cash but the petty cash slips that are also in the bank.
6. Once you have counted the bank and it balances, you must write the following information on the tape
   - Your initials
   - The date
   - The amount of the bank
7. Place the tape in the bank for the next MOD.
8. Take the clipboard that is labeled MOD bank and fill out all information.  This is located near the banks in the office behind the front desk.  This needs to be signed twice each MOD shift, both at the beginning of the shift and at the end.
9. It is your responsibility to guarantee that the keys are kept with you at all times throughout the shift.
10. Sign out a radio from the front desk office.  The radio should be on channel #2 and kept on you at all times.
11. If you should count the bank and it does not balance, count the bank again in the presence of a witness (if you haven't already done so).  If after re-counting more than once and there is a discrepancy, contact the bookkeeper, GM, or the AGM immediately.  If none of them is available, you should get another manager to count the bank to confirm the discrepancy.  The actual amount needs to be documented on the MOD log sheet as well as on the MOD report that you fill our throughout your shift.  A copy of the MOD log sheet needs to be copied to the GM, AGM, and bookkeeper in case of shortages or overages.  If the MOD Bank is short by more than $100, then the oncoming MOD needs to call the Lansing Police Department to file a police report.  Both the oncoming and outgoing MOD must give statements and provide written statements for the Human Resources Manager.

## Procedures for issuing departmental banks:

1. You will receive a call over your radio that an associate needs an MOD to issue a bank.
2. Confirm with the associate which bank number they need.
3. If issuing a bank, the key for the bank will be in the MOD bank. Open up the MOD bank and take out the bank key that is needed.
4. Open up the drawer where the bank is located and take out the bank. Count the bank to make sure that it is the correct amount and ask the associate receiving the bank to also count and verify.
5. Once you have counted the bank and it equals the correct amount, write the following information on the tape:
   - Your initials
   - The date
   - The amount of the bank
6. Place the tape in the bank for the bookkeeper.
7. Take the clipboard off the wall that is labeled "Bank Log" and initial where it asks for the MOD, stating that the bank was correct.
8. If the bank is a different amount you must make sure that the tape shows the actual amount. In addition, that should be written on the bank log.
9. If you should count the bank and it does not equal the correct amount you need to contact the bookkeeper or the AGM immediately. If neither of them is available, you should get another manager to count the bank. The actual amount needs to be documented on the bank log sheet as well as on the MOD Report that you fill out throughout your shift. A copy of the bank log needs to be copied to the GM, AGM, and bookkeeper in case of shortages or overages. If the bank is short by more than $3, then the oncoming MOD needs to call the Lansing Police Department to file a police report. Both the MOD and the associate must give statements and provide written statements for the Human Resources Manager.
10. There are also bank verification sheets that go with each bank. A new sheet is started each time the bank is issued. The left side of the sheet is filled out, verified and signed by both the issuer and receiver. The sheet stays with the bank. When it is reissued to the next receiver it is again filled out and verified. The final filled out sheet is dropped in the safe with the calculation tape stapled to each side respectively.

## Procedures for receiving banks at the end of associates shift:

1. You will be contacted by radio or phone stating that an associate with a bank is ready to go home and they need to have their bank counted by the MOD.
2. Meet the associate in the bank room.
3. Ask the associate for their bank and key.
4. Count the bank to ensure that the amount is correct. This should be done with a tape calculator with a running total.
5. Once you have counted the bank and it equals the correct amount, you must write the following information on the tape
   - Your initials
   - The date
   - The amount of the bank
6. Place the tape in the bank for the bookkeeper

7. Take the clipboard off the wall that is labeled "Bank Log" and initial where it asks for the MOD, stating that the bank was correct.
8. Place the bank key that the associate gave you in the MOD bank.
9. The associate should have cash to drop. Witness the amount of cash in which they are dropping. The amount they filled out on the cash drop clipboard should match the amount that they wrote on the envelope.
10. You should also make sure that the cash was indeed dropped in the safe. Rotate the drop area of the safe to make sure that it is empty. You should hear the envelope hitting the inside of the safe.
11. If you should count the bank and it does not equal the correct amount you need to contact the bookkeeper or the AGM immediately. If neither of them is available, you should get another manager to count the bank. The actual amount needs to be documented on the bank log sheet as well as on the MOD Report that you fill our throughout your shift. A copy of the bank log needs to be copied to the GM, AGM, and bookkeeper in case of shortages or overages. If the bank is short by more than $3, then the MOD needs to call the Lansing Police Department to file a police report. Both the MOD and associate responsible for the bank must give statements and provide written statements for the Human Resources Manager.

## Incident Reporting

### Guest Incidents

All guest accidents or injuries should be reported to the MOD. The MOD should be cautious of what is communicated to the guest and how it is communicated, however, the MOD should always show sincere interest and concern towards our guests, as the formal representative of the hotel.

### Steps to follow when handling a guest incident:
1. If applicable, obtain first aid or medical attention for the guest immediately.
2. If the guest has sustained a serious injury or personal assault, contact the insurance company's claims office and Bob Sears, Life Safety Director at WHI.
3. **Do not admit liability under any circumstances**
4. **Do not offer cash**
5. **Document only the facts, avoid judgments or speculation**

Be sure to record facts only. Be as specific as possible when getting information from the guest and ensure all information is written in your notes. Collaborate your notes and submit them to the General Manager and the Human Resource Manager. These notes will be reviewed to be submitted to our insurance company.

### Associate Accidents

All Associate accidents must be documented on the "Safety Investigation-Associate Accident" form. The MOD should complete this form after obtaining all necessary information. Be sure to record detailed facts of exactly what happened. The completed form should be submitted to the General Manager and the Human Resource Manager. Also, more guidance to this matter is provided in the following pages.

The MOD will determine whether or not an associate needs medical attention.  The MOD should always err on the side of getting medical attention immediately following the injury as opposed to a "wait and see" approach.  **For injuries requiring immediate medical attention, call 911 for an ambulance.**  All other associate injuries requiring medical treatment should be directed to the following Sparrow Occupational Health clinics nearby:

<u>Monday – Friday, 7:00 a.m. – 6:00 p.m.:</u>
**Sparrow Occupational Health**
1322 E. Michigan
Suite 101
Lansing, MI 48912
(517) 364-3900

<u>Weekend & After Hours Clinic:</u>
**St. Lawrence Emergency Department**
1210 W. Saginaw Hwy
Lansing, MI 48915
(517) 364-7000
**24 hour occupational health coverage (send only when East Michigan location is closed)**

While referring an associate for treatment, ensure that the associate is sent with the appropriate paperwork, located in the MOD binder, so that the medical facility can follow our procedures.  If necessary, an ambulance should be called for associate.  If not, associate should be brought to clinic accompanied by a manager.

## Accident/Incident Investigation

The importance of a prompt and complete investigation of accidents and incidents cannot be over-emphasized.  The adage, "if we fail to learn from our mistakes we are doomed to repeat them" still holds true.

Accident investigation should not be confused with accident reporting.  Although documentation of the investigation is essential for later review by management, an effective investigation requires a different thought process.  Perseverance may be required to analyze and integrate several possible causes.  The "Safety Investigation – Associate Accident" form should assist with this endeavor.

Accidents are investigated to:
- Prevent similar accidents.
- Identify unsafe work practices.
- Identify physical hazards.
- Identify training needs.

**Elements of an accident investigation must be:**

**Prompt:**
- To insure needed information is available.
- So causes can be quickly corrected to prevent a reoccurrence.
- To show management's concern.

**Thorough:**
- Uncovers all contributing factors.
- Leads to correct conclusions.

**Accurate:**
- Identifies all contributing factors.
- Aids in timely correction of hazards.

**Benefits of accident investigation:**
- Improve associate morale
- Decrease lost time.
- Increase efficiency.
- Implement corrective action.
- Improve safety record.
- Learn from your mistakes.

An additional resource that is very useful and should be readily available is the hotel camera.  This is located in bank #2.  If common sense dictates that photos of an accident/incident scene, victim, etc. should be included with the report, then by all means please be prepared to do so.  Ensure that photos are taken as soon as possible so that you are able to represent the condition of the area that most accurately represents its state during the incident.

## Example – Case History

On August 3, 1991 at 12:15 PM, Jane Doe, a hotel associate, entered the facility at the side door near the restaurant.  The floor was freshly mopped and still wet.  Jane slipped and fell on the wet floor and as she attempted to break the fall, Jane fractured her wrist and injured her back.  The investigation's questions and concerns should include:

- Was Jane rushing?  Perhaps she was late for work.
- Did Jane's shoes (sandals or flip flops) contribute to the fall?
- Was the area posted with an adequate amount of "Caution Wet Floor" signs?
- Why was a high traffic floor area near a restaurant mopped at lunch time?
- Are the correct reports relative to insurance claims being completed?
- Were there any witnesses from whom statements should be taken?
- Was a statement taken from the injured person?

Remember, "being more careful" or "slow down" should rarely if ever appear on a report as a sole cause of an accident.

### Damage to Hotel Property (Fire, Wind, Water, etc.) Claims Reporting Procedures

1. If the loss is in excess of $500.00, notify WHI Director of Life Safety, Bob Sears, at (513) 794-2589, cell (513) 227-4596 and your Regional Vice President of Operations.
2. Notification of the insurance company will be coordinated by WHI.

### Guest Complaint Procedures

The MOD should resolve all guest complaints during the MOD shift; however, there may be times when the guest is so upset that they will only speak to the General Manager. Every attempt should be made to satisfy the guest and to resolve the complaint prior to the guest leaving the hotel. Rarely, if ever, do we want Radisson or WHI to resolve problems or mistakes made at our hotel. All associates are empowered to make our guest happy. The MOD needs to ensure that everyone is using the *Yes I Can!* behaviors and *Making It Right* steps. Furthermore, we want to resolve guest issues before our guests receive and respond to the Medallia survey, our online guest feedback tool.

All guest complaints referred to the MOD should be handled in a courteous, concerned, and efficient manner. Your conversation with a guest should be held away from other guests if possible. If the complaint is about an associate or hotel policy, be certain you get both sides. As MOD, you have the authority to overrule any manager or department head. This must be done with the utmost caution, taking into account your experience in the matter and the possible consequences of your decision. Never belittle or discourage other team members. Listening and apologizing with empathy are very effective Making It Right steps.

If a guest complaint requires the help of others to resolve, as MOD it is your responsibility to contact the guest to be certain that the problem has been solved to his or her satisfaction. Notification of problem and resolution must be noted in the MOD report and on the Making It Right log.

Encourage associates involved with the problem to send an amenity to the guest's room, or do so yourself. Do whatever you can to resolve the problem to the guest's satisfaction before your shift ends. Use your best judgment if a rebate of financial consideration is needed, but involve the manager of the areas, and ask their recommendation. If you are unsure of your limitations, check with the General Manager.

If, despite your best efforts, the guest is not satisfied, you may promise that he will be contacted by top management the following day. In this event, make certain that the General Manager is aware of your promise and complete details of the problem on your MOD Report.

The 100% guest satisfaction guarantee at Radisson states: "If you aren't satisfied with something, please let one of our staff know during your stay and we'll make it right or you won't pay. It's guaranteed." Therefore, every effort should be made to make it right with the guest prior to the guest's departure.

## Making It Right Log

Located at the front desk is a Making It Right (MIR) log that tracks guest complaints and requests. This log is a working document and should be utilized at time of request or complaint. The associate or manager engaged in the interaction with the guest should first ensure that the guest is taken care of and that all questions, concerns, and requests are answered in a timely fashion. They should then ensure that the incident is tracked on the log for further review and as a communication tool for the other departments in the hotel and to the administrative team on property.

This log should be utilized at all times to ensure that all associates in the hotel are aware of what guests have had issues, should they come into contact with them at a later time. This log is the most important tool in ensuring that guest issues are correctly addressed before leaving the hotel. In addition the log enables us to utilize our *Yes I Can! – Surprise and Delight* strategies as guests move through various departments within the hotel.

At the end of the MOD shift, copies of the MIR log should be made and placed in the AGM/GM mailboxes. In addition, a copy should always be available in each department.

The following are some guest service principles guidelines that might be helpful as an MOD when dealing with guest issues and complaints.

### Making It Right Steps:
1. Listen
2. Apologize with Empathy
3. Find A Solution
4. Follow Through
5. Surprise & Delight

It is important when utilizing the Making It Right steps to understand what will satisfy our guests and determine what we have to do to meet our guests' desires and expectations.

### Principles of Hospitality
1. Smile and greet every guest, remembering the 10/20 rule.
2. Speak to the guest in a warm, friendly, and courteous manner.
3. Display genuine and enthusiastic interest in the guest, pay complete attention.
4. Anticipate guests' needs and be flexible in responding to them.
5. Be knowledgeable about your job.
6. Using "My Pleasure" in all customer situations, in place of "You are welcome"
7. Use LEARN process to take ownership of guest problems and resolve them.

### Types of Empowerment
There are two basic forms of Empowerment used in servicing customers. Though each is important, they are very different from each other and require a different set of skills used by the "Empowered Associates". They are as follows:

### Pro-Active Empowerment:
Pro-active means to "take action before the consequences occur". As an empowered

associate, this means to recognize a customer need before it is a problem and try to find a solution.

**Re-Active Empowerment:**

Re-active Empowerment is a "recovery" step used when fixing a customer problem or complaint. When using this form of empowerment, it is important to use the LEARN process.

**The LEARN Process**

1. Listen
2. Empathize
3. Apologize
4. React to resolve or compensate for the problem
5. Notify someone to make sure the problem does not occur again

**The Process breaks down when:**

- We try to educate the guest rather than satisfy.
- We are uncomfortable with Empowerment.
- There are not standards for compensation.

**Guest Compensation**

- Should be consistent.
- Required for core service delivery failure.
- Must be meaningful to the guest.

## Noise Complaints

### First Complaint

The hotel's security officer will approach the registered guest and ask the guest politely to quiet down, notifying them that they are disturbing other guests. The guest is also warned if a second complaint is issued, all guests may be evicted. For specifics on dealing with minors, see the security officer's standard operating procedures. The security officer will not discuss who has made the complaint.

### Second Complaint

The hotel's security officer, accompanied by the MOD, will approach the guest, reminding them that this is the second complaint received and that the noise will have to stop or the guest will have to leave the hotel. All guests except the registered guest should at this time be asked to leave the hotel. Do not hesitate to call the police if there are a large number of aggressive guests. Security may be asked for their recommendation, based on previous experiences.

### Third Complaint

The hotel's security officer, with the MOD, will approach the guest and ask him/her to leave.  At this point the MOD will have to make a decision on whether to refund their money or charge them for the evening.  This will depend on how late it is and if the room is dirty.  If guest is intoxicated, alternate transportation must be provided.  If the guest refuses and insists on driving, the police should be called to determine if the guest is able to drive.  Under no circumstances should an intoxicated guest be given their keys.

### Disturbances

Whenever a disturbance occurs in any areas the MOD should remember that the manager of that area (the same as any other manager) has the responsibility to properly deal with the problems associated with his/her assignment area.  The MOD should not automatically take over the responsibility.

Most of the time, the manager and those who regularly work in this area will quickly and properly handle any disturbance that may encounter.  The department manager, along with hotel's security officers, will usually resolve disturbances in such a way that the risk of fights occurring will be minimized.

In those cases where the police are called, the MOD should review with those involved in the disturbance, the situations and circumstances of the situation so that the MOD can satisfy himself/herself that reasonable and proper action was taken by the hotel associates.  Also, the MOD should become familiar with the situation so that he/she can assure others in the hotel regarding the appropriateness of the action taken.

### Complaint Procedure

Upon discovering that a problem exists concerning loud noise, you should first determine whether the noise level will annoy the surrounding guests.  In most cases if the noise can be clearly heard in the corridor, it can also be heard in adjacent rooms.  You should first advise the front desk of your situation and then proceed.  When someone answers the door, advise them of who you are and ask to speak with the person registered to the room.  Again, identify yourself and advise the registered guest why you are there.  In most cases, you will find the guest to be cooperative; however, there are those who are not.  Whenever it is necessary to make a second trip to a room, the registered guest should be advised that another trip could result in their being asked to leave the property.  In any case, if a third trip is necessary, the MOD should be contacted before returning.  Ideally, he/she will accompany security to the problem room.  At this point, security would act only on the MOD's advice (unless another policy has been established).  No one will be asked to leave the property without the approval of the MOD.

### Physical Confrontations

The security officer will not become involved in any physical confrontation unless it becomes necessary to protect one's self, a guest, or an associate from physical harm.  If such events occur or appear to be inevitable, the proper authorities must be notified

| Michigan Department of State Police | ORIGINAL DATE Tue, Aug 18, 2015 | INCIDENT NO. 016-0000256-15 (DB) |
|---|---|---|
| SUPPLEMENTAL INCIDENT REPORT 0006 | SUPPLEMENTARY DATE Thu, Oct 22, 2015 | FILE CLASS 21000 |

**INCIDENT STATUS**
Open

# EXTORTION

EXHIBIT
Cowser 10
1.28.20 DM

**JOURNAL:**

| 10-13-15 | Britvec | Supped to date. |
|---|---|---|
| 10-18-2015 | F/Lt. Boucher | Supp #4 reviewed, pends analysis and prosecutors review. |

## SUMMARY OF CASE/EVIDENCE:

:The complainant Todd Courser had an affair with Cindy Gamrat.

:The suspect Joseph Gamrat suspected his wife of this affair as early as the summer of 2014.

:Joseph Gamrat admitted to Undersigned Officer that he had placed recording devices in Cindy Gamrat's car.

:Joseph Gamrat told Undersigned Officer that he received an anonymous phone call of a recording of his wife (Cindy) and the complainant having sex.

:No such recording has ever been released or heard by any other person interviewed by Undersigned Officer.

:Joseph Gamrat admitted to following and observing the complainant and Cindy Gamrat together.

:Joseph Gamrat stated that in February of 2015 he observed Cindy Gamrat leaving Todd Courser's hotel room in the early morning hours at the Radisson Hotel in Lansing Mi. Joseph Gamrat attempts to confront Cindy Gamrat but she will not answer the door.

:Joseph Gamrat has 4 video recordings on his I-phone of the complainant (Courser) and Cindy Gamrat together in a vehicle. It appears that Cindy Gamrat is giving the complainant a foot massage then the two embrace before Cindy Gamrat exits the vehicle. It is believed that these videos were sent to Joe Gamrat from someone else because they are broken up into 4 videos.

:Joseph Gamrat has text chats with an unknown individual who was checking hotel records and rooms of Cindy Gamrat and the complainant (Courser). This individual provides information on phone calls, bed condition (made or not) and shower curtain position.

:Joseph Gamrat communicates regularly with Josh Cline and Keith Allard.

:Josh Cline and Keith Allard both worked in the complainant's and Cindy Gamrats office.

:Josh Cline resigned from employment in April of 2015.

:On 05-16-2016 David Horr and Joe Gamrat have a text conversation that starts with David Horr texting "Burner phone audio evidence time to have an impartial party (MEI) reach out to Courser camp."
The text string also implies that there is audio evidence of the affair.

:On 05-19-2015 the "texter" (Horr) begins sending text from 313-421-5345 to several people including the complainant. The second text sent states "The phone is a burner...dont even try it".

:On 05-20-2015 the texter sends "Relax. I'm not leaking anything...yet. Pay people better to keep quiet..I pay them better for info. #Raddisson. This text came shortly after Cindy Gamrat threatened suicide to Joe Gamrat during a telephone conversation.

:The texter also contacted and had text conversations with Wendy Day.

:The texter ask Wendy Day to contact Joe Gamrat and state "It's Wendy you and Cindy are in my prayers"....thats it.

:The texter advises that he will know if Wendy Day makes this call.

:On 09-09-2015 Undersigned Officer gets a search warrant for information on 313-421-5345.

| PAGE 1 of 3 | INVESTIGATED BY D/SGT KRAIG BRITVEC #107 | REPORTED BY | REVIEWED BY |
|---|---|---|---|

MSP- Joe Gamrat Deleted Texts

Joey did tell me that when he talked to Cindy she sounded really bad - tired, haggard, etc. :)

By the way, he obviously didn't take a shower this am as the shower curtain was ""out"" of the tub? Must have had a bath last night?

Verizon website says *67 will provide the call receiver with ""private"", ""anonymous"", or ""restricted"""

text: Did Todd's privileges get removed from Cindy's Nationbuilder and vice versa? And that would be for any and all of Cindy's usernames on Todd's?

text: Cindy told me she was contacted by Chad Livingood of the Free Press and said that he talked to Todd regarding and audio of Todd admitting to the affair. Also told her that he has audio of the three of them at the State House where she admits to it as well. She asked me to pray about it and said it will likely come out tonight or tomorrow. They had video cameras at Todd's office this morning.

"text: Cindy has been making plans for DC to leave 4/8 am, return 4/10 pm (of course I don't know this!).

Although, she now has two meetings next week on 4/8 pm that she needs to be at, so??? Unless she leaves late from metro on 4/8 I'm thinking she might not be going. "

text: Cindy also told me that apparently there's nothing she can do because I said "obviously others know about what is going on". She said then it doesn't matter does it? I said sure it does, you can try to save your marriage and family by stopping what you're doing. Also, I don't know what will happen. Maybe nothing. Maybe something. All I can tell you is that you need to end it now.

"text: Cin it is not up to me to go into your computer to get the files, it is up to you to take the step and give them to me. I only asked for the computer because a week had went by and you still didn't give them to me. You used your computer to store and listen to hundreds of hours recordings of my private conversations. If you cared you would see that giving me the files and showing me that everything is erased would be a healing step for me and go a long way for you rebuilding trust. You had your computer out in the table while I was gone at my moms then Saugatuck the entire time. Yet for the two days before that when I was gone and you had supposedly found the files, your computer was locked in your truck and not brought in the house.



MSP- Joe Gamrat Deleted Texts

text: Hotel room is considered private.

text: Hotel has now told me that his reservation is for Tuesday and Wednesday, not Monday and Tuesday. S

"text: Hey, my apologies because I feel bad that I'm copying and pasting this to you. But here are some thoughts I have:

Tomorrow afternoon will be a press conference with Cindy in East Lansing. I am planning on going to that and supporting her in that statement. I don't know where this all goes eventually but I feel that it is MY duty to be there, even if she may ultimately not be able to see our marriage working. In my eyes, although I'm doing it for Cindy, I'm ultimately doing it for my kids and showing ◆.◆◆76.U◆.....◆\...)U.... ...... ......... .............5008FFC9-94DA-4FF5-BDB0-79244DD7D877Meghan said Joey is ticked off...Paige said she feels a"

text: Haha. Ok. Nothing yet but I know that she told "someone else" that she found a recorder. I'm sure it will get interesting. Appreciate your thoughts. I hope dinner was good. It looked excellent!

"text: Fox Detroit called and asked Cindy for comment. They said the story is running tomorrow. She said no comment. She is also planning on canceling our counseling season for tomorrow pm because she doesn't know where she'll be at mentally tomorrow and what she'll need to address. She is going to the GR zoo with the kids though.

I told her that fine, we'll push it off to a later date.

Should be interesting tomorrow. "

text: Ehh not much interaction with them thankfully. Todd was in a weird mood.

text: Driving home now. Not sure what she's doing tonight. I may have dinner with Keith.

"text: Doesn't appear to be jailbroken or any weird apps on my end. Hmm.

| 5/20/2015 3:26:39 PM(UTC+0) | Inbox | Read | Relax. I'm not leaking anything...yet. Pay people better to keep quiet..**I pay them better for info. #Radisson** |
| 5/20/2015 3:40:51 PM(UTC+0) | Inbox | Read | Let me make this CRYSTAL CLEAR. I need some open dialogue. I've heard from you Cindy...better tell Todd to man-up. As long as I'm appeased, my cargo will never reach port so to speak. Can I please get a confirmation. |
| 5/21/2015 4:23:16 PM(UTC+0) | Inbox | Read | Good afternoon. Contrary to what you may think, I have other cases I'm working. Todd, go to your weekend retreat...enjoy this last holiday as a state employee. Big changes next week kids, as I change the political landscape. |
| 5/21/2015 4:25:34 PM(UTC+0) | Inbox | Read | You both can prevent this really....you've never asked how? |
| 5/21/2015 5:32:07 PM(UTC+0) | Inbox | Read | I can show your whereabouts when not in session, meetings, or together. Those whereabouts DO NOT include seedy alleys in Lansing having sex with men Todd. Grow up. I sell non-fiction...you however spin fairy tales and fiction. That email can't find another inbox....oh, change your passwords too. Dumb shit |
| 5/22/2015 9:56:34 PM(UTC+0) | Inbox | Read | Hello? |
| 5/22/2015 10:09:07 PM(UTC+0) | Inbox | Read | Cindy, Todd, Dan..we all on here? |
| 5/24/2015 12:09:16 AM(UTC+0) | Inbox | Read | i'm letting everybody off the hook...on 1 condition only. You resign Todd, Tuesday. Mention your health, your new found family bond. DO NOT mention Cind , AT ALL. Call me karma....this is for the others too! |
| 5/26/2015 11:39:05 AM(UTC+0) | Inbox | Read | Rise and Resign day....Good morning Todd....hope you found your soul-searching weekend peaceful. |

EXHIBIT

Courser   11

1·29·20   JM

Radisson mention from Burner Phone

change your passwords too. Dumb shit

5-21-15

Good afternoon. Contrary to what you may think, I have other cases I'm working. Todd. go to your weekend retreat...enjoy this last holiday as a state emp

loyee  Big changes next week kids, as I change the political landscape.

You both can prevent this really....you've never asked how?

5-22-15

Hello?
Cindy, Todd, Dan..we all on here?

5-23-15

I'm letting everybody off the hook....on 1 condition only  You resign Todd. Tuesday. Mention your health. your new found family bond. DO NOT mention Cind

y, AT ALL. Call me karma....this is for the others too!

5-26-15

Rise and Resign day....Good morning Todd. .hope you found your soul-searching weekend peaceful.

5-27-15

I've reached out to an old friend with a little teaser. He's been fact-finding since 11am or so yesterday, building the puzzle. piece by piece. I told hi

m I WILL NOT confirm the names of the woman/women. Rest assured. Tim Skubick will be in touch with you. Confirm the affair(s). NO NAMES.

5-28-15

517.643.0013

Call it....go ahead, do it. It's a personal cell.

Skubick questioned the authenticity of some of the audio. Not the story per se, rather how either of you let this happen. Not the affair....getting bugge

EXHIBIT
Courser 12
1.28.20  DM

d. I drove up to the island yesterday, on your dime. I shared 17 minutes of audio. 9-11 of sexual intimacy and 5-6 of dialogue so he could clearly unders

tand who he was listening too. He's going to label me as an anonymous source, a credible anonymous source Complete with photographic and video evidence

from DC and the Radisson. It was any easy sell. Let Joe and Fon know whats coming please.

### 6-9-15

Uh oh...good luck. I just got back in the states and heard the news.

### 7-8-15

Wow! Firing staff...be careful, the boys have A TON on you...they know everything. I saw you recently. Flint then near Great Lakes Crossing later. You gu

ys are easy but idiots. Oh, the Speaker is meeting with me on 8/3.

### 7-17-15

I was off the last few days and was offered the opportunity to do some surveillance....little did I know you'd drag me all the way to Flint....I used to

work out of that Target strip mall and often frequented Barnes/Noble....Keith and Ben were right, as was Joe...the inevitable WILL happen. Careers, fami

lies, homes. .shattered. We simply have too much on you, the server and police involvement notwithstanding.

### 7-21-15

I've been digging. How was camping Cin? Todd, your wife had an affair before, but then again. so have you...before Cindy. I may need some funding? Offers

to help?

### 7-22-15

I came across this number in this file: 260-504-6649 Its not Dans or Tims or either of yours? Whos is it?

Nevermind. I'll text it myself...

### 8-7-15

Amazing what would have happened had you simply listened. Too late. KABOOM!

```
                              chat-57
Start Time: 2/12/2015 10:29:35 AM(UTC-5)
Last Activity: 2/12/2015 10:29:35 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:29:35 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
What would you make of this?  Normal or abnormal?
-------------------------------------
```

EXHIBIT

Cowser  13

1-27-20   DM

```
                                              chat-58
Start Time: 2/12/2015 10:30:08 AM(UTC-5)
Last Activity: 2/12/2015 10:30:08 AM(UTC-5)
Participants: +12693652268 Krell Vincent
From: From: +12693652268 Krell Vincent
Timestamp: 2/12/2015 10:30:08 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
What the f@$& her room?
-------------------------------
```

chat-59

```
Start Time: 2/12/2015 10:30:48 AM(UTC-5)
Last Activity: 2/12/2015 10:30:48 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:30:48 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
His
------------------------------
```

chat-60

```
Start Time: 2/12/2015 10:33:28 AM(UTC-5)
Last Activity: 2/12/2015 10:33:28 AM(UTC-5)
Participants: +12693652268 Krell Vincent
From: From: +12693652268 Krell Vincent
Timestamp: 2/12/2015 10:33:28 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
His clothes are still there
------------------------------
```

chat-61

Start Time: 2/12/2015 10:33:43 AM(UTC-5)
Last Activity: 2/12/2015 10:33:43 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:33:43 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
He hasn't checked out yet.
-----------------------------

chat-62

Start Time: 2/12/2015 10:33:57 AM(UTC-5)
Last Activity: 2/12/2015 10:33:57 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:33:57 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
But he is scheduled to check out.
-------------------------------

chat-63

```
Start Time: 2/12/2015 10:34:24 AM(UTC-5)
Last Activity: 2/12/2015 10:34:24 AM(UTC-5)
Participants: +12693652268 Krell Vincent
From: From: +12693652268 Krell Vincent
Timestamp: 2/12/2015 10:34:24 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
Thought you were going to go home!
----------------------------
```

chat-64

Start Time: 2/12/2015 10:38:27 AM(UTC-5)
Last Activity: 2/12/2015 10:38:27 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:38:27 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
I am on my way...now. Was looking for potential evidence like trash or a wrapper.
Nothing - which doesn't say a whole lot though.
----------------------------

```
                              chat-65
Start Time: 2/12/2015 10:40:03 AM(UTC-5)
Last Activity: 2/12/2015 10:40:03 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:40:03 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
I just think it's strange that both beds are used. I typically sleep in one and put
my suitcase or bag on the other. You?  Heat was high too which is just the way Cindy
likes it.
-----------------------------
```

chat-66

Start Time: 2/12/2015 10:40:48 AM(UTC-5)
Last Activity: 2/12/2015 10:40:48 AM(UTC-5)
Participants: +12693652268 Krell Vincent
From: From: +12693652268 Krell Vincent
Timestamp: 2/12/2015 10:40:48 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
Yeah some one was in both of those beds...
------------------------------

chat-67

Start Time: 2/12/2015 10:57:37 AM(UTC-5)
Last Activity: 2/12/2015 10:57:37 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:57:37 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
Odd right?  And he checked in at 7:51 Tuesday morning.
------------------------------

chat-68

Start Time: 2/12/2015 10:58:39 AM(UTC-5)
Last Activity: 2/12/2015 10:58:39 AM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/12/2015 10:58:39 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
I'll show you one of these days. We could be the Krell Gamrat Bureau of
Investigation or KGBI
-------------------------------

```
                                    chat-69
Start Time: 2/12/2015 10:59:30 AM(UTC-5)
Last Activity: 2/12/2015 10:59:30 AM(UTC-5)
Participants: +12693652268 Krell Vincent
From: From: +12693652268 Krell Vincent
Timestamp: 2/12/2015 10:59:30 AM(UTC-5)
Source App: iMessage: +12605046649
Body:
Private investigators. We could make a killing. No pun intended.
------------------------------
```

chat-46

Start Time: 2/11/2015 6:49:19 PM(UTC-5)
Last Activity: 2/11/2015 6:49:19 PM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/11/2015 6:49:19 PM(UTC-5)
Source App: iMessage: +12605046649
Body:
Don't know for certain now. When I called that morning they said there were two reservations    And I know that his vehicle was there by 9 which is understood due to the start time for work. But??? He also said last night at the meeting that his day started at 430am. Cindy called him at 721am for 4 minutes, so maybe he got up at 430, got to Lansing around 7ish and checked in, calling Cindy from hotel phone?  Had breakfast? Anyways, still smells bad.
-------------------------------

```
                              chat-48
Start Time: 2/11/2015 11:55:14 PM(UTC-5)
Last Activity: 2/11/2015 11:55:14 PM(UTC-5)
Participants: +12605046649 Gamrat Joe
From: From: +12605046649 Gamrat Joe
Timestamp: 2/11/2015 11:55:14 PM(UTC-5)
Source App: iMessage: +12605046649
Body:
I was thinking of sometime in the middle of the night. That way if he answers the
phone, after being awakened from sleep, in her room then BINGO. After all, someone
could be calling him and Cindy answers(?) that would be suspicious too (from someone
else's perspective) since the room is in his name.
-----------------------------------
```

Page 1